1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3           WESTERN DIVISION AT DAYTON

4                    *   *   *

5   PATRICIA MARTIN, INDIVIDUALLY

6   AND AS ADMINISTRATRIX OF THE

7   ESTATE OF DONTAE MARTIN, SR.,

8        Plaintiff,

9      vs.                    CASE NO. 3:17-cv-160

10  JOSHUA HAAS, et al.,

11       Defendants.

12                   *   *   *

13        Deposition of JOSHUA HAAS, Defendant

14  herein, called by the Plaintiff for

15  cross-examination pursuant to the Rules of Civil

16  Procedure, taken before me, Kathy S. Wysong, a

17  Notary Public in and for the State of Ohio, at the

18  Montgomery County Prosecutor's Office, 301 West

19  Third Street, Dayton, Ohio, on Wednesday,

20  November 21, 2018, at 10:44 a.m.

21                   *   *   *

22

23

24

25

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 2 of 221 PAGEID #: 164

Patricia Mann, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

2

| | | PAGE |
|---|---|---|
| 1 | EXAMINATION CONDUCTED | |
| 2 | BY MS. BRANCH:....................... | 6 |

3

4                    EXHIBITS MARKED

5     (Thereupon, Plaintiff's Exhibit 20,

6     one colored photograph, was

7     previously marked for purposes of

8     identification.)...................... 33

9     (Thereupon, Plaintiff's Exhibit 57,

10    three colored photographs, was

11    marked for purposes of

12    identification.)...................... 34

13    (Thereupon, Plaintiff's Exhibit 58,

14    Deputy Joshua Haas' statement, was

15    marked for purposes of

16    identification.)...................... 45

17    (Thereupon, Plaintiff's Exhibit 14,

18    two colored photographs, was

19    previously marked for purposes of

20    identification.)...................... 82

21    (Thereupon, Plaintiff's Exhibit 1,

22    incident history detail dispatch

23    log, was previously marked for

24    purposes of identification.).......... 84

25

Patricia Mann, Admin., et al. vs Joshua Haas, et al.                Joshua Haas

3

```
 1    (Thereupon, Plaintiff's Exhibit 59,

 2    one colored photograph, was marked

 3    for purposes of identification.)......   104

 4    (Thereupon, Plaintiff's Exhibit 15,

 5    one colored photo, was previously

 6    marked for purposes of

 7    identification.)......................   106

 8    (Thereupon, Plaintiff's Exhibit 60,

 9    one colored photo, was marked for

10    purposes of identification.)..........   112

11    (Thereupon, Plaintiff's Exhibit 56,

12    one colored photograph, was

13    previously marked for purposes of

14    identification.)......................   130

15    (Thereupon, Plaintiff's Exhibit 61,

16    Joshua Haas' oath of office, was

17    marked for purposes of

18    identification.)......................   158

19    (Thereupon, Plaintiff's Exhibit 62,

20    Joshua Haas' position description,

21    was marked for purposes of

22    identification.)......................   158

23

24

25
```

Patricia Mann, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

4

1    (Thereupon, Plaintiff's Exhibit 2,

2    use of force policy, was previously

3    marked for purposes of

4    identification.)..................... 163

5    (Thereupon, Plaintiff's Exhibit 63,

6    use of force report on James Wright,

7    was marked for purposes of

8    identification.)..................... 171

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 5 of 221 PAGEID #: 167

Patricia Mann, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

5

```
1   APPEARANCES:

2       On behalf of the Plaintiff:

3           Gerhardstein & Branch

4       By:  Jennifer L. Branch
             Attorney at Law
5            Carew Tower
             441 Vine Street
6            Suite 3400
             Cincinnati, Ohio  45202
7            513-621-9100
             jbranch@gbfirm.com
8
             and
9
             Wright & Schulte, LLC
10
11      By:  Robert L. Gresham
             Attorney at Law
12           130 West Second Street
             Suite 1600
13           Dayton, Ohio  45402
             937-222-7477
14           rgresham@yourohiolegalhelp.com

15      On behalf of the Defendants:

16      By:  Anne M. Jagielski
             Assistant Prosecuting Attorney
17           301 West Third Street
             Dayton, Ohio  45422
18           937-496-7195
             jagielskia@mcohio.org
19
             and
20
             Marshall Dennehey Warner Coleman & Goggin
21
22      By:  Jillian L. Dinehart
             Attorney at Law
             127 Public Square
23           Cleveland, Ohio  44114
             216-912-3823
24           jldinehart@mdwcg.com

25
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 6 of 221 PAGEID #: 168

Patricia Mann, Admin., et al. vs Joshua Haas, et al.    Joshua Haas

6

```
 1   ALSO PRESENT:
 2          Drew Santana
 3                  *   *   *
 4                  JOSHUA HAAS
 5   of lawful age, Defendant herein, having been first
 6   duly cautioned and sworn, as hereinafter
 7   certified, was examined and said as follows:
 8                  CROSS-EXAMINATION
 9   BY MS. BRANCH:
10          Q.   Could you state your full name for
11   the record?
12          A.   Deputy Joshua Haas, H A A S.
13          Q.   And how do you pronounce your last
14   name?
15          A.   Haas.
16          Q.   Haas, not Haas?
17          A.   Either way.
18          Q.   Okay.  Well, I've been pronouncing it
19   wrong for a very long time so I will try to get it
20   right.
21          A.   Either way.
22          Q.   All right.  And I know you sat in on
23   Officer Teague's deposition the other day.
24          A.   Yes, ma'am.
25          Q.   Have you ever been deposed before
```

7

```
 1  yourself?

 2          A.   Yes.

 3          Q.   All right.  What type of cases were

 4  those?

 5          A.   Just one other time.  It was an

 6  officer-involved shooting.

 7          Q.   Do you remember who the person was

 8  that was shot?

 9          A.   Tracy Davis, Sr.

10          Q.   And when was that deposition?

11          A.   The shooting was in 2007 so I'm

12  assuming somewhere in 2007.  I don't know exactly

13  the date.

14          Q.   Did he survive that shooting?

15          A.   Yes.

16          Q.   And what was the outcome of that

17  case?

18          A.   He was convicted on some offenses,

19  but I'm not sure what exactly it was a conviction

20  on.

21          Q.   Was there a civil case brought after

22  the criminal case?

23          A.   Yes, ma'am.

24          Q.   And do you know the outcome of the

25  civil lawsuit?
```

8

```
 1              A.   No, I don't.
 2              Q.   Were you one of the officers involved
 3   in the shooting?
 4              A.   Yes, ma'am.
 5              Q.   And were you one of the officers who
 6   actually shot him?
 7              A.   Yes, ma'am.
 8              Q.   And so you know the ground rules of a
 9   deposition.  I'm going to ask you questions,
10   you're going to answer them out loud on the record
11   for the court reporter.
12              A.   Yes, ma'am.
13              Q.   Sometimes I'm slow in formulating my
14   words so just let me finish getting the question
15   out before you start your answer --
16              A.   Okay.
17              Q.   -- so we don't talk on top of each
18   other.
19              A.   Okay.
20              Q.   If you don't understand one of my
21   questions for whatever reason, just let me know
22   and I will try to rephrase it or try again.
23              A.   Okay.
24              Q.   Is there any reason that your memory
25   today would be impaired or your ability to
```

9

```
 1   concentrate would be impaired today?

 2         A.   No, ma'am.

 3         Q.   Have you been up all night working

 4   third shift?

 5         A.   No.

 6         Q.   All right.  And have you -- are you

 7   on any medications today?

 8         A.   Yes.

 9         Q.   What type of medication?

10         A.   High blood pressure medication.

11         Q.   Okay.  And do you know what -- is

12   that the same medication you were on at the time

13   of the shooting in July of '15?

14         A.   Yes, ma'am.

15         Q.   What's that medication?

16         A.   Lisinopril.

17         Q.   And how does that affect you?

18         A.   It doesn't.

19         Q.   Do you have any side effects from it?

20         A.   No, ma'am.

21         Q.   And how long have you been on it?

22         A.   I have no idea.  A while.

23         Q.   More than three and a half years?

24         A.   Probably, yes.

25         Q.   Any other medications that you're
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

10

 1   currently on?

 2         A.   No, not currently.

 3         Q.   Or that you were on at the time of

 4   the shooting of Dontae Martin?

 5         A.   Yes.  I was on an antidepressant at

 6   that time.

 7         Q.   And which antidepressant?

 8         A.   I don't remember.  I haven't taken it

 9   in two years.

10         Q.   Is that something that your physician

11   would be able to tell you or your pharmacy if you

12   needed to find out --

13         A.   Oh, I'm sure.  Yes.

14         Q.   -- what the medicine was?

15         A.   Yes.

16         Q.   And why were you on an antidepressant

17   back in July of '15?

18              MS. DINEHART:  Objection.

19              THE WITNESS:  My -- I felt that I

20   needed to be on it, as well as my doctor.

21   BY MS. BRANCH:

22         Q.   Okay.  And was that your family

23   doctor or a psychiatrist who prescribed that for

24   you?

25         A.   Family doctor.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

11

```
 1         Q.    And was there something going on at
 2   work that caused you to need to be on an
 3   antidepressant?
 4         A.    No, not necessarily.  It was
 5   basically my life in general.  I felt that I
 6   needed a little help.
 7         Q.    Okay.  And how long were you on that?
 8         A.    I don't recall the exact time.  Prior
 9   to the shooting and then up to two years ago --
10         Q.    Okay.
11         A.    -- but I don't know the exact time.
12         Q.    Were you new to taking that at the
13   time of the shooting or is it something you had
14   been on for a while?
15         A.    No, I was on it for a while.
16         Q.    Okay.  Had you had any new changes to
17   your medication, like a dosage or a brand
18   change --
19         A.    No, ma'am.
20         Q.    -- around the time of the shooting?
21         A.    No.
22         Q.    And you stopped taking that in 2017?
23         A.    Yes.
24         Q.    Or 2016?
25         A.    Two years ago from now, so 2016.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

12

1          Q.    Okay.   Any other medications you took

2    for your mood or for your depression?

3          A.    No, ma'am.

4          Q.    Any other medications that you were

5    on at the time of the shooting?

6          A.    No, that was it.   Maybe a

7    multivitamin but nothing prescribed.

8          Q.    And what documents have you reviewed

9    in preparation for the deposition?

10         A.    For the deposition none.

11         Q.    Have you looked at your -- I guess

12   the sheriff calls it the incident report, the

13   typed statement or narrative --

14         A.    Not --

15         Q.    -- have you looked at that recently?

16         A.    Not recently in preparation for this.

17         Q.    Have you looked at that in the last

18   month?

19         A.    No.

20         Q.    Do you know the last time you looked

21   at your statement?

22         A.    Maybe last year or the year before.

23         Q.    Any --

24         A.    In --

25         Q.    Any other documents related to the

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 13 of 221 PAGEID #: 175

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

13

 1  case, any of the exhibits we've been using, have

 2  you looked at any of those recently?

 3          A.   I was provided, I don't know what

 4  they call it, a form that was provided from your

 5  office that we had to answer.  I had to sign it so

 6  I was provided a copy, whatever that form was to

 7  sign.

 8          Q.   Oh, the questions that you answered?

 9          A.   Yes.

10          Q.   The interrogatories?

11          A.   Yes.

12          Q.   Okay.

13          A.   I was provided that and I signed it,

14  but that's the only thing that I was provided.

15          Q.   Have you looked at any of the

16  evidence in the case; photographs, the audio

17  recordings of the dispatch, the 911 calls,

18  anything like that?

19          A.   Other than what I saw in Deputy

20  Teague's deposition, no, I have not recently.

21          Q.   And how old are you today?

22          A.   Thirty-nine.

23          Q.   And do you have any military

24  experience?

25          A.   No.

14

```
 1        Q.    Any arrests or nonmoving violation
 2  tickets?
 3        A.    No, ma'am.
 4        Q.    And what's your educational
 5  background?
 6        A.    High school diploma.  The rest is
 7  career related, tech school.
 8        Q.    And where did you graduate from high
 9  school?
10        A.    Brookville High School.
11        Q.    You started at the Montgomery County
12  Sheriff's in 2004?
13        A.    2003.
14        Q.    2003.  And that was as a corrections
15  officer?
16        A.    Yes, ma'am.
17        Q.    And when did you move up to being a
18  sheriff's deputy?
19        A.    November of 2004.
20        Q.    And how long were you a sheriff's
21  deputy?
22        A.    Until 2016 when I retired.
23        Q.    And when was that in '16?
24        A.    July.
25        Q.    And why did you retire so early?
```

```
 1              A.    I took a medical retirement.

 2              Q.    And I think the sheriff -- I took the

 3    sheriff's deposition the other day and I think he

 4    mentioned that you were on disability --

 5              A.    Yes.

 6              Q.    -- is that right?  And he thought you

 7    could still come back to work.

 8              A.    That's correct.

 9              Q.    Okay.  Do you have plans to come back

10    to work at the sheriff's office?

11              A.    I've thought about it.

12              Q.    And what's your time frame for being

13    able to come back to work?

14              A.    I think legally I have within five

15    years to come back.

16              Q.    And what would you want to have

17    happen before you came back to work here?  What

18    would need to happen with regard to your

19    disability.

20              A.    As far as what would allow me to come

21    back?  I would have to get cleared by my family

22    doctor, the pension board's doctor, and be voted

23    on by the pension board.

24              Q.    Okay.  And have you gone through any

25    of those processes yet?
```

```
 1          A.   Yeah, actually, I have.  Yes.

 2          Q.   And does your doctor think you're

 3   ready to come back to work?

 4          A.   I'm currently waiting, hopefully

 5   today, to be voted on.

 6          Q.   So your doctor has already said yes?

 7          A.   Yes.

 8          Q.   And you're waiting for the pension

 9   board vote?

10          A.   I'm waiting for the response from the

11   pension doctor as well as the actual pension board

12   itself.

13          Q.   And when do you think the earliest

14   you could come back to work?

15          A.   That's up to -- between the pension

16   board and the sheriff's office.

17          Q.   And what is the disability that

18   caused you to take early retirement or medical

19   retirement?

20          MS. DINEHART:  Objection.

21          THE WITNESS:  Stress medical.

22   BY MS. BRANCH:

23          Q.   What kind of -- work-related stress?

24          A.   Combination of work related.  All

25   other stress accumulative from critical incidents
```

 1  with a heavy emphasis on PTSD.

 2          Q.   You were saying you had accumulative

 3  stress from critical incidents?

 4          A.   Yes.

 5          Q.   And do you define a critical incident

 6  as an officer-involved shooting?

 7          A.   No.

 8          Q.   What's your definition?

 9          A.   Any incident involving death,

10  accidents.  They define it as it's not really a

11  mental illness, it's an injury seeing trauma day

12  in and day out every day on your job.  It's not

13  necessarily something that was inflicted or caused

14  upon you, it's just what you witnessed.

15          Q.   And for you to get that disability

16  determination did the pension board have to

17  approve your disability?

18          A.   They sent me to an independent

19  doctor.

20          Q.   All right.  And did the independent

21  doctor ask you about your stress that you've had

22  your whole time that you were a sheriff's deputy?

23          A.   Absolutely, yes.

24          Q.   And did your stress start when you

25  started back in 2004 as a road officer?

18

```
 1          A.    Since then I learned different
 2   triggers that happen that I wasn't aware of it.
 3   It wasn't necessarily identified as every single
 4   incident, just basic accumulative.  Obviously the
 5   officer-involved shootings as well as a few other
 6   incidents was there, but it's a multitude of
 7   things.
 8          Q.    Are you okay talking about it today
 9   at your deposition?
10          A.    We can get through it.
11          Q.    Okay.  I don't know if I said this
12   but if you need to take a break, you're welcome to
13   take a break at any time just as long as you
14   finish answering what the question is.
15          A.    Yes, ma'am.
16          Q.    Is the last critical incident that
17   you witnessed the shooting of Dontae Martin?
18          A.    Yes, ma'am.
19          Q.    And after that shooting did you go on
20   disability leave?
21          A.    No.  After that shooting I was put on
22   paid administrative leave from the sheriff's
23   office.  That's our normal policy.
24          Q.    And how long were you on paid
25   administrative leave?
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

19

```
 1          A.    Until sometime -- I went off payroll
 2    because I was out of sick leave, but I was off
 3    administratively until maybe January of 2016, and
 4    then I went off on my own doctor's request -- at
 5    my own doctor's request.
 6          Q.    Okay.  So when your administrative
 7    leave was over, did you ever come back to work or
 8    did you go right on sick leave?
 9          A.    No, I came back to work.
10          Q.    And how long were you back to work?
11          A.    I don't recall.  There was one time I
12    was back a day.  There was another time I was
13    maybe back two days.
14          Q.    And since you were -- since you were
15    cleared to come back at the end of the
16    administrative leave in January of '16, did you
17    come back to work in January?
18          A.    No.  Once I finally got cleared to
19    come back, I did not return.
20          Q.    Okay.  That's what I was wondering.
21          A.    Yes.
22          Q.    All right.  So in the clearance to
23    come back to work did you have to go to a
24    fitness-for-duty evaluation?
25          A.    I went to several of them regarding
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

20

1   debriefing of the Dontae Martin shooting.  I guess

2   they call it fitness-for-duty.  It's a critical

3   incident debriefing I think is how they categorize

4   it.

5          Q.    And did you hear Deputy Teague's

6   testimony the other day that there was Dr. Daum?

7          A.    Yes, ma'am.

8          Q.    Was that the same --

9          A.    Yes.

10         Q.    Did you go through the same process

11  that he did?

12         A.    Yes, basically the same process.

13         Q.    Okay.  So Dr. Daum cleared you but

14  wanted to wait until the grand jury was done

15  before you came back to work?

16         A.    I believe that's how it was.  I know

17  he cleared me and then allegedly he had other

18  concerns and wanted to re-talk to me and then

19  cleared me again, and then I was uncleared because

20  of a documentation error that had to be

21  straightened up and then I was cleared again.  So

22  it was a little office problem there during that

23  time.

24         Q.    And then did you also see a doctor in

25  Columbus?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

21

1         A.    Yes, I did, Dr. Douglas.

2         Q.    Douglas?

3         A.    Yes.

4         Q.    And did Dr. Douglas clear you?

5         A.    He did.

6         Q.    And then did you see a third doctor

7    three times around December?

8         A.    I did not see her three times.  She

9    was my attending psychologist prior to the

10   fitness-for-duty from the sheriff's office.  When

11   I went there for my fitness-for-duty, I believe

12   that's the time that I decided to go ahead and

13   seek my medical retirement so I did not have I had

14   to be seen three times like Deputy Teague did.

15        Q.    I see, because you didn't need the

16   fitness-for-duty sign-off because you were going

17   to go on medical retirement?

18        A.    Yes, ma'am.

19        Q.    And what was that doctor's name?

20        A.    Dr. Platoni.

21        Q.    And where is she based?

22        A.    Centerville.

23        Q.    Have you provided any of these

24   medical records from Dr. Platoni or any other

25   doctor you've seen for your stress leave to the

22

 1   County?

 2           A.    Not reference to my medical.  That

 3   went to the pension board.  Now, the

 4   fitness-for-duty ones the doctors write up a

 5   report and give them back to them because it's

 6   pertaining to the job; but as far as my medical

 7   retirement, that's not pertaining to the job so

 8   the sheriff's office did not get those.

 9           Q.    Okay.  And what about your attorneys,

10   have you provided those to your attorneys?

11           A.    No.  No, ma'am.

12           Q.    When you went on stress leave then --

13   or disability because of your stress, was that mid

14   January 2016?

15           A.    It actually took -- yeah.  January is

16   when I went on leave where I said I can't come

17   back, but it took almost six months to actually

18   get my medical retirement.  The process is pretty

19   slow.

20           Q.    And you ran out of sick time, I take

21   it?

22           A.    Yes.

23           Q.    What did you do for income during

24   that time before you got your disability approved?

25           A.    Did what I had to do to survive, and

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

23

1  luckily at the time my wife worked so we were able

2  to get through.

3           Q.    Did you stay in law enforcement?

4           A.    No, I didn't work at all --

5           Q.    Okay.

6           A.    -- because I was obviously

7  conditioned for trying to retire.  You can't work,

8  and if you can't -- obviously being off for injury

9  or leave for the sheriff's office, you're not

10 allowed to work also.  It would be a violation of

11 policy.

12          Q.    So prior to the shooting of Dontae

13 Martin you were involved in an officer-involved

14 shooting of a James Wright --

15          A.    Yes.

16          Q.    -- in December of '14?

17          A.    Yes, ma'am.

18          Q.    Were there any other shootings

19 between December of '14 and July of '15 that you

20 were involved in?

21          A.    Not directly.  I did respond to

22 scenes where other agencies have shot somebody,

23 but me personally being involved in, no.

24          Q.    Is part of the stress that you

25 experience related to those scenes that you showed

24

1   up at where someone else had done the shooting?

2          A.   Well, the stress is related to

3   numerous incidents.  I mean, child deaths in my

4   career.  I mean, I can't say it affected me.  That

5   one, per se, I don't know.  It's just accumulative

6   of a whole bunch of stress.

7          Q.   How many officer-involved shootings

8   have you been in?

9          A.   Three total.

10         Q.   So Mr. Davis, Mr. Wright, and

11   Mr. Martin?

12         A.   Yes, ma'am.

13         Q.   And how many have you witnessed but

14   you didn't actually pull the trigger?

15         A.   That I actually witnessed.  One.

16         Q.   And what --

17         A.   Dayton Police Department, Officer

18   Cromwell.

19         Q.   And did that person survive?

20         A.   No.

21         Q.   And can you tell me about that one,

22   just what your role was?

23         A.   I was there after the car crash.  I

24   busted out the back windows of the car and the

25   front windows to gain access, put the car in park

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

25

1  and removed the deceased subject's hand off the

2  gear shifter.

3          Q.    And was that person shot while they

4  were driving?

5          A.    They were shot as they -- they were

6  crashed into the back of a fence of a residential

7  area so he was shot as he was trying to ram

8  through the fence with other officers and

9  civilians on the other side of the fence.

10          Q.    When was that incident?

11          A.    I have no idea.

12          Q.    Was that -- that was before Dontae

13  Martin?

14          A.    Yes, ma'am.

15          Q.    Was it before Mr. Wright?

16          A.    Yes, ma'am.

17          Q.    Before Mr. Davis?

18          A.    No.

19          Q.    So between Davis and Wright?

20          A.    Between 2007 and 2014.

21          Q.    What other critical incidents stick

22  out in your mind as being stressful to you in your

23  experience that you haven't already told me about?

24          A.    I was involved in a pedestrian/motor

25  vehicle accident where a lady ran out in front of

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

26

```
 1   my cruiser and I hit and killed her.
 2           Q.    And when was that?
 3           A.    2012.
 4           Q.    Did you seek treatment after that?
 5           A.    I was sent to a fitness-for-duty
 6   because it was a line-of-duty death.  Dr. Daum
 7   also.
 8           Q.    And did you need any treatment or
 9   therapy --
10           A.    No, ma'am.
11           Q.    -- or medication after that?
12           A.    No, ma'am.
13           Q.    What else sticks out in your mind as
14   being traumatic or stressful for you?
15           A.    Are we going to ask every single one
16   because we'll be here a while because I can name a
17   whole bunch?
18           Q.    Well --
19           A.    I mean.
20           Q.    -- tell me the ones closer to 2015 if
21   you recall the dates.
22           A.    I don't -- I can't do that.  I've
23   been on numerous babies -- five dead babies where
24   three out of the five I've done CPR and tried to
25   save them.  I've been on crashes and seen bodies
```

27

1   that burned up.  I've tried to do CPR on people

2   that's been shot and try to save their life.  We

3   can sit here all day and ask what I have seen my

4   seventeen years.

5          Q.   Were you in treatment or therapy

6   before July of '15 for the stress that you've --

7          A.   Yes.

8          Q.   -- experienced at work?

9          A.   Yes.  I started between --

10          MS. DINEHART:  Objection.  Go ahead.

11          THE WITNESS:  I started between 2014

12   and 2015 after the Speedway shooting on my own

13   accord, not ordered by the sheriff's office.

14   BY MS. BRANCH:

15          Q.   And what made you decide you should

16   pursue some treatment?

17          A.   I just felt like I needed it, and my

18   family life and home life confirmed that.

19          Q.   And is that when you saw Dr. Platoni?

20          A.   Yes, ma'am.

21          Q.   And how long have you been with her?

22          A.   From 2014 until 2016 --

23          Q.   And --

24          A.   -- off and on.

25          Q.   Do you still see anyone for

Patricia Martin, Admin., et al. vs Joshua Haas, et al.    Joshua Haas

28

1  psychological issues?

2        A.    No, ma'am.

3        Q.    Did you stop treating with her

4  in '16?

5        A.    Yes.

6        Q.    And did you pick up with somebody

7  else or that was just the end of your treatment?

8        A.    No, we both agreed that I'm right

9  where I need to be and no further treatment was

10 necessary.

11       Q.    Okay.  So you completed your

12 treatment plan?

13       A.    Yes, ma'am.

14       Q.    Do you have a diagnosis today?

15       A.    PTSD.  Severe PTSD.

16       Q.    And when did you get the PTSD

17 diagnosis?

18       A.    From Dr. Platoni in 2014.  Sometime

19 in 2014.  I also had depression and anxiety at

20 that time, which is no longer an issue.

21       Q.    Your depression has been resolved?

22       A.    Yes, ma'am.

23       Q.    And when did you first know you were

24 diagnosed with the depression?

25       A.    Same time.

1    Q.   So is it after the shooting of

2 Mr. Wright or before the shooting?

3    A.   Before the shooting of Mr. Wright.

4    Q.   So earlier in '14, not December

5 of '14?

6    A.   Yeah, it was earlier.

7    Q.   Got it.  All right.

8    A.   I'm sorry, correction.  No, it was

9 after the shooting in 2014 of Mr. Wright.

10    Q.   Okay.

11    A.   So between the 2014 Mr. Wright and

12 Mr. Martin is when I got diagnosed and seeked

13 treatment.

14    Q.   That was sort of the straw that broke

15 the camel's back --

16        MS. DINEHART:  Objection.

17 BY MS. BRANCH:

18    Q.   -- the shooting involving Mr. Wright?

19    A.   No.  No.  It was more of the family.

20 I did it for my family, not necessarily for work.

21    Q.   Family related to your marriage?

22    A.   Yes, my marriage, my children,

23 myself, my well-being.

24    Q.   And then your depression diagnosis

25 and anxiety, those were all at the same time as

30

1  the PTSD?

2          A.    Yes.

3          Q.    And since then the depression has

4  been resolved and the anxiety has been resolved?

5          A.    Yes, ma'am.

6          Q.    In 2016?

7          A.    Yes.

8          Q.    Any further treatment for your PTSD?

9          A.    No, ma'am.

10         Q.    Any work that you need to do to

11 function with PTSD?

12                MS. DINEHART:  Objection.

13 BY MS. BRANCH:

14         Q.    You'll always have that diagnosis,

15 right?

16         A.    Yes.  It will never go away.  It's

17 just learning to live with it and how to adapt and

18 overcome it.  Learning your triggers.

19         Q.    Okay.

20         A.    Stuff that I was unaware of at the

21 time and that I've since learned a lot about.

22         Q.    So you've learned your triggers.

23 Have you also learned coping skills?

24         A.    Yes, ma'am.

25         Q.    Okay.  And is trauma related to

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

31

1   police work, like shootings, a trigger for your

2   PTSD?

3           A.   I don't know.  I've been retired for

4   two years so I would assume not.  I know I'm a

5   fireman and an EMT now so I see trauma every day

6   and it doesn't affect me as far as car crashes

7   and --

8           Q.   Prior to treatment would a shooting

9   have been a trigger for your PTSD?

10          A.   No.  My trigger was more my home

11  life.  My work life was -- I loved going to work

12  and that wasn't a problem.  I couldn't cope with

13  home.  It sounds bad, I'd much rather deal with

14  work than my own family at home.  That was my

15  trigger.

16          Q.   And tell me about your employment

17  since you've left the sheriff's office.

18          A.   I work for the Phillipsburg Fire

19  Department part time.  Firefighter/EMT.

20          Q.   Part time?

21          A.   Yes.

22          Q.   Do you also collect disability on top

23  of that?

24          A.   Yes, ma'am.

25          Q.   Is there a limit to how much you can

1  work and still collect disability?

2          A.   No, I just have to -- whatever job

3  has to be approved by the pension board and it

4  can't be like and similar to my previous job

5  description, which would have been law

6  enforcement.  Basically I submit a letter, they

7  approve it and say yea or nay.

8          Q.   And since you've been a firefighter

9  and EMT have you experienced -- have you been

10  involved in any deaths?

11              MS. DINEHART:  Objection.

12  BY MS. BRANCH:

13          Q.   Having to treat somebody or respond

14  to a scene where someone had died or was dying?

15          A.   Dying, yes, but from natural causes,

16  not by outside causes.

17          Q.   I see.  And that did not trigger

18  PTSD?

19          A.   No, ma'am.

20          Q.   I'm going to ask you questions about

21  July 23rd, 2015, the shooting of Dontae Martin.

22          A.   Yes, ma'am.

23          Q.   And I may refer to it as the shooting

24  or the incident and it will be Dontae Martin from

25  now forward unless I specify otherwise, okay?

```
1              A.   Yes, ma'am.

2              Q.   You were on third shift at the time?

3              A.   That's correct.  Well, first shift

4    for us.

5              Q.   I'm sorry.  I keep doing that.

6              A.   First shift of the day.

7              Q.   First shift for you starting at like

8    11:30 p.m.?

9              A.   Yes, ma'am, 11:30 to 8:02.

10             Q.   And you were working in Harrison

11   Township?

12             A.   Yes.

13                  (Thereupon, Plaintiff's Exhibit 20,

14   one colored photograph, was previously marked for

15   purposes of identification.)

16   BY MS. BRANCH:

17             Q.   If you could turn to Exhibit 20, I

18   just want to see is that an accurate photograph of

19   you that day?

20             A.   Yes, ma'am.

21             Q.   I've got the additional photographs.

22   It looks like they took a photograph of you like

23   in a circle?

24             A.   I was a little skinnier but that's

25   me.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

34

1          Q.    Well, I was going to ask you how much

2    did you weigh back then?

3          A.    Actually I got down to one eighty.

4          Q.    So you were at one eighty?

5          A.    Yes.  I lost forty pounds.

6          Q.    And what was your height?

7          A.    Five seven.

8          Q.    How about with your uniform shoes?

9          A.    It's just standard Under Armour

10   tennis shoes so there's not much heel.

11               (Thereupon, Plaintiff's Exhibit 57,

12   three colored photographs, was marked for purposes

13   of identification.)

14   BY MS. BRANCH:

15         Q.    Okay.  So 57, could you identify that

16   as being the photographs -- the other photographs

17   that were taken of you on July 23rd, 2015 from the

18   back, from the right, and from the left sides?

19         A.    Yes, ma'am, that is me.

20         Q.    All right.  You're allowed to wear

21   shorts in Montgomery County?

22         A.    Yes.  It's a bike uniform.  It's a

23   standard bike uniform.  I had completed bike

24   school so I was a bike officer.

25         Q.    And on the -- I guess starting with

1  the first one, Exhibit 20 at the front, can you

2  tell me what your equipment was that you were

3  carrying?

4         A.   What you can see is a county-issued

5  taser, double mag pouch.  It's kind of dark but

6  you can see my radio would be on my left hip.

7  Pepper spray and handcuffs would be on my front

8  right followed by my gun and my asp on my right

9  hip.  Behind my radio would be my flashlight.  You

10 can also see the mic to my portable clipped to the

11 front of my shirt.  And I had a knife in my duty

12 belt.

13        Q.   And where's the knife?

14        A.   It's on the front right.  My front

15 right.  It would be the left of the picture.  You

16 can just see that little -- that glimmer shine.  I

17 don't know if you can see that.  That's where the

18 knife would be located.

19        Q.   Oh, I see it on the fourth -- the

20 last page of Exhibit 57.

21        A.   Yes, ma'am, right behind my

22 handcuffs.

23        Q.   And where's the pepper spray?

24        A.   That's in front of my duty holster.

25 The fourth picture.  It's in the front of my duty

36

```
 1   holster.
 2          Q.    In the pouch?
 3          A.    Yes.
 4          Q.    Got it.
 5          A.    Then I had keys.
 6          Q.    And your flashlight, I guess we can
 7   see that on page two --
 8          A.    Yes.
 9          Q.    -- of Exhibit 57?
10          A.    It's behind my radio.
11          Q.    It looks like the flashlight is on
12   during the photograph.  Can you tell?
13          A.    I don't know if it's on or the
14   reflection from the camera.
15          Q.    Oh.
16          A.    I would assume the reflection of the
17   camera because I think you would have seen it on
18   my shirt, but I can't say for sure.
19          Q.    That was a Stinger LED?
20          A.    Yeah, Stinger.
21          Q.    Stinger?
22          A.    County-issued flashlight.
23          Q.    Does it have any settings; bright,
24   low beam?
25          A.    No, I think it's just one.  I think
```

37

1  it might have a strobe, but I'm not a hundred

2  percent sure.  I think it does have a strobe

3  function but only one brightness.

4          Q.    All right.  And you're right-handed?

5          A.    Yes, ma'am.

6          Q.    And that's why your weapon is on your

7  right side?

8          A.    Correct.

9          Q.    You carried a Glock 17?

10         A.    Yes.

11         Q.    Where is the asp?

12         A.    It would be behind.  It's an empty

13 pouch.  It's behind my holster on my right side.

14         Q.    So on the first page of 57 it's the

15 empty pouch?

16         A.    Yes, ma'am.

17         Q.    Where was the asp at that point?

18         A.    It was left at the crash scene.

19         Q.    Did it break or bend?

20         A.    No.  Apparently I threw it down at

21 some point.  Actually I threw it down before I

22 went and got the AED.

23         Q.    And your Glock 17 is a semiautomatic

24 weapon?

25         A.    Yes, ma'am.

38

1      Q.   And when you pulled the trigger on

2  your weapon, you could do a controlled single shot

3  even though it was semiautomatic; is that right?

4      A.   No, that's incorrect.  Every trigger

5  pull is one shot.  In order to be semiautomatic

6  you've got to pull the trigger several times.

7  You've actually got to pull the trigger.  Full

8  automatic is where you hold the trigger down,

9  which we don't have, that's illegal.

10     Q.   So in your operating in this

11 semiautomatic, you would take your finger slightly

12 off the trigger --

13     A.   Correct.

14     Q.   -- and then you'd be able to

15 discharge another cartridge?

16     A.   Yes, that resets the cartridge and

17 you have to physically pull it a second time to

18 get a second round.

19     Q.   So for you to use it in semiautomatic

20 form --

21     A.   Uh-huh.

22     Q.   -- and expel seven cartridges, how

23 long would that take if you were doing it as

24 quickly as you could?

25              MS. DINEHART:  Objection.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

39

```
 1              THE WITNESS:  I have no idea.  You'd
 2   have to pull it seven times.  So however long it
 3   takes to pull a five and a half pound trigger I
 4   believe is what we carried -- we're required to
 5   carry.  So however long it took you to pull a five
 6   and a half pound trigger seven times.
 7   BY MS. BRANCH:
 8         Q.   And how about you --
 9         A.   I never tested it.  I don't know how
10   long it takes me.
11              MS. DINEHART:  Make sure she finishes
12   her question.
13              THE WITNESS:  Oh, I'm sorry.
14   BY MS. BRANCH:
15         Q.   You were used to using the Glock
16   17 -- in July of '15, that had been your service
17   weapon; is that right?
18         A.   Yes, ma'am.
19         Q.   And you would use that to get your
20   qualifications every year?
21         A.   Yes, ma'am.
22         Q.   And you qualified without problem
23   every year with your weapon?
24         A.   That's correct.
25         Q.   And you're used to using it on the
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 40 of 221 PAGEID #: 202
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

40

1    firing range in a way that you could unload the

2    entire magazine?

3            A.    No.   We do drills, certain drills.

4    We've never -- the only time we've emptied the

5    whole gun, that would be if we have any rounds

6    left over after the end of the qualifications, but

7    we never trained to empty the whole magazine.   We

8    have a certain amount of rounds that have to be

9    fired per the State.

10           Q.    Do you train to use it in the

11   semiautomatic mode?

12           A.    That's the only mode it can be used

13   in.

14           Q.    Your magazines, you said you had a

15   double magazine pouch, each of your magazines held

16   seventeen rounds --

17           A.    That's correct.

18           Q.    -- back in July of '15?

19           A.    That's correct.

20           Q.    All right.   And your weapon had the

21   capacity of holding eighteen rounds; is that

22   correct?

23           A.    That's correct.   Yes, ma'am.

24           Q.    Was that your normal way of carrying

25   your firearm, that you would have one in the

41

1  chamber and then seventeen in the magazine?

2        A.    Yes.

3        Q.    And that night did you have one in

4  the chamber and seventeen in the magazine?

5        A.    Yes.

6        Q.    Plus two seventeen magazines on your

7  belt?

8        A.    Yes.

9        Q.    So the records that I've seen

10 indicate that the sheriff's department found ten

11 cartridges left in your magazine and one in the

12 chamber.  Does that sound right?

13       A.    I believe so.

14       Q.    Let me ask that better.  After the

15 shooting was over your weapon was examined?

16       A.    Correct.

17       Q.    And at that time after the shooting

18 there were ten left in the magazine and one left

19 in the chamber; is that right?

20       A.    That's what I saw per the paperwork,

21 but that night I had no clue.

22       Q.    Okay.  So that would -- if it were

23 eleven cartridges left in your weapon after the

24 shooting, that would mean seven were fired; is

25 that right?

42

1          A.    I think there was -- I mean, yeah,

2    because it holds eighteen.  If they're saying they

3    found eleven, so that would be seven.  I don't

4    know exactly what they found.  I know on the --

5    from what I read later on, I think it was ten and

6    one in the magazine.

7          Q.    Okay.  So you have no reason to

8    dispute the forensics' determination that there

9    were eleven left in the weapon after the shooting?

10         A.    No.  I never checked so if that's

11   what they're saying, then I have no reason to

12   believe they would lie or --

13         Q.    Do you know sitting here today how

14   many times you discharged your weapon?

15              MS. DINEHART:  Objection.

16              THE WITNESS:  (Witness shaking head

17   from side to side.)

18   BY MS. BRANCH:

19         Q.    So -- you're shaking your head no?

20         A.    No.

21         Q.    Does seven -- do you have any reason

22   to believe that seven is not the correct number?

23              MS. DINEHART:  Objection.

24              THE WITNESS:  Is there a paper that

25   said I fired seven?

43

1   BY MS. BRANCH:

2           Q.    No.  In fact, it says you fired six.

3           A.    Six.

4           Q.    Yeah, because I don't think they were

5   counting the one in the chamber.

6           A.    Yes, because I read I fired six so

7   that means that number is incorrect.

8           Q.    Right.  That's what I've been trying

9   to figure out.

10          A.    So I read from the paper that I fired

11  six so, yes, the math is incorrect.  So I don't

12  know -- I can't answer where that missing round

13  is.

14          Q.    I think what might have been missing

15  from the investigator's knowledge was that you had

16  one cartridge in the chamber in addition to the

17  seventeen in the magazine.  So did anybody ever

18  ask you that that night or soon after --

19          A.    No, ma'am.

20          Q.    -- how you loaded your weapon that

21  night?

22          A.    Not that night, no, ma'am.

23          Q.    Am I the first one to ask you if you

24  had one in the chamber?

25          A.    No, I think it was asked during my

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

44

1    interview with Isaiah Kellar, Detective Kellar if

2    I carried the normal ammunition, normal load,

3    which would be seventeen and one.

4           Q.    And do you know -- I didn't see it in

5    his interview of you, which I have read recently,

6    but if you were asked by Detective Kellar, you

7    would have said seventeen plus one in the chamber?

8           A.    Absolutely.

9           Q.    Okay.  So if my math is right, it

10   sounds like you fired seven shots this night?

11          A.    I don't know.

12          Q.    The statements that you've given to

13   the sheriff's department, that included the

14   incident report that you turned in on July 28th,

15   2015 to Sergeant Kellar; is that right?  That's

16   one statement you've given?

17          A.    Yeah.  I entered a report statement

18   in the computer, correct.

19          Q.    What do you call that?  I've been

20   using the --

21          A.    Incident report.

22          Q.    Incident report?

23          A.    Yes.

24          Q.    Okay.  I'll use that.

25          A.    I didn't necessarily give it to

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

45

1   Kellar.  I just entered it in the computer.

2          Q.    And when did you enter it into the

3   computer?

4          A.    It would have been within the week of

5   the shooting, three days after, roughly.

6          Q.    Now, Detective Kellar told me that he

7   got your statement the day he met with you and

8   your attorney Robert Sauter, and that was July

9   28th.  Does that sound right to you?

10         A.    He could have printed it off the

11  computer.  Once it's entered in the computer

12  anybody can have access to it.

13         Q.    And how do we know what date you

14  entered it into the computer?

15         A.    Do you have my report?

16         Q.    Yes.  Let's make it an exhibit.

17  Let's make it a separate exhibit.

18         A.    It may or may not show on the report.

19  Everything is tracked, who looks at the reports,

20  when it's looked at, what time, when it's entered

21  so...

22              (Thereupon, Plaintiff's Exhibit 58,

23  Deputy Joshua Haas' statement, was marked for

24  purposes of identification.)

25  BY MS. BRANCH:

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

46

1          Q.    So this is the one that I have that I

2   marked as Exhibit 58.  Does this look familiar to

3   you?

4          A.    Yes, this is a copy of my report

5   which says it was -- well, it gives a printed

6   date.  Wait a minute.  It shows a printed date.

7   It does not show a date entered into the computer

8   so --

9          Q.    And how would I know from looking at

10  a printed version what date it was entered into

11  the computer?

12         A.    I don't think you can by -- I think

13  you would have to look at the actual computer

14  system because when we enter the reports, it will

15  show the current date and we go back and change

16  the date for the time of the actual incident so

17  there's no discrepancies on which date it

18  happened.  But I know if you go into the actual

19  reporting system, it should show what date it was

20  completed on.

21         Q.    Well, I've asked.  I think your

22  attorneys have tried to look for the final version

23  with that.  This is the best I've gotten.  The

24  only difference -- I've gotten various copies of

25  this.  The only difference is the printed dates

```
 1  have changed.

 2          A.    All of them are going to say draft --

 3          Q.    Right.

 4          A.    -- until it's finally approved or --

 5          Q.    Was it ever finally approved?

 6          MS. DINEHART:  Objection.

 7          THE WITNESS:  I have no idea.

 8  BY MS. BRANCH:

 9          Q.    I've seen in other incident reports

10  in other cases where the box -- see where the box

11  says approving officer, approval date, and

12  approval time, I've seen that filled in in other

13  incident reports.  Is that the typical way a final

14  version should look?

15          A.    I would -- I would assume this case

16  was so big that nothing was finalized, but I don't

17  know how they did it.  But I can tell you all --

18  when we complete ours, all of ours will say draft

19  until changed by the administrators I guess.

20          Q.    And who is the approving -- who would

21  have been the approving officer for Exhibit 58?

22          A.    I have no idea.  I would assume it

23  would either be somebody in the command staff or a

24  head detective would be my guess.  It would not be

25  a road sergeant in this case.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

48

1          Q.    Should I assume then by looking at

2    Exhibit 58 and the box is not filled in by the

3    approving officer, approval date, or approval time

4    that this version was never approved?

5                MS. DINEHART:  Objection.

6                THE WITNESS:  I can only assume on

7    the day it was printed it wasn't because it's not

8    filled in, but it does --

9    BY MS. BRANCH:

10         Q.    And I've had these reprinted on

11   different dates, including recently in this

12   calendar year, and they -- none of them have those

13   boxes filled in.  Do you know why?

14         A.    No, ma'am.

15         Q.    Did anyone ever tell you they

16   approved your statement, your incident report?

17         A.    I would assume they have.  Nobody

18   told me they didn't approve it.

19         Q.    Do you see in the box that says

20   reported date 7/23/2015?

21         A.    Yes.

22         Q.    And reported time 42, do you see

23   that?

24         A.    Yes.

25         Q.    Is the 42 when the incident started,

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

49

1  not when you wrote your statement?

2       A.   Correct.

3       Q.   And the date 7/23/15, is that the

4  date you wrote your first draft of the statement

5  or is that the date of the incident?

6            MS. DINEHART:  Objection.

7            THE WITNESS:  That's the date of the

8  incident.

9  BY MS. BRANCH:

10      Q.   Do you have anything in your

11 possession or do you know of anything at the

12 sheriff's office that would help us determine when

13 you wrote your report on the --

14      A.   I have nothing.  The only thing I can

15 say is have somebody check the actual computer

16 because every time somebody looks at a report it

17 logs their name who looked at the report and time.

18 So I could only assume that it would show when I

19 completed the report, but I physically have

20 nothing that I could give you to say when I

21 completed it.  I know it was after three days and

22 I typed it at the district.

23      Q.   Okay.  And at the time you typed it

24 did you have access to the other reports related

25 to this incident number?

```
 1            A.    No, ma'am.

 2            Q.    How about did you have access to any

 3   of the evidence that was being accumulated by the

 4   investigators?

 5            A.    No, ma'am.

 6            Q.    Had you talked to Officer Teague --

 7   or Deputy Teague about the incident before you

 8   wrote your incident report?

 9            A.    Yes, I asked him one question.

10            Q.    And what was that?

11            A.    Where was he standing and how's come

12   I didn't kill him.

13            Q.    And why did you ask that?

14            A.    Because I thought he was at the

15   passenger side window and I thought there would

16   have been crossfire and I didn't know how I didn't

17   shoot him.  That's the only question I asked him.

18   And that wasn't for the report, that was the only

19   question I asked him because I didn't know how I

20   didn't shoot him.

21            Q.    And what did he say?

22            A.    He said he wasn't at the window.  He

23   was back by the trunk.  That's the only question

24   that I asked him.

25            Q.    And was that before you finished your
```

1    report or while you were writing your report?

2         A.   No, that was the second day after the

3    shooting, that morning, because it bothered me all

4    night not knowing how I didn't shoot him.

5         Q.   What's crossfire?

6         A.   Where you have two individuals,

7    they're in a location where they're shooting and

8    the paths cross each other and potentially

9    shooting each other.  Whether it's military, law

10   enforcement, recreational shooting, I wouldn't

11   want to be shooting toward you, you wouldn't want

12   to be shooting toward me because it's crossfire.

13        Q.   And you're trained to avoid

14   crossfire?

15        A.   Whenever possible, yes.

16        Q.   And what was it that you were

17   thinking about overnight that made you think that

18   he was in your crossfire?

19        A.   Because normal approaches on

20   vehicles, one goes up to the driver's side, one

21   goes up to the passenger side window which would

22   have led me to believe that's where he was

23   standing.

24        Q.   In your mind when you were thinking

25   back on this shooting overnight were you thinking

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

52

1    that you saw Teague at that window?

2          A.   No.  No.

3          Q.   You just assumed he was there?

4          A.   I just assumed he was there, and I

5    didn't know how I didn't shoot him.

6          Q.   I see.  And your assumption that he

7    was there was based on the approach you expected

8    him to have taken?

9          A.   Correct.

10         Q.   And that approach would have taken

11   him to the passenger side front --

12         A.   B pillar.

13         Q.   -- pillar.  The pillar between the

14   front --

15         A.   Yes.

16         Q.   -- and the back window?

17         A.   Yes, ma'am.

18         Q.   But you never actually saw him there?

19         A.   No, ma'am.

20         Q.   So when you were thinking about the

21   incident through your mind's eye, your memory --

22         A.   Uh-huh.

23         Q.   -- in that day or two after the

24   shooting, you have no memory of seeing him at that

25   pillar or the front window?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 53 of 221  PAGEID #: 215

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                              Joshua Haas

53

1      A.   No, absolutely not.  I had no idea

2  where he was at, that's why I only assumed he was

3  there.

4      Q.   When he said he was at the back --

5  did you say fender?

6      A.   He was back at the back trunk area.

7      Q.   Back trunk area.

8      A.   I don't know exactly where he was.

9  That's just where he told me.

10      Q.   Did that jog your memory that you saw

11  him back there?

12           MS. DINEHART:  Objection.

13           THE WITNESS:  No.

14  BY MS. BRANCH:

15      Q.   So you just never saw him --

16      A.   No, I never saw him in general.  I

17  just didn't know how I didn't shoot him.  That was

18  more like thank God you were there and I didn't

19  have to worry about the crossfire.

20      Q.   Thinking back on the shooting today,

21  where was Teague -- what's your memory of where

22  Officer Teague was at the time that you shot?

23           MS. DINEHART:  Objection.

24           THE WITNESS:  My memory --

25  absolutely.  I have no clue.

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 54 of 221 PAGEID #: 216

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Joshua Haas

54

1  BY MS. BRANCH:

2         Q.    You had no idea where he was?

3         A.    No clue.

4         Q.    How about when you were done

5  shooting, where was he?

6         A.    When I was done shooting, he was at

7  the trunk because that's where I located him

8  because that's where I retreated back to.  Trunk

9  meaning the rear of the car, not necessarily on

10 the trunk.

11        Q.    Yeah.  So he said in his deposition

12 the other day that he took cover at the back of

13 the Grand Prix after he shot.  Do you remember his

14 testimony about that?

15        A.    I knew -- he said he retreated back

16 that way.  I don't know exactly where he said he

17 took cover, whether it was behind the trunk or the

18 quarter panel or the car.  I think he said the

19 car.  Without reading his deposition, I don't want

20 to quote him.

21        Q.    And where did you go after you were

22 done shooting?

23        A.    I retreated to the back trunk area

24 behind the actual trunk.

25        Q.    More in the center of the car?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.    Joshua Haas

55

1    A.   No, toward like the left rear

2 taillight.

3    Q.   Were you both on the back of the car,

4 one on the left, one on the right?

5    A.   Yeah, we would have been -- I don't

6 know exactly if we were side by side, but I would

7 have been on the left driver's side, he would have

8 been on the left passenger side.

9    Q.   Okay.  And do you remember seeing him

10 back there?

11    A.   Yes.

12    Q.   And how long were you back there

13 together?

14    A.   Seconds, if that.  Enough to tell him

15 that I can't see into the car, does the driver

16 still have a gun.

17    Q.   And what did he say?

18    A.   He said he couldn't see him.  And at

19 that time is when I told him I was going to bust

20 out the rear passenger window so we could see in

21 the vehicle.

22    Q.   And what happened then?

23    A.   As -- once I busted the rear window

24 out, I could see Mr. Martin sitting in the seat

25 leaning on the back headrest with apparent gun

56

```
 1   wounds -- bullet wounds to the side of his face.

 2   At that time Sergeant Jim McLaughlin arrived on

 3   scene.

 4        Q.   I went off on that tangent there.

 5   Sorry.

 6        A.   You're fine.

 7        Q.   So I was asking about when you were

 8   writing your statement on the computer.  In the

 9   sheriff's office, is that where you were?

10        A.   Uh-huh.

11        Q.   Is that the normal place where you

12   would write your incident reports?

13        A.   Yeah, I went to Harrison Township

14   substation.  That's where I was assigned to.

15        Q.   And when you entered the information

16   into the computer, did you -- you had already

17   talked to Deputy Teague about where he had been

18   when you were shooting?

19        A.   Yeah, it would have been prior.  The

20   very next day I called Deputy Teague.  So I wrote

21   the report, it would have been several days after

22   that.

23        Q.   Okay.

24        A.   The very next day, that morning, I

25   called Teague and asked where he was standing.  I
```

57

```
 1   didn't complete the report until later on that
 2   week.
 3          Q.   So I want to be clear.  So the 23rd,
 4   the shooting took place a little bit before 1:00
 5   a.m.?
 6          A.   I guess I should say it would have
 7   been the same day.  The morning of the 23rd I
 8   called Teague.
 9          Q.   Okay.  Got it.
10          A.   So it still would be the same day
11   that I called Teague, but I did not complete my
12   report until later on that week.
13          Q.   When you completed your report, did
14   you share it with anyone?
15          A.   Yes, I did.
16          Q.   And who was that?
17          A.   I completed a draft, gave it to my
18   attorney, Bob Sauter, who reviewed it.
19          Q.   Did he make any edits or changes,
20   suggestions?
21               MS. DINEHART:  Objection.  Don't talk
22   about anything that you two talked about, okay?
23               THE WITNESS:  Right.  Grammar.
24   Commas.  That's it.
25   BY MS. BRANCH:
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

58

```
 1          Q.    And what did you do after he made

 2   his -- I'm sorry.  Did he actually edit it, like

 3   with a pen --

 4          A.    No.  He told me --

 5          Q.    -- or did he tell you what to do?

 6          A.    No.  He advised me.  It's my report.

 7   I wouldn't allow nobody to change it.

 8          Q.    And did you make changes --

 9          A.    Yes, I did.

10          Q.    -- after you talked to him?

11          A.    Yes, I did.

12          Q.    Back at the substation?

13          A.    I don't know if it was the substation

14   or via conversation because I completed the draft

15   prior to the substation.  The substation is where

16   I entered it.

17          Q.    Oh, I see.  So you shared with him a

18   draft before you went to the substation to type?

19          A.    Yes, ma'am.

20          Q.    And did you type a draft in like Word

21   or --

22          A.    Yes.

23          Q.    And where did you type that?

24          A.    I typed it at home, sent him the

25   copy.
```

```
 1              Q.    By e-mail or fax?

 2              A.    I don't remember which it was.  I

 3    don't know how to e-mail so I'm assuming it was a

 4    fax.  He told me the grammatical changes, I

 5    entered it and then shredded that copy, my draft,

 6    once it was entered into the computer.

 7              Q.    And by computer, do you mean the

 8    Harrison Township sub --

 9              A.    The Harrison Township reporting

10    system.

11              MS. DINEHART:  Try not to talk over

12    her, okay?

13              THE WITNESS:  I'm sorry.  I'm sorry.

14    BY MS. BRANCH:

15              Q.    That's okay.  When you shredded the

16    draft, was that at home?

17              A.    No, that's the County shredding

18    thing.

19              Q.    And why did you shred the draft?

20              A.    Because nobody needed that draft.

21    This is the only true -- true accurate report that

22    I wanted.  I didn't want any missed commas or

23    missed words or anything.  This is my final

24    statement (indicating).

25              Q.    Did you tell anybody at the sheriff's
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

60

 1   office that you had shredded your first draft?

 2         A.   No.   They didn't even have knowledge

 3   I typed that out.

 4         Q.   Did anybody -- has anybody from the

 5   sheriff's office asked you these detailed

 6   questions about your incident report like I am?

 7              MS. DINEHART:  Objection.

 8              THE WITNESS:  No, because at times we

 9   write drafts out many of times and it's not a

10   common thing where we write a draft out, type it

11   in, and then shred it.  Just like any -- like a

12   hospital run we do now, we take notes and then we

13   shred those notes for people's safety and then

14   enter a final draft.

15   BY MS. BRANCH:

16         Q.   In officer-involved shootings that

17   you've been in, is it common for you to write a

18   draft, shred it, and only keep the final version?

19              MS. DINEHART:  Objection.

20              THE WITNESS:  I don't know if it's

21   common practice.  I know that was my thoughts

22   because that's the reason why they have you not

23   fill out a report after seventy-two hours after

24   critical incidents because you are constantly

25   always remembering stuff so that's why you put it

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

61

1    on paper in case you forget something because once

2    it's in this paper (indicating) you can't change

3    it.  So, yes, it's my common practice where I will

4    take notes myself and then if I remember

5    something, that way it's not left out or I don't

6    forget it or if it needs changed, and then once

7    it's done, shred it because that's an incorrect

8    version.  This is the correct version.

9    BY MS. BRANCH:

10        Q.   Well, I guess I was wondering if the

11   sheriff's office knew or it was common for let's

12   say a detective on the case investigating an

13   officer-involved shooting that earlier drafts or

14   notes were shredded?

15             MS. DINEHART:  Objection.

16             THE WITNESS:  No idea.

17   BY MS. BRANCH:

18        Q.   You have no idea --

19        A.   No.

20        Q.   -- if they knew?

21             MS. DINEHART:  Objection.

22             THE WITNESS:  No.

23   BY MS. BRANCH:

24        Q.   You didn't volunteer that you had

25   shredded your draft?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

62

```
 1              MS. DINEHART:  Objection.
 2              THE WITNESS:  No.
 3  BY MS. BRANCH:
 4         Q.    And Detective Kellar didn't ask?
 5         A.    Correct.
 6         Q.    How about anybody from internal, did
 7  they ask you if you had any drafts of your
 8  incident report?
 9         A.    No, ma'am.
10         Q.    You said it's -- you used the word
11  they don't want you to fill out a critical
12  incident report for seventy-two hours.  Who is the
13  they?
14         A.    Yes, all training that you go to
15  stresses don't complete a report until after
16  seventy-two hours.  I've been through numerous
17  trainings put on by the sheriff's office that
18  stresses this, as well as other trainings that
19  stress this, just for the simple fact if you
20  complete a report, you might remember stuff and
21  now you're altering your original report and it
22  doesn't look good so -- plus you can -- like I
23  said, you don't remember everything that day.
24         Q.    Have you ever done a supplemental
25  report as an officer at the Montgomery County
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

63

```
 1   Sheriff's Office?
 2          A.   Yes, numerous.
 3          Q.   And have you ever done a supplemental
 4   report reporting about something you remembered
 5   about an event after the -- after you wrote your
 6   first report?
 7          A.   No, I have not.  The only supplement
 8   has been either to my original case or somebody
 9   else's case.
10          Q.   Have you been -- have you ever been
11   to a training in Montgomery County Sheriff's
12   Office where you've been told to write a
13   supplemental report if you remember something
14   after the fact?
15          A.   I have not personally, no.
16          Q.   And are you aware that the policy for
17   Montgomery County in the use of force policy says
18   that when you use force or when you use your
19   firearm, you are to fill out an incident report
20   before the end of shift?
21              MS. DINEHART:  Objection.
22   BY MS. BRANCH:
23          Q.   Did you know that was the written
24   policy of the department?
25          A.   Yes.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

64

```
 1          Q.   And did you know it was a written
 2  policy of the department to fill out a use of
 3  force report by the end of shift in addition to
 4  the incident report?
 5               MS. DINEHART:  Objection.
 6               THE WITNESS:  Yes.
 7  BY MS. BRANCH:
 8          Q.   Anybody in this incident involving
 9  Dontae Martin ask you to fill out either an
10  incident report or a use of force report before
11  the end of your shift?
12          A.   No.  We were advised to get it done
13  as soon as we feel we're capable of doing it.
14          Q.   And who gave you that order?
15          A.   Kellar.
16          Q.   And what did you -- how did you
17  interpret as soon as you were capable?
18          A.   Everybody knows wait seventy-two
19  hours so we really didn't have to think about it,
20  and it was pretty much a written rule -- or
21  unwritten rule, everybody knows you're not going
22  to write it until after seventy-two hours.
23          Q.   And in those seventy-two hours you
24  had the opportunity to talk to your attorney?
25          A.   Yes.
```

65

1       Q.    And at least you asked a question of

2  Deputy Teague?

3       A.    I'm sorry?

4       Q.    During that seventy-two hours you had

5  the opportunity to talk to Deputy Teague?

6            MS. DINEHART:  Objection.

7            THE WITNESS:  I'm sure we did.

8  BY MS. BRANCH:

9       Q.    Did you talk to him there on the

10  scene before you guys left the scene that morning?

11       A.    I'm sure we did, but I don't recall

12  what the conversation was.

13       Q.    Did you talk about the incident?

14       A.    No.  We never even -- we still

15  haven't even spoke about it.

16       Q.    How's come?

17       A.    It's my version of it.  I don't need

18  to know his.  It's pretty much how we look at it.

19  You did what you did, I did what I did.  I mean,

20  everybody internalizes it different.  The only

21  question I've ever asked him about it was where

22  was he standing because I didn't know how I didn't

23  shoot him, but I've never discussed it with him.

24       Q.    Do you still have the computer you

25  wrote your draft on?

Patricia Martin, Admin., et al. vs Joshua Haas, et al. — Joshua Haas

66

```
1           A.    No, ma'am.

2           Q.    What kind of computer was that?

3           A.    A laptop that my kids since broke.

4           Q.    Do you still have the physical broken

5    laptop?

6           A.    No, I don't have it.

7           Q.    And when did you get rid of that?

8           A.    Oh, that's been a while ago.

9    Sometime after the shooting.  I mean, I can't tell

10   you when.  It's been a while I've had a computer.

11   I usually have to go to the library to use a

12   computer now.

13          Q.    Did you -- do you know if any of the

14   interviews you gave with Detective Kellar or

15   anybody at the sheriff's office were recorded?

16          A.    They did not tell us we were being

17   recorded so whether or not we were being recorded

18   or not, I have no idea.

19          Q.    Did you record any?

20          A.    No.

21          Q.    Other than your first draft, did you

22   have any handwritten notes about the shooting at

23   any point in time?

24          A.    No, ma'am.

25          Q.    Did you keep a journal, diary,
```

67

1  calendar, anyplace where you would jot things down

2  like that?

3          A.    No, ma'am, not about the shooting.

4          Q.    Have you gone back and looked at all

5  of your journals or calendars, e-mails, text

6  messages, Facebook posts, social media to see what

7  you have that's related to the shooting?

8          A.    That I posted or communicated in?

9          Q.    Right.

10         A.    Yeah, nothing.

11         Q.    Did you go back and look is my

12  question?

13         A.    I'm sure I have since.  The problem

14  is my account was locked down.  I had an incident

15  where we played football with some kids on Fair

16  Oaks and we were getting requests from everybody

17  in the neighborhood over there and they found our

18  personal accounts so I locked my name down and

19  used false accounts -- excuse me, fake names, so I

20  keep it pretty locked down, everything -- the

21  restrictions and everything are set pretty strict

22  so...

23         Q.    Are you talking about Facebook?

24         A.    Yeah, Facebook.

25         Q.    I found you on Facebook.

68

```
 1              A.   Well, I've since retired, I unlocked
 2    it.
 3              Q.   Oh, I see.
 4              A.   But prior to retiring I didn't.
 5              Q.   So did you go back to your Facebook
 6    that was in existence from July of 2015 through
 7    now to look at all your posts and comments and
 8    messaging to look for things related to the
 9    shooting, the lawsuit, Dontae Martin?
10              A.   No, I don't think I've ever went back
11    to even look at it.
12              Q.   Can you do that after you leave here
13    today?
14              A.   Sure.  Now, can I go back on the
15    draft?
16              Q.   Sure.
17              A.   When we write reports in drafts and
18    our sergeant gets them, he has us make changes.
19    We change them.  We don't have those drafts.  They
20    change on the original thing.  So even the
21    reporting system, if we have drafts prewritten,
22    the sergeant checks off and wants changes, we
23    don't even save those drafts.  So it's not like
24    it's a standard practice.  So if I would turn in
25    this report and the sergeant says I don't like
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

69

1   this, you need to make these changes, we'd go back

2   and make these changes and the original paper is

3   gone because we change the original on it so it's

4   not like we ever keep any written drafts.

5        Q.   Have you ever gone back into the

6   computer to see where the prior version would be

7   kept on the server?

8             MS. DINEHART:  Objection.

9             THE WITNESS:  I haven't been back

10  since I left.

11  BY MS. BRANCH:

12       Q.   Oh, I don't mean -- I'm sorry.

13  During your career at the sheriff's office, have

14  you ever tried to retrieve a prior version of an

15  incident report that you drafted?

16       A.   Yes.

17       Q.   And have you ever worked with IT to

18  see if they could retrieve it for you?

19       A.   No.  Are you talking about like a

20  previous -- like a draft, rough draft?  No, I've

21  only done originals and print them off for court

22  cases because I know the changes are actually done

23  on the original because it's owner approved and if

24  the sergeant unapproves it, we make the changes to

25  the original and then a sergeant approves it

1  again.

2  BY MS. BRANCH:

3       Q.   And you said the computer system

4  would show every time the report was accessed?

5       A.   Yes, ma'am.

6       Q.   And by whom and when?

7       A.   Yes.  If it's the same reporting

8  system.  I remember in Deputy Teague's deposition

9  they talked about changes.

10       Q.   The one that was in existence in July

11  of 2015?

12       A.   Yeah.  So they could have a new

13  reporting system.  I have no idea.

14       Q.   And have you -- did you testify at

15  the grand jury?

16       A.   Yes, I did.

17       Q.   And did you give the grand jury a

18  copy of your incident report?

19       A.   I didn't give them anything.

20       Q.   And what did you tell the grand jury?

21       A.   As far as basically the incident that

22  happened.  Everything that happened.

23       Q.   Did you tell them anything that was

24  not contained in your report?

25       A.   No, ma'am.  Not to my knowledge.

71

```
 1          Q.   And have you talked to anyone at the
 2   sheriff's office, other than Detective Kellar when
 3   he interviewed, asked you questions, about the
 4   incident?
 5               MS. DINEHART:  Objection.
 6               THE WITNESS:  No, nobody has asked me
 7   direct questions that I can say.  Kellar did his
 8   walk-through.  Maybe an E crew when he took my
 9   weapon like, hey, is this the gun; but actually
10   about the shooting, no, not to my knowledge.
11   BY MS. BRANCH:
12          Q.   Nobody from internal, no one from the
13   sheriff's command staff asked you questions or
14   interviewed you?
15          A.   Internal included questions within
16   the interview with Detective Kellar that they
17   wanted answered.
18          Q.   And do you know what questions
19   internal wanted answered?
20          A.   I don't remember them all.  I know
21   something was about the camera system, duty ammo,
22   duty gun.  Every single one of them I don't.
23          Q.   Was somebody from internal there for
24   the interview?
25          A.   No, ma'am.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

72

```
 1          Q.    How do you know what questions were
 2   internal questions?
 3          A.    Because Detective Kellar told us that
 4   internal investigations is including these
 5   questions with it.
 6          Q.    But nobody was there from internal?
 7          A.    No, ma'am.
 8          Q.    Do you know why they didn't show up
 9   for your interview?
10                MS. DINEHART:  Objection.
11                THE WITNESS:  I don't even know if
12   they were invited.  I don't know.
13   BY MS. BRANCH:
14          Q.    Is that unusual?
15                MS. DINEHART:  Objection.
16                THE WITNESS:  No.  Usually from the
17   past experience internal doesn't even get involved
18   until the criminal is completely done.
19   BY MS. BRANCH:
20          Q.    In your other cases where you were
21   either a witness or an officer who shot a
22   suspect --
23          A.    Yes, ma'am.
24          Q.    -- did internal interview you in
25   those cases at some point?
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

1        A.   I don't think I ever spoke to

2   internal in any of my shootings.  They went by the

3   entire case, grand jury, detectives, my report.  I

4   don't remember actually speaking with internal

5   personally.

6        Q.   Is it fair to say that the practice

7   at Montgomery County Sheriff's Office is for the

8   internal investigators after an officer-involved

9   shooting to rely on the original incident report?

10             MS. DINEHART:  Objection.

11             THE WITNESS:  I have no idea what

12   their practice is.

13   BY MS. BRANCH:

14        Q.   But the practice from your point of

15   view is in the shooting of Mr. Wright, Mr. Davis,

16   and Mr. Martin, internal did not ask you any

17   questions?

18        A.   I'm not going to say practice, but I

19   know I was never interviewed.  I can't say that's

20   their practice, but I know I never spoke to

21   anybody.

22        Q.   In any of those three shootings?

23        A.   Correct.

24        Q.   Nor in the shooting where you were a

25   witness, the Dayton police officer?

74

```
 1           A.   Yeah.
 2                MS. DINEHART:  Objection.
 3  BY MS. BRANCH:
 4           Q.   Did internal investigate that one?
 5           A.   I didn't speak to nobody.
 6                MS. DINEHART:  Objection.
 7  BY MS. BRANCH:
 8           Q.   Did internal investigate that one?
 9                MS. DINEHART:  Objection.
10                THE WITNESS:  I would assume so, but
11  I don't know how the City does their stuff.
12  BY MS. BRANCH:
13           Q.   But you never talked to anybody from
14  internal about that shooting?
15                MS. DINEHART:  Objection.
16                THE WITNESS:  No, but I completed a
17  report.
18  BY MS. BRANCH:
19           Q.   Did you talk to somebody from
20  internal about the pedestrian that was killed?
21           A.   No.  Ohio State Highway Patrol
22  handled that as a crash.
23           Q.   Did internal do an investigation
24  after that?
25           A.   I don't believe so.  I think it was
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 75 of 221 PAGEID #: 237

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

75

1  all kept as a motor vehicle crash.

2         Q.   Did anyone in the sheriff's

3  department review your actions related to that to

4  see if you were in compliance with the policy?

5              MS. DINEHART:  Objection.

6              THE WITNESS:  I have no idea.

7  BY MS. BRANCH:

8         Q.   Anybody from internal interview you

9  in that one?

10        A.   No.

11        Q.   Okay.  So let me ask you how you got

12 to the scene on July 23rd, 2015.

13             MS. DINEHART:  Would now be an okay

14 time to take a break?

15             MS. BRANCH:  Sure.

16             MS. DINEHART:  Only because I get the

17 sense that you're changing themes.

18             MS. BRANCH:  I'm changing topics.

19             (Pause in proceedings.)

20 BY MS. BRANCH:

21        Q.   In the Davis shooting and in the

22 Wright shooting did you submit your report to the

23 sheriff's department in seventy-two hours -- at

24 least seventy-two hours after the shootings?

25        A.   No.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

76

1        Q.   Did you report those on the same day
2    that the shootings occurred?
3        A.   The Davis shooting, yes, I was
4    ordered to complete it that day.
5        Q.   And who ordered?
6        A.   Sheriff David Vore.
7        Q.   Vore, V O R E?
8        A.   Yes, ma'am.
9        Q.   And did you submit an incident report
10   the same shift and a use of force report?
11       A.   I don't believe so.
12       Q.   Just the incident report?
13       A.   Yes.
14       Q.   And how about the Wright shooting?
15       A.   As far as?  What's the question?
16       Q.   Oh.  Did you submit an incident
17   report by the end of shift?
18       A.   No.
19       Q.   And did anyone tell you that you had
20   permission to wait?
21            MS. DINEHART:  Objection.
22            THE WITNESS:  I don't recall anybody
23   saying anything about it.
24   BY MS. BRANCH:
25       Q.   When did you submit that one?

```
1          A.   I have no idea.  Within a week.  That
2   week.
3          Q.   And did you submit a use of force
4   report in Wright?
5          A.   Yes.  Eventually.  I can't tell you
6   when exactly it was filled out.
7          Q.   And you did not submit a use of force
8   report in the shooting of Dontae Martin; is that
9   right?
10          A.   I don't recall if I ever did one.  I
11   thought I did one.  It would have been much, much
12   later, but I can't say for sure.
13          Q.   I don't have one when I've asked for
14   all the documents so --
15          A.   Then one must not have been done.
16          Q.   Do you know why it wasn't done?
17          A.   No, ma'am.
18          Q.   Is it the practice at Montgomery
19   County that a use of force report should be filled
20   out by an officer in an officer-involved shooting?
21              MS. DINEHART:  Objection.
22              THE WITNESS:  Yes, it is common
23   practice.  Obviously there is exceptions.
24   BY MS. BRANCH:
25          Q.   What are the exceptions?
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Joshua Haas

78

```
 1              A.    Whether or not somebody has been --
 2   like, for instance, Wright, I had no idea who that
 3   person was so you can't complete a use of force
 4   report on somebody you don't have a suspect or any
 5   information to include in there so -- in this case
 6   I can't say for sure what happened there.
 7              Q.    Sitting here today, do you know if
 8   anybody told you not to fill out a use of force
 9   report on the shooting of Dontae Martin?
10              A.    Absolutely not.  Nobody told me not
11   to do it.
12              Q.    But you don't know why you didn't --
13              A.    Correct.
14              Q.    -- follow the policy?
15              A.    I don't know why one wasn't done.
16              Q.    And that should have been done by
17   both you and Officer Teague?
18                    MS. DINEHART:  Objection.
19   BY MS. BRANCH:
20              Q.    You would both be required under the
21   policy to fill out a use of force report?
22              A.    Under the policy anybody using force
23   has to do it so anybody on that scene would have
24   had to do one.
25              Q.    In the Wright and Davis incidents did
```

79

1    you share a draft of your incident report with

2    your attorney?

3                MS. DINEHART:  Objection.  Go ahead.

4                THE WITNESS:  Davis, no, because my

5    attorney refused to come down from Columbus that

6    day and I was ordered to write it.

7    BY MS. BRANCH:

8         Q.   And what about in Wright?

9         A.   I would assume -- I believe I did

10   because Bob Sauter was my same attorney so I would

11   assume -- not assume.  I'm sure if I would have

12   completed a draft, he would have looked at it,

13   checked for grammar.

14        Q.   Same process you followed in the

15   Dontae Martin incident report?

16        A.   Yes, ma'am.

17        Q.   Same attorney?

18        A.   Yes.

19        Q.   Same sheriff?

20        A.   Yes.

21        Q.   So the difference between Wright and

22   Martin versus Davis is that you had a different

23   sheriff --

24                MS. DINEHART:  Objection.

25   BY MS. BRANCH:

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 80 of 221 PAGEID #: 242

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

80

1              Q.    -- at that time?

2                    MS. DINEHART:  Objection.

3                    THE WITNESS:  Is there a question

4    or -- yes, there was different sheriffs.

5    BY MS. BRANCH:

6              Q.    Did Sheriff Vore enforce the written

7    policy that an incident report should be written

8    before the end of shift?

9                    MS. DINEHART:  Objection.

10                   THE WITNESS:  I have no idea who

11   wrote the original policy for the sheriff's

12   office.

13   BY MS. BRANCH:

14             Q.    Did -- the entire time that you've

15   been with the sheriff's office, was the written

16   policy -- did the written policy require that you

17   write an incident report by the end of shift --

18                   MS. DINEHART:  Objection.

19   BY MS. BRANCH:

20             Q.    -- regardless of who the sheriff was?

21                   MS. DINEHART:  Objection.

22                   THE WITNESS:  I can't answer that

23   because if you're talking about an incident

24   report, we've all been trained not to write one

25   until after seventy-two hours.  That was the only

81

1  incident where I was required to write it.

2  BY MS. BRANCH:

3         Q.   I see.  And do you know why the

4  sheriff required that you write it in the Davis

5  incident?

6         A.   No, ma'am.

7              MS. DINEHART:  Objection.

8  BY MS. BRANCH:

9         Q.   And the computer that you used, was

10 that a computer that accessed the Cloud, like an

11 Apple product, either a --

12        A.   For --

13        Q.   -- a Mac?

14        A.   For what purpose?

15        Q.   Oh.  For any purpose.  Did you have a

16 Mac laptop?

17        A.   No.  They're desktop computers

18 controlled by our IT department.

19        Q.   Your home laptop.

20        A.   No, it's -- I don't know nothing

21 about the Cloud or anything like that.

22        Q.   Do you know what kind of laptop you

23 owned back in 2015?

24        A.   At that time it was a

25 Hewlett-Packard.

82

1        Q.   Can you tell me how you were alerted

2   that you needed to get to 324 Springbrook on July

3   23rd, 2015?

4        A.   Via dispatch.

5        Q.   And dispatch told you that there was

6   a maroon Grand Prix involved in a two-vehicle

7   crash and of an unknown cause; is that right?

8        A.   I believe it was a check and advise

9   crash is how it was dispatched.

10        Q.   And you knew that the person had not

11   gotten out of the car?

12        A.   Do you have the actual dispatch that

13   I can look at?  If I'm not mistaken, it was

14   broadcasted as two vehicles, one maroon, one

15   green, and the driver hasn't got out, but I don't

16   want to quote exact wordage.

17             (Thereupon, Plaintiff's Exhibit 14,

18   two colored photographs, was previously marked for

19   purposes of identification.)

20   BY MS. BRANCH:

21        Q.   How about Exhibit 14?  That's your

22   MDT terminal.  I do have the dispatch if you want

23   to look at that as well.

24        A.   Let's see.  Yeah, that's actually my

25   MDT.

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 83 of 221 PAGEID #: 245

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

83

1          Q.    That's yours?

2          A.    Yes.

3          Q.    And it says that there is a

4     two-vehicle accident; vehicle one, green car,

5     parked; vehicle two, maroon Grand Prix, tinted

6     windows, nobody has gotten out.  Did I read that

7     correctly?

8          A.    Yes.

9          Q.    So that was the -- at least some of

10    the information you had before you got to the

11    scene?

12         A.    Yes.

13         Q.    And you understood what tinted

14    windows meant, right?

15         A.    Yes, ma'am.

16         Q.    And you saw that when you got out of

17    the car -- when you got to the scene, did you see

18    the Grand Prix's windows were tinted?

19         A.    I did not see until I approached the

20    car.

21         Q.    And you knew that this was a check

22    and advise situation --

23         A.    Yes, ma'am.

24         Q.    -- where you were checking on the

25    well-being of the people in the car?

84

1          A.    Checking on the crash --

2    investigating the crash and checking to see if

3    there were any injuries, correct.

4          Q.    You weren't there to investigate a

5    crime?

6          A.    No, ma'am, we were there to

7    investigate a motor vehicle accident.

8          Q.    And if somebody was injured in the

9    accident, you would have provided medical

10   attention for them?

11         A.    Absolutely.

12               (Thereupon, Plaintiff's Exhibit 1,

13   incident history detail dispatch log, was

14   previously marked for purposes of identification.)

15   BY MS. BRANCH:

16         Q.    And when you got to the scene,

17   according to the dispatch log -- that's going to

18   be Exhibit 1.  You were Harrison 121?

19         A.    Yes, ma'am.

20         Q.    45:02, the time code on the log, do

21   you see that?

22         A.    45:02.

23         Q.    00:45.

24         A.    Oh, 45:02.  Yes.

25         Q.    That says you were on scene at 45:02?

1     A.    Yes, that's my unit number.

2     Q.    And a couple lines down 45:54 Teague

3   is on scene, he was Harrison 111?

4     A.    Yes, it shows him on scene.

5     Q.    All right.  That puts him on scene,

6   oh, about fifty seconds after you were on scene

7   according to the dispatch log; is that right?

8     A.    Correct, according to the log.

9     Q.    And is that your memory of what

10  happened?

11    A.    No, that is not my memory at all.  We

12  arrived simultaneously.

13    Q.    And how did you get on scene?

14    A.    As far as?

15    Q.    Did you call dispatch, did you put

16  yourself on scene?

17    A.    It looks like I put myself on scene

18  because it has my unit number and my MDT terminal.

19  So it has 723 and H508 I believe is my terminal so

20  that leads me to believe I pressed my on scene

21  button.  Now, if you look at Teague's, it does not

22  have that information.

23    Q.    If you go back to Exhibit 14, is

24  there anything on that printout that you can

25  explain to me that is your terminal number?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 03/25/19 Page: 86 of 221 PAGEID #: 248

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

86

1          A.   Yeah, our terminals are assigned
2    numbers.  Let's see if I can check this one.  It's
3    kind of real blurry, but if you look at the very
4    bottom, it kind of makes it out to HR121.  That
5    shows you it's my terminal, but I'm trying to
6    see -- do you have my initial log-in screen for
7    the beginning of the day?
8          Q.   No, this is the only screen I was
9    given.
10          A.   Okay.
11          Q.   I think it's a photograph somebody --
12          A.   Every terminal is assigned a number,
13    it's H something, so that -- looking at this, that
14    leads me to believe that is my unit number and my
15    terminal number, H508.
16          Q.   And how would you put yourself on
17    scene?
18          A.   I'd press a button that says on
19    scene.  If you look at the picture, 14, you see
20    the button underneath en route, on scene.  All you
21    do is touch that screen.
22          Q.   All right.  And when did you touch
23    the screen?
24          A.   I would assume as soon as I got on
25    scene.

1        Q.   Parked?

2        A.   As soon as I parked or pulling up.  I

3 could have done it pulling up.  There's numerous

4 times I do it pulling up just in case you don't

5 know what happened so you hit your button and you

6 don't have to worry about nothing.  So I can't say

7 exactly when I did it.

8        Q.   All right.  And it looks like then,

9 if that's the way this is interpreted, that Teague

10 did not put himself on scene himself?

11       A.   I can't say that for sure, but

12 looking on this, I can only assume dispatch did

13 that because if you look farther down to 756,

14 which is Deputy Haas, it also says H502.  That

15 would be her terminal number.

16       Q.   She put herself en route at 47:03?

17       A.   That's what it says.

18       Q.   Okay.  And when you got on scene,

19 where was -- who was on the scene before you?

20 Were there any officers?

21       A.   No.

22       Q.   And who got out first?

23       A.   Me.

24       Q.   And where was Teague?

25       A.   Behind me.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Joshua Haas

88

```
 1            Q.    Still in his vehicle?

 2            A.    I have no idea.  I got out and

 3   approached the vehicle.

 4            Q.    Did you talk to him?

 5            A.    No, not when we arrived on scene.

 6            Q.    Before you got out of your vehicle

 7   did you and Officer Teague talk about how you were

 8   going to approach the vehicles in the driveway?

 9            A.    When we arrived on scene?  No.

10            Q.    Or before you got there?

11            A.    No.

12            Q.    Do you call each other on the radio

13   or communicate somehow?

14            A.    No.

15            Q.    When you got there and you exited

16   your vehicle, did you see any neighbors?

17            A.    I saw several subjects standing

18   across the driveway in the yard in front of the

19   crashed vehicles.

20            Q.    Okay.  And what did you -- did you

21   interact with them at all?

22            A.    No.

23            Q.    Do you know which yards they were in?

24            A.    The yard just directly I guess it

25   would be east of the crash.  Right across the
```

89

```
 1   driveway from where the cars crashed.

 2            Q.    Did you see anybody in the street?

 3            A.    No.

 4            Q.    Did you see anybody -- or did you

 5   look for anybody in the street?

 6            A.    Yes.

 7            Q.    And if I -- at the scene you had your

 8   vehicle parked on the street parallel to the front

 9   yards?

10            A.    Yes.

11            Q.    Parallel to the Grand Prix?

12            A.    Yes.

13            Q.    So your --

14            A.    Which Grand Prix?  There's two of

15   them.

16            Q.    The maroon.

17            A.    The maroon.  Okay.

18            Q.    So your headlights were not focused

19   on the crash site; is that right?

20            A.    I think the cars were a little bit

21   off the roadway.  I can't tell you if they were

22   focused.  I know I'm parallel to the street so

23   some of the light might have caught it, some of it

24   might not.

25            Q.    Any streetlights that were helping to
```

1  illuminate the crash scene?

2       A.   I don't believe there was street

3  lights.

4       Q.   House lights or porch lights, any of

5  those helping to illuminate the scene?

6       A.   There was porch lights.

7       Q.   Did that make any difference?

8       A.   I can't tell you.  I don't remember.

9       Q.   It was dark when you got there?

10      A.   Yeah, it was dark.

11      Q.   And you couldn't actually see that

12 the windows were even tinted until you got right

13 up close to the maroon Grand Prix?

14      A.   Correct, once I made my approach.

15      Q.   So tell me what your plan was when

16 you got out of your vehicle.

17      A.   To investigate a crash.

18      Q.   And how were you going to do that?

19      A.   Make contact with any occupants in

20 the vehicle.

21      Q.   And what was your -- how did you do

22 that?

23      A.   I never had the opportunity to make

24 contact with them.

25      Q.   What did you do when you got out of

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

91

 1    your vehicle?

 2            A.   Immediately approached the driver's

 3    side of the vehicle, saw that the windows were

 4    tinted so I removed my flashlight from my duty

 5    belt and I illuminated the interior of the vehicle

 6    through the back window.

 7            Q.   Which back window?

 8            A.   The back rear passenger window -- the

 9    driver window.  I'm sorry.

10            Q.   Not the back window --

11            A.   No, no.

12            Q.   -- of the trunk but the --

13            A.   The actual back --

14            Q.   -- driver's side passenger back

15    window?

16            A.   Yes.

17            Q.   Okay.  What did you see?

18            A.   I saw that there was nobody else in

19    the back of the vehicle.  I could also see there

20    was nobody in the front passenger seat of the

21    vehicle and that the driver had only one male

22    occupant in the driver's seat.

23            Q.   And when you looked through the back

24    passenger window into the vehicle, were you

25    looking into the backseat?

```
 1          A.    Yes.

 2          Q.    And you could see the driver's head?

 3          A.    Yes, I could see the driver's

 4   upper --

 5          Q.    And you could see --

 6          A.    -- upper body and head seated in the

 7   upright position.

 8          Q.    And you could see the chair -- the

 9   driver's seat reclined?

10          A.    Yes.

11          Q.    And you could see his head on the

12   headrest?

13          A.    Yes.

14          Q.    All right.  From your perspective

15   standing at the back window, did it appear to you

16   that he was reclined in his seat so far that his

17   head was close to the bench in the backseat?

18          A.    No, his head was resting on the seat.

19          Q.    On the headrest?

20          A.    On the headrest of the driver's seat.

21          Q.    And you could tell right away there

22   was nobody else inside the vehicle?

23          A.    Yeah, I could see the rear seats, the

24   bench.  There was nobody hiding down there.  There

25   was nobody in the front passenger seat.  There was
```

93

1  only one occupant.

2        Q.    All right.  And at that point what

3  did you do when you saw that?

4        A.    Walked to the driver's side window.

5        Q.    Front window?

6        A.    Front window.  Illuminated with my

7  flashlight, and I immediately noticed that he was

8  holding a firearm in his right hand.

9        Q.    What did you do?

10        A.    I yelled gun, gun, he's holding a gun

11  to Teague.

12        Q.    What did you do?

13        A.    Once I identified he was holding a

14  gun, I drew my service weapon, pointed it at

15  Mr. Martin, and start giving him commands to drop

16  the gun.

17        Q.    What part of Mr. Martin were you

18  pointing at?

19        A.    It would have been his head, upper

20  body.  Whatever is visible through the window.

21        Q.    And then what happened?

22        A.    I kept giving him commands to drop

23  the gun.  He refused to comply.

24        Q.    What did he do?

25        A.    He wasn't responding to me period.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

94

1          Q.    Then what happened?

2          A.    He started moving the gun off his

3    right thigh pointing it in all different

4    directions toward the passenger front window.

5          Q.    Passenger side front window?

6          A.    Yes, where I believed Deputy Teague

7    was standing.

8          Q.    You thought he was standing there but

9    you realize now that he wasn't?

10               MS. DINEHART:  Objection.

11               THE WITNESS:  Yeah, I found out days

12   later that he wasn't.  Correct.  Not at that time.

13   BY MS. BRANCH:

14         Q.    And then what happened?

15         A.    He kept moving the gun back on his

16   thigh.

17         Q.    Did he put the gun down on his thigh?

18         A.    No, still in his hand and he rested

19   it on his thigh.  He was moving it all around in

20   the front of the car (indicating).

21         Q.    Okay.  And when you say he rested it

22   on his thigh, are you talking about the gun?

23         A.    The gun he was holding he put on his

24   right thigh still in his hand.

25         Q.    And you were giving a command to drop

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                     Joshua Haas

95

1   the gun?

2         A.    Drop the gun.

3         Q.    And then what happened?

4         A.    Dontae Martin sit up in his seat

5   because he was previously laying back against the

6   headrest.

7         Q.    Okay.  When you say previously laying

8   back, was he reclined in the reclined chair?

9         A.    He was sitting in the driver's seat.

10  The driver's seat, yes, was in a past ninety

11  degrees so it was somewhat reclined with his head

12  on the headrest when I approached him.

13        Q.    Was the seat also pushed back?

14        A.    I have no idea how the seat was.

15        Q.    Okay.

16        A.    I just know the back of the seat was

17  past ninety degrees.

18        Q.    Got it.

19        A.    I described it as a Detroit lean.

20        Q.    And then what happened?

21        A.    He sat up.  He looked to the left,

22  looked directly at me, raised the gun up to his

23  chest level, pointed the barrel right at me.

24        Q.    Where were you?

25        A.    In the driver's window still giving

1   him commands to drop the gun.

2          Q.    And then what happened?

3          A.    Fearing that he was about to shoot

4   me, I discharged my weapon and then retreated --

5   as I was firing, retreated back to the back trunk

6   area of the car.

7          Q.    Then what did you do?

8          A.    Once we got -- once I got to the back

9   of the car I started yelling for Teague does he

10  still have the gun, does he still have the gun.

11  Teague informed me that he couldn't tell.

12         Q.    And then what happened?

13         A.    I could not see in either driver's

14  side windows because of being shattered from the

15  gunfire so I shattered the rear passenger window

16  first so I could see into the vehicle.

17         Q.    How did you do that?

18         A.    With my asp baton.

19         Q.    And then what?  What did you see when

20  you shattered the window?

21         A.    Saw that Mr. Martin was laying back

22  in his seat once again and he appeared to have

23  gunshot wounds to the left side of his body.

24         Q.    Then what did you do?

25         A.    I asked Teague again if he could see

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

97

1   the gun.  He informed me that it's no longer in

2   his hand but it's in his lap.  He said next to the

3   console.

4           Q.    Then what?

5           A.    Sergeant McLaughlin arrived on scene.

6   I advised Sergeant McLaughlin and Teague to

7   provide cover while I proceeded to bust out the

8   driver's side window because the door was locked

9   and I could not gain entry into the vehicle.

10          Q.    Then what?

11          A.    Once I shattered the window, I

12  reached in, unlocked the vehicle, immediately saw

13  the firearm and retrieved the firearm.

14          Q.    Where was the firearm?

15          A.    It was sitting next to his right

16  thigh in like the -- I guess you call it central

17  console area, it was like a little glove box

18  thing, kind of wedged right by his right thigh

19  (indicating).

20          Q.    You were pointing down to your chair.

21          A.    Yeah, it's like if you were sitting

22  in the driver's seat, it was by his right thigh

23  and there's a center console between the two front

24  seats and it was kind of wedged right there.

25          Q.    Was his gun when you saw it wedged

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

 1  between his leg -- his right thigh and the

 2  console?

 3          A.   I don't remember.  I just grabbed it.

 4          Q.   When you said right there, it was

 5  wedged right there, I was just trying to get that

 6  in the record what you meant.

 7          A.   Somewhere between his right thigh and

 8  center console.

 9          Q.   Okay.

10          A.   I mean, whether it was his leg, by

11  his knee, I'm not sure which way.  I just know he

12  wasn't holding it.  It was between his right leg

13  and the center console.

14          Q.   And then what happened?

15          A.   Once I retrieved the handgun I put

16  it -- I told Deputy Teague and Deputy Bender who

17  arrived on scene to remove Mr. Martin from the

18  vehicle so we could provide first aid and I placed

19  the handgun on the hood of my cruiser.

20          Q.   And then what?

21          A.   Advised Deputy Achtermann and Officer

22  Huff from the Trotwood Police Department to watch

23  the gun and I retrieved the AED from my cruiser.

24          Q.   What did you do with the AED?

25          A.   I ran back to Martin, advised

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

99

 1  whatever deputy to cut his shirt off, turned it
 2  on, and started hooking up the automatic
 3  defibrillator.
 4        Q.   Then what happened with the
 5  defibrillator?
 6        A.   It went through the cycles, the
 7  prompts, and advised no shock advised, to continue
 8  CPR, which was being at that time administered by
 9  Deputy A. Haas and Bender.
10        Q.   Amber Haas?
11        A.   Yes, ma'am.
12        Q.   No shock meant to you his heart could
13  not be revived with the defibrillator?
14             MS. DINEHART:  Objection.
15             THE WITNESS:  No.
16  BY MS. BRANCH:
17        Q.   What did it mean to you?
18        A.   I know it works on different rhythms.
19  What exactly those rhythms are I have no idea.
20        Q.   And then what did you do?
21        A.   After it advised no shock advised, I
22  walked away.
23        Q.   Where did you go?
24        A.   I think I walked somewhere on
25  Merrimac.  It would have been toward the west.

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

100

```
 1          Q.   What did you do?
 2          A.   I cussed and screamed and yelled.
 3          Q.   Was anybody around you?
 4          A.   No.
 5          Q.   And how long were you there?
 6          A.   Five minutes maybe, if that.
 7          Q.   And what were you upset about?
 8          A.   Because I gave a guy an opportunity
 9   to drop the gun and he refused and pointed it at
10   me and I had to shoot him and it really upset me.
11          Q.   What did you do after that?
12          A.   I think I was advised by Sergeant
13   McLaughlin to sit in front of his vehicle because
14   that's the only place there was no news media and
15   it was the only place for us to stand.
16          Q.   And how long did you stay there?
17          A.   I have no idea.
18          Q.   So when you went up first -- I'm
19   going to go back and ask you some more questions.
20   When you at first went up to the driver's side
21   back window, do you know where Officer Teague was?
22          A.   I would assume on the passenger side
23   somewhere.
24          Q.   But you didn't see him?
25          A.   I have no clue.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

101

1      Q.   And did you hear his testimony in his
2  deposition the other day?
3      A.   Yes, ma'am.
4      Q.   He testified that when you said he's
5  got a gun, Teague was still back at his car.  Do
6  you remember that testimony?
7           MS. DINEHART:  Objection.
8           THE WITNESS:  I don't remember him
9  exactly saying that, that he was still by the back
10 of his car.
11 BY MS. BRANCH:
12     Q.   Do you -- if that is where he said he
13 was, do you have any reason to dispute that?
14     A.   I have no clue where he was at.
15     Q.   Okay.  So it's up to him to say where
16 he was?
17     A.   Yeah, I have no clue where he was at.
18     Q.   When you exited your vehicle and went
19 up to Dontae Martin's car, at that point you did
20 not wait for anyone else to come on the scene --
21          MS. DINEHART:  Objection.
22 BY MS. BRANCH:
23     Q.   -- any additional backup; is that
24 right?
25          MS. DINEHART:  Objection.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

1          THE WITNESS:  No.

2    BY MS. BRANCH:

3          Q.    Did you wait --

4          A.    No.

5          Q.    -- for backup?

6          A.    No.

7          Q.    Did you do a tactical assessment of

8    your surroundings and your environment before you

9    approached the vehicle?

10         A.    I approached the car tactical, but I

11   also approached it going into thinking it's a

12   crash.

13         Q.    And what about your approach was

14   tactical?

15         A.    I approach on a forty-five degree

16   angle so that way he can't see me in his mirrors

17   that way I can clear the back of his car and then

18   I end up right at the B pillar driver's side

19   window like I would do any other traffic stop.

20   It's just for officer safety reasons.

21         Q.    You did not mention in your

22   description of what happened that you identified

23   yourself as a sheriff or deputy or police; is that

24   right?

25         A.    Yeah, I don't -- I'm not sure if I

 1  did or not.

 2          Q.   You didn't -- you don't say in your

 3  incident report that you identified yourself; is

 4  that correct?

 5          A.   I don't remember if I did or if I

 6  didn't.

 7          Q.   And you didn't just tell us when you

 8  told us what happened that you took time to

 9  identify yourself?

10          A.   Correct, I did not say that.

11          Q.   So are you trained to identify

12  yourself as a police officer when you come upon a

13  car accident?

14          A.   When the circumstance allows us to.

15          Q.   And how would you do that

16  identification?

17          A.   Sheriff's department, sheriff's

18  office.

19          Q.   And you didn't have your lights on,

20  you didn't have your siren on, so there wasn't any

21  other indicator that an officer had arrived on the

22  scene, right?

23                  MS. DINEHART:  Objection.

24                  THE WITNESS:  The uniform of the day.

25  BY MS. BRANCH:

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

104

1      Q.    Okay.  Anything else that would have

2   indicated that you were a sheriff's officer coming

3   up to the cars?

4      A.    Marked police cars.

5      Q.    Your police car was behind the Grand

6   Prix, correct?

7      A.    Correct.  But it's also an indicator

8   that the police are there.

9           (Thereupon, Plaintiff's Exhibit 59,

10  one colored photograph, was marked for purposes of

11  identification.)

12  BY MS. BRANCH:

13     Q.    This is Exhibit 59.

14     A.    Yes.

15     Q.    The lighting here is artificial light

16  brought in after the shooting, right?  This big

17  bright light was not illuminating the car at the

18  time?

19     A.    I have no idea.  I wasn't here when

20  this picture was taken.

21     Q.    Okay.

22     A.    Based on the picture, yes, there is

23  artificial light.

24     Q.    Okay.  When you were on the scene,

25  was your car and Teague's car and the maroon Grand

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 105 of 221 PAGEID #: 267
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                        Joshua Haas
105

1  Prix in these locations as they are in the

2  photograph?

3         A.   Yes.

4         Q.   When you were on the scene before the

5  shooting, it was dark?

6         A.   Correct.

7         Q.   All right.  The yellow tape wasn't

8  there and the light on the street and the yellow

9  markers, they weren't present?

10        A.   At the time of arrival or at the time

11 on the scene?

12        Q.   At the time that you got there.

13        A.   Yes, correct, that was not there.

14        Q.   All right.  And your vehicle as it's

15 parked, that's the one in front?

16        A.   Yes.

17        Q.   And you did not have your bar lights

18 on or any other lights; is that right?

19             MS. DINEHART:  Objection.

20             THE WITNESS:  Headlights.

21 BY MS. BRANCH:

22        Q.   You had your headlights.  Anything

23 else?

24        A.   Not to my knowledge.

25        Q.   Do you see that there's some people

106

1  standing in the yard in front of the maroon car?

2        A.   Yes.

3        Q.   Okay.  Was that the vicinity where

4  you saw the neighbors in the yard?

5        A.   It could have been.  I just know it

6  was in the front of the crashed vehicles on the

7  other side of the yard.  Where exactly they were

8  standing, I have no idea.

9        Q.   When you got to the maroon car, was

10 the engine running?

11       A.   I don't remember.

12       Q.   Radio on?  Any noise coming from the

13 inside?

14       A.   I have no clue.

15       Q.   Windows up?

16       A.   Yes.

17       Q.   Tinted?

18       A.   Yes.

19       Q.   And did you see any movement inside

20 the car when you first looked in?

21       A.   No.

22            (Thereupon, Plaintiff's Exhibit 15,

23 one colored photo, was previously marked for

24 purposes of identification.)

25 BY MS. BRANCH:

107

1      Q.   If you look at Exhibit 15 in the

2  book, you see a photograph of the maroon car in

3  the grass?

4      A.   Yes.

5      Q.   And do you see through the broken

6  back driver's side window the headrest for the

7  driver's seat?

8      A.   Yes.

9      Q.   It's -- the chair itself is pushed

10 farther back than the passenger seat; is that

11 right?

12     A.   The backseat is.  I'm not -- I don't

13 know necessarily the chair.  It appears the

14 backrest is back farther --

15     Q.   Okay.

16     A.   -- but as far as the actual chair, I

17 have no idea.

18     Q.   You don't know about the chair's

19 position front to back?

20     A.   No.

21     Q.   But the reclining, the driver's seat

22 is reclined farther back than the passenger seat?

23     A.   Based on this photo it appears, yes,

24 it is reclined a little bit farther than the

25 passenger seat.

1    Q.    And is that how it looked to you at

2  the time that you looked inside?

3    A.    Yes, it appeared reclined.

4    Q.    Do you have your statement still?

5  Yeah.  Exhibit 58.  Could you look at your written

6  statement, the first page, fourth paragraph down?

7  The paragraph starts as soon as I illuminated the

8  vehicle, I observed Martin.  Do you see that?

9    A.    Yes.

10    Q.    So what you just told us was as soon

11  as you shined your light in, the first thing you

12  saw was Martin, his head and his chest, and he was

13  reclined with his head on the headrest, right?

14    A.    Yeah.  If you go up to the paragraph

15  before that it says I first illuminated the

16  vehicle through the rear driver's side window and

17  observed it was only occupied by a male driver,

18  later identified as Dontae Martin.

19    Q.    Slow down.  If you want to read it

20  out loud, you can.  You've just got to slow down

21  because the court reporter can't type that fast.

22    A.    I'm sorry.  But yes, if you go to the

23  paragraph before that, I describe where I seen

24  him.

25    MS. BRANCH:  Okay.  So Jillian, we

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 109 of 221 PAGEID #: 271

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

109

1    are concerned because you appear to be signalling

2    your client --

3                    MS. DINEHART:  I'm reading from a

4    paper.

5                    MS. BRANCH:  I know but you have long

6    legs.

7                    MS. DINEHART:  I'll back up.

8                    MS. BRANCH:  That would be great.

9    Thank you.

10                    MS. DINEHART:  All right.  No

11   problem.

12   BY MS. BRANCH:

13           Q.   So you're welcome, because I'm going

14   to ask you questions about your statement --

15           A.   You're fine.  I apologize.  I forgot.

16   That's my mistake.

17           Q.   But you're welcome to read silently

18   to yourself.  So if I ask you to read a paragraph,

19   you can just say let me read it first and go ahead

20   and read that silently.  If you want to read from

21   it out loud to answer a question, that's fine too

22   but just slow down.

23                    So that paragraph I was reading, one,

24   two, three, four, five, as soon as I illuminated

25   the vehicle, so this is the second time you looked

Patricia Martin, Admin., et al. vs Joshua Haas, et al.    Joshua Haas

110

1 in?

2     A. Yes, because if you go to the

3 paragraph before is where I --

4     Q. That's where you write about his head

5 on the headrest?

6     A. Yes.

7     Q. Okay. So in this paragraph you write

8 I observed Martin who appeared, from my -- from my

9 vantage point, to be holding a large semiautomatic

10 handgun in his right hand. Did I read that

11 correctly?

12     A. That's correct.

13     Q. All right. And you wrote who

14 appeared, comma, from my vantage point, comma, to

15 be holding a weapon. Right?

16     A. Yeah. It appeared from my vantage

17 point, correct.

18     Q. You don't say that you saw a weapon,

19 you say that he appeared to have a weapon from

20 your point of view; is that right?

21     MS. DINEHART: Objection.

22     THE WITNESS: Yes.

23 BY MS. BRANCH:

24     Q. Is that right?

25     A. It says -- yes, it says who appeared,

111

1   from my vantage point, to be holding a large

2   semiautomatic handgun.  But then if you read

3   further, I go on and tell how -- exactly where it

4   was laying, how he was holding it.

5         Q.   And that's when you yelled to Deputy

6   Teague gun, gun, he's holding a gun?

7         A.   Correct.

8         Q.   So at that point in time what you saw

9   when you looked inside the window appeared to you

10   to be a gun and you alerted Teague to the gun?

11         A.   Yes, when I looked through the

12   driver's window.

13         Q.   And you're not standing at the pillar

14   anymore, you're at the front window; is that your

15   testimony?

16         A.   No.  I'm at the driver's window.  I'm

17   not at the front windshield.  I just stepped out

18   past the pillar.  I'm still at the driver's side

19   window.

20         Q.   I'm really specific when I say

21   driver's side window because I think of them as

22   being two windows.  There's the front window --

23         A.   That's the windshield.

24         Q.   -- and the back window?

25         A.   That's a windshield.  That's not a

112

1   window.  You've got the windshield, you've got the

2   driver's window, the rear passenger window, you've

3   got an opera window, and then you've got a back

4   window of that car.  So when I say front driver's

5   side window, I'm meaning the driver's window, not

6   the windshield.

7           Q.   So you were standing where --

8           A.   The driver's window.

9           Q.   -- when it appeared to you that there

10  was a gun and you said gun?

11          A.   Driver's window.

12          Q.   The driver's --

13          A.   If you would like me to --

14          Q.   -- front window?

15          A.   Yes, driver's front window.

16          Q.   I'm going to have you mark this one,

17  make it easy.

18          A.   Very good.

19               (Thereupon, Plaintiff's Exhibit 60,

20  one colored photo, was marked for purposes of

21  identification.)

22  BY MS. BRANCH:

23          Q.   There's some Sharpies in there.

24          A.   What color would you like?

25          Q.   I guess black might be easiest to

113

1   see.  This is Exhibit 60.  So could you mark where

2   you were standing, and if you want to mark on

3   the -- well, actually point first --

4           A.    Okay.

5           Q.    -- where you were standing when you

6   observed Martin who appeared from your vantage

7   point to be holding a gun?

8           A.    I can't give you an exact location

9   because the door is open.  So this is a different

10  view from what I'm seeing, but it would be just

11  past the pillar where the window would be, right

12  about here (indicating).

13          Q.    Can you just put it on the table so I

14  can see where you pointed to?

15          A.    This is the B pillar so obviously

16  this door would be shut, the B pillar.

17          Q.    Right.

18          A.    So I would be looking right about

19  around here (indicating).

20          Q.    Okay.  Can you mark on the ground

21  where you were standing?

22          A.    I can give you a presumed location,

23  but I don't know for sure where I was standing.  I

24  just know it was just past the B pillar.  I have

25  no problem --

```
 1          Q.   Can you put a --

 2          A.   Somewhere in this area (indicating).

 3          Q.   All right.  How close to the car were

 4   you?

 5          A.   Inches.

 6          Q.   So you put an X on Exhibit 60?

 7          A.   Yes.

 8          Q.   All right.

 9          A.   You want me to initial it?

10          Q.   Yes.  And the X indicates where you

11   were standing when you saw what appeared to you

12   from that point to be a gun?

13          A.   No, X is indicating where I believe I

14   was standing.  I cannot tell you exactly where I

15   was standing.  I know I was just standing a little

16   bit past the B pillar.

17          Q.   Were you close enough to touch the

18   window?

19          A.   I was within inches of my gun barrel,

20   so yes.

21          Q.   And was your gun out at this point?

22          A.   When I saw the firearm, yes, it was.

23   My initial approach, no.

24          Q.   And was your gun out and pointed at

25   the driver's side front window?
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

                                                                    115

 1              A.    Yes.

 2              MS. DINEHART:   Objection.

 3  BY MS. BRANCH:

 4              Q.    Was your gun in your hand with your

 5  arm straight or with your arm bent?

 6              A.    No clue.

 7              Q.    I'm trying to figure out how close

 8  you were to the vehicle.

 9              A.    Inches.

10              Q.    Inches?

11              A.    I can tell you my gun barrel was

12  within inches of that windshield.

13              Q.    Did you knock on the window at any

14  point?

15              A.    No.

16              Q.    Did you call out to try to speak to

17  him before you saw what appeared to be a gun?

18              A.    No.  I immediately started screaming

19  gun, gun, drop the gun.

20              Q.    And when you say the B pillar, can

21  you maybe --

22              A.    This is the B pillar.  This is where

23  the two doors meet.  This is -- I'll just put a B.

24  Is that okay?

25              Q.    You know what, can you put a B like

116

```
 1   on the roof --

 2          A.    Sure.

 3          Q.    -- above the pillar?

 4          A.    This would be the B pillar

 5   (indicating).

 6          Q.    Okay.  Got it.  Thank you.

 7              MS. DINEHART:  Do you want him to

 8   initial that?

 9   BY MS. BRANCH:

10          Q.    Oh, sure.  You can put your initials

11   on it.

12          A.    (Witness complies.)

13          Q.    And then you heard Officer Teague say

14   over the radio we've got one with a gun?

15          A.    Yes.

16          Q.    Did you hear him say that himself,

17   like in the location, or did you hear it over the

18   radio?

19          A.    No, I heard it over the radio.

20          Q.    Do you know where he was standing

21   when he said that?

22          A.    No, ma'am.

23          Q.    If he was between his vehicle and the

24   Grand Prix -- the maroon car, would that be

25   accurate?
```

1          A.    I have no clue --

2                MS. DINEHART:  Objection.

3                THE WITNESS:  -- where he was

4   standing.

5   BY MS. BRANCH:

6          Q.    He hadn't reached the rear of the car

7   yet; is that right?

8                MS. DINEHART:  Objection.

9                THE WITNESS:  I have no idea where he

10  was at.

11  BY MS. BRANCH:

12         Q.    Now, at this point where you're

13  standing seeing what appeared from that point of

14  view to be a gun, Dontae Martin's head was still

15  on the headrest, according to your statement?

16         A.    Yes, when I first identified him, he

17  was still on the headrest.

18         Q.    Now, you made a command to Dontae

19  Martin to drop the gun; is that right?

20         A.    Yes.

21         Q.    You yelled that?

22         A.    Yes.

23         Q.    In your police officer voice?

24         A.    Yes.

25         Q.    Did Officer Teague make any commands?

```
 1          A.    I have no idea.

 2          Q.    He said in his statement that the

 3   command he gave was he also was yelling and he

 4   said put your hands up, put your hands in the air.

 5   Do you recall him saying that on scene?

 6          A.    On scene?  No.

 7          Q.    After you yelled drop the gun, were

 8   you aware that Officer Teague saw Dontae Martin

 9   put the gun in his lap, resting it on his thigh?

10          MS. DINEHART:  Objection.

11          THE WITNESS:  I have no clue what

12   Deputy Teague saw.

13   BY MS. BRANCH:

14          Q.    Did you see Dontae Martin put the gun

15   on his lap or on his thigh?

16          MS. DINEHART:  Objection.  At what

17   time?

18   BY MS. BRANCH:

19          Q.    After you yelled drop the gun.

20          A.    Yes.  Once I initially said drop the

21   gun, he started picking it up off his thigh and

22   that's when he started moving the barrel different

23   directions in the car, one being pointed toward

24   the passenger window where I believed Deputy

25   Teague was standing at that time.
```

1     Q.   So did you yourself -- I'll leave

2  aside what Teague saw for a moment.  Did you

3  yourself see Dontae Martin put the gun in his lap

4  and resting it on his thigh?

5     A.   Yes.  I seen him put it on his thigh.

6  I wouldn't say lap.

7     Q.   And he did that after you said, for

8  the first time, yelled drop the gun --

9          MS. DINEHART:  Objection.

10 BY MS. BRANCH:

11    Q.   -- is that right?

12    A.   Yeah, I think that's what I answered.

13    Q.   Would you consider that compliance

14 with your first command to drop the gun?

15    A.   No.

16    Q.   Why not?

17    A.   Because I would expect a civilian to

18 take the gun completely out of their hand.

19    Q.   What do you mean?

20    A.   The gun was still in his hand so

21 although he put it on his thigh, he didn't drop

22 the gun.  Dropping to me would be get rid of the

23 gun, throw it on the floor, throw it on another

24 seat.  He did not do that.

25    Q.   Did you -- but the only command you

120

1    gave was drop the gun?

2            A.    Correct.

3            Q.    Both of you were saying the same

4    command, drop the gun, right?

5                  MS. DINEHART:  Objection.

6                  THE WITNESS:  I have no idea what he

7    was saying.

8    BY MS. BRANCH:

9            Q.    So you -- sitting here today after

10   listening to his testimony, nothing reminded you

11   about what Teague did?

12           A.    I have no clue --

13                 MS. DINEHART:  Objection.

14                 THE WITNESS:  -- what Teague did on

15   the scene.

16   BY MS. BRANCH:

17           Q.    Everything I want to know about

18   Teague is from Teague?

19           A.    Correct.

20           Q.    Okay.  So you don't know if there

21   were inconsistent commands being given?

22           A.    No.  I know the commands I was giving

23   was drop the gun.

24           Q.    You ever been in that situation where

25   your fellow officer is giving a command, you're

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

121

1  giving a command, and you realize, wait a minute,

2  our commands are inconsistent and the suspect

3  doesn't know what to do?

4                MS. DINEHART:  Objection.

5                THE WITNESS:  Have I been in a

6  situation where multiple commands were given?

7  Yes.

8  BY MS. BRANCH:

9        Q.   Yes.

10       A.   Whether the suspect didn't know what

11 to do, I have no clue.  That's up to the suspect.

12       Q.   Well, my question is, multiple

13 commands that are given that are inconsistent.

14       A.   No.  Usually --

15                MS. DINEHART:  Objection.

16                THE WITNESS:  -- put your hands up,

17 drop the gun, get rid of the gun.  No matter what

18 you tell them, it's all the same thing.  There's

19 only one objective, get rid of the gun so -- but

20 to answer your question, no, I've never been in

21 that situation.

22 BY MS. BRANCH:

23       Q.   Have you ever been trained to avoid

24 multiple commands or inconsistent commands?

25       A.   Yes, when the situation allows us to,

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 122 of 221 PAGEID #: 284

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

122

1  via felony stop where it can be controlled.

2         Q.   And in those situations one officer

3  is in charge of giving commands only?

4         A.   Yes, in a controlled environment.

5         Q.   Okay.  But that didn't occur here?

6  You and Teague didn't have a conversation I'm the

7  one giving commands, let me do this?

8         A.   No, this was not a controlled

9  environment.

10        Q.   Now, you said that after you gave the

11 first command to drop the gun you then saw Dontae

12 Martin raise his hands to his chest?

13        A.   No.  When I first started giving the

14 command to drop the gun, he picked the gun up off

15 his thigh and started pointing it in different

16 directions.

17        Q.   And you eventually saw him move his

18 hand up with the gun in it to his chest?

19        A.   After he sit up in his seat, correct.

20        Q.   Okay.  Is it possible that he was

21 raising his hand in compliance with one of

22 Teague's commands?

23        A.   No.

24             MS. DINEHART:  Objection.

25 BY MS. BRANCH:

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 123 of 221 PAGEID #: 285

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

123

1     Q.    You said you didn't hear Teague's

2   commands?

3     A.    Correct, because when he sit up, he

4   looked me square in my face so that leads me to

5   believe he wasn't listening to Teague, he was

6   worrying about me so...

7     Q.    So if Teague was saying put your

8   hands up and Dontae Martin raised his hand up to

9   his chest, would that be in compliance with a

10  command?

11            MS. DINEHART:   Objection.

12  BY MS. BRANCH:

13    Q.    Teague's command, not your command.

14    A.    I have no idea what Mr. Martin was

15  thinking that night.

16    Q.    At times while you were beside the

17  vehicle giving commands did you believe that

18  Dontae Martin was complying with some of your

19  commands?

20    A.    No, ma'am.

21    Q.    Or some of Officer Teague's commands?

22            MS. DINEHART:   Objection.

23            THE WITNESS:   I didn't hear Officer

24  Teague give commands.  I just know he was not

25  responding to mine.

Patricia Martin, Admnn., et al. vs Joshua Haas, et al.                    Joshua Haas

124

1   BY MS. BRANCH:

2          Q.    Even though the gun was put on his

3   thigh?

4                MS. DINEHART:  Objection.

5                THE WITNESS:  Correct.

6   BY MS. BRANCH:

7          Q.    Did you have any indication that

8   Dontae Martin was intoxicated at the time that you

9   were on the scene before the shooting?

10         A.    No, ma'am.  I had no contact with him

11  period.

12         Q.    And if he had been intoxicated, is

13  that something that you would have taken into

14  account when giving a command?

15         A.    No.

16         Q.    Or assessing a person's response to

17  your command?

18         A.    No.

19         Q.    Are you trained to do that?

20         A.    It depends on the situation.

21         Q.    Have you ever had a situation where

22  you gave a command and you were aware that the

23  person was incapacitated or intoxicated?

24         A.    Absolutely but --

25         Q.    And do you take that into

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 125 of 221 PAGEID #: 287

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

125

1  consideration when you are considering whether

2  they were in compliance with your command or not?

3          A.    No.   The whole situation is

4  different.

5          Q.    What do you mean?

6          A.    This situation he was holding a gun

7  so whether he's intoxicated or not that night

8  would have no bearings on this night.

9          Q.    Have you ever been in a situation

10 where somebody was intoxicated and couldn't comply

11 with your commands?

12         A.    Yeah.   DUI investigations.

13         Q.    And what do you do in those

14 situations?

15         A.    Appropriate situations, refusal and

16 continue my DUI investigation.   The difference is

17 this guy was holding a firearm.

18         Q.    So in a DUI where you're giving a

19 command to do a field sobriety test, for

20 example --

21         A.    Uh-huh.

22         Q.    -- and they're not complying with

23 your command, is that something that you take as

24 failure to comply or an indicator of intoxication?

25              MS. DINEHART:   Objection.

126

1          THE WITNESS:  It could be an

2   indication of their intoxicated state.  It could

3   be.  But like I said, in this situation, I had no

4   contact with him or knowledge whether or not he

5   was intoxicated.

6   BY MS. BRANCH:

7          Q.    Did you consider that he may have

8   been injured from the car accident?

9          A.    I guess possibly.

10         Q.    Did you consider he may have had a

11  medical condition that caused the car accident?

12         A.    Anything is possible.

13         Q.    And were those things that you took

14  into account when you were giving your commands

15  and assessing his response to your commands?

16         A.    No.

17         Q.    According to the internal

18  investigation, from the moment that you radioed we

19  have one with a gun -- let me back up.  Do you

20  remember saying that on the radio?

21         A.    I didn't say that.  Teague did.

22         Q.    Okay.  From the moment Teague said we

23  have one with a gun to dispatch, fourteen seconds

24  elapsed from that moment until you radioed shots

25  fired.

1              MS. DINEHART:  Objection.

2              THE WITNESS:  Okay.

3    BY MS. BRANCH:

4         Q.   Did you know that internal figured

5    out that that was fourteen seconds?

6         A.   No, not until I think you said it in

7    Teague's deposition.

8         Q.   Okay.  Do you have any reason to

9    dispute that time frame?

10        A.   I have no clue how long it took.  I

11   mean, it could have took one second, it could have

12   took two minutes.  I have no idea.

13        Q.   All right.  I played the audio of the

14   dispatch for Officer Teague during his deposition.

15   You were present for that?

16        A.   Yes, ma'am.

17        Q.   I'm not going to do that for you as

18   well, but when we looked at the time codes for

19   when he said we have got one with a gun and when

20   you said shots fired, that was fourteen seconds;

21   is that right?

22             MS. DINEHART:  Objection.

23             THE WITNESS:  Sure.  I believe -- I

24   know it was short but I don't remember exactly

25   what the number was without looking.

128

```
 1   BY MS. BRANCH:

 2         Q.    Would you agree that the entire

 3   incident from when the first moment it appeared to

 4   you that Dontae Martin had a gun until both of you

 5   stopped firing was fourteen seconds?

 6         A.    No.

 7               MS. DINEHART:  Objection.

 8               THE WITNESS:  I wouldn't agree to

 9   that at all.

10   BY MS. BRANCH:

11         Q.    What time would you give it?

12         A.    I wouldn't give it a time.  I would

13   just say it was fast.  I have no clue how long it

14   took.

15         Q.    Shorter than fourteen seconds?

16         A.    No clue.

17         Q.    But in your mind, in your memory, it

18   was quick?

19         A.    It was quick.

20         Q.    When you were aiming your weapon at

21   Dontae Martin standing at the driver's side

22   window, looking at Exhibit 60, you were to the

23   left of the B pillar?

24         A.    That's correct, when you're facing

25   the car.
```

```
 1          Q.   When you were standing there
 2   observing Dontae Martin, did you have your firearm
 3   aimed at him or anything in the car?
 4          A.   At him.
 5          Q.   All right.  And what part of him were
 6   you aiming at?
 7          A.   His upper body, head.  Whatever I
 8   could see through the window.
 9          Q.   And you were seeing that through the
10   front window, the front driver's side window?
11          A.   Correct.
12          Q.   And is that when you fired or did you
13   wait before you fired?
14          A.   No, I already answered that, I fired
15   after he sat up, looked at me, raised the gun and
16   pointed it right at me is when I fired.
17          Q.   And you said that you -- well, do you
18   know how many shots you fired from that position?
19               MS. DINEHART:  Objection.
20               THE WITNESS:  No.
21   BY MS. BRANCH:
22          Q.   Where you have the X, is that where
23   you were standing when you fired your first shot?
24          A.   That area, yes, that's where I fired.
25   Somewhere in that area.
```

130

1          Q.    And do you know how many shots you

2    fired from the X position?

3          A.    No, ma'am.

4          Q.    What was your next position that you

5    were in when you were firing?

6          A.    I wasn't in a position.  I was

7    retreating straight back to the trunk as I was

8    firing.

9          Q.    And where did you -- where were you

10   standing when you fired your last shot?

11         A.    I have no idea.

12         Q.    Are you aware that one of your

13   bullets struck the door -- the back driver's side

14   door?

15         A.    No.

16               (Thereupon, Plaintiff's Exhibit 56,

17   one colored photograph, was previously marked for

18   purposes of identification.)

19   BY MS. BRANCH:

20         Q.    I think I have a picture, Exhibit 56

21   in the book.  Do you see where the bullet hole is

22   in the window frame?

23         A.    Yes.

24         Q.    And that's the back door window

25   frame?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 131 of 221 PAGEID #: 293

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                          Joshua Haas

131

1          A.    I would assume so.  You can see a B

2    pillar here (indicating).  Yeah, I believe so but

3    I can't tell for sure.

4          Q.    And you see the headrest --

5          A.    Yes.

6          Q.    -- through the window?

7          A.    Yes.

8          Q.    Were you aware at the time that you

9    struck the door?

10          A.    I have no idea where my rounds went.

11          Q.    Do you know where you were standing

12    when you fired that shot?

13          A.    No clue.

14          Q.    In looking back at Exhibit 60, you

15    have no idea where you were standing when you were

16    done shooting?

17          A.    No.  I know I ended at the trunk.

18    Where I stopped firing my last round, I have no

19    clue.

20          Q.    From your position at the X spot on

21    Exhibit 60, would you -- do you know what part of

22    the body you struck?

23                MS. DINEHART:  Objection.

24                THE WITNESS:  No, ma'am.

25    BY MS. BRANCH:

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

132

```
 1          Q.    What direction do you think your shot
 2   would have entered the body?
 3               MS. DINEHART:  Objection.
 4               THE WITNESS:  I don't even know if my
 5   rounds hit him.  I have no idea.
 6   BY MS. BRANCH:
 7          Q.    Have you looked at any of the
 8   forensic evidence from the coroner's office?
 9          A.    No.
10          Q.    Are you aware there were no shots
11   from front to back?
12          A.    I'm not aware of anything.
13          Q.    Okay.
14          A.    I've never looked at it.  I have no
15   clue where the rounds went.
16          Q.    Would you agree it would be
17   impossible for you to be standing in the X
18   position when shooting Dontae Martin's head, neck,
19   or face?
20          A.    I wouldn't agree --
21               MS. DINEHART:  Objection.
22               THE WITNESS:  -- to nothing.
23   BY MS. BRANCH:
24          Q.    Without -- oh, let me ask it this
25   way.  Would you agree that if you were standing in
```

 1  the X position and hit Dontae Martin's upper body

 2  or head, that the shot would have to be in the

 3  direction of front to back?

 4          MS. DINEHART:  Objection.

 5          THE WITNESS:  Like I said, I'm not

 6  going to agree to nothing.  I have not read it,

 7  I've not seen it, nor do I even know how many

 8  rounds I even fired.

 9  BY MS. BRANCH:

10      Q.   Did you see any of your bullets

11  strike Dontae Martin?

12      A.   No.

13          MS. DINEHART:  Objection.

14  BY MS. BRANCH:

15      Q.   How were you holding your weapon when

16  you shot him?

17      A.   One-handed, in my right hand canted a

18  little bit inward (indicating).

19      Q.   What's that mean?

20      A.   A little bit inward.  We shoot

21  one-handed, that's how I train myself.  It takes

22  out the recoil.  So I cant inward a little bit to

23  help with the recoil.  That's how I trained for

24  seventeen years when I shoot one-handed.  So I was

25  shooting one-handed with my right hand.

134

1    Q.    All right.  So I need to put this on

2  the record so I'm going to use some words to try

3  to describe what you just mimicked for me.

4         A.    Okay.

5         Q.    So if you were holding the gun in a

6  way that was up and down, not canted --

7         A.    Correct.

8         Q.    -- what word would you use to

9  describe that?

10        A.    Up and down is fine.

11        Q.    All right.  That would mean that the

12  grip was perpendicular to the ground?

13        A.    Sure.

14        Q.    All right.  And when you cant the

15  gun, the grip is now at an angle toward the

16  ground?

17        A.    Yes.

18        Q.    And it's tilted -- the gun is tilted,

19  the way you described it to me --

20        A.    Inward.

21        Q.    -- where the top of the weapon is

22  tilted to your left?

23        A.    Correct.

24        Q.    And the bottom of the grip is tilted

25  out to the right?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 135 of 221 PAGEID #: 297

Patricia Martin, Admn., et al. vs Joshua Haas, et al.          Joshua Haas

135

 1        A.    Correct.

 2        Q.    All right.  And if that's the way you

 3   were holding your gun when you shot Dontae Martin,

 4   where would you expect your casings to eject?

 5        A.    I have no idea --

 6              MS. DINEHART:  Objection.

 7              THE WITNESS:  -- because I was

 8   shooting and moving.

 9   BY MS. BRANCH:

10        Q.    Because you were shooting and moving?

11        A.    Yes.

12        Q.    If you were shooting from a

13   stationary position, where would you expect your

14   casings to be?

15        A.    It depends on guns.  I mean, every

16   gun is different.

17        Q.    Oh, I'm asking about your gun.

18        A.    I don't know.  I've never sat and

19   watched my casings because we're actually doing

20   drills.

21        Q.    Do you know what the typical ejection

22   pattern is for your Glock when you're firing it at

23   a cant from left to right?

24        A.    No.

25              MS. DINEHART:  Objection.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

136

1  BY MS. BRANCH:

2        Q.    Do you know if anybody asked you to

3  demonstrate that for them as part of the

4  investigation?

5        A.    No.

6        Q.    Do you know how many shots you fired

7  through the back driver's side window?

8        A.    I don't know how many shots I fired

9  period.

10       Q.    Do you know if you fired shots

11 through that window?

12       A.    I have no clue.  I don't know if they

13 were mine or Teague's.

14       Q.    And why were you moving back?

15       A.    To safety.

16       Q.    Why is that more safe?

17       A.    Because I'm putting distance from the

18 known threat.

19       Q.    Anything else?

20       A.    No.

21       Q.    Did you consider at any point to go

22 to safety before you shot?

23       A.    Absolutely not.

24       Q.    Did you consider before you shot

25 Dontae Martin to wait for backup before you shot

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

137

```
 1   him?
 2              MS. DINEHART:  Objection.
 3              THE WITNESS:  No.
 4   BY MS. BRANCH:
 5        Q.    Did you consider before you shot
 6   Dontae Martin to take cover?
 7        A.    No.
 8        Q.    Did you alert dispatch that shots
 9   were fired multiple times?
10        A.    Twice.
11        Q.    And why did you repeat yourself?
12        A.    Because I was walked on by another
13   deputy and I wanted to make sure dispatch was
14   clear that shots were fired and that a medic was
15   en route.
16        Q.    And is it your voice the second time
17   where you say to dispatch we just shot the
18   suspect, start the medic?
19        A.    Yes.
20        Q.    After you retreated to the back of
21   the vehicle and then came toward the driver's side
22   windows, at that point were you the first one to
23   come back to the car between you and Teague?
24        A.    I have no idea.
25              MS. DINEHART:  Objection.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

138

```
 1                    THE WITNESS:  No clue.
 2   BY MS. BRANCH:
 3           Q.   And were both windows -- was the
 4   window that you broke first the back driver's side
 5   window?
 6           A.   Yes, back driver's side window.
 7           Q.   And why did you break that?
 8           A.   So I could see into the car.
 9           Q.   Did you unlock the car at that point?
10                MS. DINEHART:  Objection.
11                THE WITNESS:  No.  I busted that
12   window out and then I think I realized it was
13   locked, that's why I couldn't get into the front
14   of the vehicle.
15   BY MS. BRANCH:
16           Q.   Did you ask Teague to break out his
17   window?
18           A.   No.
19           Q.   Did you realize at that point that
20   the bullet holes through the driver's side windows
21   were evidence of shooting?
22           A.   I'm sure, yeah, that's evidence.
23           Q.   And that when you used your asp to
24   break the window out, you were destroying the
25   evidence of where the holes were in the window?
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 139 of 221 PAGEID #: 301

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

139

 1                    MS. DINEHART:  Objection.

 2                    THE WITNESS:  Those windows weren't

 3   my concern.

 4   BY MS. BRANCH:

 5          Q.    Well, were you aware that you were

 6   destroying evidence when you were using your asp

 7   to break the windows?

 8          A.    Absolutely, but that wasn't my

 9   concern at the time.

10          Q.    And then Teague said to you -- or do

11   you remember Teague saying to you that the gun was

12   on the seat right next to his leg?

13          A.    Yes.

14          Q.    And that the gun was no longer in his

15   hand?

16          A.    Yes, because I asked him is he still

17   holding the gun.

18          Q.    And you removed the gun from the

19   vehicle before Dontae Martin was removed from the

20   vehicle; is that right?

21          A.    I did.

22          Q.    And was that your decision?

23          A.    Yes, it was.

24          Q.    And why did you make that decision?

25          A.    To make sure that the scene is safe

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 140 of 221 PAGEID #: 302
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

140

1    and nobody else is put in harm's way.

2          Q.    Was Dontae Martin moving?

3          A.    I don't remember.  I just grabbed the

4    gun.

5               MS. BRANCH:  I'm going to take a

6    five-minute break.  You're welcome to stay.  I

7    just want to read through my notes.

8               THE WITNESS:  Yes, ma'am.

9               (Pause in proceedings.)

10   BY MS. BRANCH:

11         Q.    You said that Deputy Bender was on

12   the scene with Teague and the both of them removed

13   Dontae Martin from the vehicle; is that right?

14         A.    Yes, ma'am.

15         Q.    And you said that you told them to do

16   that?

17         A.    I did.

18         Q.    Were you the officer in charge?

19         A.    No, ma'am.

20         Q.    So why were you giving directions to

21   the other officers?

22         A.    Because I know we needed to

23   administer first aid to Dontae as soon as

24   possible.

25         Q.    What were they doing at the time you

1  gave them the direction to remove him?

2          A.   I don't know.  I just told him to get

3  him out of the vehicle, I'm going to get the AED.

4          Q.   So before you went to get the AED,

5  you reached into the car, you took the gun out,

6  you then walked back to the front of your car and

7  put the gun on the hood; is that right?

8          A.   Yes.  I'm not sure I walked, but,

9  yes, I removed the gun and put it on my hood.

10         Q.   And while you were doing that Dontae

11 Martin was still inside his vehicle?

12         A.   Correct.

13         Q.   And then Deputy Bender arrived on the

14 scene?

15         A.   Yes.

16         Q.   And when he arrived on scene, you

17 asked he and Teague to remove Dontae?

18         A.   I did.

19         Q.   Why didn't you remove Dontae Martin?

20         A.   Because I had the firearm.

21         Q.   Why didn't you remove him before the

22 firearm was retrieved?

23         A.   Because the scene wouldn't be safe.

24         Q.   Well, if you removed Dontae Martin

25 from the vehicle --

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

142

1          A.    Right.

2          Q.    -- he wouldn't be near the gun?

3          A.    The gun was still on his -- right by

4   his leg.  I didn't know if he was deceased, what

5   his condition is.  I didn't want another shootout

6   so the gun is the threat, that's what I removed.

7          Q.    And why was it -- why did you decide

8   you should be the one to retrieve the gun?

9          A.    I just did.

10         Q.    Well, you were the one that shot

11  Dontae Martin and you were closest to -- if you

12  were worried that the gun was unsafe, you were the

13  closest to him, right?

14         A.    I'm the one that shot --

15              MS. DINEHART:  Objection.

16              THE WITNESS:  -- at Dontae Martin.  I

17  don't know if I shot him.

18  BY MS. BRANCH:

19         Q.    You saw that he was bleeding?

20         A.    I don't know if it's from my wounds

21  or --

22         Q.    You saw that he --

23         A.    -- Teague's wounds.

24         Q.    -- had gunshot wounds?

25         A.    Correct.

143

```
 1        Q.   And you knew he was bleeding from the
 2   gunshot wounds?
 3        A.   Correct.
 4        Q.   And you knew that you would have to
 5   reach over him in order to retrieve the gun,
 6   right?
 7        A.   Yes.
 8        Q.   If Officer Teague opened the door, he
 9   wouldn't have needed to reach over Dontae Martin,
10   correct, from the passenger side?
11        A.   I guess.  Sure.
12        Q.   Wouldn't it have been safer for
13   officer safety to have Officer Teague retrieve the
14   gun from his side without having to reach over
15   Dontae Martin?
16             MS. DINEHART:  Objection.
17             THE WITNESS:  My opinion is no.
18   Who's going to provide cover for Teague?  Teague
19   is already in position and Shamus is already in
20   position, they can provide cover for me.  You
21   would have to have people moving around in order
22   to be able to do that and redoing positions.
23   BY MS. BRANCH:
24        Q.   Why couldn't you provide cover for
25   Teague?
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 144 of 221 PAGEID #: 306

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

144

 1          A.    Because I would have had to left that

 2    side of the vehicle, go all the way around to that

 3    side to be able -- go around Shamus to be able to

 4    cover.  And then it's also a situation, we didn't

 5    think about it, we just did it.

 6          Q.    Why can't you provide cover where you

 7    were standing at the side -- the driver's side?

 8          A.    I feel that you couldn't provide

 9    cover.

10          Q.    So when you say Shamus, you mean

11    Sergeant McLaughlin?

12          A.    I'm sorry, Sergeant McLaughlin.

13          Q.    And your statement doesn't mention

14    Sergeant McLaughlin on scene; is that right?

15          A.    Let me look at it.

16          Q.    Exhibit 58, the incident report.

17          A.    Yes, it does.  Second page, the back,

18    second paragraph I say Sergeant McLaughlin arrives

19    on scene.

20          Q.    You say in your statement that he

21    arrived on scene before you broke out the window

22    or after?

23          A.    I think I was knocking out the rear

24    window as he showed up.

25          Q.    The first -- the first window?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 145 of 221 PAGEID #: 307

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

145

1          A.   Yes.

2               MS. DINEHART:  I'm sorry, that was

3    first in time, not first in position is what you

4    meant when you said first window?

5    BY MS. BRANCH:

6          Q.   The first window that you broke out?

7          A.   Yes.

8          Q.   After you retrieved the AED where did

9    you go?

10         A.   Straight back to Mr. Martin who was

11   lying on the ground.

12         Q.   And who was the officer that assisted

13   you with hooking up the AED?

14         A.   I have no idea who -- somebody hooked

15   up the pads.  I plugged the pads in, went through

16   the prompt, and ran the AED, but I have no idea

17   who actually put the pads on his chest.

18         Q.   Was it Amber Haas?

19              MS. DINEHART:  Objection.

20              THE WITNESS:  No clue.

21   BY MS. BRANCH:

22         Q.   Do you know when she arrived?

23         A.   Yeah.  It was shortly after I

24   retrieved the AED.

25         Q.   At any point did you provide CPR?

Patricia Martin, Admnn., et al. vs Joshua Haas, et al.                    Joshua Haas

146

```
 1            A.    No.

 2            Q.    Rescue breathing?

 3            A.    No.

 4            Q.    At any point was Dontae Martin

 5    conscious after the shooting?

 6            A.    Not -- no, he was not responding

 7    period.

 8            Q.    Did he say anything?

 9            A.    No.

10            Q.    Did he make any sounds?

11            A.    No.

12            Q.    Did he move at all?

13            A.    Not to my knowledge, no.

14            Q.    Was he breathing?

15            A.    He was breathing, yes.

16            Q.    When you left him, was he still

17    breathing?

18            A.    When I left the AED, I have no idea

19    because they were doing rescue breathing.

20            Q.    And who was doing the rescue

21    breathing?

22            A.    Bender, and Amber Haas was doing

23    compressions.

24            Q.    You knew that the Grand Prix had --

25    I'm sorry, the maroon Grand Prix had tinted
```

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 147 of 221 PAGEID #: 309
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

147

 1  windows before you arrived, right --
 2            MS. DINEHART:  Objection.
 3  BY MS. BRANCH:
 4        Q.    -- according to your MDT?
 5        A.    Based on dispatch, correct.
 6        Q.    And you could see them when you got
 7  to the car with your flashlight; is that right?
 8        A.    Yes, ma'am.
 9        Q.    And you had to use your flashlight to
10  pierce the tint to see inside of the car, to light
11  it up?
12        A.    Yes, I used it to light the car up.
13        Q.    Without your flashlight, you would
14  not have been able to see inside the car?
15        A.    I have no idea.  I just used my
16  flashlight.  I just knew they were tinted.  I
17  couldn't -- I just used my flashlight.
18        Q.    Before you turned your flashlight on,
19  could you see inside?
20        A.    I don't believe so.  I can't say for
21  sure.
22        Q.    Have you ever experienced coming upon
23  a car with tinted windows in a low light situation
24  before?
25        A.    Yes, at nighttime.

148

1      Q.    And had you ever used your flashlight

2  to shine inside a tinted window at night?

3      A.    Yes.

4      Q.    And in your experience had you ever

5  seen a reflection from the tinted window --

6      A.    Not at nighttime.

7      Q.    -- when using a flashlight?

8      A.    Not at nighttime.

9      Q.    Do you know of any officer that

10  you've worked with who had experience seeing a

11  reflection in a tinted window with a flashlight at

12  night?

13      A.    I have no idea.

14      Q.    You said not at nighttime.  What did

15  you mean by that?

16      A.    During the daytime I have where it's

17  been brighter outside, you can see your reflection

18  in the tinted windows.

19      Q.    All right.  And how do you avoid

20  that, seeing a reflection?

21      A.    Usually you can roll down your

22  window.

23      Q.    Is there another way to minimize the

24  reflection?

25      A.    Usually people has already got their

1 windows rolled down when you make normal traffic

2 stops.

3        Q.   Have you ever moved your position

4 when you're looking through a tinted window to

5 minimize the reflection?

6        A.   No.  I approach all vehicles the

7 same.

8        Q.   Have you ever been trained to

9 recognize that you're seeing a reflection in a

10 tinted window in a low light situation?

11        A.   No, ma'am.

12        Q.   Have you ever been trained on how to

13 avoid seeing a reflection with a flashlight in a

14 tinted window in a low light situation?

15        A.   No, ma'am.

16        Q.   Sergeant McLaughlin told me that that

17 is something that he's experienced, seeing a

18 reflection of his flashlight in a tinted window.

19 Are you -- have you two ever discussed that?

20        A.   No.

21        Q.   He was your supervisor when you were

22 in Harrison Township?

23        A.   Yes.  At that time, yes.

24        Q.   Do you have any reason to dispute

25 that other officers have seen a reflection in a

150

1   tinted window with their flashlight in a low light

2   situation?

3          A.    No.

4          Q.    Is this the first time you ever heard

5   about that?

6          A.    No, I heard about it in Teague's

7   deposition.

8          Q.    Do you know who was providing CPR to

9   Dontae Martin other than Amber Haas --

10               MS. DINEHART:  Objection.

11  BY MS. BRANCH:

12         Q.    -- and the EMTs?

13               MS. DINEHART:  Objection.

14               THE WITNESS:  No.  All I saw was

15  Bender and Amber Haas.

16  BY MS. BRANCH:

17         Q.    Do you know if anyone was providing

18  CPR to Dontae Martin before Amber arrived?

19               MS. DINEHART:  Objection.

20               THE WITNESS:  No, I think everybody

21  pretty much arrived simultaneously once we got him

22  out of the car.

23  BY MS. BRANCH:

24         Q.    Who arrived simultaneously?

25         A.    I think Bender -- McLaughlin arrived,

151

1   Bender arrived, Amber arrived.  Pretty quickly, I

2   don't know how fast they initiated it prior to

3   removing him -- you know, once they removed him

4   from the vehicle.  I can't tell you when it

5   stopped.  I just know those two were doing rescue

6   breaths and CPR.

7           Q.   Were you at the scene when the EMTs

8   arrived?

9           A.   Yes.

10          Q.   Had you left to go to Merrimac yet or

11  was that --

12          A.   I have no idea when they removed him

13  because there was difficulty getting the ambulance

14  in there.

15          Q.   Oh.  When you draw your firearm at

16  the scene, as you were taking your weapon out of

17  your holster, where was your trigger finger?

18          A.   We train to index, it's called

19  indexing, which goes -- runs parallel with the

20  slide and your finger is on the slide off the

21  trigger.

22          Q.   And how are you holding your index

23  finger when you withdrew your weapon?

24          A.   When I drew it?

25          Q.   Yes.

152

```
 1          A.   Not on the trigger.

 2          Q.   When did you put your finger on the

 3   trigger?

 4          A.   Once I identified the threat and the

 5   gun.

 6          Q.   Well, you -- when you pulled your

 7   weapon and had your finger on the side of the

 8   trigger --

 9          A.   Uh-huh.

10          Q.   -- at that point you hadn't

11   determined there was a threat yet?

12          A.   No, I determined there was a threat,

13   but I'm not going to put my finger on a trigger

14   until it's pointed at somebody and the direction

15   I'm going to use it.  That prevents accidents.

16          Q.   I'm not sure I understand.

17          A.   What don't you understand?

18          Q.   I thought you saw the threat when you

19   pulled your weapon?

20          A.   Absolutely.

21          Q.   So you had your finger on the

22   trigger --

23          A.   No, I did not.

24          Q.   -- when you pulled your weapon?

25          A.   No, I did not.  I had my finger on
```

153

```
 1   the slide.  Once I raised it up and pointed at

 2   Dontae Martin, then I put my finger on the

 3   trigger.

 4         Q.    When you pulled your gun, did you

 5   immediately pull it up and point it at Dontae

 6   Martin?

 7         A.    Absolutely.

 8         Q.    Would you agree that if Dontae --

 9   given all the facts that you've told us here today

10   and what's in your statement, if Dontae Martin had

11   not raised the gun and you perceived that he was a

12   threat with the gun, that you couldn't have shot

13   him under your use of force policy?

14               MS. DINEHART:  Objection.

15               THE WITNESS:  You're asking two

16   different things.  You're asking did I perceive it

17   as a threat with a gun or he didn't raise the gun?

18   That's two different scenarios.  So what are you

19   asking me?

20   BY MS. BRANCH:

21         Q.    Could you use deadly force on Dontae

22   Martin if he -- if you came up across him in his

23   vehicle and he had the gun on his lap or on his

24   thigh?

25               MS. DINEHART:  Objection.
```

Patricia Martin, Admnn., et al. vs Joshua Haas, et al.                    Joshua Haas

154

```
 1              THE WITNESS:  I can't answer that.
 2   You've got to have background information.  What
 3   happens after that?
 4   BY MS. BRANCH:
 5         Q.    Everything you --
 6         A.    If you're asking would I shoot him
 7   because he's got a gun on his thigh, no.
 8         Q.    Why not?
 9         A.    He's not -- he's not threatening his
10   life.  He's not threatening nobody else's life.
11   Now, if you put more information on that and said
12   that he's already threatened to kill the people in
13   front of him and he makes a motion toward it,
14   yeah.
15         Q.    Well, I'm talking about the facts
16   that you knew that night.
17         A.    Yes.
18         Q.    If we took away the fact that you
19   perceived that Dontae Martin was going to shoot
20   you or Officer Teague, would you have had
21   justification for shooting him?
22         A.    I'm not going to answer.
23               MS. DINEHART:  Objection.
24               THE WITNESS:  I'm not going to answer
25   that.  I'm not taking away the fact.  The fact is
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

155

1   this is what happened.  I'm not going to sit here

2   and say try to take facts away, so no, I'm not

3   going to answer that.

4   BY MS. BRANCH:

5        Q.   So is your training as an officer

6   when you're using force -- using deadly force --

7        A.   Yes, ma'am.

8        Q.   -- are you allowed to shoot a suspect

9   when you see a gun inside a vehicle and the person

10  is not following your command to drop the gun?  Is

11  that enough to use deadly force?

12            MS. DINEHART:  Objection.

13            THE WITNESS:  It's up to the

14  individual officers.  Are you asking me what I

15  would do?  Was the gun in his hand?  Has he

16  already threatened to shoot somebody?  Has he

17  already threatened to shoot himself?  You can't

18  just sit here and speculate on that.  It doesn't

19  work.  That ain't how it works.  I mean, it's not

20  illegal to have a gun in the car --

21  BY MS. BRANCH:

22       Q.   Right.

23       A.   -- so I'm not going to shoot somebody

24  that has it on the scene.  But the fact of the

25  matter is, he was holding it, he pointed it at me,

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 156 of 221 PAGEID #: 318

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

156

1   and those are the facts.  We could take -- we're

2   not going to sit here and try to take away the

3   facts.

4           Q.    So let me take it one at a time.

5           A.    Yes, ma'am.

6           Q.    You perceive everything you've said

7   up until the point and you saw -- up until the

8   point you saw the gun?

9           A.    Correct.

10          Q.    When you first saw the gun, was

11  that -- would that justify a reasonable officer

12  shooting Dontae Martin?

13              MS. DINEHART:  Objection.

14              THE WITNESS:  I'm not going to answer

15  that.  I'm going to answer it at that point would

16  I have shot him?  No.  I would have continued to

17  give him commands --

18  BY MS. BRANCH:

19          Q.    And why would you not have shot him?

20          A.    -- to drop the gun.  Because at that

21  point I've already been -- gotten myself in a

22  tactical position, I'm already armed, I'm giving

23  him the opportunity to drop the weapon.

24          Q.    And is it your testimony that another

25  officer could have shot him?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

157

```
 1          A.   No, I'm not testifying to that at
 2   all.
 3               MS. DINEHART:  Objection.
 4               THE WITNESS:  That's your words, not
 5   mine.
 6   BY MS. BRANCH:
 7          Q.   I thought you said I wouldn't have
 8   shot him.
 9          A.   Yeah.  I can only testify to what I
10   would do.  I'm not going to testify what another
11   officer would do.
12          Q.   And what justified your being able to
13   shoot him, in your mind, was the threat that you
14   thought he was creating to your safety and Officer
15   Teague's safety, is that what made it justifiable
16   to shoot him --
17          A.   No.
18          Q.   -- in your mind?
19               MS. DINEHART:  Objection.
20               THE WITNESS:  My mind what justified
21   it is he didn't drop the gun, he sat up, looked me
22   square in my face and pointed a gun at me, that's
23   why I shot him.
24               MS. BRANCH:  All right.  I'm going to
25   take a break.
```

```
 1                  (Pause in proceedings.)

 2   BY MS. BRANCH:

 3        Q.   Who was the first one to shoot at

 4   Dontae Martin between you and Officer Teague?

 5        A.   I have no idea.

 6        Q.   Did you perceive Officer Teague

 7   shooting his weapon at any point?

 8        A.   Yes.  I knew he was shooting.

 9        Q.   And when was that?

10        A.   During the shooting.  I can't tell

11   you for sure when.

12        Q.   During your shooting you noticed him

13   shooting?

14        A.   That's correct.

15             (Thereupon, Plaintiff's Exhibit 61,

16   Joshua Haas' oath of office, was marked for

17   purposes of identification.)

18   BY MS. BRANCH:

19        Q.   Okay.  61 is your oath of office with

20   Sheriff Plummer; is that right?

21        A.   Yes, ma'am.

22             (Thereupon, Plaintiff's Exhibit 62,

23   Joshua Haas' position description, was marked for

24   purposes of identification.)

25   BY MS. BRANCH:
```

1    Q.   And then 62 is your job description

2    once you became a deputy sheriff; is that right?

3         A.   Yes.  Wait a minute.  Yes.

4         Q.   That's the one you signed an oath

5    for?

6         A.   Yes.

7         Q.   Exhibit 62, one of your duties in

8    order of importance -- do you see that column in

9    your job description?

10        A.   Yes, job duties in order of

11   importance.

12        Q.   And the first most important duty is

13   to preserve the peace and enforce the laws of this

14   state; is that right?

15        A.   That's part of it, yes.

16        Q.   And the next one in order is protect

17   the life and property of citizens as a sworn

18   officer of the County, including patrolling, and

19   then it goes on.  Is that right?

20        A.   Yes.

21        Q.   And then in your oath of office,

22   which is Exhibit 61, you sign a new oath every

23   time there's a new sheriff; is that right?

24        A.   That's correct.

25        Q.   And this is the one for Sheriff

160

1   Plummer?

2          A.   Yes.

3          Q.   You signed this July 11th, 2008?

4          A.   That's correct.

5          Q.   Are you actually like asked to stand

6   up, put up your right hand and say these words out

7   loud, or do you just sign a piece of paper?

8          A.   I don't recall.  I know the initial

9   one that I did under Dave Vore I had to raise my

10  hand, but I can't say for sure on Plummer's.

11         Q.   Is there a ceremony or a formal event

12  that occurs when you take an oath of office as a

13  sheriff's deputy here?

14         A.   No, ma'am.

15              MS. DINEHART:  Objection.

16  BY MS. BRANCH:

17         Q.   Is it merely for Sheriff Plummer when

18  he became sheriff you just had to sign this piece

19  of paper?

20              MS. DINEHART:  Objection.

21              THE WITNESS:  I have no idea.

22  BY MS. BRANCH:

23         Q.   You don't recall?

24         A.   No, I just know my sergeant at the

25  time had me sign it.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

161

1      Q.   I see.  It's not like the sheriff has

2  you sign it?

3      A.   My sergeant had me sign it so...

4      Q.   And who was your sergeant?

5      A.   Renee -- or Sergeant Jo Renee O'Ryan

6  at this time, 2008.

7      Q.   And your oath states I do solemnly

8  swear that I will support the Constitution of the

9  United States and the Constitution of the State of

10  Ohio, and that I will faithfully discharge the

11  duties of deputy sheriff of Montgomery County,

12  Ohio during my continuance in office; is that

13  right?

14      A.   That's right, that's what it says.

15      Q.   The laws of the State of Ohio allow

16  for open carry of a gun; is that right?

17      A.   That's correct.

18      Q.   It also allows for concealed carry of

19  a gun; is that right?

20      A.   Yes.  Correct.

21      Q.   Including in a car?

22      A.   Yes.

23      Q.   A person may -- in Ohio it's legal to

24  have a gun concealed in a vehicle?

25      A.   With the carry -- concealed weapons

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

162

1    permit.

2           Q.    Did you do anything to determine

3    whether Dontae Martin had a concealed carry

4    permit?

5           A.    No.

6           Q.    Did you do anything when you saw the

7    gun in the vehicle at first to determine whether

8    he was permitted to have an open carry gun?

9           A.    No.

10          Q.    Did it occur to you that he may be

11   permitted to have that gun that you saw?

12          A.    No.

13          Q.    Did you -- when you saw the gun

14   inside the car, did you perceive it as a threat?

15          A.    Absolutely.

16          Q.    Even though it could have been legal

17   to have the gun?

18          A.    Absolutely.

19          Q.    And why is that?

20          A.    Because he was holding the firearm.

21          Q.    Now, Deputy Teague said that he was

22   not holding the firearm.  Do you dispute that?

23                MS. DINEHART:  Objection.

24                THE WITNESS:  I don't know what he

25   saw from his vantage point.  I know from my

163

1    vantage point he was holding the firearm in his

2    right hand.

3    BY MS. BRANCH:

4         Q.    Well, from your vantage point.  You

5    said it appeared, from your vantage point, that he

6    was holding a gun; is that right?

7         A.    There it is.

8         Q.    Paragraph five of Exhibit 58?

9         A.    That's correct.  From my vantage

10   point he appeared to be holding a firearm -- large

11   semiautomatic handgun in his right hand.

12        Q.    So having a gun in his vehicle on

13   his -- in his car on his person with his hand on

14   the gun, that was a threat to you?

15        A.    Yes.

16        Q.    Was that a sufficient threat under

17   the County's use of force policy to be able to use

18   deadly force?

19        A.    Can I see the policy?

20        Q.    Sure.  It's Exhibit 2, and the deadly

21   force section starts on Section B as in boy.

22             (Thereupon, Plaintiff's Exhibit 2,

23   use of force policy, was previously marked for

24   purposes of identification.)

25   BY MS. BRANCH:

164

```
 1        Q.    You're welcome to read whatever you
 2   need, just let me know when you're done.
 3        A.    Okay.
 4        Q.    Okay.
 5        A.    What was your question?
 6              (Record read.)
 7              THE WITNESS:  My opinion, it falls
 8   under imminent danger, an appearance of threatened
 9   and impending injury as would put a reasonable and
10   prudent person to his instant defense so...
11   BY MS. BRANCH:
12        Q.    That's a yes?
13        A.    In a prudent person, yes, with the
14   totality of circumstances.
15        Q.    So that would be enough for you to
16   use deadly force?
17        A.    That would be part of enough to use
18   deadly force, correct; but obviously you've got to
19   take the whole circumstances.  If you're asking me
20   would I have shot Dontae Martin that night for
21   holding a gun on his lap, no.  I shot Dontae
22   Martin when he sat up, pointed the gun at me, and
23   then I shot him.
24        Q.    In the use of force policy, the
25   section above deadly force, do you see the section
```

 1    at the top of the page, number six?

 2         A.    Yes.

 3         Q.    Did you read that while you took the

 4    time to read the deadly force paragraph?

 5         A.    No, I read the deadly force

 6    paragraph.

 7         Q.    Number six, seven lines down from the

 8    top of the paragraph it says if a safe alternative

 9    to the use of deadly force is likely to achieve

10    the purpose of averting an imminent danger, deadly

11    force is not necessary.  Did I read that

12    correctly?

13         A.    That's correct.

14         Q.    And is that a policy that you

15    followed at the Montgomery County Sheriff's

16    Office?

17         A.    Based on what?  Based on what

18    happened that night?

19         Q.    No.  I'm just asking is that a policy

20    that you followed while you were a sheriff's

21    deputy?

22              MS. DINEHART:  Objection.

23              THE WITNESS:  Yeah, I follow all

24    policies, to the best of my knowledge.

25    BY MS. BRANCH:

Patricia Martin, Admnn., et al. vs Joshua Haas, et al.        Joshua Haas

166

 1        Q.    Okay.

 2        A.    But if you're asking me about that

 3   night --

 4        Q.    You would agree that you -- the

 5   policy of the office and the training that you've

 6   received is that if there's a safe alternative to

 7   using deadly force, deadly force would not be

 8   necessary --

 9              MS. DINEHART:  Objection.

10   BY MS. BRANCH:

11        Q.    -- is that correct?

12        A.    Based on the situation, correct.

13        Q.    Right.  And if there is a safe

14   alternative that would overt any danger, then

15   deadly force would be excessive force; is that

16   your understanding of the policy and your

17   training?

18              MS. DINEHART:  Objection.

19              THE WITNESS:  Based on the

20   individual -- I mean, we can subject the policy to

21   whatever; but unless you're applying a situation

22   that we can use or reference, I mean, I can't

23   answer that.  I mean, if you're talking about the

24   night in question, no, that does not fit.  There

25   was no safe alternative.

167

1   BY MS. BRANCH:

2          Q.   Well, my question was, was it -- is

3   it the policy that you followed, is it the

4   training that you had at Montgomery County that if

5   there's a safe alternative to deadly force that

6   ends the threat, deadly force is not permitted?

7                MS. DINEHART:  Objection.

8                THE WITNESS:  When it's safe to do so

9   and you have alternative means.

10  BY MS. BRANCH:

11         Q.   Then yes?

12         A.   But there's obviously situations

13  where the policy does not apply.

14         Q.   Have you ever been in a situation

15  where the policy did apply and you found a safe

16  alternative without having to --

17         A.   Yes.

18         Q.   -- use deadly force?  Tell me about

19  that.

20         A.   When people won't comply with

21  commands.

22         Q.   Can you give me an example?

23         A.   Yeah, I got in a foot chase with a

24  shooting suspect, he pulled a gun on me, listened

25  to my commands, and he dropped it.  He went home

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 168 of 221 PAGEID #: 330

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

168

 1   that night.  Well, he went to jail.  I've had

 2   people barricaded in a house who eventually come

 3   out.  Policy would apply there.  But every single

 4   situation is different.

 5        Q.   Have you ever used cover to avoid

 6   using deadly force?

 7        A.   No.

 8        Q.   Do you know your policy allows you to

 9   use cover, Section -- the second bullet point

10   under Section 6?

11        A.   Yeah, it says --

12        Q.   Cover provides a tactical advantage

13   that works both ways.  An armed subject attempting

14   to gain a position of cover may necessitate the

15   use of deadly force; conversely, employees in a

16   position of cover may gain additional time to

17   assess the need to use deadly force without

18   exposure to additional risks.  Do you agree with

19   that policy?

20             MS. DINEHART:  Objection.

21             THE WITNESS:  Yes, but it doesn't

22   apply to the situation on July 23rd.

23   BY MS. BRANCH:

24        Q.   Have you been in a situation where

25   you have felt justified in using deadly force but

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 169 of 221 PAGEID #: 331

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

169

1   you waited and held off to see if another

2   alternative would be able to eliminate the threat

3   so you could avoid using deadly force?

4          A.    No.

5          Q.    Did you ever give a warning -- a

6   verbal warning to Dontae Martin that if he failed

7   to comply with your commands, you would shoot?

8          A.    No.

9          Q.    Are you trained to do that in

10  Montgomery County?

11         A.    No.

12         Q.    If you look at the next page of the

13  policy, the bottom it's page 1602.

14         A.    Yes.

15         Q.    And at the top of the page you see a

16  number three?

17         A.    Yes.

18         Q.    That policy says if feasible, and if

19  to do so would not increase the danger to

20  employees or others, a verbal warning to submit to

21  the employee's authority should be given before

22  the use of deadly force.  Did I read that

23  correctly?

24         A.    Yes.

25         Q.    Is that the policy?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

170

1          A.    That's what the policy says.

2          Q.    Did you ever practice that?

3          A.    Not to my knowledge.  I don't ever

4    recall threatening to shoot somebody.

5          Q.    Did you ever in your career at

6    Montgomery County before you shot your weapon, to

7    Dontae Martin --

8          A.    Yes.

9          Q.    -- Mr. Davis, Mr. Wright, say if you

10   don't comply, I'll shoot?

11         A.    No.

12         Q.    Did you comply with this policy in

13   other situations where deadly force was being

14   considered but you didn't actually have to shoot

15   your weapon?

16         A.    When you say deadly force, no.  Have

17   I ever been in a deadly force situation where I

18   haven't shot my weapon?  No.  Have I pointed my

19   firearm at people?  Yes.

20         Q.    In situations where you've pointed

21   your firearm at people, have you warned them stop

22   whatever it is they're doing or I'll shoot?

23         A.    No.

24         Q.    Have you ever been trained to give a

25   warning at Montgomery County?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 171 of 221 PAGEID #: 333
Patricia Martin, Admin., et al. vs Joshua Haas, et al.
Joshua Haas
171

1    A.    The warning stop or I'll shoot?

2    Q.    Yes.

3    A.    No.

4    Q.    What warnings have you been trained
5    to give?

6    A.    Drop the gun, show me your hands, the
7    normal basic commands.  I've never been trained
8    drop the gun or I'll shoot.

9          (Thereupon, Plaintiff's Exhibit 63,
10   use of force report on James Wright, was marked
11   for purposes of identification.)

12   BY MS. BRANCH:

13   Q.    Exhibit 63.  Have you seen -- if you
14   could take a minute to look at Exhibit 63.  The
15   first page is a use of force report involving the
16   shooting of Mr. Wright, your incident report
17   involving the shooting of Mr. Wright, and the
18   information sheet for the internal on the shooting
19   of Mr. Wright.  Just take a few minutes to look at
20   those and let me know when you're done.

21   A.    Okay.

22   Q.    Do you recall this incident?

23   A.    Yes, ma'am, very well.

24   Q.    This was the shooting that occurred
25   in December '14 prior to the shooting of Dontae

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

172

1   Martin in July of '15; is that right?

2           A.    That's correct.

3           Q.    The incident occurred on December 27,

4   2014?

5           A.    Yes.

6           Q.    And you signed your use of force

7   report on December 31, 2014; is that right?

8           A.    Yes.

9           Q.    And page one, is that the typical use

10  of force report form that existed back in 2015?

11          A.    Yes.

12          Q.    And I will just say for the record I

13  haven't seen a use of force report regarding

14  Dontae Martin, but do you recall, now that you've

15  seen the form for Mr. Wright, whether you filled

16  one out?

17          A.    I don't remember filling one out for

18  Mr. Martin.

19          Q.    Your use of force was investigated by

20  internal?

21          A.    Yes.

22          Q.    And you were found to have been in

23  compliance with the use of force policy; is that

24  right?

25          A.    That's correct.

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

173

```
 1          Q.    And specifically the use of deadly
 2    force because you shot him, right?
 3          A.    It doesn't say what I was
 4    investigated for on here.
 5          Q.    Did you use deadly force on
 6    Mr. Wright?
 7          A.    Yes.
 8          Q.    He lived, though, right?
 9          A.    Correct.
10          Q.    And the sheriff's department found
11    that your conduct was proper?
12          A.    For the investigation, yes.
13          Q.    And you said there was a civil case
14    brought after that?
15          A.    Not with Mr. Wright.
16          Q.    Oh, that was Mr. Davis?
17          A.    Davis.
18          Q.    Okay.  In the situation involving
19    Mr. Wright, did you feel threatened?
20          A.    Absolutely.
21          Q.    Tell me about Mr. Wright in that
22    situation.
23          A.    He already brandished a firearm.  He
24    had aggressive demeanor.  He stared right at me
25    and he refused numerous, numerous verbal commands
```

174

1   to drop his gun.

2           Q.    Was there a threat to others?

3           A.    Yes.

4           Q.    And to who?

5           A.    Patrons at the gas station, the

6   clerk, employees, other deputies when they arrived

7   on the scene.

8           Q.    Tell me about the situation and what

9   occurred there.

10          A.    I showed up to get gas.  The subject

11  was seated on a trash can, saw me, jumped up, had

12  a pistol in his hand, took an aggressive erect

13  posture, stared right at me.

14          Q.    What did you do?

15          A.    I notified dispatch, exited my patrol

16  vehicle and deployed my shotgun --

17  department-issued shotgun and began commands to

18  drop the gun.

19          Q.    You notified dispatch that you had a

20  suspect with a gun?

21          A.    Suspicious person, yes, with a gun.

22          Q.    And why did you get your shotgun

23  instead of your firearm?

24          A.    Because of the distance, I was more

25  comfortable.  I wasn't comfortable taking a

1   pistol.

2          Q.   And what happened after you told

3   dispatch that he had a gun?

4          A.   I continued to give him commands.  I

5   renotified dispatch that he is challenging me and

6   refusing to drop the gun.

7          Q.   Did you shoot him?

8          A.   Not at that time.

9          Q.   Why not?

10         A.   Because he didn't point the gun at

11  me, any civilians, employees at that time.

12         Q.   And then what happened?

13         A.   Deputy Teague arrived on scene.

14  Sergeant McLaughlin arrived on scene.  I think

15  over two hundred commands were given, drop the

16  gun, we don't want to shoot you.  He failed to

17  comply.  Huber Heights Police Department showed

18  up, deployed less lethal in the form of beanbag

19  rounds, shot Mr. Wright twice.  Prior to the third

20  round being deployed he pointed the handgun at

21  Sergeant McLaughlin.  At that time I discharged my

22  shotgun and shot him simultaneously with the third

23  beanbag round.

24         Q.   Who was giving the two hundred

25  commands to drop the gun?

```
 1          A.    Myself, Deputy Teague, and Sergeant
 2   McLaughlin.  It's just an estimate.  I heard it
 3   was anywhere between two hundred and four hundred
 4   times.
 5          Q.    From the beginning of your calling
 6   dispatch until the end of the shooting -- or to
 7   the moment you shot him, would you agree that was
 8   several minutes?
 9          A.    Yes.  I think it was like an almost
10   seven-minute standoff.
11          Q.    And it -- when you called dispatch,
12   where were you?  I'm sorry, the first time you
13   called dispatch to say he had a gun, where had you
14   positioned yourself?
15          A.    I was already pulling up to the gas
16   pump to get gas and once I stopped is when I saw
17   him.  So between I think pump four and -- yeah.
18          Q.    Were you in your vehicle when you
19   called dispatch?
20          A.    Yes.
21          Q.    When you got out of your vehicle, did
22   you take cover?
23          A.    No.  Yeah, behind my driver's side
24   door.  I stayed behind my driver's side door.  I
25   never went around or anything but later on ended
```

177

1    up taking cover behind a fuel pump.

2          Q.    You took cover behind a fuel pump?

3          A.    Yes, ma'am.  That's the only cover I

4    had.

5          Q.    All right.  Was there anybody else on

6    scene at that point?

7          A.    Deputy Teague, Sergeant McLaughlin,

8    Officer Waller from Huber Heights, and then a

9    plethora of cops afterwards I found out.

10          Q.    Okay.  And when you were taking cover

11   either behind your door or at the fuel pump, was

12   anyone else taking cover?

13          A.    Deputy Teague behind his cruiser,

14   Sergeant McLaughlin behind his cruiser, and then

15   Sergeant McLaughlin left his cruiser and advanced

16   to a parked Volkswagen bug to take cover.

17          Q.    All right.  And were there civilians

18   around?

19          A.    At that time they went in the gas

20   station.  An RTA bus driver was standing right

21   there for two and a half minutes until they

22   contacted RTA bus and told him to leave.  So he

23   was standing right there outside his bus videoing

24   everything.

25          Q.    And did you ever watch that video?

178

```
 1            A.    Yes, I did.

 2            Q.    Did he take cover?

 3            A.    The bus driver?

 4            Q.    Yes.

 5            A.    No, he stood right there until

 6   dispatch got ahold of RTA and told him to leave.

 7            Q.    Were you ordering him to take cover

 8   and get out of the way?

 9            A.    I was not.

10            Q.    Was somebody else?

11            A.    Somebody else was yelling for him to

12   get out of here.

13            Q.    And he just stood there?

14            A.    Yes, videoing.

15            Q.    Anyone else in danger other than the

16   bus driver at that point?

17            A.    Like I said, the employees inside,

18   the employees outside, and all the officers in the

19   parking lot.

20            Q.    And you said that the less than

21   lethal was deployed, so for the record that's the

22   beanbag gun?

23            A.    Beanbag shotgun, correct.

24            Q.    How does that work?

25            A.    It's a normal shotgun.  It looks like
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

179

1   a normal shotgun round.  You operate it the same

2   way as a normal shotgun.

3          Q.    And that was a Huber Heights officer?

4          A.    Yes.

5          Q.    And did you give him the command to

6   shoot his beanbag gun?

7          A.    Sort of.  He was asking for

8   permission from Sergeant McLaughlin.  Sergeant

9   McLaughlin was not responding, and I believe my

10  exact words is just fucking shoot him with the

11  beanbag gun.

12         Q.    Why was Sergeant McLaughlin not

13  responding?

14                MS. DINEHART:  Objection.

15                THE WITNESS:  I can't answer that.

16  BY MS. BRANCH:

17         Q.    Did you ever ask him?

18         A.    No.

19         Q.    Did he freeze?

20                MS. DINEHART:  Objection.

21                THE WITNESS:  I have no idea.

22  BY MS. BRANCH:

23         Q.    Was he the officer in charge?

24         A.    He was my sergeant, yes.

25         Q.    He was your supervisor?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

180

1        A.    Yes.

2        Q.    Teague's supervisor?

3        A.    Yes, the deputies.  All the deputies.

4        Q.    Was there any other Montgomery County

5   sheriff's person higher than McLaughlin?

6              MS. DINEHART:  Objection.

7              THE WITNESS:  After the shooting?

8   BY MS. BRANCH:

9        Q.    No, before the shooting.

10       A.    No, ma'am.

11       Q.    And Huber Heights, how does that work

12   when another agency is working with you on the

13   scene, does your command person command the other

14   agency?

15       A.    No clue.

16       Q.    And why did you say go ahead and

17   shoot him?

18       A.    At that time he was starting to walk

19   away and heading toward Main Street.  He would

20   have been out of our containment.  Less lethal was

21   available.  At that time it was the only option

22   that I thought we had available.

23       Q.    And at the time that the less than

24   lethal -- you told the Huber Heights --

25       A.    Absolutely.

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

181

1        Q.    -- officer to use his beanbag gun,
2   did Mr. Wright have his gun drawn?
3        A.    No.
4        Q.    Where was his gun?
5        A.    Still down to his side.
6        Q.    And what happened after the beanbag,
7   the first deployment of it?
8        A.    No effect on him.  The second one
9   kind of spun him.  As he was spinning, he raised
10  the gun and pointed it at Shamus McLaughlin,
11  Sergeant McLaughlin, and I feared his life and
12  that's when I deployed my shotgun and shot
13  Mr. Wright.
14       Q.    So the threat that you perceived was
15  the threat to Sergeant McLaughlin?
16       A.    Yes, ma'am.
17       Q.    And how many times did you shoot the
18  shotgun?
19       A.    Once.
20       Q.    Is it capable of being shot again
21  without having to reload?
22       A.    Correct.  Yes.
23       Q.    And how many shots could you have
24  gotten off from your shotgun?
25       A.    Five.  Five, I believe.

1        Q.    Why did you just shoot once?

2        A.    He crumbled and the gun was no longer

3   in his hand so I felt at that time a second shot

4   was not necessary.

5        Q.    You said in your statement, this is

6   the third page of Exhibit 63, your narrative, at

7   the top of the page, at one point Wright lifted

8   the gun by rotating his wrist and pointed at me.

9   Do you see that?

10       A.    Yes, ma'am.

11       Q.    Did you shoot him at that point?

12       A.    No, I did not.

13       Q.    Why not?

14       A.    Because I was afraid of making a

15  mistake, and then after the shooting I went to

16  Deputy McLaughlin and Teague and asked them if

17  they saw what I saw because I didn't want to make

18  a mistake.

19       Q.    What do you mean a mistake?

20       A.    Because at that time I believed he

21  was pointing the gun at me.  I wasn't one hundred

22  percent sure.  I wasn't willing to make that

23  mistake.  So after the shooting I went to them and

24  verified what I saw, and they said yes, that's

25  what he was doing.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                          Joshua Haas

183

1        Q.    And what did you think at that point?

2        A.    I didn't really think of nothing.

3   That basically it confirmed what I saw but I

4   wasn't one hundred percent sure and I wasn't

5   willing to make that mistake.

6        Q.    Did that affect you, that you didn't

7   trust what you saw?

8        A.    No.

9             MS. DINEHART:  Objection.

10  BY MS. BRANCH:

11       Q.    Did Officer Teague or Sergeant

12  McLaughlin tell you that you could have taken the

13  shot at that point?

14       A.    No.

15       Q.    Or that you should have?

16       A.    No.

17       Q.    Were you criticized by any of your

18  fellow officers for not having shot Mr. Wright

19  sooner?

20       A.    No.

21       Q.    Were there any commands given to

22  Mr. -- or warnings given to Mr. Wright that if he

23  didn't drop his gun, he was going to be shot?

24       A.    No.  I think it was basically

25  pleading with him, we don't want to shoot you.  I

184

1  don't recall anybody saying if you don't drop it,

2  we're going to shoot because that's not what we

3  say.

4          Q.   And why -- were you one of the people

5  pleading with him?

6          A.   Yes.

7          Q.   What were you saying?

8          A.   I don't want to shoot you.  And I

9  also keyed my radio so it got put over a taped

10  line on dispatch so it's purposely recorded me

11  saying over and over again drop the gun, I don't

12  want to shoot you.

13         Q.   Why did you do that?

14         A.   Just I felt it was necessary.

15         Q.   How did you key your radio?

16         A.   Just pressed it and held it and it's

17  on a tape-recording just to show the numerous

18  commands that we gave this gentleman and that we

19  did not want to shoot him.

20         Q.   So you tried for seven minutes to get

21  him to drop his gun before you felt you had no

22  choice but to shoot him?

23         A.   Roughly seven minutes.  I don't know

24  the exact time but --

25         Q.   About?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

185

 1          A.    -- it's about seven minutes.  Yes,

 2   ma'am.

 3          Q.    And you shot him once, not multiple

 4   times?

 5          A.    Yes, ma'am.

 6          Q.    And one shot was enough to end the

 7   threat?

 8          A.    Yes, ma'am.

 9          Q.    You were able to use lethal force

10   without actually killing him, right?

11          A.    It worked out that way.  I mean,

12   that's up to God and doctors.

13          Q.    So in that situation, if we compare

14   it to your response to Dontae Martin, you waited

15   for backup to arrive before approaching the

16   suspect?

17          A.    That's incorrect.  I never approached

18   the suspect.

19          Q.    You waited for backup before you shot

20   him?

21          A.    No.  I didn't wait for backup.

22   Backup came.  I didn't wait for backup for nothing

23   in this situation.

24          Q.    You took cover before you shot him?

25          A.    Yes.

186

```
 1          Q.    You and others gave commands for
 2    around seven minutes --
 3          A.    Yes.
 4          Q.    -- before you felt the need to shoot
 5    him?
 6          A.    Yes.
 7          Q.    You and the Huber Heights officer
 8    considered and did use nonlethal force first
 9    before shooting, right?
10          A.    That's correct.
11          Q.    It was your command and the officer
12    followed it?
13          A.    Yes.
14          Q.    Twice?
15          A.    Three times.
16          Q.    Three times.  You recorded your
17    warnings?  You had the presence of mind to record
18    your warnings by keying your mic, right?
19          A.    Yes, ma'am.
20          Q.    You did not do that with Dontae
21    Martin, correct?
22          A.    No, because I had a seven-minute
23    standoff to do that.  This lasted, according to
24    you, fourteen seconds.
25          Q.    You used or attempted to use an
```

Patricia Martin, Admnr., et al. vs Joshua Haas, et al.                    Joshua Haas

187

1   alternative, less than lethal force, to stop the

2   threat so that you wouldn't have to use lethal

3   force, right?

4           A.    For the Speedway, Mr. Wright?

5           Q.    For Mr. Wright.

6           A.    Absolutely, yes.

7           Q.    You followed that policy that we

8   looked at earlier in Exhibit 2, Section 6?

9           A.    No, I didn't follow it.

10          MS. DINEHART:  Objection.

11          THE WITNESS:  I didn't follow the

12  policy.  It was an option available on the scene

13  and I chose to use that option.  We didn't have

14  that option.  So I did not follow that policy.

15  BY MS. BRANCH:

16          Q.    Well, you're permitted under the

17  policies to use a safe alternative to end a

18  threat?

19          MS. DINEHART:  Objection.

20          THE WITNESS:  Correct.  If you have

21  that means.  We don't have that means.

22  BY MS. BRANCH:

23          Q.    And you had that -- you had the

24  ability in the Wright situation because Huber

25  Heights had the shot -- the beanbag gun?

188

```
 1              A.    Yes.

 2              Q.    In the Dontae Martin situation you

 3   had the ability to take cover, you had the ability

 4   to wait for backup, you had the ability to give

 5   commands for more than a few seconds, would you

 6   agree?

 7              A.    No.

 8                    MS. DINEHART:  Objection.

 9                    THE WITNESS:  No, I would not agree.

10   BY MS. BRANCH:

11              Q.    How did you react to shooting

12   Mr. Wright?

13              A.    I opened the rear of my cruiser,

14   threw the shotgun on the floorboard and took off

15   toward Main Street cussing.

16              Q.    And what were you cussing?

17              A.    I'm sure F bombs.  I'm sure -- you

18   name it because I just stood on a seven minute

19   standoff begging for somebody to drop the gun and

20   he failed and I had to shoot him.

21              Q.    And how did that make you feel?

22              A.    At the time?  I was pissed, I'm not

23   going to lie.  He had every opportunity.

24              Q.    And how did that affect you when you

25   came back to work?
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

189

1          A.    It didn't affect me at all.  I had no

2    problem being at work.  Like I stated earlier, my

3    problem was home.

4          Q.    In the situation involving Mr. Wright

5    did you testify to a grand jury?

6          A.    Yes, ma'am.

7          Q.    And did the grand jury come back with

8    a no bill?

9          A.    That's correct.

10          Q.    And when they were done, did internal

11    pick up their investigation?

12          A.    Yes, ma'am.

13          Q.    Did anybody from internal talk to

14    you?

15               MS. DINEHART:  Objection.

16               THE WITNESS:  I think I already

17    answered that.  Without contradicting myself, I

18    don't think I spoke to anybody.

19    BY MS. BRANCH:

20          Q.    Do you know how much time elapsed

21    between the moment -- I'm sorry, back to the

22    Dontae Martin shooting.

23               Do you know how much time elapsed

24    from the time you exited your vehicle until you

25    shoot at Dontae Martin the first time?

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 190 of 221 PAGEID #: 352

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

190

1        A.    No, ma'am.

2        Q.    At the time that you perceived

3   Mr. Martin to have a gun, were you able to key

4   your radio mic by touching the mic on your

5   uniform?

6        A.    Was I capable?

7        Q.    Uh-huh.

8        A.    Yes.

9        Q.    Was there any other way that you

10  could have talked to dispatch other than touching

11  your microphone on your uniform?

12       A.    I could have keyed it on the actual

13  radio itself, but that's the only way.

14       Q.    And were you wearing a microphone

15  that was connected to the video recorder in your

16  car?

17       A.    Yes.

18       Q.    Where was that microphone?

19       A.    Right shirt pocket.

20       Q.    On Exhibit 20 can we see it?  Exhibit

21  20 is in the book.

22       A.    That's Teague.  That's 19.  I'm

23  sorry.  That's me.  Yeah, you can't see it, but I

24  have a shirt pocket under my name, the badge is

25  embroidered over the pocket so you can't actually

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

191

1     see it.

2              Q.    I see.

3              A.    But I have a right shirt pocket.

4              Q.    And how would you have turned that

5     on?

6              A.    There's a red button on top and you

7     can just press it right through the material.

8              Q.    Is that something you're used to

9     doing, touching that button --

10             A.    Yes.

11             Q.    -- through your closed-up shirt

12    pocket?

13             A.    Yes.

14             Q.    Did you do that at any point during

15    the encounter with Mr. Martin?

16             A.    No.

17             Q.    Why not?

18             A.    I didn't have time and I didn't think

19    about it.

20             Q.    How about after the shooting, did you

21    turn it on?

22             A.    No.

23             Q.    Did you consider turning it on?

24             A.    No.

25             Q.    At any point did you consider whether

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

192

```
 1   Dontae Martin had committed a crime?
 2         A.   No.  I was there to investigate a
 3   crash.
 4         Q.   How about after the shooting, if he
 5   had survived, did he do anything that was criminal
 6   conduct while you were on the scene?
 7         A.   Yeah, he pointed a gun at law
 8   enforcement which is a felony.
 9         Q.   If he had survived, what crime would
10   you have charged him with?
11         A.   Felonious assault.
12              MS. DINEHART:  Objection.
13   BY MS. BRANCH:
14         Q.   Did you have a cell phone with you
15   while you were on duty on July 23rd, 2015?
16         A.   Yes, ma'am.
17         Q.   Was that -- how many cell phones did
18   you have with you?
19         A.   One.
20         Q.   Personal or department?
21         A.   Personal.
22         Q.   And do you know the number from
23   that -- I don't want you to tell me, but do you
24   know the number from that cell phone?
25         A.   Yes.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                              Joshua Haas

193

1        Q.   And do you still use that phone?

2        A.   Not the phone.

3        Q.   Do you still use that number?

4        A.   Yes.

5        Q.   And do you know who the carrier was

6   you had back in 2015?

7        A.   Yes.

8        Q.   And who was your carrier?

9        A.   Verizon.

10       Q.   Have you gone through your phone

11   records to see if you used your phone on July 23rd

12   through July 25th, 2015?

13       A.   Through Verizon or through my phone

14   itself?

15       Q.   Either -- both.

16       A.   I don't have that phone, it's in the

17   bottom of the Great Miami River, and I haven't

18   contacted Verizon to look for it.

19       Q.   Did you ask -- at any point during

20   the litigation did you try to find if Verizon had

21   any records of use of the cell phone on those

22   dates?

23       A.   No, ma'am.

24       Q.   Did you have text messaging?  Did you

25   have text on your phone?

```
 1              A.    Yes.

 2              Q.    Have you asked Verizon to provide any

 3   of those?

 4              A.    No, ma'am.

 5              Q.    During the incident did you use your

 6   cell phone at all?

 7              A.    No.

 8              Q.    How about after the shooting while

 9   you were still on the scene before you left to go

10   back to the station?

11              A.    No.  My phone was in my cruiser.  I

12   don't carry it on my person.

13              Q.    Did you go to your cruiser to get the

14   phone while you were waiting?

15              A.    I did not.  Somebody retrieved it for

16   me.

17              Q.    Okay.  And how did you use your phone

18   that night -- that early morning?

19              A.    I'm sure I used it for personal

20   reasons, but at the time of the shooting I didn't

21   use it at all.

22              Q.    Yeah.  So you are on scene for a

23   couple hours --

24              A.    Uh-huh.

25              Q.    -- before you were -- went to the
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

195

```
 1    Harrison substation?

 2          A.    Yes, ma'am.

 3          Q.    And while you were on scene who did

 4    you call?

 5          A.    I didn't call nobody.

 6          Q.    Text?

 7          A.    No.

 8          Q.    Message?

 9          A.    No.

10          Q.    Used your phone in any way?

11          A.    No.

12          Q.    Anybody call you?

13          A.    No.

14          Q.    Why did you have your phone

15    retrieved?

16          A.    Because the cruiser -- I think I got

17    my phone and my patrol rifle because it's part of

18    the crime scene, I knew it was going to be there

19    forever and I wasn't going to be there so I got

20    my -- I think I actually got my duty bag, my

21    rifle, and my phone -- my personal effects out of

22    the cruiser because they were going to be tied up.

23          Q.    I see.  So you got your stuff so --

24          A.    Yes.

25          Q.    -- you could take it home with you?
```

```
 1          A.   Yes.
 2          Q.   Who did you talk to while you were at
 3  the scene about what happened?
 4          A.   About what happened?
 5          Q.   Yes.
 6          A.   Isaiah Kellar would be the only one.
 7          Q.   Did you talk to your wife?
 8          A.   No, I told her to get away from me
 9  and do her job.
10          Q.   What was her job at that point?
11          A.   As a deputy sheriff.
12          Q.   What were her duties at the scene?
13          A.   Whatever the sergeant or the command
14  staff had her do.
15          Q.   Do you know what they were?
16          A.   No, ma'am.
17          Q.   Did you see what she did?
18          A.   I saw her doing CPR on Mr. Martin,
19  but after that, no.
20          Q.   Do you know -- sitting here today,
21  years later, do you know why she was on scene for
22  several hours?
23          A.   Because she was working as a deputy
24  in Harrison Township is the only reason why I
25  could assume.  Everybody was on scene.
```

197

1          Q.   Were there people on scene who had

2    nothing else to do and -- no other assignments or

3    dispatches to go to?

4          A.   I have no idea.  They dropped the 99

5    so any cop within Montgomery County came to that

6    scene.  So to say who had what, I have no clue.

7          Q.   And when did you talk to your wife

8    about the events, what happened with the shooting?

9               MS. DINEHART:  Objection.  She's not

10   asking you what you said.  She's asking you when.

11              THE WITNESS:  I would assume we

12   discussed it within our marriage.

13   BY MS. BRANCH:

14         Q.   That day?

15         A.   No.  I didn't talk to nobody that

16   day.  I isolated myself.

17         Q.   Where did you go?

18         A.   Home.  Then we went out to dinner

19   that night but nothing was discussed.

20         Q.   When was the first time you talked to

21   her?

22         A.   I don't remember.

23         Q.   How many times did you talk to her?

24         A.   I don't know.  I couldn't say.

25         Q.   Okay.  Sitting here today, does any

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

198

1   of the conversations with your wife about what

2   happened come to mind?

3           A.    No.

4           Q.    When you talked to your wife about

5   the incident, who else was present?

6           A.    Me and my wife.

7           Q.    In any of the conversations you had

8   with her was anyone else present?

9           A.    No.

10          Q.    If you don't remember the

11  conversations, how do you know?

12          A.    Because I wouldn't discuss it in

13  front of my children and nobody else lived in my

14  house.

15          Q.    What about when you went out to

16  dinner?

17          A.    We wouldn't have discussed that.

18  That's not appropriate dinner conversation.

19          Q.    Have you ever been disciplined in any

20  of your positions at Montgomery County?

21          A.    Yes.

22          Q.    And what type of incidents did you

23  get disciplined for?

24          A.    Violation of pursuit policy and an

25  evidence violation.

1      Q.    What was the pursuit?

2      A.    A car that we weren't supposed to be

3  chasing but some of the deputies were chasing it,

4  and we all got I think letters of caution or

5  reprimands.

6      Q.    Were you doing a high pursuit --

7      A.    No.

8      Q.    -- I mean a high speed chase?

9      A.    No.

10     Q.    Why shouldn't you be pursuing?

11     A.    It didn't meet our pursuit policy --

12     Q.    Anybody get hurt?

13     A.    -- according to command staff.  No.

14     Q.    And what was the other one?

15     A.    Violation of evidence.

16     Q.    And what happened there?

17     A.    I did not put my disk into evidence.

18  I put it back in its normal place where it's kept.

19  It was on a crash/assault case where I reviewed my

20  disk, it didn't show any of the vehicles involved,

21  it was pointed in a whole different direction, and

22  I determined it wasn't evidentiary value so I just

23  stuck it back in the case and they said no, I

24  should have put it in the property room.

25     Q.    And what's the disk?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

200

```
 1              A.    It's the disk that goes into our
 2    camera system, the CD.
 3              Q.    The CD, the recording?
 4              A.    Yes, ma'am.
 5              Q.    Okay.  Do you recall the conversation
 6    you had with the sheriff about your
 7    fitness-for-duty return?
 8              A.    Which one?
 9              Q.    Let me ask it differently.  Have you
10    talked to the sheriff about your fitness -- your
11    return to fitness for duty after the Dontae Martin
12    shooting?
13              A.    I think we talked twice maybe.
14              Q.    And --
15              A.    He put us on leave a couple times.
16              Q.    And what did he tell you?
17              A.    I don't remember the exact
18    conversation other than I'm putting you back on
19    leave, go home.
20              Q.    Why did he take you off leave and
21    then put you back on leave?
22              A.    One instance we were concerned.  We
23    were identified as the shooters in the jail
24    because the sheriff moved us into the courts, and
25    we brought up that concern to our sergeant and it
```

201

1    went up the chain and we got called into Sheriff

2    Plummer's office and he put us on administrative

3    leave.

4          Q.    What was your concern?

5          A.    That we were unarmed and we already

6    got identified as the shooters who killed Tae and

7    we didn't feel safe being around hundreds of

8    inmates unarmed.

9          Q.    And what was your assignment?

10         A.    The court, which takes -- the

11   transport staging takes all the inmates in the

12   jail to different court locations where they're

13   all housed before they go to courts in one area.

14   So you're surrounded by a hundred inmates and

15   that's where we were identified.  Not to mention

16   when we take them to court, we're in a secured

17   elevator.  We didn't feel safe so we brought up

18   them concerns.

19         Q.    And any other conversations with the

20   sheriff?

21         A.    About the incident that happened that

22   night?  Not that I can think of.

23         Q.    The incident, your fitness-for-duty,

24   the lawsuit.

25         A.    No.  I haven't spoke to the sheriff.

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

202

1   Other than the meetings he put us on, I never had

2   any contact with the sheriff.  It was always

3   through Julie Droessler or Chief Deputy Strek.

4          Q.   And what conversation did you have

5   with Julie Droessler?

6          A.   Strictly work related.  Not about the

7   shooting.

8          Q.   When you say work related, you mean

9   return to work?

10          A.   Return to work, not return to work,

11   return to work, not return to work.

12          Q.   What about Chief Deputy Strek, what

13   conversations did you have with him?

14          A.   He put me back on administrative

15   leave while I was at the range.  There was a

16   meeting with Julie Droessler and Chief Deputy

17   Strek in the office one time.  I think I may have

18   had two conversations with him.

19          Q.   And what did he talk to you about?

20          A.   I don't remember.  The one was we

21   weren't cleared by Dr. Daum and then we were

22   cleared.  There was a grammatical error and

23   paperwork wasn't done and we weren't cleared to

24   come back so we got put back on.  I know I called

25   him on the phone saying that I can't come back to

203

1   work, this is prior to starting my medical, I'm

2   not ready to come back, I need help was with

3   Strek, but it was very limited.

4           Q.   Did Chief Deputy Strek or the sheriff

5   ever ask any questions about what happened?

6           A.   No.  Absolutely not.

7           Q.   How about the county commissioners,

8   any conversations with them about Dontae Martin,

9   the shooting, the lawsuit?

10          A.   I can't even tell you who the county

11  commissioners are.

12              MS. BRANCH:  I'm going to check my

13  notes, take a quick break, and we may be done.

14  We'll see.

15              THE WITNESS:  Yes, ma'am.

16              (Pause in proceedings.)

17              MS. BRANCH:  I have no further

18  questions.  Thank you.

19              MS. DINEHART:  We will read.

20              (Thereupon, the deposition was

21  concluded at 2:44 p.m.)

22

23

24

25

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Joshua Haas

204

1        I, JOSHUA HAAS, do hereby certify that the

2    foregoing is a true and accurate transcription of

3    my testimony.

4

5

6                    _ _ _ _ _ _ _ _ _ _ _ _ _ _

7

8            Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Job: 181121KSB

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 205 of 221 PAGEID #: 367

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Joshua Haas

205

```
 1   STATE OF OHIO          )

 2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE

 3              I, Kathy S. Wysong, a Notary

 4   Public within and for the State of Ohio, duly

 5   commissioned and qualified,

 6              DO HEREBY CERTIFY that the

 7   above-named JOSHUA HAAS, was by me first duly

 8   sworn to testify the truth, the whole truth and

 9   nothing but the truth.

10              Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14              I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20

21

22

23

24

25
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

206

1          IN WITNESS WHEREOF, I have hereunto set my

2   hand and seal of office at Dayton, Ohio, on this

3   3rd day of December, 2018.

4

5

6   _____
                            KATHY S. WYSONG, RPR
7                           NOTARY PUBLIC, STATE OF OHIO
                            My commission expires 12-1-2018
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Patricia Martin, Admnr., et al. vs Joshua Haas, et al.                                                          Joshua Haas

**0**

**00:45** 84:23

**1**

**1** 84:12,18
**111** 85:3
**11:30** 33:8,9
**11th** 160:3
**121** 84:18
**14** 23:16,19 29:4,5 82:17,
21 85:23 86:19 171:25
**15** 9:13 10:17 23:19 27:6
39:16 40:18 106:22 107:1
172:1
**16** 14:23 19:16 28:4
**1602** 169:13
**17** 37:9,23 39:16
**19** 190:22
**1:00** 57:4

**2**

**2** 163:20,22 187:8
**20** 33:13,17 35:1 190:20,21
**2003** 14:13,14
**2004** 14:12,19 17:25
**2007** 7:11,12 25:20
**2008** 160:3 161:6
**2012** 26:3
**2014** 25:20 27:11,22
28:18,19 29:9,11 172:4,7
**2015** 26:20 27:12 32:21
34:17 44:15 68:6 70:11
75:12 81:23 82:3 172:10
192:15 193:6,12
**2016** 11:24,25 14:22 19:3
22:14 27:22 30:6
**2017** 11:22
**23rd** 32:21 34:17 57:3,7
75:12 82:3 168:22 192:15
193:11
**25th** 193:12
**27** 172:3
**28th** 44:14 45:9
**2:44** 203:21

**3**

**31** 172:7

**324** 82:2

**4**

**42** 48:22,25
**45:02** 84:20,22,24,25
**45:54** 85:2
**47:03** 87:16

**5**

**56** 130:16,20
**57** 34:11,15 35:20 36:9
37:14
**58** 45:22 46:2 47:21 48:2
108:5 144:16 163:8
**59** 104:9,13

**6**

**6** 168:10 187:8
**60** 112:19 113:1 114:6
128:22 131:14,21
**61** 158:15,19 159:22
**62** 158:22 159:1,7
**63** 171:9,13,14 182:6

**7**

**7/23/15** 49:3
**7/23/2015** 48:20
**723** 85:19
**756** 87:13

**8**

**8:02** 33:9

**9**

**911** 13:17
**99** 197:4

**A**

**a.m.** 57:5
**ability** 8:25 187:24 188:3,
4
**absolutely** 17:23 44:8
53:1,25 78:10 84:11
124:24 136:23 139:8
152:20 153:7 162:15,18
173:20 180:25 187:6 203:6

**access** 24:25 45:12 49:24
50:2
**accessed** 70:4 81:10
**accident** 25:25 83:4 84:7,
9 103:13 126:8,11
**accidents** 17:10 152:15
**accord** 27:13
**account** 67:14 124:14
126:14
**accounts** 67:18,19
**accumulated** 50:3
**accumulative** 16:25 17:2
18:4 24:5
**accurate** 33:18 59:21
116:25
**achieve** 165:9
**Achtermann** 98:21
**actions** 75:3
**actual** 16:11 46:13,16,18
49:15 54:24 82:12 91:13
107:16 190:12
**adapt** 30:17
**addition** 43:16 64:3
**additional** 33:21 101:23
168:16,18
**administer** 140:23
**administered** 99:8
**administrative** 18:22,25
19:6,16 201:2 202:14
**administratively** 19:3
**administrators** 47:19
**advanced** 177:15
**advantage** 168:12
**advise** 82:8 83:22
**advised** 58:6 64:12 97:6
98:21,25 99:7,21 100:12
**AED** 37:22 98:23,24 141:3,
4 145:8,13,16,24 146:18
**affect** 9:17 31:6 183:6
188:24 189:1
**affected** 24:4
**afraid** 182:14
**age** 6:5
**agencies** 23:22
**agency** 180:12,14
**aggressive** 173:24
174:12
**agree** 128:2,8 132:16,20,
25 133:6 153:8 166:4
168:18 176:7 188:6,9

**agreed** 28:8
**ahead** 21:12 27:10 79:3
109:19 180:16
**ahold** 178:6
**aid** 98:18 140:23
**aimed** 129:3
**aiming** 128:20 129:6
**air** 118:4
**alert** 137:8
**alerted** 82:1 111:10
**allegedly** 20:17
**allowed** 23:10 34:20
155:8
**altering** 62:21
**alternative** 165:8 166:6,
14,25 167:5,9,16 169:2
187:1,17
**Amber** 99:10 145:18
146:22 150:9,15,18 151:1
**ambulance** 151:13
**ammo** 71:21
**ammunition** 44:2
**amount** 40:8
**angle** 102:16 134:15
**answering** 18:14
**antidepressant** 10:5,7,
16 11:3
**anxiety** 28:19 29:25 30:4
**anymore** 111:14
**anyplace** 67:1
**apologize** 109:15
**apparent** 55:25
**Apparently** 37:20
**appearance** 164:8
**appeared** 96:22 108:3
110:8,14,16,19,25 111:9
112:9 113:6 114:11 115:17
117:13 128:3 163:5,10
**appears** 107:13,23
**Apple** 81:11
**apply** 167:13,15 168:3,22
**applying** 166:21
**approach** 52:7,10 88:8
90:14 102:13,15 114:23
149:6
**approached** 83:19 88:3
91:2 95:12 102:9,10,11
185:17
**approaches** 51:19

**approaching** 185:15

**approval** 47:11,12 48:3

**approve** 17:17 32:7 48:18

**approved** 22:24 32:3 47:4,5 48:4,16 69:23

**approves** 69:25

**approving** 47:11,20,21 48:3

**area** 25:7 53:6,7 54:23 96:6 97:17 114:2 129:24, 25 201:13

**arm** 115:5

**armed** 156:22 168:13

**Armour** 34:9

**arrests** 14:1

**arrival** 105:10

**arrive** 185:15

**arrived** 56:2 85:12 88:5,9 97:5 98:17 103:21 141:13, 16 144:21 145:22 147:1 150:18,21,24,25 151:1,8 174:6 175:13,14

**arrives** 144:18

**artificial** 104:15,23

**asp** 35:8 37:11,17 96:18 138:23 139:6

**assault** 192:11

**assess** 168:17

**assessing** 124:16 126:15

**assessment** 102:7

**assigned** 56:14 86:1,12

**assignment** 201:9

**assignments** 197:2

**assisted** 145:12

**assume** 31:4 36:16 47:15, 22 48:1,6,17 49:18 74:10 79:9,11 86:24 87:12 100:22 131:1 196:25 197:11

**assumed** 52:3,4 53:2

**assuming** 7:12 59:3

**assumption** 52:6

**attempted** 186:25

**attempting** 168:13

**attending** 21:9

**attention** 84:10

**attorney** 45:8 57:18 64:24 79:2,5,10,17

**attorneys** 22:9,10 46:22

**audio** 13:16 127:13

---

**authority** 169:21

**automatic** 38:8 99:2

**averting** 165:10

**avoid** 51:13 121:23 148:19 149:13 168:5 169:3

**aware** 18:2 63:16 118:8 124:22 130:12 131:8 132:10,12 139:5

---

**B**

**babies** 26:23

**back** 10:17 15:7,9,13,15, 17,21 16:3,14 17:25 19:7, 9,10,12,13,15,17,19,23 20:15 22:5,17 24:24 25:6 29:15 34:2,18 40:18 46:15 50:23 51:25 52:16 53:4,6, 7,11,20 54:8,12,15,23 55:3,10,12,25 58:12 67:4, 11 68:5,10,14 69:1,5,9 81:23 85:23 91:6,7,8,10, 13,14,19,23 92:15 94:15 95:5,8,13,16 96:5,8,21 98:25 100:19,21 101:5,9 102:17 107:6,10,14,19,22 109:7 111:24 112:3 126:19 130:7,13,24 131:14 132:11 133:3 136:7,14 137:20,23 138:4,6 141:6 144:17 145:10 172:10 188:25 189:7,21 193:6 194:10 199:18,23 200:18,21 202:14,24,25 203:2

**background** 14:5 154:2

**backrest** 107:14

**backseat** 91:25 92:17 107:12

**backup** 101:23 102:5 136:25 185:15,19,21,22 188:4

**bad** 31:13

**badge** 190:24

**bag** 195:20

**bar** 105:17

**barrel** 95:23 114:19 115:11 118:22

**barricaded** 168:2

**based** 21:21 52:7 104:22 107:23 147:5 165:17 166:12,19

**basic** 18:4 171:7

**basically** 11:5 20:12 32:6 70:21 183:3,24

**baton** 96:18

**beam** 36:24

**beanbag** 175:18,23

---

**babies** 26:23

178:22,23 179:6,11 181:1, 6 187:25

**bearings** 125:8

**began** 174:17

**begging** 188:19

**beginning** 86:7 176:5

**believed** 94:6 118:24 182:20

**belt** 35:12 41:7 91:5

**bench** 92:17,24

**bend** 37:19

**Bender** 98:16 99:9 140:11 141:13 146:22 150:15,25 151:1

**bent** 115:5

**big** 47:16 104:16

**bike** 34:22,23,24

**bill** 189:8

**bit** 57:4 89:20 107:24 114:16 133:18,20,22

**black** 112:25

**bleeding** 142:19 143:1

**blood** 9:10

**blurry** 86:3

**board** 15:23 16:9,11,16 17:16 22:3 32:3

**board's** 15:22

**Bob** 57:18 79:10

**bodies** 26:25

**body** 92:6 93:20 96:23 129:7 131:22 132:2 133:1

**bombs** 188:17

**book** 107:2 130:21 190:21

**bothered** 51:3

**bottom** 86:4 134:24 169:13 193:17

**box** 47:10 48:2,19 97:17

**boxes** 48:13

**boy** 163:21

**BRANCH** 6:9 10:21 16:22 27:14 29:17 30:13 32:12 33:16 34:14 39:7,14 42:18 43:1 45:25 47:8 48:9 49:9 53:14 54:1 57:25 59:14 60:15 61:9,17,23 62:3 63:22 64:7 65:8 69:11 70:2 71:11 72:13,19 73:13 74:3, 7,12,18 75:7,15,18,20 76:24 77:24 78:19 79:7,25 80:5,13,19 81:2,8 82:20 84:15 94:13 99:16 101:11, 22 102:2 103:25 104:12 105:21 106:25 108:25

---

109:5,8,12 110:23 112:22 115:3 116:9 117:5,11 118:13,18 119:10 120:8,16 121:8,22 122:25 123:12 124:1,6 126:6 127:3 128:1, 10 129:21 130:19 131:25 132:6,23 133:9,14 135:9 136:1 137:4 138:2,15 139:4 140:5,10 142:18 143:23 145:5,21 147:3 150:11,16,23 153:20 154:4 155:4,21 156:18 157:6,24 158:2,18,25 160:16,22 163:3,25 164:11 165:25 166:10 167:1,10 168:23 171:12 179:16,22 180:8 183:10 187:15,22 188:10 189:19 192:13 197:13 203:12,17

**brand** 11:17

**brandished** 173:23

**break** 18:12,13 37:19 75:14 138:7,16,24 139:7 140:6 157:25 203:13

**breathing** 146:2,14,15,17, 19,21

**breaths** 151:6

**bright** 36:23 104:17

**brighter** 148:17

**brightness** 37:3

**broadcasted** 82:14

**broke** 29:14 66:3 138:4 144:21 145:6

**broken** 66:4 107:5

**Brookville** 14:10

**brought** 7:21 104:16 173:14 200:25 201:17

**bug** 177:16

**bullet** 56:1 130:21 138:20 168:9

**bullets** 130:13 133:10

**bunch** 24:6 26:17

**burned** 27:1

**bus** 177:20,22,23 178:3,16

**bust** 55:19 97:7

**busted** 24:24 55:23 138:11

**button** 85:21 86:18,20 87:5 191:6,9

---

**C**

**calendar** 48:12 67:1

**calendars** 67:5

**call** 13:4 20:2 44:19 85:15

88:12 97:16 115:16 195:4,
5,12

**called** 56:20,25 57:8,11
151:18 176:11,13,19 201:1
202:24

**calling** 176:5

**calls** 12:12 13:17

**camel's** 29:15

**camera** 36:14,17 71:21
200:2

**canted** 133:17 134:6

**capable** 64:13,17 181:20
190:6

**capacity** 40:21

**car** 24:23,24,25 31:6 54:9,
18,19,25 55:3,15 82:11
83:4,17,20,25 94:20 96:6,9
101:5,10,19 102:10,17
103:13 104:5,17,25 106:1,
9,20 107:2 112:4 114:3
116:24 117:6 118:23
126:8,11 128:25 129:3
137:23 138:8,9 141:5,6
147:7,10,12,14,23 150:22
155:20 161:21 162:14
163:13 190:16 199:2

**career** 14:7 24:4 69:13
170:5

**carried** 37:9 39:4 44:2

**carrier** 193:5,8

**carry** 39:5 161:16,18,25
162:3,8 194:12

**carrying** 35:3 40:24

**cars** 89:1,20 104:3,4

**cartridge** 38:15,16 43:16

**cartridges** 38:22 41:11,23

**case** 7:17,21,22 13:1,16
47:15,25 61:1,12 63:8,9
73:3 78:5 87:4 173:13
199:19,23

**cases** 7:3 47:10 69:22
72:20,25

**casings** 135:4,14,19

**categorize** 20:3

**caught** 89:23

**caused** 11:2 16:18 17:13
126:11

**caution** 199:4

**cautioned** 6:6

**CD** 200:2,3

**cell** 192:14,17,24 193:21
194:6

**center** 54:25 97:23 98:8,
13

**Centerville** 21:22

**central** 97:16

**ceremony** 160:11

**certified** 6:7

**chain** 201:1

**chair** 92:8 95:8 97:20
107:9,13,16

**chair's** 107:18

**challenging** 175:5

**chamber** 41:1,4,12,19
43:5,16,24 44:7

**change** 11:18 46:15 58:7
61:2 68:19,20 69:3

**changed** 47:1,19 61:6

**changing** 75:17,18

**charge** 122:3 140:18
179:23

**charged** 192:10

**chase** 167:23 199:8

**chasing** 199:3

**check** 49:15 82:8 83:21
86:2 203:12

**checked** 42:10 79:13

**checking** 83:24 84:1,2

**checks** 68:22

**chest** 95:23 108:12
122:12,18 123:9 145:17

**Chief** 202:3,12,16 203:4

**child** 24:3

**children** 29:22 198:13

**choice** 184:22

**chose** 187:13

**circle** 33:23

**circumstance** 103:14

**circumstances** 164:14,
19

**citizens** 159:17

**City** 74:11

**civil** 7:21,25 173:13

**civilian** 119:17

**civilians** 25:9 175:11
177:17

**clear** 21:4 57:3 102:17
137:14

**clearance** 19:22

**cleared** 15:21 19:15,18
20:13,17,19,21 202:21,22,
23

**clerk** 174:6

**client** 109:2

**clipped** 35:10

**close** 90:13 92:17 114:3,
17 115:7

**closed-up** 191:11

**closer** 26:20

**closest** 142:11,13

**Cloud** 81:10,21

**clue** 41:21 53:25 54:3
100:25 101:14,17 106:14
115:6 117:1 118:11 120:12
121:11 127:10 128:13,16
131:13,19 132:15 136:12
138:1 145:20 180:15 197:6

**code** 84:20

**codes** 127:18

**collect** 31:22 32:1

**color** 112:24

**colored** 33:14 34:12
82:18 104:10 106:23
112:20 130:17

**Columbus** 20:25 79:5

**column** 159:8

**Combination** 16:24

**comfortable** 174:25

**comma** 110:14

**command** 47:23 71:13
94:25 117:18 118:3
119:14,25 120:4,25 121:1
122:11,14 123:10,13
124:14,17,22 125:2,19,23
155:10 179:5 180:13
186:11 196:13 199:13

**commands** 93:15,22 96:1
117:25 120:21,22 121:2,6,
13,24 122:3,7,22 123:2,17,
19,21,24 125:11 126:14,15
156:17 167:21,25 169:7
171:7 173:25 174:17
175:4,15,25 183:21 184:18
186:1 188:5

**commas** 57:24 59:22

**comments** 68:7

**commissioners** 203:7,
11

**committed** 192:1

**common** 60:10,17,21
61:3,11 77:22

**communicate** 88:13

**communicated** 67:8

**compare** 185:13

**complete** 47:18 57:1,11
62:15,20 76:4 78:3

**completed** 28:11 34:23
46:20 49:19,21 57:13,17
58:14 74:16 79:12

**completely** 72:18 119:18

**compliance** 75:4 119:13
122:21 123:9 125:2 172:23

**complies** 116:12

**comply** 93:23 125:10,24
167:20 169:7 170:10,12
175:17

**complying** 123:18 125:22

**compressions** 146:23

**computer** 44:18 45:1,3,
11,14 46:7,11,13 49:15
56:8,16 59:6,7 65:24 66:2,
10,12 69:6 70:3 81:9,10

**computers** 81:17

**concealed** 161:18,24,25
162:3

**concentrate** 9:1

**concern** 139:3,9 200:25
201:4

**concerned** 109:1 200:22

**concerns** 20:18 201:18

**concluded** 203:21

**condition** 126:11 142:5

**conditioned** 23:7

**conduct** 173:11 192:6

**confirmed** 27:18 183:3

**connected** 190:15

**conscious** 146:5

**consideration** 125:1

**considered** 170:14 186:8

**console** 97:3,17,23 98:2,
8,13

**constantly** 60:24

**Constitution** 161:8,9

**contact** 90:19,24 124:10
126:4 202:2

**contacted** 177:22 193:18

**contained** 70:24

**containment** 180:20

**continuance** 161:12

**continue** 99:7 125:16

**continued** 156:16 175:4

**contradicting** 189:17

**controlled** 38:2 81:18
122:1,4,8

**conversation** 58:14
65:12 122:6 198:18 200:5,

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 210 of 221 PAGEID #: 372

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Joshua Haas

18 202:4

**conversations** 198:1,7, 11 201:19 202:13,18 203:8

**conversely** 168:15

**convicted** 7:18

**conviction** 7:19

**cop** 197:5

**cope** 31:12

**copies** 46:24

**coping** 30:23

**cops** 177:9

**copy** 13:6 46:4 58:25 59:5 70:18

**coroner's** 132:8

**correct** 15:8 33:3 37:8 38:13 39:24 40:17,19,22, 23 41:16 42:22 44:18 49:2 52:9 61:8 62:5 73:23 78:13 84:3 85:8 90:14 94:12 103:4,10 104:6,7 105:6,13 110:12,17 111:7 120:2,19 122:19 123:3 124:5 128:24 129:11 134:7,23 135:1 141:12 142:25 143:3,10 147:5 156:9 158:14 159:24 160:4 161:17,20 163:9 164:18 165:13 166:11,12 172:2,25 173:9 178:23 181:22 186:10,21 187:20 189:9

**correction** 29:8

**corrections** 14:14

**correctly** 83:7 110:11 165:12 169:23

**counting** 43:5

**county** 14:11 22:1 34:21 59:17 62:25 63:11,17 73:7 77:19 159:18 161:11 165:15 167:4 169:10 170:6,25 180:4 197:5 198:20 203:7,10

**County's** 163:17

**county-issued** 35:4 36:22

**couple** 85:2 194:23 200:15

**court** 8:11 69:21 108:21 201:10,12,16

**courts** 200:24 201:13

**cover** 54:12,17 97:7 137:6 143:18,20,24 144:4,6,9 168:5,9,12,14,16 176:22 177:1,2,3,10,12,16 178:2,7 185:24 188:3

**CPR** 26:24 27:1 99:8 145:25 150:8,18 151:6

196:18

**crash** 24:23 37:18 74:22 75:1 82:7,9 84:1,2 88:25 89:19 90:1,17 102:12 192:3

**crash/assault** 199:19

**crashed** 25:6 88:19 89:1 106:6

**crashes** 26:25 31:6

**creating** 157:14

**crew** 71:8

**crime** 84:5 192:1,9 195:18

**criminal** 7:22 72:18 192:5

**critical** 16:25 17:3,5 18:16 20:2 25:21 60:24 62:11

**criticized** 183:17

**Cromwell** 24:18

**cross** 51:8

**CROSS-EXAMINATION** 6:8

**crossfire** 50:16 51:5,12, 14,18 53:19

**cruiser** 26:1 98:19,23 177:13,14,15 188:13 194:11,13 195:16,22

**crumbled** 182:2

**current** 46:15

**cussed** 100:2

**cussing** 188:15,16

**cut** 99:1

**cycles** 99:6

---

**D**

**danger** 164:8 165:10 166:14 169:19 178:15

**dark** 35:5 90:9,10 105:5

**date** 7:13 45:13 46:6,7,10, 15,16,17,19 47:11 48:3,20 49:3,4,5,7

**dates** 26:21 46:25 48:11 193:22

**Daum** 20:6,13 26:6 202:21

**Dave** 160:9

**David** 76:6

**Davis** 7:9 24:10 25:17,19 73:15 75:21 76:3 78:25 79:4,22 81:4 170:9 173:16, 17

**day** 6:23 15:3 17:11,12 19:12 20:6 27:3 31:5 33:6, 19 45:7 48:7 51:2 52:23 54:12 56:20,24 57:7,10

62:23 76:1,4 79:6 86:7 101:2 103:24 197:14,16

**days** 19:13 45:5 49:21 56:21 94:11

**daytime** 148:16

**Dayton** 24:17 73:25

**dead** 26:23

**deadly** 153:21 155:6,11 163:18,20 164:16,18,25 165:4,5,9,10 166:7,15 167:5,6,18 168:6,15,17,25 169:3,22 170:13,16,17 173:1,5

**deal** 31:13

**death** 17:9 26:6

**deaths** 24:3 32:10

**debriefing** 20:1,3

**deceased** 25:1 142:4

**December** 21:7 23:16,19 29:4 171:25 172:3,7

**decide** 27:15 142:7

**decided** 21:12

**decision** 139:22,24

**Defendant** 6:5

**defense** 164:10

**defibrillator** 99:3,5,13

**define** 17:5,10

**definition** 17:8

**degree** 102:15

**degrees** 95:11,17

**demeanor** 173:24

**demonstrate** 136:3

**department** 24:17 31:19 41:10 44:13 63:24 64:2 75:3,23 81:18 98:22 103:17 173:10 175:17 192:20

**department-issued** 174:17

**depends** 124:20 135:15

**deployed** 174:16 175:18, 20 178:21 181:12

**deployment** 181:7

**deposed** 6:25

**deposition** 6:23 7:10 8:9 12:9,10 13:20 15:3 18:9 54:11,19 70:8 101:2 127:7, 14 150:7 203:20

**depression** 12:2 28:19, 21,24 29:24 30:3

**deputies** 174:6 180:3 199:3

**deputy** 6:12 13:19 14:18, 21 17:22 20:5 21:14 45:23 50:7 56:17,20 65:2,5 70:8 87:14 94:6 98:16,21 99:1,9 102:23 111:5 118:12,24 137:13 140:11 141:13 159:2 160:13 161:11 162:21 165:21 175:13 176:1 177:7,13 182:16 196:11,23 202:3,12,16 203:4

**describe** 108:23 134:3,9

**description** 32:5 102:22 158:23 159:1,9

**desktop** 81:17

**destroying** 138:24 139:6

**detail** 84:13

**detailed** 60:5

**detective** 44:1,6 45:6 47:24 61:12 62:4 66:14 71:2,16 72:3

**detectives** 73:3

**determination** 17:16 42:8

**determine** 49:12 162:2,7

**determined** 152:11,12 199:22

**Detroit** 95:19

**diagnosed** 28:24 29:12

**diagnosis** 28:14,17 29:24 30:14

**diary** 66:25

**died** 32:14

**difference** 46:24,25 79:21 90:7 125:16

**differently** 200:9

**difficulty** 151:13

**DINEHART** 10:18 16:20 27:10 29:16 30:12 32:11 38:25 39:11 42:15,23 47:6 48:5 49:6 53:12,23 57:21 59:11 60:7,19 61:15,21 62:1 63:21 64:5 65:6 69:8 71:5 72:10,15 73:10 74:2, 6,9,15 75:5,13,16 76:21 77:21 78:18 79:3,24 80:2, 9,18,21 81:7 94:10 99:14 101:7,21,25 103:23 105:19 109:3,7,10 110:21 115:2 116:7 117:2,8 118:10,16 119:9 120:5,13 121:4,15 122:24 123:11,22 124:4 125:25 127:1,22 128:7 129:19 131:23 132:3,21 133:4,13 135:6,25 137:2, 25 138:10 139:1 142:15 143:16 145:2,19 147:2 150:10,13,19 153:14,25 154:23 155:12 156:13

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 211 of 221 PAGEID #: 373

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

157:3,19 160:15,20 162:23
165:22 166:9,18 167:7
168:20 179:14,20 180:6
183:9 187:10,19 188:8
189:15 192:12 197:9
203:19

**dinner** 197:18 198:16,18

**diploma** 14:6

**direct** 71:7

**direction** 132:1 133:3
141:1 152:14 199:21

**directions** 94:4 118:23
122:16 140:20

**directly** 23:21 88:24 95:22

**disability** 15:4,19 16:17
17:15,17 18:20 22:13,24
31:22 32:1

**discharge** 38:15 161:10

**discharged** 42:14 96:4
175:21

**disciplined** 198:19,23

**discrepancies** 46:17

**discuss** 198:12

**discussed** 65:23 149:19
197:12,19 198:17

**disk** 199:17,20,25 200:1

**dispatch** 13:17 82:4,5,12,
22 84:13,17 85:7,15 87:12
126:23 127:14 137:8,13,17
147:5 174:15,19 175:3,5
176:6,11,13,19 178:6
184:10 190:10

**dispatched** 82:9

**dispatches** 197:3

**dispute** 42:8 101:13 127:9
149:24 162:22

**distance** 136:17 174:24

**district** 49:22

**doctor** 10:20,23,25 15:22
16:2,6,11 17:19,21 20:24
21:6,25

**doctor's** 19:4,5 21:19

**doctors** 22:4 185:12

**documentation** 20:20

**documents** 12:8,25 77:14

**Dontae** 10:4 18:17 20:1
23:12 25:12 32:21,24 64:9
68:9 77:8 78:9 79:15 95:4
101:19 108:18 117:14,18
118:8,14 119:3 122:11
123:8,18 124:8 128:4,21
129:2 132:18 133:1,11
135:3 136:25 137:6 139:19
140:2,13,23 141:10,17,19,
24 142:11,16 143:9,15

146:4 150:9,18 153:2,5,8,
10,21 154:19 156:12 158:4
162:3 164:20,21 169:6
170:7 171:25 172:14
185:14 186:20 188:2
189:22,25 192:1 200:11
203:8

**door** 97:8 113:9,16
130:13,14,24 131:9 143:8
176:24 177:11

**doors** 115:23

**dosage** 11:17

**double** 35:5 40:15

**Douglas** 21:1,2,4

**draft** 47:2,18 49:4 57:17
58:14,18,20 59:5,16,19,20
60:1,10,14,18 61:25 65:25
66:21 68:15 69:20 79:1,12

**drafted** 69:15

**drafts** 60:9 61:13 62:7
68:17,19,21,23 69:4

**draw** 151:15

**drawn** 181:2

**drew** 6:2 93:14 151:24

**drills** 40:3 135:20

**driver** 55:15 82:15 91:9,21
108:17 177:20 178:3,16

**driver's** 51:20 55:7 91:2,
14,22 92:2,3,9,20 93:4
95:9,10,25 96:13 97:8,22
100:20 102:18 107:6,7,21
108:16 111:12,16,18,21
112:2,4,5,8,11,12,15
114:25 128:21 129:10
130:13 136:7 137:21
138:4,6,20 144:7 176:23,
24

**driveway** 88:8,18 89:1

**driving** 25:4

**Droessler** 202:3,5,16

**drop** 93:15,22 94:25 95:2
96:1 100:9 115:19 117:19
118:7,19,20 119:8,14,21
120:1,4,23 121:17 122:11,
14 155:10 156:20,23
157:21 171:6,8 174:1,18
175:6,15,25 183:23 184:1,
11,21 188:19

**dropped** 167:25 197:4

**Dropping** 119:22

**DUI** 125:12,16,18

**duly** 6:6

**duties** 159:7,10 161:11
196:12

**duty** 35:11,24,25 71:21,22
91:4 159:12 192:15 195:20

200:11

**dying** 32:14,15

### E

**e-mail** 59:1,3

**e-mails** 67:5

**earlier** 29:4,6 61:13 187:8
189:2

**earliest** 16:13

**early** 14:25 16:18 194:18

**easiest** 112:25

**east** 88:25

**easy** 112:17

**edit** 58:2

**edits** 57:19

**educational** 14:4

**effect** 181:8

**effects** 9:19 195:21

**eighteen** 40:21 42:2

**eighty** 34:3,4

**eject** 135:4

**ejection** 135:21

**elapsed** 126:24 189:20,23

**elevator** 201:17

**eleven** 41:23 42:3,9

**eliminate** 169:2

**else's** 63:9 154:10

**embroidered** 190:25

**emphasis** 17:1

**employee's** 169:21

**employees** 168:15
169:20 174:6 175:11
178:17,18

**employment** 31:16

**emptied** 40:4

**empty** 37:12,15 40:7

**EMT** 31:5 32:9

**EMTS** 150:12 151:7

**en** 86:20 87:16 137:15

**encounter** 191:15

**end** 19:15 28:7 40:6 63:20
64:3,11 76:17 80:8,17
102:18 176:6 185:6 187:17

**ended** 131:17 176:25

**ends** 167:6

**enforce** 80:6 159:13

**enforcement** 23:3 32:6
51:10 192:8

**engine** 106:10

**enter** 45:2 46:14 60:14

**entered** 44:17 45:1,11,14,
20 46:7,10 56:15 58:16
59:5,6 132:2

**entire** 40:2 73:3 80:14
128:2

**entry** 97:9

**environment** 102:8
122:4,9

**equipment** 35:2

**erect** 174:12

**error** 20:20 202:22

**estimate** 176:2

**evaluation** 19:24

**event** 63:5 160:11

**events** 197:8

**eventually** 77:5 122:17
168:2

**evidence** 13:16 50:3
132:8 138:21,22,25 139:6
198:25 199:15,17

**evidentiary** 199:22

**exact** 11:8,11 82:16 113:8
179:10 184:24 200:17

**examined** 6:7 41:15

**exceptions** 77:23,25

**excessive** 166:15

**excuse** 67:19

**exhibit** 33:13,17 34:11
35:1,20 36:9 45:16,17,22
46:2 47:21 48:2 82:17,21
84:12,18 85:23 104:9,13
106:22 107:1 108:5 112:19
113:1 114:6 128:22
130:16,20 131:14,21
144:16 158:15,22 159:7,22
163:8,20,22 171:9,13,14
182:6 187:8 190:20

**exhibits** 13:1

**existed** 172:10

**existence** 68:6 70:10

**exited** 88:15 101:18
174:15 189:24

**expect** 119:17 135:4,13

**expected** 52:7

**expel** 38:22

**experience** 13:24 23:25
25:23 72:17 148:4,10

**experienced** 27:8 32:9
147:22 149:17

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                                                Joshua Haas

**explain** 85:25

**exposure** 168:18

**eye** 52:21

---

**F**

**face** 56:1 123:4 132:19 157:22

**Facebook** 67:6,23,24,25 68:5

**facing** 128:24

**fact** 43:2 62:19 63:14 154:18,25 155:24

**facts** 153:9 154:15 155:2 156:1,3

**failed** 169:6 175:16 188:20

**failure** 125:24

**fair** 67:15 73:6

**faithfully** 161:10

**fake** 67:19

**falls** 164:7

**false** 67:19

**familiar** 46:2

**family** 10:22,25 15:21 27:18 29:19,20,21 31:14

**farther** 87:13 107:10,14, 22,24

**fast** 108:21 128:13 151:2

**fax** 59:1,4

**feared** 181:11

**Fearing** 96:3

**feasible** 169:18

**feel** 64:13 144:8 173:19 188:21 201:7,17

**fellow** 120:25 183:18

**Felonious** 192:11

**felony** 122:1 192:8

**felt** 10:19 11:5 27:17 168:25 182:3 184:14,21 186:4

**fence** 25:6,8,9

**fender** 53:5

**field** 125:19

**fifty** 85:6

**figure** 43:9 115:7

**figured** 127:4

**fill** 60:23 62:11 63:19 64:2, 9 78:8,21

**filled** 47:12 48:2,8,13 77:6, 19 172:15

**filling** 172:17

**final** 46:22 47:13 59:23 60:14,18

**finalized** 47:16

**finally** 19:18 47:4,5

**find** 10:12 193:20

**fine** 56:6 109:15,21 134:10

**finger** 38:11 151:17,20,23 152:2,7,13,21,25 153:2

**finish** 8:14 18:14

**finished** 50:25

**finishes** 39:11

**Fire** 31:18

**firearm** 40:25 63:19 93:8 97:13,14 114:22 125:17 129:2 141:20,22 151:15 162:20,22 163:1,10 170:19,21 173:23 174:23

**fired** 40:9 41:24 42:25 43:2,6,10 44:10 126:25 127:20 129:12,13,14,16, 18,23,24 130:2,10 131:12 133:8 136:6,8,10 137:9,14

**firefighter** 32:8

**Firefighter/emt** 31:19

**fireman** 31:5

**firing** 40:1 96:5 128:5 130:5,8 131:18 135:22

**fit** 166:24

**fitness** 200:10,11

**fitness-for-duty** 19:24 20:2 21:10,11,16 22:4 26:5 200:7 201:23

**five-minute** 140:6

**flashlight** 35:9 36:6,11,22 91:4 93:7 147:7,9,13,16, 17,18 148:1,7,11 149:13, 18 150:1

**floor** 119:23

**floorboard** 188:14

**focused** 89:18,22

**follow** 78:14 165:23 187:9,11,14

**foot** 167:23

**football** 67:15

**force** 63:17,18 64:3,10 76:10 77:3,7,19 78:3,8,21, 22 153:13,21 155:6,11 163:17,18,21,23 164:16, 18,24,25 165:4,5,9,11 166:7,15 167:5,6,18 168:6, 15,17,25 169:3,22 170:13, 16,17 171:10,15 172:6,10, 13,19,23 173:2,5 185:9

**186:8 187:1,3**

**forensic** 132:8

**forensics'** 42:8

**forever** 195:19

**forget** 61:1,6

**forgot** 109:15

**form** 13:4,6 38:20 172:10, 15 175:18

**formal** 160:11

**formulating** 8:13

**forty** 34:5

**forty-five** 102:15

**forward** 32:25

**found** 41:10 42:3,4 67:17, 25 94:11 167:15 172:22 173:10 177:9

**fourteen** 126:23 127:5,20 128:5,15 186:24

**fourth** 35:19,25 108:6

**frame** 15:12 127:9 130:22, 25

**freeze** 179:19

**front** 24:25 25:25 35:1,7, 11,14,24,25 52:11,14,25 88:18 89:8 91:20 92:25 93:5,6 94:4,5,20 97:23 100:13 105:15 106:1,6 107:19 111:14,17,22 112:4,14,15 114:25 129:10 132:11 133:3 138:13 141:6 154:13 198:13

**fucking** 179:10

**fuel** 177:1,2,11

**full** 6:10 38:7

**function** 30:11 37:3

---

**G**

**gain** 24:25 97:9 168:14,16

**gas** 174:5,10 176:15,16 177:19

**gave** 57:17 64:14 66:14 100:8 118:3 120:1 122:10 124:22 141:1 184:18 186:1

**gear** 25:2

**general** 11:5 53:16

**gentleman** 184:18

**give** 22:5 44:25 49:20 70:17,19 113:8,22 123:24 128:11,12 156:17 167:22 169:5 170:24 171:5 175:4 179:5 188:4

**giving** 93:15,22 94:25

95:25 120:22,25 121:1 122:3,7,13 123:17 124:14 125:18 126:14 140:20 156:22 175:24

**glimmer** 35:16

**Glock** 37:9,23 39:15 135:22

**glove** 97:17

**God** 53:18 185:12

**good** 62:22 112:18

**grabbed** 98:3 140:3

**graduate** 14:8

**grammar** 57:23 79:13

**grammatical** 59:4 202:22

**grand** 20:14 54:13 70:15, 17,20 73:3 82:6 83:5,18 89:11,14 90:13 104:5,25 116:24 146:24,25 189:5,7

**grass** 107:3

**great** 109:8 193:17

**green** 82:15 83:4

**grip** 134:12,15,24

**ground** 8:8 113:20 134:12,16 145:11

**guess** 12:11 20:1 34:25 36:6 47:19,24 57:6 61:10 88:24 97:16 112:25 126:9 143:11

**gun** 35:8 40:5 55:16,25 71:9,22 93:10,14,16,23 94:2,15,17,22,23 95:1,2,22 96:1,10 97:1,25 98:23 100:9 101:5 111:6,10 112:10 113:7 114:12,19, 21,24 115:4,11,17,19 116:14 117:14,19 118:7,9, 14,19,21 119:3,8,14,18,20, 22,23 120:1,4,23 121:17, 19 122:11,14,18 124:2 125:6 126:19,23 127:19 128:4 129:15 134:5,15,18 135:3,16,17 139:11,14,17, 18 140:4 141:5,7,9 142:2, 3,6,8,12 143:5,14 152:5 153:4,11,12,17,23 154:7 155:9,10,15,20 156:8,10, 20 157:21,22 161:16,19,24 162:7,8,11,13,17 163:6,12, 14 164:21,22 167:24 171:6,8 174:1,18,20,21 175:3,6,10,16,25 176:13 178:22 179:6,11 181:1,2,4, 10 182:2,8,21 183:23 184:11,21 187:25 188:19 190:3 192:7

**gunfire** 96:15

**guns** 135:15

**gunshot** 96:23 142:24 143:2

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 213 of 221 PAGEID #: 375

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

**guy** 100:8 125:17

**guys** 65:10

---

**H**

---

**H502** 87:14

**H508** 85:19 86:15

**Haas** 6:4,12,15,16 87:14 99:9,10 145:18 146:22 150:9,15

**Haas'** 45:23 158:16,23

**half** 9:23 39:3,6 177:21

**hand** 25:1 93:8 94:18,24 97:2 110:10 115:4 119:18, 20 122:18,21 123:8 133:17,25 139:15 155:15 160:6,10 163:2,11,13 174:12 182:3

**handcuffs** 35:7,22

**handgun** 98:15,19 110:10 111:2 163:11 175:20

**handled** 74:22

**hands** 118:4 121:16 122:12 123:8 171:6

**handwritten** 66:22

**happen** 15:17,18 18:2

**happened** 46:18 55:22 70:22 78:6 85:10 87:5 93:21 94:1,14 95:3,20 96:2,12 98:14 99:4 102:22 103:8 155:1 165:18 175:2, 12 181:6 196:3,4 197:8 198:2 199:16 201:21 203:5

**harm's** 140:1

**Harrison** 33:10 56:13 59:8,9 84:18 85:3 149:22 195:1 196:24

**head** 42:16,19 47:24 92:2, 6,11,17,18 93:19 95:11 108:12,13 110:4 117:14 129:7 132:18 133:2

**heading** 180:19

**headlights** 89:18 105:20, 22

**headrest** 55:25 92:12,19, 20 95:6,12 107:6 108:13 110:5 117:15,17 131:4

**hear** 20:5 101:1 116:16,17 123:1,23

**heard** 116:13,19 150:4,6 176:2

**heart** 99:12

**heavy** 17:1

**heel** 34:10

**height** 34:6

**Heights** 175:17 177:8 179:3 180:11,24 186:7 187:25

**held** 40:15 169:1 184:16

**helping** 89:25 90:5

**hereinafter** 6:6

**Hewlett-packard** 81:25

**hey** 71:9

**hiding** 92:24

**high** 9:10 14:6,8,10 199:6, 8

**higher** 180:5

**Highway** 74:21

**hip** 35:6,9

**history** 84:13

**hit** 26:1 87:5 132:5 133:1

**hold** 38:8

**holding** 40:21 93:8,10,13 94:23 98:12 110:9,15 111:1,4,6 113:7 125:6,17 133:15 134:5 135:3 139:17 151:22 155:25 162:20,22 163:1,6,10 164:21

**holds** 42:2

**hole** 130:21

**holes** 138:20,25

**holster** 35:24 36:1 37:13 151:17

**home** 27:18 31:10,13,14 58:24 59:16 81:19 167:25 189:3 195:25 197:18 200:19

**hood** 98:19 141:7,9

**hooked** 145:14

**hooking** 99:2 145:13

**hospital** 60:12

**hours** 60:23 62:12,16 64:19,22,23 65:4 75:23,24 80:25 194:23 196:22

**house** 90:4 168:2 198:14

**housed** 201:13

**how's** 50:11 65:16

**HR121** 86:4

**Huber** 175:17 177:8 179:3 180:11,24 186:7 187:24

**Huff** 98:22

**hundred** 37:1 175:15,24 176:3 182:21 183:4 201:14

**hundreds** 201:7

**hurt** 199:12

---

**I**

---

**idea** 9:22 25:11 39:1 47:7, 22 53:1 54:2 61:16,18 66:18 70:13 73:11 75:6 77:1 78:2 80:10 88:2 95:14 99:19 100:17 104:19 106:8 107:17 117:9 118:1 120:6 123:14 127:12 130:11 131:10,15 132:5 135:5 137:24 145:14,16 146:18 147:15 148:13 151:12 158:5 160:21 179:21 197:4

**identification** 33:15 34:13 45:24 82:19 84:14 103:16 104:11 106:24 112:21 130:18 158:17,24 163:24 171:11

**identified** 18:3 93:13 102:22 103:3 108:18 117:16 152:4 200:23 201:6,15

**identify** 34:15 103:9,11

**illegal** 38:9 155:20

**illness** 17:11

**illuminate** 90:1,5

**illuminated** 91:5 93:6 108:7,15 109:24

**illuminating** 104:17

**immediately** 91:2 93:7 97:12 115:18 153:5

**imminent** 164:8 165:10

**impaired** 8:25 9:1

**impending** 164:9

**importance** 159:8,11

**important** 159:12

**impossible** 132:17

**incapacitated** 124:23

**inches** 114:5,19 115:9,10, 12

**incident** 12:12 17:5,9 18:4,16 20:3 25:10 32:24 44:14,21,22 46:16 47:9,13 48:16,25 49:5,8,25 50:7,8 52:21 56:12 60:6 62:8,12 63:19 64:4,8,10 65:13 67:14 69:15 70:18,21 71:4 73:9 76:9,12,16 79:1,15 80:7,17,23 81:1,5 84:13 103:3 128:3 144:16 171:16,22 172:3 194:5 198:5 201:21,23

**incidents** 16:25 17:3 18:6 24:3 25:21 60:24 78:25 198:22

**include** 78:5

**included** 44:13 71:15

**including** 48:11 72:4 159:18 161:21

**income** 22:23

**inconsistent** 120:21 121:2,13,24

**incorrect** 38:4 43:7,11 61:7 185:17

**increase** 169:19

**independent** 17:18,20

**index** 151:18,22

**indexing** 151:19

**indicating** 59:24 61:2 94:20 97:19 113:12,19 114:2,13 116:5 131:2 133:18

**indication** 124:7 126:2

**indicator** 103:21 104:7 125:24

**individual** 155:14 166:20

**individuals** 51:6

**inflicted** 17:13

**information** 56:15 78:5 83:10 85:22 154:2,11 171:18

**informed** 96:11 97:1

**initial** 86:6 114:9,23 116:8 160:8

**initially** 118:20

**initials** 116:10

**initiated** 151:2

**injured** 84:8 126:8

**injuries** 84:3

**injury** 17:11 23:8 164:9

**inmates** 201:8,11,14

**inside** 92:22 106:13,19 108:2 111:9 141:11 147:10,14,19 148:2 155:9 162:14 178:17

**instance** 78:2 200:22

**instant** 164:10

**interact** 88:21

**interior** 91:5

**internal** 62:6 71:12,15,19, 23 72:2,4,6,17,24 73:2,4,8, 16 74:4,8,14,20,23 75:8 126:17 127:4 171:18 172:20 189:10,13

**internalizes** 65:20

**interpret** 64:17

Case: 3:17-cv-00160-TMR Doc #: 46-1 Filed: 02/25/19 Page: 214 of 221 PAGEID #: 376

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Joshua Haas

**interpreted** 87:9

**interrogatories** 13:10

**interview** 44:1,5 71:16,24 72:9,24 75:8

**interviewed** 71:3,14 73:19

**interviews** 66:14

**intoxicated** 124:8,12,23 125:7,10 126:2,5

**intoxication** 125:24

**investigate** 74:4,8 84:4,7 90:17 192:2

**investigated** 172:19 173:4

**investigating** 61:12 84:2

**investigation** 74:23 125:16 126:18 136:4 173:12 189:11

**investigations** 72:4 125:12

**investigator's** 43:15

**investigators** 50:4 73:8

**invited** 72:12

**involved** 8:2 23:13,20,23 25:24 32:10 72:17 82:6 199:20

**involving** 17:9 29:18 64:8 171:15,17 173:18 189:4

**Isaiah** 44:1 196:6

**isolated** 197:16

**issue** 28:20

**issues** 28:1

_____

**J**

**jail** 168:1 200:23 201:12

**James** 23:14 171:10

**January** 19:3,16,17 22:14, 15

**Jillian** 108:25

**Jim** 56:2

**Jo** 161:5

**job** 17:12 22:6,7 32:2,4 159:1,9,10 196:9,10

**jog** 53:10

**Joshua** 6:4,12 45:23 158:16,23

**jot** 67:1

**journal** 66:25

**journals** 67:5

**Julie** 202:3,5,16

**July** 9:13 10:17 14:24 23:19 27:6 32:21 34:17 39:16 40:18 44:14 45:8 68:6 70:10 75:12 82:2 160:3 168:22 172:1 192:15 193:11,12

**jumped** 174:11

**jury** 20:14 70:15,17,20 73:3 189:5,7

**justifiable** 157:15

**justification** 154:21

**justified** 157:12,20 168:25

**justify** 156:11

_____

**K**

**Kellar** 44:1,6,15 45:1,6 62:4 64:15 66:14 71:2,7,16 72:3 196:6

**key** 184:15 190:3

**keyed** 184:9 190:12

**keying** 186:18

**keys** 36:5

**kids** 66:3 67:15

**kill** 50:12 154:12

**killed** 26:1 74:20 201:6

**killing** 185:10

**kind** 16:23 35:5 66:2 81:22 86:3,4 97:18,24 181:9

**knee** 98:11

**knew** 54:15 61:11,20 82:10 83:21 143:1,4 146:24 147:16 154:16 158:8 195:18

**knife** 35:11,13,18

**knock** 115:13

**knocking** 144:23

**knowing** 51:4

**knowledge** 43:15 60:2 70:25 71:10 105:24 126:4 146:13 165:24 170:3

_____

**L**

**lady** 25:25

**lap** 97:2 118:9,15 119:3,6 153:23 164:21

**laptop** 66:3,5 81:16,19,22

**large** 110:9 111:1 163:10

**lasted** 186:23

**law** 23:3 32:5 51:9 192:7

**lawful** 6:5

**laws** 159:13 161:15

**lawsuit** 7:25 68:9 201:24 203:9

**laying** 95:5,7 96:21 111:4

**leads** 85:20 86:14 123:4

**lean** 95:19

**leaning** 55:25

**learned** 18:1 30:21,22,23

**learning** 30:17,18

**leave** 18:20,22,25 19:2,7, 8,16 21:25 22:12,16 23:9 68:12 119:1 177:22 178:6 200:15,19,20,21 201:3 202:15

**led** 36:19 51:22

**left** 31:17 34:18 35:6,15 37:18 40:6 41:11,18,23 42:9 55:1,4,7,8 61:5 65:10 69:10 95:21 96:23 128:23 134:22 135:23 144:1 146:16,18 151:10 177:15 194:9

**leg** 98:1,10,12 139:12 142:4

**legal** 161:23 162:16

**legally** 15:14

**legs** 109:6

**lethal** 175:18 178:21 180:20,24 185:9 187:1,2

**letter** 32:6

**letters** 199:4

**level** 95:23

**library** 66:11

**lie** 42:12 188:23

**life** 11:5 27:2,18 31:11 154:10 159:17 181:11

**lifted** 182:7

**light** 89:23 104:15,17,23 105:8 108:11 147:10,12,23 149:10,14 150:1

**lighting** 104:15

**lights** 90:3,4,6 103:19 105:17,18

**limit** 31:25

**limited** 203:3

**line-of-duty** 26:6

**lines** 85:2 165:7

**Lisinopril** 9:16

**listened** 167:24

**listening** 120:10 123:5

**litigation** 193:20

**live** 30:17

**lived** 173:8 198:13

**load** 44:2

**loaded** 43:20

**located** 35:18 54:7

**location** 51:7 113:8,22 116:17

**locations** 105:1 201:12

**locked** 67:14,18,20 97:8 138:13

**log** 84:13,17,20 85:7,8

**log-in** 86:6

**logs** 49:17

**long** 6:19 9:21 11:7 14:20 18:13,24 19:10 27:21 38:23 39:2,5,10 55:12 100:5,16 109:5 127:10 128:13

**longer** 28:20 97:1 139:14 182:2

**looked** 12:11,15,17,20 13:2,15 45:20 49:17 67:4 79:12 91:23 95:21,22 106:20 108:1,2 109:25 111:9,11 123:4 127:18 129:15 132:7,14 157:21 187:8

**lost** 34:5

**lot** 30:21 178:19

**loud** 8:10 108:20 109:21 160:7

**loved** 31:11

**low** 36:24 147:23 149:10, 14 150:1

**luckily** 23:1

**lying** 145:11

_____

**M**

**Mac** 81:13,16

**made** 27:15 51:17 58:1 90:14 117:18 157:15

**mag** 35:5

**magazine** 40:2,7,15 41:1, 4,11,18 42:6 43:17

**magazines** 40:14,15 41:6

**Main** 180:19 188:15

**make** 39:11 45:16,17 57:19 58:8 68:18 69:1,2,24 90:7,19,23 112:17 117:25 137:13 139:24,25 146:10 149:1 182:17,22 183:5 188:21

**makes** 86:4 154:13

**making** 182:14

**male** 91:21 108:17

**mark** 112:16 113:1,2,20

**marked** 33:14 34:12 45:23 46:2 82:18 84:14 104:4,10 106:23 112:20 130:17 158:16,23 163:23 171:10

**markers** 105:9

**maroon** 82:6,14 83:5 89:16,17 90:13 104:25 106:1,9 107:2 116:24 146:25

**marriage** 29:21,22 197:12

**Martin** 10:4 18:17 20:1 23:13 24:11 25:13 29:12 32:21,24 55:24 64:9 68:9 73:16 77:8 78:9 79:15,22 93:15,17 95:4 96:21 98:17, 25 108:8,12,18 110:8 113:6 117:19 118:8,14 119:3 122:12 123:8,14,18 124:8 128:4,21 129:2 133:11 135:3 136:25 137:6 139:19 140:2,13 141:11, 19,24 142:11,16 143:9,15 145:10 146:4 150:9,18 153:2,6,10,22 154:19 156:12 158:4 162:3 164:20,22 169:6 170:7 172:1,14,18 185:14 186:21 188:2 189:22,25 190:3 191:15 192:1 196:18 200:11 203:8

**Martin's** 101:19 117:14 132:18 133:1

**material** 191:7

**math** 43:11 44:9

**matter** 121:17 155:25

**Mclaughlin** 56:2 97:5,6 100:13 144:11,12,14,18 149:16 150:25 175:14,21 176:2 177:7,14,15 179:8,9, 12 180:5 181:10,11,15 182:16 183:12

**MDT** 82:22,25 85:18 147:4

**meaning** 54:9 112:5

**means** 43:7 167:9 187:21

**meant** 83:14 98:6 99:12 145:4

**media** 67:6 100:14

**medic** 137:14,18

**medical** 15:1 16:18,21 21:13,17,24 22:2,6,18 84:9 126:11 203:1

**medication** 9:9,10,12,15 11:17 26:11

**medications** 9:7,25 12:1, 4

**medicine** 10:14

**meet** 115:23 199:11

**meeting** 202:16

**meetings** 202:1

**memory** 8:24 52:21,24 53:10,21,24 85:9,11 128:17

**mental** 17:11

**mention** 102:21 144:13 201:15

**mentioned** 15:4

**Merrimac** 99:25 151:10

**Message** 195:8

**messages** 67:6

**messaging** 68:8 193:24

**met** 45:7

**Miami** 193:17

**mic** 35:10 186:18 190:4

**microphone** 190:11,14, 18

**mid** 22:13

**military** 13:23 51:9

**mimicked** 134:3

**mind** 25:22 26:13 51:24 128:17 157:13,18,20 186:17 198:2

**mind's** 52:21

**mine** 123:25 136:13 157:5

**minimize** 148:23 149:5

**minute** 46:6 121:1 159:3 171:14 188:18

**minutes** 100:6 127:12 171:19 176:8 177:21 184:20,23 185:1 186:2

**mirrors** 102:16

**missed** 59:22,23

**missing** 43:12,14

**mistake** 109:16 182:15, 18,19,23 183:5

**mistaken** 82:13

**mode** 40:11,12

**moment** 119:2 126:18,22, 24 128:3 176:7 189:21

**Montgomery** 14:11 34:21 62:25 63:11,17 73:7 77:18 161:11 165:15 167:4 169:10 170:6,25 180:4 197:5 198:20

**month** 12:18

**months** 22:17

**mood** 12:2

**morning** 51:3 56:24 57:7 65:10 194:18

**motion** 154:13

**motor** 75:1 84:7

**move** 14:17 122:17 146:12

**moved** 149:3 200:24

**movement** 106:19

**moving** 94:2,15,19 118:22 135:8,10 136:14 140:2 143:21

**multiple** 121:6,12,24 137:9 185:3

**multitude** 18:6

**multivitamin** 12:7

---

## N

**names** 67:19

**narrative** 12:13 182:6

**natural** 32:15

**nay** 32:7

**necessarily** 11:4 17:13 18:3 29:20 44:25 54:9 107:13

**necessitate** 168:14

**neck** 132:18

**needed** 10:12,20 11:6 27:17 59:20 82:2 140:22 143:9

**neighborhood** 67:17

**neighbors** 88:16 106:4

**news** 100:14

**night** 9:3 41:3,21 43:18, 21,22 44:10 51:4 123:15 125:7,8 148:2,12 154:16 164:20 165:18 166:3,24 168:1 194:18 197:19 201:22

**nighttime** 147:25 148:6,8, 14

**ninety** 95:10,17

**noise** 106:12

**nonlethal** 186:8

**nonmoving** 14:1

**normal** 18:23 40:24 44:2 51:19 56:11 149:1 171:7 178:25 179:1,2 199:18

**notes** 60:12,13 61:4,14 66:22 140:7 203:13

**noticed** 93:7 158:12

**notified** 174:15,19

**November** 14:19

**number** 42:22 43:7 49:25 85:1,18,25 86:12,14,15 87:15 127:25 165:1,7 169:16 192:22,24 193:3

**numbers** 86:2

**numerous** 24:3 26:23 62:16 63:2 87:3 173:25 184:17

---

## O

**O'RYAN** 161:5

**Oaks** 67:16

**oath** 158:16,19 159:4,21, 22 160:12 161:7

**Objection** 10:18 16:20 27:10 29:16 30:12 32:11 38:25 42:15,23 47:6 48:5 49:6 53:12,23 57:21 60:7, 19 61:15,21 62:1 63:21 64:5 65:6 69:8 71:5 72:10, 15 73:10 74:2,6,9,15 75:5 76:21 77:21 78:18 79:3,24 80:2,9,18,21 81:7 94:10 99:14 101:7,21,25 103:23 105:19 110:21 115:2 117:2,8 118:10,16 119:9 120:5,13 121:4,15 122:24 123:11,22 124:4 125:25 127:1,22 128:7 129:19 131:23 132:3,21 133:4,13 135:6,25 137:2,25 138:10 139:1 142:15 143:16 145:19 147:2 150:10,13,19 153:14,25 154:23 155:12 156:13 157:3,19 160:15,20 162:23 165:22 166:9,18 167:7 168:20 179:14,20 180:6 183:9 187:10,19 188:8 189:15 192:12 197:9

**objective** 121:19

**observed** 108:8,17 110:8 113:6

**observing** 129:2

**occupant** 91:22 93:1

**occupants** 90:19

**occupied** 108:17

**occur** 122:5 162:10

**occurred** 76:2 171:24 172:3 174:9

**occurs** 160:12

**offenses** 7:18

**office** 13:5 15:10 16:16 18:23 20:22 21:10 22:8 23:9 27:13 31:17 49:12

---

56:9 60:1,5 61:11 62:17
63:1,12 66:15 69:13 71:2
73:7 80:12,15 103:18
132:8 158:16,19 159:21
160:12 161:12 165:16
166:5 201:2 202:17

**officer** 6:23 14:15 17:25
24:17 34:24 47:11,21 48:3
50:6 53:22 62:25 72:21
73:25 77:20 78:17 88:7
98:21 100:21 102:20
103:12,21 104:2 116:13
117:23,25 118:8 120:25
122:2 123:21,23 127:14
140:18 143:8,13 145:12
148:9 154:20 155:5
156:11,25 157:11,14
158:4,6 159:18 177:8
179:3,23 181:1 183:11
186:7,11

**officer-involved** 7:6 17:6
18:5 23:13 24:7 60:16
61:13 73:8 77:20

**officers** 8:2,5 25:8 87:20
140:21 149:25 155:14
178:18 183:18

**Ohio** 74:21 161:10,12,15,
23

**one-handed** 133:17,21,
24,25

**open** 113:9 161:16 162:8

**opened** 143:8 188:13

**opera** 112:3

**operate** 179:1

**operating** 38:10

**opinion** 143:17 164:7

**opportunity** 64:24 65:5
90:23 100:8 156:23 188:23

**option** 180:21 187:12,13,
14

**order** 38:5 64:14 143:5,21
159:8,10,16

**ordered** 27:13 76:4,5 79:6

**ordering** 178:7

**original** 62:21 63:8 68:20
69:2,3,23,25 73:9 80:11

**originals** 69:21

**outcome** 7:16,24

**overcome** 30:18

**overnight** 51:17,25

**overt** 166:14

**owned** 81:23

**owner** 69:23

## P

**p.m.** 33:8 203:21

**pads** 145:15,17

**paid** 18:22,24

**panel** 54:18

**paper** 42:24 43:10 61:1,2
69:2 109:4 160:7,19

**paperwork** 41:20 202:23

**paragraph** 108:6,7,14,23
109:18,23 110:3,7 144:18
163:8 165:4,6,8

**parallel** 89:8,11,22 151:19

**park** 24:25

**parked** 83:5 87:1,2 89:8
105:15 177:16

**parking** 178:19

**part** 23:24 31:19,20 93:17
129:5 131:21 136:3 159:15
164:17 195:17

**passenger** 50:15 51:21
52:11 55:8,20 91:8,14,20,
24 92:25 94:4,5 96:15
100:22 107:10,22,25 112:2
118:24 143:10

**past** 72:17 95:10,17
111:18 113:11,24 114:16

**paths** 51:8

**patrol** 74:21 174:15
195:17

**patrolling** 159:18

**Patrons** 174:5

**pattern** 135:22

**pause** 75:19 140:9 158:1
203:16

**payroll** 19:1

**peace** 159:13

**pedestrian** 74:20

**pedestrian/motor** 25:24

**pen** 58:3

**pension** 15:22,23 16:8,11,
15 17:16 22:3 32:3

**people** 27:1 83:25 105:25
143:21 148:25 154:12
167:20 168:2 170:19,21
184:4 197:1

**people's** 60:13

**pepper** 35:7,23

**perceive** 153:16 156:6
158:6 162:14

**perceived** 153:11 154:19
181:14 190:2

**percent** 37:2 182:22
183:4

**period** 93:25 124:11 136:9
146:7

**permission** 76:20 179:8

**permit** 162:1,4

**permitted** 162:8,11 167:6
187:16

**perpendicular** 134:12

**person** 7:7 24:19 25:3
78:3 82:10 124:23 155:9
161:23 163:13 164:10,13
174:21 180:5,13 194:12

**person's** 124:16

**personal** 67:18 192:20,21
194:19 195:21

**personally** 23:23 63:15
73:5

**perspective** 92:14

**pertaining** 22:6,7

**pharmacy** 10:11

**Phillipsburg** 31:18

**phone** 192:14,24 193:1,2,
10,11,13,16,21,25 194:6,
11,14,17 195:10,14,17,21
202:25

**phones** 192:17

**photo** 106:23 107:23
112:20

**photograph** 33:14,18,22
36:12 86:11 104:10 105:2
107:2 130:17

**photographs** 13:16
33:21 34:12,16 82:18

**physical** 66:4

**physically** 38:17 49:19

**physician** 10:10

**pick** 28:6 189:11

**picked** 122:14

**picking** 118:21

**picture** 35:15,25 86:19
104:20,22 130:20

**piece** 160:7,18

**pierce** 147:10

**pillar** 52:12,13,25 102:18
111:13,18 113:11,15,16,24
114:16 115:20,22 116:3,4
128:23 131:2

**pissed** 188:22

**pistol** 174:12 175:1

**place** 56:11 57:4 100:14,
15 199:18

**Plaintiff's** 33:13 34:11
45:22 82:17 84:12 104:9
106:22 112:19 130:16
158:15,22 163:22 171:9

**plan** 28:12 90:15

**plans** 15:9

**Platoni** 21:20,24 27:19
28:18

**played** 67:15 127:13

**pleading** 183:25 184:5

**plethora** 177:9

**plugged** 145:15

**Plummer** 158:20 160:1,17

**Plummer's** 160:10 201:2

**pocket** 190:19,24,25
191:3,12

**point** 37:17,21 66:23
72:25 73:14 93:2 101:19
110:9,14,17,20 111:1,8
113:3,7 114:12,21 115:14
117:12,13 136:21 137:22
138:9,19 145:25 146:4
152:10 153:5 156:7,8,15,
21 158:7 162:25 163:1,4,5,
10 168:9 175:10 177:6
178:16 182:7,11 183:1,13
191:14,25 193:19 196:10

**pointed** 93:14 95:23
100:9 113:14 114:24
118:23 129:16 152:14
153:1 155:25 157:22
164:22 170:18,20 175:20
181:10 182:8 192:7 199:21

**pointing** 93:18 94:3 97:20
122:15 182:21

**police** 24:17 31:1 73:25
98:22 102:23 103:12
104:4,5,8 117:23 175:17

**policies** 165:24 187:17

**policy** 18:23 23:11 63:16,
17,24 64:2 75:4 78:14,21,
22 80:7,11,16 153:13
163:17,19,23 164:24
165:14,19 166:5,16,20
167:3,13,15 168:3,8,19
169:13,18,25 170:1,12
172:23 187:7,12,14 198:24
199:11

**porch** 90:4,6

**portable** 35:10

**position** 92:7 107:19
129:18 130:2,4,6 131:20
132:18 133:1 135:13
143:19,20 145:3 149:3
156:22 158:23 168:14,16

**positioned** 176:14

**positions** 143:22 198:20

Patricia Martin, Admin., et al. vs Joshua Haas, et al.  Joshua Haas

**possession** 49:11

**possibly** 126:9

**posted** 67:8

**posts** 67:6 68:7

**posture** 174:13

**potentially** 51:8

**pouch** 35:5 36:2 37:13,15 40:15

**pound** 39:3,6

**pounds** 34:5

**practice** 60:21 61:3 68:24 73:6,12,14,18,20 77:18,23 170:2

**preparation** 12:9,16

**prescribed** 10:23 12:7

**presence** 186:17

**present** 6:1 105:9 127:15 198:5,8

**preserve** 159:13

**press** 86:18 191:7

**pressed** 85:20 184:16

**pressure** 9:10

**presumed** 113:22

**pretty** 22:18 64:20 65:18 67:20,21 150:21 151:1

**prevents** 152:15

**previous** 32:4 69:20

**previously** 33:14 82:18 84:14 95:5,7 106:23 130:17 163:23

**prewritten** 68:21

**print** 69:21

**printed** 45:10 46:5,6,10, 25 48:7

**printout** 85:24

**prior** 11:8 21:9 23:12 31:8 56:19 58:15 68:4 69:6,14 151:2 171:25 175:19 203:1

**Prix** 54:13 82:6 83:5 89:11,14 90:13 104:6 105:1 116:24 146:24,25

**Prix's** 83:18

**problem** 20:22 31:12 39:22 67:13 109:11 113:25 189:2,3

**proceeded** 97:7

**proceedings** 75:19 140:9 158:1 203:16

**process** 20:10,12 22:18 79:14

**processes** 15:25

**product** 81:11

**prompt** 145:16

**prompts** 99:7

**pronounce** 6:13

**pronouncing** 6:18

**proper** 173:11

**property** 159:17 199:24

**protect** 159:16

**provide** 97:7 98:18 143:18,20,24 144:6,8 145:25 194:2

**provided** 13:3,4,6,13,14 21:23 22:10 84:9

**providing** 150:8,17

**prudent** 164:10,13

**psychiatrist** 10:23

**psychological** 28:1

**psychologist** 21:9

**PTSD** 17:1 28:15,16 30:1, 8,11 31:2,9 32:18

**pull** 24:14 38:5,6,7,17 39:2,3,5 153:5

**pulled** 38:1 152:6,19,24 153:4 167:24

**pulling** 87:2,3,4 176:15

**pump** 176:16,17 177:1,2, 11

**purpose** 81:14,15 165:10

**purposely** 184:10

**purposes** 33:15 34:12 45:24 82:19 84:14 104:10 106:24 112:20 130:18 158:17,24 163:24 171:11

**pursue** 27:16

**pursuing** 199:10

**pursuit** 198:24 199:1,6,11

**pushed** 95:13 107:9

**put** 18:21 24:25 60:25 62:17 85:15,17 86:16 87:10,16 94:17,23 98:15 113:13 114:1,6 115:23,25 116:10 118:4,9,14 119:3,5, 21 121:16 123:7 124:2 134:1 140:1 141:7,9 145:17 152:2,13 153:2 154:11 160:6 164:9 184:9 199:17,18,24 200:15,21 201:2 202:1,14,24

**puts** 85:5

**putting** 136:17 200:18

**Q**

**qualifications** 39:20 40:6

**qualified** 39:22

**quarter** 54:18

**question** 8:14 18:14 39:12 50:9,17,19,23 65:1, 21 67:12 76:15 80:3 109:21 121:12,20 164:5 166:24 167:2

**questions** 8:9,21 13:8 32:20 60:6 71:3,7,13,15,18 72:1,2,5 73:17 100:19 109:14 203:5,18

**quick** 128:18,19 203:13

**quickly** 38:24 151:1

**quote** 54:20 82:16

**R**

**radio** 35:6,9 36:10 88:12 106:12 116:14,18,19 126:20 184:9,15 190:4,13

**radioed** 126:18,24

**raise** 122:12 153:17 160:9

**raised** 95:22 123:8 129:15 153:1,11 181:9

**raising** 122:21

**ram** 25:7

**ran** 22:20 25:25 98:25 145:16

**range** 40:1 202:15

**re-talk** 20:18

**reach** 143:5,9,14

**reached** 97:12 117:6 141:5

**react** 188:11

**read** 42:5 43:6,10 44:5 83:6 108:19 109:17,18,19, 20 110:10 111:2 133:6 140:7 164:1,6 165:3,4,5,11 169:22 203:19

**reading** 54:19 109:3,23

**ready** 16:3 203:2

**real** 86:3

**realize** 94:9 121:1 138:19

**realized** 138:12

**rear** 54:9 55:1,20,23 91:8 92:23 96:15 116:2 117:6 144:23 188:13

**reason** 8:21,24 42:7,11,21 60:22 101:13 127:8 149:24 196:24

**reasonable** 156:11 164:9

**reasons** 102:20 194:20

**recall** 11:8 19:11 26:21 65:11 76:22 77:10 118:5 160:8,23 170:4 171:22 172:14 184:1 200:5

**received** 166:6

**recently** 12:15,16 13:2,20 44:5 48:11

**reclined** 92:9,16 95:8,11 107:22,24 108:3,13

**reclining** 107:21

**recognize** 149:9

**recoil** 133:22,23

**record** 6:11 8:10 66:19 98:6 134:2 164:6 172:12 178:21 186:17

**recorded** 66:15,17 184:10 186:16

**recorder** 190:15

**recording** 200:3

**recordings** 13:17

**records** 21:24 41:9 193:11,21

**recreational** 51:10

**red** 191:6

**redoing** 143:22

**refer** 32:23

**reference** 22:2 166:22

**reflection** 36:14,16 148:5, 11,17,20,24 149:5,9,13,18, 25

**refusal** 125:15

**refused** 79:5 93:23 100:9 173:25

**refusing** 175:6

**regard** 15:18

**related** 12:25 14:7 16:24 23:25 24:2 29:21 30:25 49:24 67:7 68:8 75:3 202:6,8

**reload** 181:21

**rely** 73:9

**remember** 7:7 10:8 54:13 55:9 59:2 61:4 62:20,23 63:13 70:8 71:20 73:4 90:8 98:3 101:6,8 103:5 106:11 126:20 127:24 139:11 140:3 172:17 197:22 198:10 200:17 202:20

**remembered** 63:4

**remembering** 60:25

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                                                    Joshua Haas

**reminded** 120:10

**remove** 98:17 141:1,17, 19,21

**removed** 25:1 91:4 139:18,19 140:12 141:9,24 142:6 151:3,12

**removing** 151:3

**Renee** 161:5

**renotified** 175:5

**repeat** 137:11

**rephrase** 8:22

**report** 12:12 22:5 44:14, 17,21,22 45:15,18 46:4 48:16 49:13,16,17,19 50:8, 18 51:1 56:21 57:1,12,13 58:6 59:21 60:6,23 62:8, 12,15,20,21,25 63:4,6,13, 19 64:3,4,10 68:25 69:15 70:4,18,24 73:3,9 74:17 75:22 76:1,9,10,12,17 77:4,8,19 78:4,9,21 79:1, 15 80:7,17,24 103:3 144:16 171:10,15,16 172:7,10,13

**reported** 48:20,22

**reporter** 8:11 108:21

**reporting** 46:19 59:9 63:4 68:21 70:7,13

**reports** 45:19 46:14 47:9, 13 49:24 56:12 68:17

**reprimands** 199:5

**reprinted** 48:10

**request** 19:4,5

**requests** 67:16

**require** 80:16

**required** 39:4 78:20 81:1, 4

**rescue** 146:2,19,20 151:5

**resets** 38:16

**residential** 25:6

**resolved** 28:21 30:4

**respond** 23:21 32:13

**responding** 93:25 123:25 146:6 179:9,13

**response** 16:10 124:16 126:15 185:14

**rest** 14:6

**rested** 94:18,21

**resting** 92:18 118:9 119:4

**restrictions** 67:21

**retire** 14:25 23:7

**retired** 14:22 31:3 68:1

**retirement** 15:1 16:18,19 21:13,17 22:7,18

**retiring** 68:4

**retreated** 54:8,15,23 96:4, 5 137:20

**retreating** 130:7

**retrieve** 69:14,18 142:8 143:5,13

**retrieved** 97:13 98:15,23 141:22 145:8,24 194:15 195:15

**return** 19:19 200:7,11 202:9,10,11

**review** 75:3

**reviewed** 12:8 57:18 199:19

**revived** 99:13

**rhythms** 99:18,19

**rid** 66:7 119:22 121:17,19

**rifle** 195:17,21

**right-handed** 37:4

**risks** 168:18

**River** 193:17

**road** 17:25 47:25

**roadway** 89:21

**Robert** 45:8

**role** 24:22

**roll** 148:21

**rolled** 149:1

**roof** 116:1

**room** 199:24

**rotating** 182:8

**rough** 69:20

**roughly** 45:5 184:23

**round** 38:18 43:12 131:18 175:20,23 179:1

**rounds** 40:5,8,16,21 131:10 132:5,15 133:8 175:19

**route** 86:20 87:16 137:15

**RTA** 177:20,22 178:6

**rule** 64:20,21

**rules** 8:8

**run** 60:12

**running** 106:10

**runs** 151:19

---

**S**

**safe** 136:16 139:25 141:23

165:8 166:6,13,25 167:5,8, 15 187:17 201:7,17

**safer** 143:12

**safety** 60:13 102:20 136:15,22 143:13 157:14, 15

**Santana** 6:2

**sat** 6:22 95:21 129:15 135:18 157:21 164:22

**Sauter** 45:8 57:18 79:10

**save** 26:25 27:2 68:23

**scenarios** 153:18

**scene** 32:14 37:18 56:3 65:10 75:12 78:23 83:11, 17 84:16,25 85:3,4,5,6,13, 16,17,20 86:17,19,20,25 87:10,18,19 88:5,9 89:7 90:1,5 97:5 98:17 101:20 103:22 104:24 105:4,11 118:5,6 120:15 124:9 139:25 140:12 141:14,16, 23 144:14,19,21 151:7,16 155:24 174:7 175:13,14 177:6 180:13 187:12 192:6 194:9,22 195:3,18 196:3, 12,21,25 197:1,6

**scenes** 23:22,25

**school** 14:6,7,9,10 34:24

**screamed** 100:2

**screaming** 115:18

**screen** 86:6,8,21,23

**seat** 55:24 91:20,22 92:9, 16,18,20,25 95:4,9,10,13, 14,16 96:22 97:22 107:7, 10,21,22,25 119:24 122:19 139:12

**seated** 92:6 174:11

**seats** 92:23 97:24

**seconds** 55:14 85:6 126:23 127:5,20 128:5,15 186:24 188:5

**section** 163:21 164:25 168:9,10 187:8

**secured** 201:16

**seek** 21:13 26:4

**seeked** 29:12

**semiautomatic** 37:23 38:3,5,11,19 40:11 110:9 111:2 163:11

**sense** 75:17

**separate** 45:17

**sergeant** 44:15 47:25 56:2 68:18,22,25 69:24,25 97:5,6 100:12 144:11,12, 14,18 149:16 160:24 161:3,4,5 175:14,21 176:1

177:7,14,15 179:8,12,24 181:11,15 183:11 196:13 200:25

**server** 69:7

**service** 39:16 93:14

**set** 67:21

**settings** 36:23

**seven-minute** 176:10 186:22

**seventeen** 27:4 40:16 41:1,4,6 43:17 44:3,7 133:24

**seventy-two** 60:23 62:12, 16 64:18,22,23 65:4 75:23, 24 80:25

**Severe** 28:15

**shaking** 42:16,19

**Shamus** 143:19 144:3,10 181:10

**share** 57:14 79:1

**shared** 58:17

**Sharpies** 112:23

**shattered** 96:14,15,20 97:11

**sheet** 171:18

**sheriff** 12:12 15:2 76:6 79:19,23 80:6,20 81:4 102:23 158:20 159:2,23,25 160:17,18 161:1,11 196:11 200:6,10,24 201:1,20,25 202:2 203:4

**sheriff's** 14:12,18,20 15:3,10 16:16 17:22 18:22 21:10 22:8 23:9 27:13 31:17 41:10 44:13 49:12 56:9 59:25 60:5 61:11 62:17 63:1,1 66:15 69:13 71:2,13 73:7 75:2,23 80:11,15 103:17 104:2 160:13 165:15,20 173:10 180:5

**sheriffs** 80:4

**shift** 9:4 33:2,3,6,7 63:20 64:3,11 76:10,17 80:8,17

**shifter** 25:2

**shine** 35:16 148:2

**shined** 108:11

**shirt** 35:11 36:18 99:1 190:19,24 191:3,11

**shock** 99:7,12,21

**shoes** 34:8,10

**shoot** 50:17,20 51:4 52:5 53:17 65:23 96:3 100:10 133:20,24 154:6,19 155:8, 16,17,23 157:13,16 158:3

Patricia Martin, Admin., et al. Vs Joshua Haas, et al.                                    Joshua Haas

169:7 170:4,10,14,22
171:1,8 175:7,16 179:6,10
180:17 181:17 182:1,11
183:25 184:2,8,12,19,22
186:4 188:20 189:25

**shooters** 200:23 201:6

**shooting** 7:6,11,14 8:3
9:13 10:4 11:9,13,20 12:5
17:6 18:17,19,21 20:1
23:12,14 24:1 27:12 29:1,
2,3,9,18 31:8 32:21,23
41:15,17,24 42:9 45:5
51:3,7,9,10,11,12,25 52:24
53:20 54:5,6,22 56:18 57:4
61:13 66:9,22 67:3,7 68:9
71:10 73:9,15,24 74:14
75:21,22 76:3,14 77:8,20
78:9 104:16 105:5 124:9
131:16 132:18 133:25
135:8,10,12 138:21 146:5
154:21 156:12 158:7,8,10,
12,13 167:24 171:16,17,
18,24,25 176:6 180:7,9
182:15,23 186:9 188:11
189:22 191:20 192:4
194:8,20 197:8 200:12
202:7 203:9

**shootings** 18:5 23:18
24:7 31:1 60:16 73:2,22
75:24 76:2

**shootout** 142:5

**short** 127:24

**Shorter** 128:15

**shortly** 145:23

**shorts** 34:21

**shot** 7:8 8:6 23:22 25:3,5,7
27:2 38:2,5 53:22 54:13
72:21 129:23 130:10
131:12 132:1 133:2,16
135:3 136:22,24,25 137:5,
17 142:10,14,17 153:12
156:16,19,25 157:8,23
164:20,21,23 170:6,18
173:2 175:19,22 176:7
181:12,20 182:3 183:13,
18,23 185:3,6,19,24
187:25

**shotgun** 174:16,17,22
175:22 178:23,25 179:1,2
181:12,18,24 188:14

**shots** 44:10 126:24
127:20 129:18 130:1
132:10 136:6,8,10 137:8,
14 181:23

**show** 45:18 46:7,15,19
49:18 70:4 72:8 171:6
184:17 199:20

**showed** 23:25 144:24
174:10 175:17

**shows** 46:6 85:4 86:5

**shred** 59:19 60:11,13,18

61:7

**shredded** 59:5,15 60:1
61:14,25

**shredding** 59:17

**shut** 113:16

**sick** 19:2,8 22:20

**side** 9:19 25:9 37:7,13
42:17 50:15 51:20,21
52:11 55:6,7,8 56:1 91:3,
14 93:4 94:5 96:14,23 97:8
100:20,22 102:18 106:7
107:6 108:16 111:18,21
112:5 114:25 128:21
129:10 130:13 136:7
137:21 138:4,6,20 143:10,
14 144:2,3,7 152:7 176:23,
24 181:5

**sides** 34:18

**sign** 13:5,7 159:22 160:7,
18,25 161:2,3

**sign-off** 21:16

**signalling** 109:1

**signed** 13:13 159:4 160:3
172:6

**silently** 109:17,20

**similar** 32:4

**simple** 62:19

**simultaneously** 85:12
150:21,24 175:22

**single** 18:3 26:15 38:2
71:22 168:3

**siren** 103:20

**sit** 27:3 95:4 100:13
122:19 123:3 155:1,18
156:2

**site** 89:19

**sitting** 42:13 55:24 78:7
95:9 97:15,21 120:9
196:20 197:25

**situation** 83:22 120:24
121:6,21,25 124:20,21
125:3,6,9 126:3 144:4
147:23 149:10,14 150:2
166:12,21 167:14 168:4,
22,24 170:17 173:18,22
174:8 185:13,23 187:24
188:2 189:4

**situations** 122:2 125:14,
15 167:12 170:13,20

**skills** 30:23

**skinnier** 33:24

**slide** 151:20 153:1

**slightly** 38:11

**slow** 8:13 22:19 108:19,20
109:22

**sobriety** 125:19

**social** 67:6

**solemnly** 161:7

**sooner** 183:19

**sort** 29:14 179:7

**sound** 41:12 45:9

**sounds** 31:13 44:10
146:10

**speak** 74:5 115:16

**speaking** 73:4

**specific** 111:20

**specifically** 173:1

**speculate** 155:18

**speed** 199:8

**Speedway** 27:12 187:4

**spinning** 181:9

**spoke** 65:15 73:1,20
189:18 201:25

**spot** 131:20

**spray** 35:7,23

**Springbrook** 82:2

**spun** 181:9

**square** 123:4 157:22

**Sr** 7:9

**staff** 47:23 71:13 196:14
199:13

**staging** 201:11

**stand** 100:15 160:5

**standard** 34:9,23 68:24

**standing** 50:11 51:23
56:25 65:22 88:17 92:15
94:7,8 106:1,8 111:13
112:7 113:2,5,21,23
114:11,14,15 116:20
117:4,13 118:25 128:21
129:1,23 130:10 131:11,15
132:17,25 144:7 177:20,23

**standoff** 176:10 186:23
188:19

**stared** 173:24 174:13

**start** 8:15 17:24 93:15
137:18

**started** 14:11 17:25 27:9,
11 48:25 94:2 96:9 99:2
115:18 118:21,22 122:13,
15

**starting** 33:7 34:25
180:18 203:1

**starts** 108:7 163:21

**state** 6:10 40:9 74:21
126:2 159:14 161:9,15

**stated** 189:2

**statement** 12:13,21
44:16,17 45:7,23 48:16
49:1,4 56:8 59:24 108:4,6
109:14 117:15 118:2
144:13,20 153:10 182:5

**statements** 44:12

**states** 161:7,9

**station** 174:5 177:20
194:10

**stationary** 135:13

**stay** 23:3 100:16 140:6

**stayed** 176:24

**stepped** 111:17

**stick** 25:21

**sticks** 26:13

**Stinger** 36:19,20,21

**stood** 178:5,13 188:18

**stop** 28:3 102:19 122:1
170:21 171:1 187:1

**stopped** 11:22 128:5
131:18 151:5 176:16

**stops** 149:2

**straight** 115:5 130:7
145:10

**straightened** 20:21

**straw** 29:14

**street** 89:2,5,8,22 90:2
105:8 180:19 188:15

**streetlights** 89:25

**Strek** 202:3,12,17 203:3,4

**stress** 16:21,23,25 17:3,
21,24 21:25 22:12,13
23:24 24:2,6 27:6 62:19

**stresses** 62:15,18

**stressful** 25:22 26:14

**strict** 67:21

**Strictly** 202:6

**strike** 133:11

**strobe** 37:1,2

**struck** 130:13 131:9,22

**stuck** 199:23

**stuff** 30:20 60:25 62:20
74:11 195:23

**subject** 166:20 168:13
174:10

**subject's** 25:1

**subjects** 88:17

**submit** 32:6 75:22 76:9,
16,25 77:3,7 169:20

**substation** 56:14 58:12, 13,15,18 195:1

**sufficient** 163:16

**suggestions** 57:20

**supervisor** 149:21 179:25 180:2

**supplement** 63:7

**supplemental** 62:24 63:3,13

**support** 161:8

**supposed** 199:2

**surrounded** 201:14

**surroundings** 102:8

**survive** 7:14 22:25 24:19

**survived** 192:5,9

**suspect** 72:22 78:4 121:2, 10,11 137:18 155:8 167:24 174:20 185:16,18

**Suspicious** 174:21

**swear** 161:8

**sworn** 6:6 159:17

**system** 46:14,19 59:10 68:21 70:3,8,13 71:21 200:2

**T**

**table** 113:13

**tactical** 102:7,10,14 156:22 168:12

**Tae** 201:6

**taillight** 55:2

**takes** 39:3,10 133:21 201:10,11

**taking** 11:12,22 151:16 154:25 174:25 177:1,10,12

**talk** 8:17 57:21 59:11 64:24 65:5,9,13 74:19 88:4,7 189:13 196:2,7 197:7,15,23 202:19

**talked** 50:6 56:17 57:22 58:10 70:9 71:1 74:13 190:10 197:20 198:4 200:10,13

**talking** 18:8 67:23 69:19 80:23 94:22 154:15 166:23

**tangent** 56:4

**tape** 105:7

**tape-recording** 184:17

**taped** 184:9

**taser** 35:5

**Teague** 21:14 50:6,7 52:1

53:21,22 56:17,20,25 57:8, 11 65:2,5 78:17 85:2 87:9, 24 88:7 93:11 94:6 96:9, 11,25 97:6 98:16 100:21 101:5 111:6,10 116:13 117:25 118:8,12,25 119:2 120:11,14,18 122:6 123:5, 7,24 126:21,22 127:14 137:23 138:16 139:10,11 140:12 141:17 143:8,13, 18,25 154:20 158:4,6 162:21 175:13 176:1 177:7,13 182:16 183:11 190:22

**Teague's** 6:23 13:20 20:5 70:8 85:21 104:25 122:22 123:1,13,21 127:7 136:13 142:23 150:6 157:15 180:2

**tech** 14:7

**ten** 41:10,18 42:5

**tennis** 34:10

**terminal** 82:22 85:18,19, 25 86:5,12,15 87:15

**terminals** 86:1

**test** 125:19

**tested** 39:9

**testified** 101:4

**testify** 70:14 157:9,10 189:5

**testifying** 157:1

**testimony** 20:6 54:14 101:1,6 111:15 120:10 156:24

**text** 67:5 193:24,25 195:6

**themes** 75:17

**therapy** 26:9 27:5

**thigh** 94:3,16,17,19,22,24 97:16,18,22 98:1,7 118:9, 15,21 119:4,5,21 122:15 124:3 153:24 154:7

**thing** 13:14 49:14 59:18 60:10 68:20 97:18 108:11 121:18

**things** 18:7 67:1 68:8 126:13 153:16

**thinking** 51:17,24,25 52:20 53:20 102:11 123:15

**Thirty-nine** 13:22

**thought** 15:6,11 50:14,15 77:11 94:8 152:18 157:7, 14 180:22

**thoughts** 60:21

**threat** 136:18 142:6 152:4, 11,12,18 153:12,17 157:13 162:14 163:14,16 167:6 169:2 174:2 181:14,15 185:7 187:2,18

**threatened** 154:12 155:16,17 164:8 173:19

**threatening** 154:9,10 170:4

**threw** 37:20,21 188:14

**throw** 119:23

**tickets** 14:2

**tied** 195:22

**tilted** 134:18,22,24

**time** 6:19 7:5 9:12 10:3,6 11:8,11,13,20 12:5,20 15:12 17:22 18:13 19:11, 12 20:23 21:12 22:20,24 23:1 28:20,25 29:25 30:21 31:19,20 33:2 38:17 40:4 41:17 45:20 46:16 47:12 48:3,22 49:16,17,23 53:22 55:19 56:2 66:23 70:4 75:14 80:1,14 81:24 84:20 94:12 99:8 103:8 104:18 105:10,12 108:2 109:25 111:8 118:17,25 119:8 124:8 127:9,18 128:11,12 131:8 137:16 139:9 140:25 145:3 149:23 150:4 156:4 159:23 160:25 161:6 165:4 168:16 175:8,11,21 176:12 177:19 180:18,21,23 182:3,20 184:24 188:22 189:20,23,24,25 190:2 191:18 194:20 197:20 202:17

**times** 21:7,8,14 38:6 39:2, 6 42:14 60:8,9 87:4 123:16 137:9 176:4 181:17 185:4 186:15,16 197:23 200:15

**tint** 147:10

**tinted** 83:5,13,18 90:12 91:4 106:17 146:25 147:16,23 148:2,5,11,18 149:4,10,14,18 150:1

**today** 8:25 9:1,7 13:21 16:5 18:8 28:14 42:13 53:20 68:13 78:7 120:9 153:9 196:20 197:25

**told** 25:23 45:6 48:18 53:9 55:19 58:4 59:4 63:12 72:3 78:8,10 82:5 98:16 103:8 108:10 140:15 141:2 149:16 153:9 175:2 177:22 178:6 180:24 196:8

**top** 8:17 31:22 134:21 165:1,8 169:15 182:7 191:6

**topics** 75:18

**total** 24:9

**totality** 164:14

**touch** 86:21,22 114:17

**touching** 190:4,10 191:9

**Township** 33:11 56:13 59:8,9 149:22 196:24

**tracked** 45:19

**Tracy** 7:9

**traffic** 102:19 149:1

**train** 40:10 133:21 151:18

**trained** 40:7 51:13 80:24 103:11 121:23 124:19 133:23 149:8,12 169:9 170:24 171:4,7

**training** 62:14 63:11 155:5 166:5,17 167:4

**trainings** 62:17,18

**transport** 201:11

**trash** 174:11

**trauma** 17:11 30:25 31:5

**traumatic** 26:14

**treat** 32:13

**treating** 28:3

**treatment** 26:4,8 27:5,16 28:7,9,12 29:13 30:8 31:8

**trigger** 24:14 31:1,9,10,15 32:17 38:1,4,6,7,8,12 39:3, 6 151:17,21 152:1,3,8,13, 22 153:3

**triggers** 18:2 30:18,22

**Trotwood** 98:22

**true** 59:21

**trunk** 50:23 53:6,7 54:7,8, 10,17,23,24 91:12 96:5 130:7 131:17

**trust** 183:7

**turn** 33:17 68:24 191:21

**turned** 44:14 99:1 147:18 191:4

**turning** 191:23

**two-vehicle** 82:6 83:4

**type** 7:3 9:9 58:18,20,23 60:10 108:21 198:22

**typed** 12:13 49:22,23 58:24 60:3

**typical** 47:13 135:21 172:9

**U**

**Uh-huh** 38:21 52:22 56:10 125:21 152:9 190:7 194:24

**unapproves** 69:24

**unarmed** 201:5,8

**unaware** 30:20

**uncleared** 20:19

**underneath** 86:20

**understand** 8:20 152:16, 17

**understanding** 166:16

**understood** 83:13

**uniform** 34:8,22,23 103:24 190:5,11

**unit** 85:1,18 86:14

**United** 161:9

**unknown** 82:7

**unload** 40:1

**unlock** 138:9

**unlocked** 68:1 97:12

**unsafe** 142:12

**unusual** 72:14

**unwritten** 64:21

**upper** 92:4,6 93:19 129:7 133:1

**upright** 92:7

**upset** 100:7,10

---

**V**

**vantage** 110:9,14,16 111:1 113:6 162:25 163:1, 4,5,9

**vehicle** 25:25 55:21 75:1 83:4,5 84:7 88:1,3,6,16 89:8 90:16,20 91:1,3,5,19, 21,24 92:22 96:16 97:9,12 98:18 100:13 101:18 102:9 105:14 108:8,16 109:25 115:8 116:23 123:17 137:21 138:14 139:19,20 140:13 141:3,11,25 144:2 151:4 153:23 155:9 161:24 162:7 163:12 174:16 176:18,21 189:24

**vehicles** 51:20 82:14 88:8,19 106:6 149:6 199:20

**verbal** 169:6,20 173:25

**verified** 182:24

**Verizon** 193:9,13,18,20 194:2

**version** 46:10,22 47:14 48:4 60:18 61:8 65:17 69:6,14

**versus** 79:22

**vicinity** 106:3

**video** 177:25 190:15

**videoing** 177:23 178:14

**view** 73:15 110:20 113:10 117:14

**violation** 14:1 23:10 198:24,25 199:15

**visible** 93:20

**voice** 117:23 137:16

**Volkswagen** 177:16

**volunteer** 61:24

**Vore** 76:6,7 80:6 160:9

**vote** 16:9

**voted** 15:22 16:5

---

**W**

**wait** 20:14 46:6 64:18 76:20 101:20 102:3 121:1 129:13 136:25 159:3 185:21,22 188:4

**waited** 169:1 185:14,19

**waiting** 16:4,8,10 194:14

**walk** 180:18

**walk-through** 71:8

**walked** 93:4 99:22,24 137:12 141:6,8

**Waller** 177:8

**wanted** 20:14,18 59:22 71:17,19 137:13

**warned** 170:21

**warning** 169:5,6,20 170:25 171:1

**warnings** 171:4 183:22 186:17,18

**watch** 98:22 177:25

**watched** 135:19

**ways** 168:13

**weapon** 37:6,24 38:2 39:17,23 40:20 41:15,23 42:9,14 43:20 71:9 93:14 96:4 110:15,18,19 128:20 133:15 134:21 151:16,23 152:7,19,24 156:23 158:7 170:6,15,18

**weapons** 161:25

**wear** 34:20

**wearing** 190:14

**wedged** 97:18,24,25 98:5

**week** 45:4 57:2,12 77:1,2

**weigh** 34:2

**well-being** 29:23 83:25

**west** 99:25

**wife** 23:1 196:7 197:7 198:1,4,6

**window** 50:15,22 51:21 52:1,16,25 55:20,23 91:6, 7,8,9,10,15,24 92:15 93:4, 5,6,20 94:4,5 95:25 96:15, 20 97:8,11 100:21 102:19 107:6 108:16 111:9,12,14, 16,19,21,22,24 112:1,2,3, 4,5,8,11,14,15 113:11 114:18,25 115:13 118:24 128:22 129:8,10 130:22,24 131:6 136:7,11 138:4,5,6, 12,17,24,25 144:21,24,25 145:4,6 148:2,5,11,22 149:4,10,14,18 150:1

**windows** 24:24,25 83:6, 14,18 90:12 91:3 96:14 106:15 111:22 137:22 138:3,20 139:2,7 147:1,23 148:18 149:1

**windshield** 111:17,23,25 112:1,6 115:12

**withdrew** 151:23

**witnessed** 17:14 18:17 24:13,15

**wondering** 19:20 61:10

**word** 58:20 62:10 134:8

**wordage** 82:16

**words** 8:14 59:23 134:2 157:4 160:6 179:10

**work** 11:2 15:7,10,13,17 16:3,14,24 19:7,9,10,17,23 20:15 23:4,7,10 27:8 29:20 30:10 31:1,11,14,18 32:1 155:19 178:24 180:11 188:25 189:2 202:6,8,9,10, 11 203:1

**work-related** 16:23

**worked** 23:1 69:17 148:10 185:11

**working** 9:3 33:10 180:12 196:23

**works** 99:18 155:19 168:13

**worried** 142:12

**worry** 53:19 87:6

**worrying** 123:6

**wounds** 56:1 96:23 142:20,23,24 143:2

**Wright** 23:14 24:10 25:15, 19 29:2,3,9,11,18 73:15 75:22 76:14 77:4 78:2,25 79:8,21 170:9 171:10,16, 17,19 172:15 173:6,15,19, 21 175:19 181:2,13 182:7 183:18,22 187:4,5,24 188:12 189:4

**wrist** 182:8

**write** 22:4 56:12 60:9,10, 17 63:12 64:22 68:17 79:6

80:17,24 81:1,4 110:4,7

**writing** 51:1 56:8

**written** 63:23 64:1,20 69:4 80:6,7,15,16 108:5

**wrong** 6:19

**wrote** 49:1,4,13 50:8 56:20 63:5 65:25 80:11 110:13

---

**Y**

**yard** 88:18,24 106:1,4,7

**yards** 88:23 89:9

**yea** 32:7

**year** 12:22 39:20,23 48:12

**years** 9:23 10:9 11:9,25 15:15 27:4 31:4 133:24 196:21

**yelled** 93:10 100:2 111:5 117:21 118:7,19 119:8

**yelling** 96:9 118:3 178:11

**yellow** 105:7,8