1              UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION AT DAYTON

4                        *   *   *

5   PATRICIA MARTIN, INDIVIDUALLY

6   AND AS ADMINISTRATRIX OF THE

7   ESTATE OF DONTAE MARTIN, SR.,

8         Plaintiff,

9      vs.                    CASE NO. 3:17-cv-160

10  JOSHUA HAAS, et al.,

11        Defendants.

12                       *   *   *

13         Deposition of GUST A. TEAGUE, Defendant

14  herein, called by the Plaintiff for

15  cross-examination pursuant to the Rules of Civil

16  Procedure, taken before me, Kathy S. Wysong, a

17  Notary Public in and for the State of Ohio, at the

18  Montgomery County Prosecutor's Office, 301 West

19  Third Street, Dayton, Ohio, on Tuesday, November

20  13, 2018, at 10:41 a.m.

21                       *   *   *

22

23

24

25

2

```
 1              EXAMINATION CONDUCTED        PAGE

 2   BY MS. BRANCH:........................     6

 3

 4                  EXHIBITS MARKED

 5   (Thereupon, Plaintiff's Exhibit 19,

 6   one colored photograph, was

 7   previously marked for purposes of

 8   identification.).....................    30

 9   (Thereupon, Plaintiff's Exhibit 1,

10   incident history detail dispatch

11   log, was previously marked for

12   purposes of identification.)..........    68

13   (Thereupon, Plaintiff's Exhibit 14,

14   two colored photographs, was

15   previously marked for purposes of

16   identification.).....................    71

17   (Thereupon, Plaintiff's Exhibit 44,

18   previously marked Plaintiff's

19   Exhibit 14, was marked for purposes

20   of identification.)..................    87

21   (Thereupon, Plaintiff's Exhibit 45,

22   one colored photograph, was marked

23   for purposes of identification.)......    94

24

25
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                           Gust A. Teague

3

1  (Thereupon, Plaintiff's Exhibit 46,

2  photograph Bates stamped GB003726,

3  was marked for purposes of

4  identification.)...................... 96

5  (Thereupon, Plaintiff's Exhibit 47,

6  one colored photograph, was marked

7  for purposes of identification.)...... 98

8  (Thereupon, Plaintiff's Exhibit 7,

9  Ohio traffic crash report diagram,

10  was previously marked for purposes

11  of identification.)................... 101

12  (Thereupon, Plaintiff's Exhibit 48,

13  one colored photograph, was marked

14  for purposes of identification.)...... 102

15  (Thereupon, Plaintiff's Exhibit 49,

16  one colored photograph, was marked

17  for purposes of identification.)...... 125

18  (Thereupon, Plaintiff's Exhibit 50,

19  photograph Bates stamped GB003777,

20  was marked for purposes of

21  identification.)...................... 127

22  (Thereupon, Plaintiff's Exhibit 51,

23  oath of office, was marked for

24  purposes of identification.).......... 128

25

4

```
 1    (Thereupon, Plaintiff's Exhibit 51,

 2    use of force policy read and sign

 3    for Gust A. Teague, was marked for

 4    purposes of identification.)..........   131

 5    (Thereupon, Plaintiff's Exhibit 2,

 6    use of force policy, was previously

 7    marked for purposes of

 8    identification.)....................   131

 9    (Thereupon, Plaintiff's Exhibit 53,

10    Deputy Gust Teague's statement, was

11    marked for purposes of

12    identification.)....................   137

13    (Thereupon, Plaintiff's Exhibit 11,

14    Detective Isaiah Kellar's

15    investigation, was previously marked

16    for purposes of identification.)......   151

17    (Thereupon, Plaintiff's Exhibit 43,

18    CD with audio recordings, was

19    previously marked for purposes of

20    identification.)....................   167
```

21

22

23

24

25

Patricia Martin, Admn., et al. vs Joshua Haas, et al.                    Gust A. Teague

5

```
 1    APPEARANCES:

 2        On behalf of the Plaintiff:

 3            Gerhardstein & Branch

 4        By:  Jennifer L. Branch
                 Attorney at Law
 5               Carew Tower
                 441 Vine Street
 6               Suite 3400
                 Cincinnati, Ohio  45202
 7               513-621-9100
                 jbranch@gbfirm.com
 8
                 and
 9
                 Wright & Schulte, LLC
10
          By:  Robert L. Gresham
11               Attorney at Law
                 130 West Second Street
12               Suite 1600
                 Dayton, Ohio  45402
13               937-222-7477
                 rgresham@yourohiolegalhelp.com
14
          On behalf of the Defendants:
15
          By:  Anne M. Jagielski
16               Benjamin A. Mazer
                 Assistant Prosecuting Attorneys
17               301 West Third Street
                 Dayton, Ohio  45422
18               937-496-7195
                 jagielskia@mcohio.org
19               mazerb@mcohio.org

20               and

21               Marshall Dennehey Warner Coleman & Goggin

22        By:  Jillian L. Dinehart
                 Attorney at Law
23               127 Public Square
                 Cleveland, Ohio  44114
24               216-912-3823
                 jldinehart@mdwcg.com

25
```

6

```
 1   ALSO PRESENT:

 2          Patricia Martin

 3                      *   *   *

 4                   GUST A. TEAGUE

 5   of lawful age, Defendant herein, having been first

 6   duly cautioned and sworn, as hereinafter

 7   certified, was examined and said as follows:

 8                   CROSS-EXAMINATION

 9   BY MS. BRANCH:

10          Q.    Good morning, Officer Teague.  I'm

11   Jennifer Branch and along with Robert Gresham we

12   represent Patricia Martin, the mother of Dontae

13   Martin and the estate of Dontae Martin, and I'm

14   going to ask you questions today in your

15   deposition.  Okay?

16          A.    Okay.

17          Q.    Could you state your full name for

18   the record, please?

19          A.    Deputy Gust Teague.

20          Q.    And how do you spell your name?

21          A.    First name is G U S T.  Last name

22   Teague, T E A G U E.

23          Q.    And do you have a middle name Andrew?

24          A.    Yes.

25          Q.    Do you go by Andy?
```

7

```
 1            A.    Yes.

 2            Q.    Okay.  And you're currently an

 3    officer with the Montgomery County Sheriff's

 4    Department; is that right?

 5            A.    Yes.

 6            Q.    Have you ever had your deposition

 7    taken before?

 8            A.    No.

 9            Q.    So the ground rules -- I'll just give

10    you a couple ground rules.  You're going to answer

11    questions so I'd like your answers to be out loud

12    instead of an uh-huh or a nod of the head.

13            A.    Okay.

14            Q.    Is that okay?  If you don't

15    understand one of my questions, it's too long, it

16    doesn't make sense, whatever the problem is, just

17    let me know and I will fix it for you.  Okay?

18            A.    Okay.

19            Q.    If you later on in the deposition

20    realize a previous answer was incomplete or

21    incorrect, something has jogged your memory, you'd

22    like to go back to a line of questioning, just let

23    me know.

24            A.    Okay.

25            Q.    I'm going to be asking you questions.
```

8

```
 1   Sometimes my questions will be very short,
 2   sometimes they might be a little longer.  Just let
 3   me finish getting the question out before you
 4   start the answer.  Okay?
 5           A.   Okay.
 6           Q.   Because sometimes I take a pause in
 7   between words just to make sure the record is
 8   accurate.  All right?
 9           A.   Okay.
10           Q.   Is there any reason that your memory
11   or your ability to concentrate would be impaired
12   today?
13           A.   Not that I can think of.
14           Q.   Okay.  On any medications that would
15   impair your memory or ability to concentrate?
16           A.   No.
17           Q.   Just get off third shift and worked
18   all night?
19           A.   No.
20           Q.   Okay.  Have you reviewed any
21   documents in preparation for your deposition?
22           A.   Yes.
23           Q.   I assume you reviewed your statement?
24           A.   I have looked at it, yes.
25           Q.   Did you also look at the interview
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gus A. Teague

9

1  summaries that were done by Detective Kellar?

2          A.   No.

3          Q.   He interviewed you the night of the

4  shooting, I think we're referring to it as a

5  walkthrough.  Do you recall him doing that,

6  interviewing you the night of the shooting at the

7  scene?

8          A.   No.

9          Q.   Okay.  Have you looked at his

10  investigation report which is about sixty-four

11  pages any time recently?

12          A.   No.

13          Q.   He also interviewed you a few days

14  later with your attorney present.  Do you recall

15  that interview?

16          A.   I don't remember who it was that did

17  an interview, but yes, I do remember an interview.

18          Q.   All right.  And was that an interview

19  with somebody from the sheriff's department?

20          A.   Yes.

21          Q.   And your attorney was present?

22          A.   Yes.

23          Q.   And that was approximately five days

24  after the shooting?

25          A.   I don't know.

1      Q.   Have you looked at the summary of

2  that interview?

3      A.   No.

4      Q.   Do you remember if any of the two

5  interviews by Detective -- by the Montgomery

6  County Sheriff's Office of you were recorded?

7      A.   I don't know if they were or not.

8      Q.   Have you heard about any recordings

9  of those interviews?

10      A.   No.

11      Q.   Was there anybody who witnessed your

12  walkthrough with Detective Kellar that evening?

13  I'm sorry, I keep saying night.  I know this

14  happened a few minutes before midnight so if I say

15  the night of the shooting, we understand it's

16  after midnight, that's really early morning?

17      A.   Yes.

18      Q.   Okay.  Was anybody present when you

19  did your walkthrough with the sheriff's office

20  after the shooting?

21      A.   With the sheriff's office or Kellar

22  because the last time you asked me about Kellar?

23      Q.   I'm being broader --

24      A.   Okay.

25      Q.   -- so anybody.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 11 of 216 PAGEID #: 947

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

11

 1          A.    There were people on scene, but I
 2    don't remember who was all right around me.  I
 3    don't know if anybody followed me or anything like
 4    that.
 5          Q.    Was there anybody present in your
 6    interview with someone from the sheriff's office
 7    and your attorney a few days later?
 8          A.    There were people in the room.  I
 9    don't remember exactly who was in there.
10          Q.    Were those people from the sheriff's
11    office?
12          A.    Yes.
13          Q.    And was anyone else -- was there
14    anybody that you recall by either rank or name or
15    description of what they looked like?
16          A.    I remember Detective Kellar, my
17    attorney, and -- if I gave you names, it would
18    just be a total guess.  I don't know exactly who
19    it was in there.
20          Q.    And what's your guess of who also was
21    there?
22          A.    I think Deputy -- or Detective
23    Steele, but I'm not a hundred percent sure on
24    that.
25          Q.    Somebody from internal

 1  investigations?

 2          A.    I don't think they were in there.

 3          Q.    And Deputy Haas, was he present?

 4          A.    I don't believe so.

 5          Q.    There are two Deputy Haases we may

 6  talk about today so when I say Deputy Haas, I'll

 7  be referring to Joshua Haas --

 8          A.    Okay.

 9          Q.    -- unless I give a different first

10  name.  Okay?

11          A.    Okay.

12          Q.    Any other documents that you've

13  looked at other than your written statement?

14          A.    No.

15          Q.    How about in the last six months, any

16  documents related to the case that you have looked

17  at?

18          A.    Other than my statements, no.

19          Q.    And when you say statements, how many

20  statements are there?

21          A.    My apologies.  My statement that's

22  with the report.

23          Q.    Did you look at the discovery

24  responses that the attorneys typed up for you in

25  response to questions that I asked about various

13

1   details about the incident?

2          A.   I'm not -- the attorneys had a form

3   that they were asking me questions.  I know that

4   it was supposed to be signed off on, some paper

5   that I signed off on, I don't know if that's it or

6   not.

7          Q.   Anything else that you looked at

8   related to the case or the shooting of Dontae

9   Martin in the last six months?

10         A.   No.

11         Q.   I assume that you've had

12  conversations with your attorneys over the last

13  few years so I won't ask you any questions about

14  those discussions.

15         A.   Okay.

16         Q.   So if I ask you a question and you

17  say to yourself, oh, that was with my attorney,

18  just tell me that without answering the question.

19         A.   Okay.

20         Q.   However, if you did have discussions

21  with your attorney and someone else was present,

22  then I may ask you more about those conversations

23  so we will have to break those down when the time

24  comes.

25         A.   Okay.

14

1    Q.   In the last six months have you

2  talked to anyone other than a meeting with you and

3  your attorneys alone about this case or the

4  shooting?

5    A.   No.

6    Q.   Have you talked to Joshua Haas in the

7  last six months at all about anything?

8    A.   Yeah, we talked.

9    Q.   Okay.  And what have you two talked

10  about?

11    A.   Asked him about his current job

12  status, asked how he's doing, asked him about his

13  dinners that he's had.  In general it's just more

14  of a catching up because we don't see each other

15  as often as we used to.

16    Q.   At any time would you consider Joshua

17  Haas a friend of yours, either at work or outside

18  of work?

19    A.   Yes.

20    Q.   Somebody you would socialize with and

21  do things with outside of work?

22    A.   Yes.

23    Q.   And when did that relationship start?

24    A.   I don't know, maybe 2009, 2010.

25    Q.   Okay.  And were you working together

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 15 of 216 PAGEID #: 951
Patricia Mann, Admin., et al. vs Joshua Haas, et al.                    Gus A. Teague

15

1   at that time, on the same shift or beat?

2          A.   I don't think so.  We'd maybe pass

3   each other in working shifts and stuff.

4          Q.   And what kind of things did you do

5   together as friends outside of work?

6          A.   I know we've gone to dinner a couple

7   of times.  I know we went and watched a movie.

8   He's come to my house.  We've looked at my

9   property regarding hunting.

10         Q.   Do you hunt together?

11         A.   No, we never did hunt together.

12         Q.   Fish, do any other sports together?

13         A.   No.

14         Q.   And how about your families, do they

15  interact with each other, have a social

16  relationship?

17         A.   My family and his family?

18         Q.   Yes.

19         A.   Not really.  It was a -- when Josh

20  and I would hang out, you know, my wife and his

21  wife had a good relationship.  I had a good

22  relationship with his kids to the point of -- and

23  this goes with my wife and his wife, not as a call

24  each other up and see how things are going, but

25  Josh and I are wanting to go hang out and do

16

1   things so the wives were cordial and things.

2          Q.   Okay.  Have you spoken to Joshua Haas

3   about this incident at any time since the night of

4   the shooting?

5          A.   Yeah, we've talked about it.

6          Q.   Okay.  How many times do you think

7   you've talked to him about the actual events that

8   night?

9          A.   I don't know if -- just -- can you

10  explain events a little bit deeper for me?

11         Q.   I think I'd make it really broad.  I

12  mean that shift, from the shooting through the end

13  of shift that night -- that morning.

14         A.   I -- you know, whatever number I'd

15  give you would be a guess, but, you know, very

16  limited number of times and it was extremely

17  broad, just in the sense of, you know -- no detail

18  as far as what happened that night, it was more

19  along the lines of, you know, just why things

20  happened, you know.  More of a why and it's like,

21  you know, we don't know.  It's not our -- it's not

22  our fault, you know.  It's okay.  You know, we'll

23  make it.

24         Q.   Between the shooting on July 15th and

25  the grand jury which convened in November of that

Patricia Marin, Admin., et al. vs Joshua Haas, et al.    Gust A. Teague

17

1   year did you talk to Josh about the events of the

2   shooting?

3          A.   You said July 15th?

4          Q.   I'm sorry.  Let me -- let me start

5   from the moment of the shooting --

6          A.   Okay.

7          Q.   -- until the grand jury -- let me do

8   it until the end of November, did you talk to him

9   about the shooting; the events that led to it, the

10  reasons that occurred, any of the details?  So

11  that would be during those five months.

12         A.   Did we ever talk details of the

13  shooting?

14         Q.   Yes.

15         A.   No.

16         Q.   What about between the time of the

17  shooting and the time you turned your written

18  statement in to the County, did you talk to him?

19         A.   Yes, we talked, but did we talk

20  details?  No, we never talked details about the

21  shooting.

22         Q.   So sitting here today, have you ever

23  had a conversation with Joshua Haas about the

24  details of the shooting?

25         A.   No.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

18

```
 1          Q.   This is going to be the first time he
 2   ever hears from you what your position is as to
 3   what happened?
 4          A.   I believe so, yes.
 5          Q.   How old are you?  I don't need your
 6   birth date, just age.
 7          A.   Forty-three.
 8          Q.   And how long have you been in law
 9   enforcement?
10          A.   I want to say September of '97.
11          Q.   You don't have any military
12   background; is that right?
13          A.   Yes and no.  I was in the Marine
14   Corps and I suffered an injury to my leg.
15          Q.   And when were you in the Marine
16   Corps?
17          A.   That would have been -- I went in
18   March 21st, 1995.
19          Q.   Okay.  And when did you -- when were
20   you discharged?
21          A.   Four months later.
22          Q.   Where did you serve?
23          A.   It was all at Parris Island.
24          Q.   And was that injury related to
25   training?
```

19

```
 1          A.   Yes.
 2          Q.   Is that the reason you left the
 3   military?
 4          A.   Yes.
 5          Q.   Was that a permanent injury?
 6          A.   You know, I don't know how they
 7   titled it.
 8          Q.   Oh, I mean do you still suffer from
 9   that injury today?
10          A.   Yeah, I walk with a limp.
11          Q.   Any other military experience?
12          A.   No.
13          Q.   Ever been arrested?
14          A.   Have I ever been arrested?
15          Q.   Yes.
16          A.   No.
17          Q.   I see you finished high school?
18          A.   Yes.
19          Q.   And what year did you graduate?
20          A.   '94.
21          Q.   Any college or any other formal
22   education after high school?
23          A.   No.
24          Q.   And since you finished high school,
25   between high school and working in law
```

20

1    enforcement, did you do any other career paths

2    other than law enforcement?

3          A.    I was a firefighter.

4          Q.    And where was that?

5          A.    Loveland-Symmes Fire Department,

6    Forest Park Fire Department, Glendale Fire

7    Department.  I think that's it.

8          Q.    And what made you switch from

9    firefighting to law enforcement?

10         A.    I always wanted to be a police

11   officer.

12         Q.    And when did you get your academy --

13   go to the academy?

14         A.    I believe it was September of '97.

15         Q.    And where have you worked since

16   you've been a sworn officer?

17         A.    Arlington Heights Police Department.

18   That is a department that on paper I worked at but

19   I never even worked a day there.  That was

20   required for me to go to the police academy to be

21   sponsored by an agency.

22         Q.    Were you considered auxiliary?

23         A.    Yes.

24         Q.    So you never worked, you never

25   received pay?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

21

```
 1            A.    Correct.

 2            Q.    And after that?

 3            A.    Went to Golf Manor Police Department.

 4            Q.    Also auxiliary?

 5            A.    No, that was part time.

 6            Q.    Was that after you had your

 7   certification?

 8            A.    Yes.

 9            Q.    And how long were you there part

10   time?

11            A.    I don't remember.

12            Q.    And after --

13            A.    A couple years.

14            Q.    Did you work anywhere else while you

15   were in Golf Manor?

16            A.    I was working at one of the fire

17   departments.

18            Q.    What other law enforcement agencies?

19            A.    I worked at Warren County Sheriff's

20   Office, Woodlawn Police Department, and now here,

21   the sheriff's office.

22            Q.    Okay.  And why did you leave Golf

23   Manor?

24            A.    They laid off their entire part-time

25   staff.
```

 1        Q.    And why did you leave Warren County?

 2        A.    For a full-time position with

 3   Woodlawn.  Warren County was a corrections

 4   officer.

 5        Q.    Was that a sworn position at Warren

 6   County or were you an unsworn corrections officer?

 7        A.    You know, I don't know how they

 8   classified it there.  We were not deputies.  We

 9   were corrections officers.

10        Q.    So Woodlawn, was that your first

11   full-time law enforcement?

12        A.    Yes.

13        Q.    And how long did you stay there?

14        A.    Hang on just a second.  Montgomery

15   County -- or Warren County was a full-time

16   position but it was a corrections officer, not a

17   deputy.

18        Q.    Oh, I thought you said part-time

19   corrections.

20        A.    No, it's full time.

21        Q.    No chance to move up in Warren County

22   to get out of corrections?

23        A.    There's always opportunity.

24        Q.    Oh.  So why did you leave?

25        A.    Because I wanted a full-time road

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 23 of 216 PAGEID #: 959

Patricia Martin, Admin, et al. vs Joshua Haas, et al.                    Gust A. Teague

23

1    position.

2            Q.    So you wanted a full-time position as

3    a road deputy?

4            A.    As a road officer, yes.

5            Q.    Road officer.  And how long did you

6    stay at Woodlawn?

7            A.    Five or six years.

8            Q.    And did you achieve any rank other

9    than officer?

10           A.    No, just police officer.

11           Q.    And while you were there did you have

12   any discipline?

13           A.    I would -- do you have my personnel

14   file from there or anything so I can go back and

15   review it?

16           Q.    I'm asking you.

17           A.    I don't know.

18           Q.    You don't know if you had discipline

19   or you don't remember what discipline you had?

20           A.    I don't remember what or if any

21   discipline I had.

22           Q.    And why did you -- while you were at

23   Woodlawn did you use force on suspects?

24           A.    Yes.

25                 MS. DINEHART:  Objection.

24

```
 1  BY MS. BRANCH:
 2          Q.   And what type of force?
 3          A.   I've used -- I've used the taser in
 4  the past.  And then I know I've had a couple of
 5  balance displacements.
 6          Q.   Did you ever shoot your weapon at a
 7  suspect?
 8          A.   No.
 9          Q.   What about aim your weapon at a
10  suspect?
11          A.   Yes.
12          Q.   Was that considered a use of force at
13  Woodlawn?
14          A.   That policy had changed several times
15  while I was there so at the time of it, I don't
16  remember if they used that as a use of force or
17  display of force or not.
18          Q.   And of the use of forces that you had
19  at Woodlawn, were those investigated by their use
20  of force committee?
21              MS. DINEHART:  Objection.
22              THE WITNESS:  All their uses of force
23  were investigated, but I don't know the process,
24  how they did that.
25  BY MS. BRANCH:
```

25

1        Q.    And what were the outcomes of those?

2        A.    All the use of forces I've been

3  involved in were justified.

4        Q.    And at Golf Manor did you use force?

5              MS. DINEHART:  Objection.

6              THE WITNESS:  I don't remember any at

7  Golf Manor.

8  BY MS. BRANCH:

9        Q.    And did you receive any discipline

10 while you were at Golf Manor?

11       A.    I don't know.

12       Q.    How about Warren County, did you use

13 force as a corrections officer?

14       A.    Yes.

15       Q.    And were those investigated?

16       A.    Yes.

17       Q.    And what were those outcomes?

18       A.    Everything was justified.

19       Q.    And how about discipline at Warren

20 County?

21       A.    I don't know.

22       Q.    Montgomery County Sheriff's Office,

23 you've been here since 1997; is that right?

24       A.    No.  I've been here since 2006.

25       Q.    2006.  I'm sorry.  And did you start

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 26 of 216 PAGEID #: 962

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

26

 1    in corrections?

 2         A.    No.

 3         Q.    You started as a road patrol?

 4         A.    Yes, ma'am.

 5         Q.    And have you received any promotions

 6    since then, since you started?

 7         A.    No, I'm still a deputy.

 8         Q.    Did you take any promotional exams?

 9         A.    No.

10         Q.    And of the discipline that you've had

11    at Montgomery County Sheriff's Office, what do you

12    recall?

13         A.    I would have to see my personnel

14    file.  Do we have that?

15         Q.    So you don't recall without reviewing

16    your file?

17         A.    Correct.

18         Q.    And how about use of force, have you

19    used force in the Montgomery County Sheriff's

20    Office other than the incident involving Dontae

21    Martin?

22              MS. DINEHART:  Objection.

23              THE WITNESS:  Yes.

24    BY MS. BRANCH:

25         Q.    Have you used your firearm to shoot

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Gust A. Teague

27

```
 1    someone or shoot at a suspect other than Dontae
 2    Martin?
 3          A.   No.
 4          Q.   Have you used your firearm as a show
 5    of force in any situation in Montgomery County?
 6          A.   Yes.
 7          Q.   Have you used a taser at Montgomery
 8    County?
 9          A.   Yes.
10          Q.   And you've used force involving
11    handcuffing?
12               MS. DINEHART:  Objection.
13    BY MS. BRANCH:
14          Q.   Does Montgomery County -- let me ask
15    it this way, does Montgomery County consider the
16    use of handcuffs a use of force?
17          A.   Properly applying handcuffs on
18    somebody as use of force?
19          Q.   Yes.
20          A.   No.
21          Q.   Have you been in situations in
22    Montgomery County where you've been accused of
23    excessive force with handcuffs?
24          A.   No.
25               MS. DINEHART:  Objection.
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 28 of 216 PAGEID #: 964

Patricia Marlin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

28

1  BY MS. BRANCH:

2        Q.   Have you been -- used balance

3  displacement techniques or hands-on uses of force

4  at Montgomery County?

5        A.   Yes.

6        Q.   Okay.  And of all of those uses of

7  force, have any of them -- have all of them been

8  investigated by the County?

9        A.   Yes.

10       Q.   And in those situations were any

11  found to be unjustified use of force?

12       A.   They're all justified that I can

13  think of.

14       Q.   And how many uses of force

15  investigations have you been subjected to since

16  you've been here at the County?

17       A.   I have no idea.

18       Q.   What is a justified use of force in

19  the terms of Montgomery County's policies,

20  procedures, and training?

21            MS. DINEHART:  Objection.

22            THE WITNESS:  Do you have that

23  policy?  I can read it and let you know.

24  BY MS. BRANCH:

25       Q.   So your answer would be to read to me

29

```
 1   the use of force policy?

 2          A.   If you want me to, I can read it to

 3   you.

 4          Q.   No, I don't want you to read the

 5   policy.  We have it.  I'm just asking you if you

 6   know -- when you said all of your uses of force in

 7   all of these jurisdictions were justified, what

 8   did you mean by that?

 9          A.   When they were investigated, the

10   outcome was that they were justified.

11          Q.   And what would justify a use of force

12   by a law enforcement officer against a citizen?

13               MS. DINEHART:  Objection.

14               THE WITNESS:  I really have no idea

15   what you're asking me.

16   BY MS. BRANCH:

17          Q.   Do you know what your use of force

18   limits are in Montgomery County, when you can use

19   deadly force and when you can't?

20          A.   Yes.

21          Q.   And what are those?

22          A.   To protect myself, my partner, the

23   community.

24          Q.   Anything else?

25          A.   That's the basics of it, but if you
```

30

1    have the policy, I can go through and read it for

2    you.

3            Q.    That's okay.  You don't need to read

4    me the policy.

5            A.    Okay.

6            Q.    Have you been involved in any of your

7    career in law enforcement where you observed

8    another officer using force that you thought was

9    not justified?

10           A.    No.

11                (Thereupon, Plaintiff's Exhibit 19,

12   one colored photograph, was previously marked for

13   purposes of identification.)

14   BY MS. BRANCH:

15           Q.    If you can look at Exhibit 19 in the

16   book.  Is that a photograph of you?  Is that a

17   photograph of you?

18           A.    Yes.

19           Q.    It's my understanding this photograph

20   was taken after the shooting sometime in the early

21   morning of July 23rd, 2015.  Do you recall this

22   photograph being taken?

23           A.    I don't know if it was this

24   photograph, but I do remember someone taking a

25   photo of me.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 31 of 216 PAGEID #: 967

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

31

1          Q.    And is this how you appeared that

2    morning --

3          A.    Yes.

4          Q.    -- at the time of the shooting?

5          A.    I believe so, yes.

6          Q.    And your firearm is on your right hip

7    of your duty belt; is that correct?

8          A.    Yes.

9          Q.    And where is your flashlight?

10          A.    I don't think you can see it on here.

11          Q.    Where would it be?

12          A.    In this picture it would be on the

13    right-hand side behind my radio.

14          Q.    Okay.  And were you wearing your

15    radio the way it is depicted in the photograph, on

16    your hip and then the microphone on your shoulder?

17          A.    Yes.

18          Q.    And at that time what was your height

19    and weight?

20          A.    Five seven, about a hundred and

21    seventy-five, hundred and eighty pounds.

22          Q.    And is that the height without your

23    shoes?

24          A.    Yes.

25          Q.    And how -- what would your height be

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 32 of 216 PAGEID #: 968

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

32

 1   with your shoes or boots that you were wearing

 2   that night?

 3           A.    I have no idea.

 4           Q.    And what were you -- what kind of

 5   footwear did you wear?

 6           A.    Boots.

 7           Q.    Same thing you're wearing today?

 8           A.    No, these are brand-new.

 9           Q.    Did you have about a one inch heel on

10   your boots?

11           A.    I have no idea.

12           Q.    What else did you have as equipment

13   that you were wearing on your uniform at the time

14   of the shooting?

15           A.    I would have worn two pairs of

16   handcuffs, a taser, an asp.  Flashlight, taser,

17   asp, two handcuffs, my radio, firearm.  My

18   magazines, two of them.  Two magazines in a single

19   pouch.  I would have worn my keys.  I believe

20   that's it.

21           Q.    Do you have your flashlight on you

22   today?

23           A.    No.

24           Q.    Do you have your firearm with you?

25           A.    Yes.

33

```
 1            Q.    Is it the same firearm you used?

 2            A.    No.

 3            Q.    The fire -- the flashlight that you

 4   used in July of 2015, did it have multiple

 5   settings?

 6            A.    I -- I don't think it does -- or did.

 7            Q.    Did it have multiple colors?

 8            A.    As far as -- well, no.

 9            Q.    So it just had one brightness?

10            A.    Yes, as far as I can remember.

11            Q.    And do you still have that

12   flashlight?

13            A.    No.

14            Q.    And do you still use a Pelican

15   flashlight?

16            A.    Yes.

17            Q.    Did you have a microphone on your

18   person that night?

19            A.    Yes.

20            Q.    And where was that?

21            A.    In my pocket.

22            Q.    Which pocket?

23            A.    In my chest pocket.  Right pocket.

24            Q.    Okay.  Can I see -- can we see that

25   in the photograph?
```

34

```
 1              A.   The mic?  No.

 2              Q.   And was the microphone inside the

 3   pocket or attached to the pocket?

 4              A.   Inside the pocket.

 5              Q.   And how would you activate it?

 6              A.   It could be activated by pushing a

 7   button.  It's activated by overhead lights turning

 8   on.  The exact system I don't remember.  We've

 9   changed systems several times so I don't remember

10   which system we were using at the time.  All of

11   our systems are activated by pushing the button,

12   the overhead lights turning on.  Newer systems

13   today have changed, and I don't remember what

14   system we had then, but it could be activated by G

15   force in the car, sudden stopping, speed, large

16   jolt in the vehicle, like if you hit a big

17   pothole.  That's the system that I use today, I

18   just don't remember if it was the same system

19   then.

20              Q.   Okay.  So at least the overhead

21   lights, if they were activated, your microphone

22   would have gone on back in July of '15?

23              A.   Yes.

24              Q.   And is the microphone always inside

25   your right front breast pocket?
```

35

```
 1              A.    Yes.
 2              Q.    Does it pick up your voice even
 3   though it's inside your pocket?
 4              A.    Yes.
 5              Q.    And you said it could also be
 6   activated by hitting a button.  Is that a button
 7   on your person?
 8              A.    It's a button on the -- on the mic
 9   box itself.
10              Q.    Okay.  And do you have one on you
11   now?
12              A.    No.
13              Q.    How would you access the button?  Do
14   you have to actually go in your pocket or can you
15   do it from the outside of your pocket?
16              A.    I can do it from the outside.
17              Q.    All right.  So you were -- did you
18   have occasion while you were an officer to
19   activate your microphone from the pocket button
20   back in 2015?
21              A.    I'm sorry, I don't understand what
22   you're asking.  Say that again.
23              Q.    Did you ever activate your
24   microphone --
25              A.    Yes.
```

36

```
 1          Q.    -- that was in your pocket by hitting
 2    the button?
 3          A.    Yes.
 4          Q.    Okay.  It was something you were
 5    comfortable doing?
 6          A.    Yes.
 7          Q.    Knew how to do?
 8          A.    Yes.
 9          Q.    Able to do that correctly and get the
10    recording started?
11          A.    Yes.  When we get a minute, I have to
12    use the restroom.
13          Q.    Sorry, that was one of my ground
14    rules that I skipped.  You're welcome to take a
15    break whenever you need.  You don't have to tell
16    me why.
17          A.    Okay.
18          Q.    I just ask that you finish answering
19    whatever the question is.  If you want to take a
20    break now, that's fine.
21          A.    Okay.  Yeah.  Just give me a couple
22    minutes.
23                (Pause in proceedings.)
24                (Thereupon, Ms. Jagielski exited the
25    room.)
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

37

1  BY MS. BRANCH:

2          Q.    Have you ever been sued before?

3          A.    Yes.

4          Q.    How many times?

5          A.    I remember one.  I remember one.

6          Q.    What was that about?

7          A.    That one was a -- it was a -- I don't

8  know what you want to call it.  I don't know what

9  the lawsuit was for.

10         Q.    Oh.  What was the -- what happened

11 that gave rise to the lawsuit?

12         A.    A deputy -- or not deputy, this is

13 when I was in Woodlawn.  There was a police

14 officer that was involved in an incident that at

15 the end of the incident he wound up being sued

16 over.

17         Q.    What were the things that he said or

18 did that got him sued?

19         A.    I'm not allowed to discuss that.

20         Q.    The basis for the lawsuit?

21         A.    I don't remember what it was or don't

22 know what it was.

23         Q.    Were you a defendant in the lawsuit?

24         A.    Yes.

25         Q.    And there was a confidential

38

 1   settlement reached in that case?

 2        A.   I'm not sure what it was titled.  I

 3   just know at the end of it we were told we were

 4   never allowed to discuss it as part of the --

 5        Q.   You were not allowed to discuss the

 6   settlement?

 7        A.   The way I understood it, we were not

 8   allowed to discuss the lawsuit or anything.

 9        Q.   Okay.  Well, you're being deposed

10   today so I don't know what the grounds are of your

11   settlement agreement, if your attorney does, you

12   can let me know, but I'm not interested in what

13   the settlement was, I'm interested in just what

14   the issue was that got everybody sued.  What were

15   the allegations?

16        A.   As I just --

17             MS. DINEHART:  I'm just going to step

18   in and say I don't know what the grounds are of

19   the agreement, I don't know what lawsuit he's

20   referring to, I haven't looked into it at all, but

21   it's his belief, as he's testified today, that the

22   whole thing might be confidential.  I can maybe

23   try and find out later what exactly this lawsuit

24   is, but maybe you can ask him for the time frame

25   and look it up so that he's not breaching any kind

                                                                      39

 1   of confidentiality orders as he understands them.

 2   BY MS. BRANCH:

 3        Q.   Were you sued in state court or

 4   federal court?

 5        A.   I believe it was state court.

 6        Q.   Okay.  And were you named as a

 7   defendant?

 8        A.   No.

 9        Q.   You were a witness?

10        A.   You know, I don't even know how

11   it's --

12        Q.   Who was the -- who were the other

13   officers involved that were sued?

14        A.   I can't discuss it.

15        Q.   So I can't look it up if I don't know

16   the name of the defendant.

17        A.   I'm sorry, I don't know what to tell

18   you.

19        Q.   Okay.  So if -- who represented you

20   in that case?

21        A.   I remember one name, the attorney's

22   name was Lynnette Ballato.

23        Q.   Okay.

24        A.   I believe that's how it was

25   pronounced.

1        Q.     Yes.  I know who she is.  And what

2   year or years did that litigation take place?

3        A.     Early 2000, 2001, somewhere in that

4   area.

5        Q.     Were you still with Woodlawn when it

6   was over?

7        A.     Yes.

8        Q.     Okay.  Well, we'll come back to this.

9   Any other cases in which you've been involved in

10   litigation either as a witness or a defendant or

11   even a plaintiff?

12        A.     Nothing that I can think of.

13        Q.     On July 23rd, 2015, what was your

14   assignment that shift?  Were you assigned to

15   Harrison Township?

16        A.     Yes.

17        Q.     And what was your shift hours?

18        A.     It would be 11:30 to 8:02 I think is

19   our time frame for midnights.

20        Q.     Is that considered third shift?

21        A.     That's considered first shift.

22        Q.     And before you got the call regarding

23   the accident or the one car -- the two car vehicle

24   accident on Springbrook, what were you doing?

25        A.     We were doing a narcotics

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 41 of 216 PAGEID #: 977

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Gust A. Teague

41

1   investigation.

2          Q.   And where was that?

3          A.   What's the name of the street?  I

4   cannot remember the name of the street that we

5   were on.

6          Q.   In Harrison Township?

7          A.   Yes.

8          Q.   And what were you investigating?

9          A.   We had smelled marijuana coming from

10  a group of individuals that were on the street,

11  and I cannot think of the name of the street.

12         Q.   That's a good example, if you think

13  of it as we go forward, just let me know.

14         A.   Okay.

15         Q.   And what were you doing to

16  investigate; talking to the individuals or

17  stopping and frisking?

18         A.   We had smelled the odor of

19  marijuana -- or I had smelled the odor of

20  marijuana, called Deputy Haas on the radio, told

21  him what I had smelled, asked him to come over and

22  let's do a foot patrol in the area.  I don't

23  remember us actually getting to the full

24  investigation of it before we got the auto

25  accident call.  I don't remember how far we went

42

1   with the investigation.

2        Q.    Okay.  Were you -- you and Deputy

3   Haas both out of your vehicles and on your feet

4   doing this patrol before you got the call?

5        A.    Yes.

6        Q.    And how long were you out on the foot

7   patrol?

8        A.    A couple minutes.

9        Q.    Did someone take over that

10  investigation or you just abandoned it?

11       A.    I can't say abandoned because I don't

12  remember how far we went into it, but we left that

13  call.

14       Q.    And did your sergeant, Sergeant

15  McLaughlin, know that you were on the foot patrol?

16       A.    I don't know what he knew.

17       Q.    And why did you call Deputy Haas to

18  assist?  Oh, let me ask you this way, were there

19  any other deputies available to assist you?

20       A.    I have no idea who else was

21  available.

22       Q.    And why did you call Deputy Haas?

23       A.    Because the way Harrison Township is

24  designed, there's an east and a west side of

25  Harrison.  You have an eleven beat and a twelve

43

1    beat on the west side and a thirteen and fourteen

2    beat on the east side and it's split by the city

3    of Dayton, and Deputy Haas and I both worked the

4    west side together.

5            Q.    And how long had you and Deputy Haas

6    been working together on the west side?

7            A.    A couple years.

8            Q.    Anything else that you remember about

9    what you did on shift before you arrived at 324

10   Springbrook Boulevard?

11           A.    We had our roll call, our vehicle

12   checks.  I don't -- we on occasion would go to one

13   of the gas stations and pick up something to

14   drink.  I don't know if we did it that night, but

15   probably did get -- stop and get something to

16   drink because that was a fairly normal thing that

17   we did together.  Then went about our patrol.  I

18   don't remember if we got any dispatches between

19   that time and the drug complaint, and then from

20   the drug complaint to the auto accident.

21           Q.    So when you smelled marijuana, you

22   were responding to a complaint?

23           A.    When I say drug complaint, I'm the

24   complainant because I smelled the marijuana.

25           Q.    Oh, I see.  I've got it.  I assume

44

1   you were drinking nonalcoholic beverages?

2          A.   Yes.

3          Q.   Okay.  Were you tired that night?

4          A.   No.

5          Q.   Had you worked -- what was your

6   normal workweek?

7          A.   We work five -- our normal schedule

8   is we work five days on, two days off, five days

9   on, three days off.  I have no idea where I was at

10  in that rotation.

11         Q.   Hadn't worked any extra shifts --

12         A.   No.

13         Q.   -- that month?

14         A.   That month?  I don't remember that

15  month.

16         Q.   Do you know if you had worked the

17  shift before on the 22nd?

18         A.   My shift or the shift --

19         Q.   July 22nd.

20         A.   I worked July 22nd from 11:30 at

21  night until 8:00 o'clock in the morning -- or 8:02

22  in the morning.

23         Q.   But no extra shift that day?

24         A.   No.

25         Q.   Anything that would have distracted

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 45 of 216 PAGEID #: 981

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Gus A. Teague

45

1    you while you were at work on July 23rd?

2            A.    No.

3            Q.    Any medications that you were taking?

4            A.    I'm on pantoprazole, which is an acid

5    reflux medication.

6            Q.    Anything else?

7            A.    No.

8            Q.    In the interview with Detective

9    Kellar he says that you were on prescription

10   medications that evening.  Do you know what you

11   had taken before you went on shift on the 22nd --

12           A.    I --

13           Q.    -- on the 22nd at 11:30 at night?

14           A.    That day, I don't know if it was just

15   before shift but I would have taken the

16   pantoprazole, which is a prescription medication.

17           Q.    Anything else that you would have

18   ingested that was a medication?

19           A.    No.

20           Q.    Tell me about the firearm that you

21   carried with you that night.

22           A.    I would have to review my report.

23   I've changed firearms since then so...

24           Q.    The records show that you had a Glock

25   Model 23 pistol that fired forty caliber rounds.

 1   Is that right?

 2            A.   Yes, that's correct.

 3            Q.   It was a semiautomatic weapon?

 4            A.   Yes.

 5            Q.   Did it have a capacity to be

 6   non-semiautomatic, in other words, you could do a

 7   single trigger pull and just shoot one shot?

 8            A.   That's what semiautomatic is.

 9            Q.   And do you know how you were

10   operating the gun that evening?  Did you do a

11   single --

12                 MS. DINEHART:  Objection.

13   BY MS. BRANCH:

14            Q.   Let me ask it this way.  On your

15   Glock that you were using back in July of 2015 --

16            A.   Okay.

17            Q.   -- how did you use that weapon on a

18   firing range?  What different techniques did you

19   use when you were training?

20                 MS. DINEHART:  Objection.

21                 THE WITNESS:  I'm sorry, I have no

22   idea what you're asking, what kind of techniques I

23   used.  You mean --

24   BY MS. BRANCH:

25            Q.   Did you always use it in a

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 47 of 216 PAGEID #: 983

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

47

1    semiautomatic mode when you were training?

2           A.    Yes.   There's only a semiautomatic

3    mode to that gun.

4           Q.    And how many rounds did you carry in

5    your magazine?

6           A.    I believe those magazines were

7    thirteen rounds.

8           Q.    And you had one in the chamber?

9           A.    Yes.

10          Q.    So that night you had fourteen rounds

11   in your weapon?

12          A.    Yes.

13          Q.    And you had two spares of thirteen?

14          A.    Two spare magazines, yes.

15          Q.    Did you -- do you know sitting here

16   today how many shots you fired that night?

17          A.    I do now, yes.

18          Q.    And what was the total number?

19          A.    Seven.

20          Q.    And how many of those struck Dontae

21   Martin?

22          A.    I -- I think it was seven, but I'm

23   not a hundred percent sure.  I would have to read

24   a report that might reflect exactly what that is.

25          Q.    And what report would that be?

48

1      A.   No idea.  That's what I'm asking you.

2  If you have a report telling me that --

3      Q.   Well, I thought you hadn't looked at

4  any reports or documents related to the case

5  except your statement?

6      A.   I just asked you if you have a

7  report, tell me, then I can reflect that answer to

8  you; but I don't have that report.

9      Q.   I see.  And so why do you think you

10  shot him seven times?

11      A.   Because I pulled the trigger seven

12  times.

13      Q.   And why did you pull the trigger only

14  seven times if you had the ability to pull it

15  more?

16      A.   Well, during the time I didn't count

17  so I had no idea how many I was pulling --

18      Q.   Sure.

19      A.   -- but I stopped when I no longer

20  could see my threat.

21      Q.   Tell me what you mean by that.

22      A.   What I mean by what's the threat?

23      Q.   You stopped when you no longer could

24  see your threat.

25      A.   I could no longer see Dontae Martin

1   in the vehicle.

2          Q.   And why could -- why was there a

3   point in time that you could no longer see him in

4   the vehicle?  Had your flashlight moved?

5          A.   I was moving.

6          Q.   And you were moving backwards?

7          A.   Yeah, for the -- not directly

8   backwards but it was back and at an angle.

9          Q.   Okay.  You were positioned at the

10  right rear fender of the vehicle at the time you

11  started shooting; is that right?

12         A.   No.  I was -- I was near the -- and

13  forgive me, I don't use right and left because

14  depending on what side you're looking at the car,

15  it could be right or left --

16         Q.   Oh, sure.

17         A.   -- so I'll just use passenger side.

18         Q.   That's fine.

19         A.   I began firing my weapon when I was

20  at about the rear passenger door.

21         Q.   And where were you when you stopped

22  firing?

23         A.   Toward the rear passenger fender.

24         Q.   And one of your bullets hit the door;

25  is that right?

50

```
 1          A.   I have no idea where my bullets hit,
 2   ma'am.
 3          Q.   Have you seen any of the photographs
 4   of the vehicle after the shooting?
 5          A.   I don't remember seeing any pictures
 6   of the car afterwards.
 7          Q.   Do you remember hitting the door?
 8          A.   I know I hit in the area.  I don't
 9   know what I hit --
10          Q.   Do you remember hitting the --
11          A.   -- of the part of the car.
12          Q.   -- glass?
13          A.   You know, just -- I don't -- you
14   know, what I hit on the vehicle, I don't remember
15   what I hit.  I don't know what I hit.  I don't
16   remember going back and ever seeing it.
17          Q.   You said that you stopped firing when
18   you had moved away from -- far enough away from
19   the vehicle that you could no longer see Dontae
20   Martin inside the vehicle; is that right?
21              MS. DINEHART:  Objection.
22              THE WITNESS:  I don't know if it was
23   because it was too far away, but I could no longer
24   see the -- Mr. Martin.
25   BY MS. BRANCH:
```

1      Q.   And how far away were you at the

2  point that you could no longer see him?

3      A.   I would -- probably -- when I stopped

4  firing, I was probably six to eight feet from the

5  rear passenger side bumper, fender area.

6      Q.   And you were closer than that when

7  you first started firing; is that right?

8      A.   Yes, ma'am.

9      Q.   And how many steps -- or feet closer

10  were you when you started to fire?

11      A.   I was probably two feet from the

12  vehicle.

13      Q.   Close enough to touch it?

14      A.   No, I couldn't touch it.  I was

15  probably further away.  Two, three feet.

16      Q.   I forget, you told me how tall you

17  were.  Do you know how long your reach is?

18      A.   I have no idea.

19      Q.   So somewhere between three feet and

20  six feet you lost visual contact with Dontae

21  Martin?

22      A.   Yes.

23      Q.   Was your flashlight up and shining

24  into the vehicle the whole time you were shooting?

25      A.   Yes.

52

```
 1          Q.   And at what angle was your
 2    flashlight?
 3          A.   I have no idea.
 4          Q.   And were you looking through the rear
 5    passenger window?
 6               MS. DINEHART:  Objection.
 7               THE WITNESS:  The passenger door?
 8    BY MS. BRANCH:
 9          Q.   Well, I was asking if you were
10    looking through the window on the rear passenger
11    side.
12               MS. DINEHART:  Objection.
13               THE WITNESS:  Are we talking about
14    the driver's side -- or the passenger side door or
15    the passenger side of the rear window?
16    BY MS. BRANCH:
17          Q.   I see.  Let me just say there would
18    be -- there's a passenger side front door window,
19    a passenger side back door window --
20          A.   Okay.
21          Q.   -- and then a passenger side small
22    window that doesn't open.
23          A.   Okay.
24          Q.   Do you know which of those three
25    windows you were looking through when you first
```

53

```
 1  saw him?

 2       A.   It would be the passenger side door

 3  window, the one that goes up and down.

 4            (Thereupon, Ms. Jagielski entered the

 5  room.)

 6  BY MS. BRANCH:

 7       Q.   Okay.  And that's the back door

 8  window?

 9       A.   Yes.

10       Q.   And at the time that you stopped

11  seeing him, were you looking through that same

12  window or the small window that doesn't move?

13       A.   Neither one.

14       Q.   Were you looking through the rear

15  window?

16       A.   Yes.

17       Q.   That was also tinted?

18       A.   Yes.

19       Q.   The rear windshield -- or the rear

20  window?

21       A.   Yes.

22       Q.   So you said that you fired seven

23  shots and only seven shots because you no longer

24  could see Dontae Martin in the vehicle; is that

25  right?
```

54

```
 1          A.   Correct.

 2          Q.   And you started off by saying you

 3   could no longer see my threat; is that right?

 4          A.   Yes.

 5          Q.   And your threat in your assessment of

 6   the threat at the scene was Dontae Martin was a

 7   threat to your partner, Officer Haas; is that

 8   right?

 9          A.   Dontae possessing a firearm was my

10   threat.

11          Q.   And what was the threat that you saw?

12          A.   Him holding a firearm.

13          Q.   Anything else?

14          A.   That's the initial threat.  That's

15   what made it the threat.  It evolved into him

16   pointing it at Deputy Haas.

17          Q.   Any other threats that you

18   identified?

19          A.   No.  The fact that, you know, he

20   pointed the firearm at Deputy Haas, that was my

21   threat, and then you no longer see that.

22          Q.   Okay.  So I just want to make sure

23   I've got all the threats that you identified that

24   caused you to fire your weapon at Dontae Martin.

25   The fact that Dontae Martin was holding a firearm
```

1  was one threat and the fact that he pointed a

2  firearm at Deputy Haas was another threat; is that

3  right?

4          A.    Well, it is a little bit more into it

5  than just the fact that he's holding the firearm.

6  He's holding a firearm and he is not complying

7  with our commands to drop the firearm.  He

8  continues to raise the firearm during our orders

9  for him to drop the firearm so that continues to

10  heighten that threat to an even greater threat to

11  the point that Dontae looked for Deputy Haas in

12  the driver's side mirror and raised the firearm up

13  toward his shoulder pointing it toward Deputy

14  Haas.

15          Q.    Anything else?

16          A.    We had that threat -- Deputy Haas was

17  definitely a large part of the threat or being a

18  victim of this threat, but I also had numerous

19  civilians standing around that I had to worry

20  about that threat as well.

21          Q.    Anything else?

22          A.    Not knowing what Dontae was thinking,

23  I worried about my safety.

24          Q.    Anything else?

25          A.    Nothing off the top of my head.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 56 of 216 PAGEID #: 992

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

56

1     Q.   Okay.  So the question was what was

2  the -- you said you stopped shooting when you no

3  longer could see my threat, and the threat

4  includes Dontae Martin holding a firearm, Dontae

5  Martin pointing the firearm at Deputy Haas, Dontae

6  Martin not complying with your command to drop the

7  firearm, and you didn't know what Dontae Martin

8  was thinking and that made you worried about your

9  safety?

10     A.   As well as the community.

11     Q.   Okay.  Anything else?

12     A.   No.

13     Q.   When you say that he was holding the

14  firearm, tell me about why that's a threat.

15     A.   It's a threat because, you know, you

16  pull the trigger, you shoot and hurt somebody, you

17  shoot and kill somebody.

18     Q.   Okay.  Is it a threat to possess a

19  firearm?

20          MS. DINEHART:  Objection.

21          THE WITNESS:  You said -- ask that

22  question again.  I'm sorry.

23  BY MS. BRANCH:

24     Q.   Are citizens in Ohio permitted to own

25  a firearm?

57

```
 1            A.    Yes.

 2            Q.    Are they permitted to hold a firearm?

 3            A.    Yes.

 4            Q.    Okay.  In Ohio people may possess a

 5   firearm and carry it out in the open; is that

 6   right?

 7            A.    Yes.

 8            Q.    They can also possess a firearm and

 9   carry it concealed; is that correct?

10            A.    If they have --

11                 MS. DINEHART:  Objection.

12                 THE WITNESS:  If they have their

13   concealed carry permits, yes.

14   BY MS. BRANCH:

15            Q.    So at the time that you were

16   perceiving Dontae Martin holding a firearm as a

17   threat, why did you consider that a threat if it's

18   legal to possess a firearm, carry it in the open,

19   or even carry it concealed?

20            A.    It becomes -- everybody who possesses

21   a firearm, there is a potential threat to what

22   they're going to do with that firearm.  As a

23   police officer, we have to keep that in the back

24   of our minds of what an individual is going to do

25   with that firearm.  But when -- I'm sorry, the
```

58

 1   vibration, whatever that was just took me off that

 2   comment.

 3              Q.    That's fine.

 4              MS. BRANCH:   Whoever's phone is on

 5   the table, if you could just take it off the table

 6   so we don't hear it.

 7              THE WITNESS:   When a police officer

 8   gives someone an order to do something specific,

 9   especially pertaining to a firearm, and every

10   situation is different, but when an officer gives

11   those orders and the individual does not listen

12   and continues to do whatever he or she is doing,

13   that increases my awareness, my thought of, you

14   know, is this threat toward me, is it toward

15   myself, is it toward somebody else, or is the

16   individual just not hearing me or listening.

17   BY MS. BRANCH:

18              Q.    So it's not holding the firearm, it's

19   how the firearm is used in response to commands?

20              A.    It's a totality of the moment.  Every

21   situation, again, is different.  This situation is

22   an auto accident where when he's told to drop the

23   firearm he continues to hold the firearm and

24   raising it up off of his leg.  We've identified

25   ourselves -- or I've identified myself as a deputy

59

1   sheriff and he continues to still hold that

2   firearm and raise it up off of his leg, lower it

3   back down, raise it up, lower it back down.  And,

4   again, we're continuing the orders telling

5   somebody to drop the firearm, I, you know,

6   perceive that as an individual that's not

7   listening, doesn't want to comply with our

8   commands, but the threat becomes reality when he

9   raises that firearm and points it at another

10  person.

11          Q.   Okay.  So I'm breaking down your

12  answer.  The first thing you told me, the first

13  threat you stated was that he was holding a

14  firearm.  In Ohio is -- are you justified at

15  shooting a person who's holding a firearm and

16  doing nothing else?

17              MS. DINEHART:  Objection.

18              THE WITNESS:  As long as they're

19  not -- as long as they're not, you know, going

20  after an individual, you know, if they're not

21  continuing a threat, you know.  As a police

22  officer, when I walk up on an individual who's

23  holding a firearm, you know, is it legal for him

24  to have the firearm in his hand?  Absolutely, you

25  know, but --

Patricia Mahin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

60

```
 1  BY MS. BRANCH:

 2          Q.    You can't --

 3          A.    -- I can also order him to put down

 4  the firearm.

 5          Q.    Would you agree --

 6                MS. DINEHART:  Let him finish his

 7  answer.

 8                THE WITNESS:  And if he puts down the

 9  firearm, you know, then I continue on with

10  whatever my business is being there and I know

11  that I'm safe, I know that the people around me

12  are safe, you know, and that being a partner, if I

13  have one with me, that being civilians that are

14  around.  But the problem here is the fact that

15  Dontae did not comply with what we told him to do.

16  We told him to put down the firearm and he failed

17  to put down that firearm --

18  BY MS. BRANCH:

19          Q.    So I'm --

20          A.    -- and continued -- hang on.  And

21  continued on after we gave him several orders to

22  put down the firearm, and instead of just putting

23  the firearm down, you know, he pointed it at my

24  partner which forced me to fire, you know, my

25  weapon.  Had it been a situation where he had
```

61

1  never pointed it at my partner, just kept it on

2  his lap and holding it, no idea what the outcome

3  was because we have no idea what he would have

4  done next, but we would have maintained -- or I

5  would have never fired my weapon by him just

6  holding the firearm and lifting it up off of his

7  leg.  But it wasn't until he pointed it at Deputy

8  Haas that forced me to do what I did.

9          Q.   So you would agree that a person just

10  holding a firearm is not grounds to shoot them as

11  a police officer?

12          MS. DINEHART:  Objection.

13  BY MS. BRANCH:

14          Q.   You need more than that?

15          A.   Yeah, I have to have a lot more than

16  just holding a firearm.

17          Q.   Would you agree that when you gave

18  Dontae Martin a command to put the gun down, he

19  did?

20          A.   Would I agree that he put the gun

21  down when I gave him the command?

22          Q.   Yes.

23          A.   No, I wouldn't agree to that.

24          Q.   Would you agree that there were

25  multiple commands being given by you and Deputy

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 62 of 216 PAGEID #: 998

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

62

1  Haas at the same time?

2        A.   I don't know what Deputy Haas was

3  saying to him.

4        Q.   And the command you were saying was

5  put the gun down?

6        A.   Sheriff's office, drop the gun, put

7  the gun down, something in that relationship.

8        Q.   Okay.  And how often did you say --

9        A.   I have no idea.

10       Q.   -- put the gun down?

11       A.   I have no idea.  It was just a

12  continuous order, one right after another.

13       Q.   When you say that Dontae Martin

14  pointed the gun at Deputy Haas, is that fact alone

15  enough to shoot the suspect?

16       A.   Yes.

17       Q.   Have you been involved in situations

18  where a suspect has pointed a gun at an officer

19  and he's not been shot?

20       A.   Not that I can think of.

21       Q.   Have you been involved in a situation

22  where a person pointed a gun at an officer and

23  less than lethal force was used as a first

24  response?

25       A.   Ask that one more time.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

                                                                                63

 1                   MS. BRANCH:  Could you read the

 2     question back?

 3                   (Record read.)

 4                   THE WITNESS:  I was involved in an

 5     incident where an individual pointed the firearm

 6     and both lethal and less than lethal force was

 7     used at the same time.

 8     BY MS. BRANCH:

 9          Q.    When you say that -- you said -- you

10     said earlier that when Dontae Martin was in the

11     car, he looked for Deputy Haas in his mirror?

12          A.    Yes.

13          Q.    Tell me about that.

14          A.    From -- from my vantage point through

15     the passenger windows -- or the passenger side of

16     the car, he was holding the firearm in his right

17     hand, keeps raising it up, putting it down,

18     raising it up, putting it down, never released the

19     gun from his hand, it was just a constant raising

20     it up and putting it down, and I could see him

21     looking over his shoulder and it would appear as

22     if he looked in his driver's side door mirror and

23     then after looking at the mirror he looked over

24     his left shoulder and raised the gun up over -- up

25     toward his left shoulder.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 64 of 216 PAGEID #: 1000
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

64

1    Q.   And when did you recall these events

2    happening, that he looked in the mirror and looked

3    over his left shoulder?

4         A.   What do you mean when did I recall

5    it?

6         Q.   When did you first --

7         A.   When he was doing it.

8         Q.   Those details are not in your

9    statement, would you agree?

10        A.   I would have to see my statement.

11        Q.   You said you didn't know what Dontae

12   Martin was thinking and that made you worried

13   about the safety of yourself and others.  How is

14   that -- how did you use your worry as a threat

15   assessment?  Is that one of the things you took

16   into account when you decided to fire your weapon?

17             MS. DINEHART:  Objection.

18             THE WITNESS:  Again, everything is a

19   totality of the incident going on.

20   BY MS. BRANCH:

21        Q.   Is this one of the circumstances?

22        A.   You have a guy holding a firearm and

23   you're ordering him numerous times to drop the

24   firearm and he's looking around for your partner,

25   as I perceived it, and he found him in the mirror

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

65

```
 1   and raised the gun up to his left shoulder, as

 2   each second goes by, I don't know what he's

 3   thinking for the next second until he actually

 4   does something, and when he raised his gun up to

 5   his shoulder, I was forced to protect my partner's

 6   life.

 7         Q.   So my question was, how did you use

 8   your worry that he -- you didn't know what he was

 9   thinking to justify shooting him?

10              MS. DINEHART:  Objection.

11              THE WITNESS:  Again, when I have an

12   individual that's holding a firearm and I have no

13   idea what he's getting ready to do and he's not

14   listening to the commands to drop the firearm,

15   numerous commands to drop the firearm, and he

16   continues to do what he wants to do and then seeks

17   out my partner in a mirror and raises the gun up

18   toward his shoulder in the direction of my

19   partner, it forces me to act.

20   BY MS. BRANCH:

21         Q.   When you gave any of your commands to

22   put the gun down, did you notice that Dontae

23   Martin responded to your command?

24         A.   I noticed that he didn't respond to

25   my commands.
```

66

1    Q.    Did you ever notice that he did

2  respond?

3    A.    No, he never responded to my

4  commands.

5    Q.    And you said that Officer Haas was

6  giving commands but you don't recall what they

7  were?

8    A.    No, I said I had no idea what he was

9  saying.

10   Q.    And do you know if your commands were

11 consistent with each other or inconsistent?

12   A.    Again, I have no idea what he said.

13 No idea what commands he was saying, no idea what

14 he was saying at all.

15   Q.    He was the senior officer at the

16 scene?

17   A.    He's been here longer than I have,

18 yes.

19   Q.    When you got to the scene, did one of

20 you decide who would be in charge?

21   A.    No.

22   Q.    Had you had any discussions with him

23 prior to stepping onto the scene as to who would

24 be the officer to give commands?

25   A.    No.

Patricia Marlin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

67

1        Q.    Have you had any training at

2   Montgomery County to ensure that officers are

3   giving commands -- when more than one officer is

4   present, that the commands are being given by one

5   officer only?

6        A.    There are certain situations where

7   that's ideal; but in my opinion, this was not an

8   ideal situation where only one person speaks.

9        Q.    Have you been given any training at

10  Montgomery County to ensure that the commands that

11  are being given if two officers are present that

12  are both giving commands are consistent with each

13  other?

14       A.    I don't remember any specific

15  training on how to give commands.  You know, in

16  regards to a man with a gun, other than being loud

17  and concise to get your point across, you know,

18  for this type of an incident, you know, to drop

19  the firearm, that's what we wanted him to do.

20       Q.    When you got to the scene at

21  Springbrook, what did you understand you were

22  there to do?

23       A.    An auto accident.

24       Q.    And nobody had gotten out of the car?

25       A.    Correct.

1          Q.    Was that considered a potential

2    medical run?

3          A.    It could have been, yes.

4          Q.    Were you there to investigate to see

5    whether anybody was injured?

6          A.    I don't remember exactly how it was

7    dispatched.  Do we have the dispatch log?

8          Q.    We do.

9          A.    Can I see it?

10         Q.    It's Exhibit 1.

11               (Thereupon, Plaintiff's Exhibit 1,

12    incident history detail dispatch log, was

13    previously marked for purposes of identification.)

14               THE WITNESS:  This is not -- my

15    understanding, if I'm looking at this correctly,

16    this is not my dispatch to the auto accident.

17    This is the dispatch responding to -- or other

18    officers coming to our aid from being involved in

19    a shooting.  And the only entries that I'm finding

20    on here of anything pertaining to the auto

21    accident are what other officers are typing in

22    their notes that are attached to the call so I

23    would have to hear the dispatch or do you have

24    another exhibit or something?

25    BY MS. BRANCH:

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

69

1        Q.    Does this refresh your memory that

2   you were responding to an unknown accident with

3   two vehicles, a green car and a maroon Grand Prix

4   with tinted windows, nobody has gotten out?

5        A.    Some of it does, some of it doesn't

6   so I -- without giving an answer to it, I'd rather

7   see the actual dispatch to the auto accident or if

8   you have the audio or something that I could

9   listen to on what we heard that day.

10        Q.    Have you heard the audio of the

11   dispatch run?

12        A.    I have -- not since that original

13   day.

14        Q.    Did you listen to it that day after

15   it was -- the shooting was over?

16        A.    No.

17        Q.    You never heard it?

18        A.    Not that I remember.

19        Q.    So why do you think that would

20   refresh your memory?

21        A.    Because you're asking me what I was

22   dispatched to and that's how they dispatched us.

23        Q.    Sitting here today, did you think you

24   were being dispatched to a crime scene?

25        A.    Everything is different, ma'am.  I

1  have no idea what I was dispatching -- if I knew

2  what I was dispatched to, I could answer that

3  question for you.

4          Q.   And other than you say that there's a

5  dispatch log for the auto accident that's not this

6  Exhibit 1?

7          A.   I'm not saying -- this isn't -- I'm

8  not saying that this isn't the actual dispatch

9  log.  If it is, it's -- what's the word I'm

10  looking for here?  Unfortunately, we've changed

11  systems since the shooting to today, and the type

12  of call that we're going on, you know, it's saying

13  in here that it's a -- never mind.  I do see it

14  right here.  Accident, unknown injuries.  I was

15  looking at the officer down, the 99 earlier.  So,

16  yes, it's an accident, unknown injuries.

17          Q.   If you look at the top of page one of

18  Exhibit 1 above the line --

19          A.   Page one?

20          Q.   -- it says type --

21          A.   Yes.

22          Q.   -- ACCUNK, accident unknown?

23          A.   Yes.

24          Q.   And it was changed to a priority one,

25  officer down call?

71

1          A.    Correct.

2          Q.    Okay.  If you go to the next entry at

3     43:31.  Do you see that?

4          A.    Yes.

5          Q.    The dispatcher typed two vehicle

6     accident.  Vehicle one, green car parked, vehicle

7     two, maroon Grand Prix, tinted windows, nobody has

8     gotten out.  Do you see that?

9          A.    Yes, I do see that.

10         Q.    Okay.  Was that the information you

11    had before you came to the scene?

12         A.    I believe so.

13         Q.    And that's the same information that

14    would be on your MDT, computer screen in your

15    vehicle?

16         A.    I'm trying to remember how it was

17    done in the old system.  I don't -- I don't

18    remember this information coming across our

19    computers.  Basically where it says red -- in red

20    it says priors, you have a line under that.  I

21    don't remember that information being under the

22    dispatch or how it's dispatched under it.  Again,

23    we've changed things.

24              (Thereupon, Plaintiff's Exhibit 14,

25    two colored photographs, was previously marked for

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

72

1   purposes of identification.)

2   BY MS. BRANCH:

3           Q.    Could you turn --

4           A.    Okay.

5           Q.    I'm sorry -- to Exhibit 14.  It's a

6   two-page exhibit of photographs, two photographs.

7           A.    I don't have a 14.

8           Q.    Here it is.  It's under Tab 13.  So

9   the first page of Tab 14, just to orient you, is

10  that an MDT computer screen in your vehicle?

11          A.    I don't know if this is my vehicle,

12  but yes, it's -- now that I'm looking at it, it

13  does look familiar.

14          Q.    Okay.

15          A.    I actually think this is out -- if

16  memory serves me correctly, I believe this is out

17  of Deputy Haas' car.

18          Q.    Can you tell from the exhibit which

19  terminal was photographed?

20          A.    If you look at the bottom of the

21  picture, you'll see the little blue block

22  surrounded by black, to the right of it looks like

23  it says HAR 121, which would be Harrison 121 --

24          Q.    I see.

25          A.    -- which was Deputy Haas' vehicle.

73

1          Q.    And does this MDT depict the same

2    words we just looked at on Exhibit 1 under the

3    entry at 43:31?

4          A.    Yes.

5          Q.    Was this the information you had then

6    prior to arriving at the scene and getting out of

7    your vehicle?

8          A.    Yes, ma'am.

9          Q.    All right.  In responding to an

10   unknown vehicle accident, nobody has gotten out,

11   would you consider that a call that potentially

12   could be for medical assistance for someone inside

13   the vehicle?

14         A.    Yes, it could be.

15         Q.    All right.  And while we're on

16   Exhibit 14, there's a second photograph.

17         A.    This one?

18         Q.    Yes.

19         A.    Okay.

20         Q.    And that's a photograph of your

21   vehicle parked behind Officer Haas' vehicle parked

22   behind the Grand Prix; is that right?

23         A.    Correct.

24         Q.    Does that accurately show the

25   position of your vehicles at the night of the --

74

1   the time of the shooting?

2          A.   Yes.

3          Q.   Would you agree with me that the

4   lighting that we see in this photograph was not

5   present at the time of the shooting?

6          A.   Correct.

7          Q.   The only lights that would have been

8   visible here would be -- at the time of the

9   shooting would have been your headlights of your

10  vehicle and Officer Haas' vehicle?

11         A.   Yes, and there was a -- there was a

12  house just -- actually, you can -- I believe this

13  is -- that looks more like a lamp, but there was a

14  house that was just past the maroon car that had

15  the -- I think it was a front porch light and

16  stuff on, but, yeah, it pretty much depicts what

17  we can see there.

18         Q.   Would you agree that that night it

19  was dark?

20         A.   Yes.

21         Q.   And the closest streetlight was

22  twenty-two yards away?

23         A.   I have no idea where the closest

24  streetlight was.

25         Q.   Do you remember seeing a streetlight?

75

1          A.    No.

2          Q.    Would you agree because of the tinted

3    windows, that when you got out of your vehicle,

4    you could not see into the windows of the Grand

5    Prix?

6          A.    When I got out of my vehicle, yeah, I

7    could not see into the vehicle.

8          Q.    And, in fact, it wasn't until you

9    were three feet away with your flashlight shining

10   through the back passenger door window that you

11   could for the first time see into the Grand Prix?

12         A.    I don't remember exactly how far I

13   was or when I could first see into the vehicle,

14   but I was close.

15         Q.    Were you close enough to touch the

16   vehicle when you first could see into it?

17         A.    No.

18         Q.    When you arrived at the scene, your

19   sirens and lights had never been on on the vehicle

20   activating your audio and video equipment; is that

21   correct?

22         A.    Not while responding to this, no.

23         Q.    Okay.  At any time did you activate

24   your microphone?

25         A.    Not for the incident, no.

76

```
 1          Q.    How about after the incident?

 2          A.    No.

 3          Q.    Did you consider turning your

 4   microphone on at any point?

 5          A.    No.

 6          Q.    Before you got out of your vehicle

 7   did you turn on your spotlight?

 8          A.    I don't remember turning it on.

 9          Q.    Was it on at any time that evening?

10          A.    I don't remember turning it on.

11          Q.    Was the Grand Prix -- the windows

12   were up on the car; is that right?

13          A.    Yes.

14          Q.    And its headlights were on but they

15   were so close to the green car that they weren't

16   really illuminating anything; is that right?

17          A.    I don't remember if they were on or

18   not.

19          Q.    Was the engine on in the Grand Prix?

20          A.    I don't know.

21          Q.    When you first got out of your

22   vehicle, what was the discussion that you had

23   with -- I'm sorry, not when you got out of your

24   vehicle.  Strike that.

25                At what point did you talk with
```

1  Deputy Haas about what the plan would be for

2  exiting your vehicle and approaching the Grand

3  Prix?

4         A.    There was no plan.

5         Q.    Did you talk to Deputy Haas before

6  you approached the vehicle?

7         A.    The last time I had talked to Haas

8  before this incident was while we were on the drug

9  complaint that I initiated over off of whatever

10  street that was.  I can't remember.

11        Q.    And did you talk about how you were

12  going to approach the run to Springbrook?

13        A.    No.

14        Q.    Did you talk to Deputy Haas about

15  what you were planning to do before shots were

16  fired?

17        A.    No.

18        Q.    So the two of you did not converse

19  about the run before shots were fired?

20        A.    No.

21        Q.    What was your plan when you arrived

22  on scene?

23              MS. DINEHART:  Objection.

24              THE WITNESS:  Conduct an

25  investigation, take care of anybody that might be

Patricia Martin, Admin., et al. vs. Joshua Haas, et al.     Gust A. Teague

78

1  injured.  You know, I didn't mentally sit back and

2  say this is what I'm going to do.  Again, in

3  police work, we don't have the opportunity to sit

4  down and plan out our day.  We plan out the

5  incident as it happens, you know, so there was no

6  plan to -- on who was going to do what, what was

7  going to happen.  Unfortunately, we found

8  ourselves on the scene of a guy who had a firearm

9  in his hand and he refused to obey our commands to

10  drop that firearm and, unfortunately, he pointed

11  the firearm at Deputy Haas and I was forced to

12  protect his life.

13  BY MS. BRANCH:

14          Q.   When you got to the scene, Officer

15  Haas had already arrived; is that right?

16          A.   It was -- you know, we were pretty

17  much simultaneously arriving at the scene.

18          Q.   According to the dispatch log, you

19  arrived about fifty seconds after him.  Does that

20  sound about right?

21          A.   Yeah, I don't know.  It didn't seem

22  that long, but, you know, it could have been.

23          Q.   According to the dispatch log, you

24  arrived at forty-five minutes and two seconds

25  after midnight.  Does that sound right?

79

```
 1          A.    I have no idea what time I was on
 2   scene.
 3          Q.    Do you -- how did you put yourself on
 4   scene?
 5          A.    I don't remember if I pushed the
 6   button or used the radio or even if I went on
 7   scene.  I have no idea.
 8          Q.    And what is your practice for going
 9   on scene in a nonemergency?  Do you push your
10   button or call dispatch?
11          A.    Whatever I do.  Sometimes I push the
12   button.  Sometimes I get on the radio and tell
13   them I'm on scene.
14          Q.    If it's not on the radio traffic that
15   you're on the scene, is it fair to assume that you
16   pushed your button?
17          A.    In general it is, but, you know,
18   there are times that, you know, I've been on the
19   scene and realized I never pushed the button or
20   got on the radio and put myself on the scene.
21          Q.    If the shooting occurred at forty-six
22   minutes after midnight and you're on scene -- I'm
23   sorry, I read the wrong entry.  You were on scene
24   at forty-five minutes and fifty-four seconds
25   according to the dispatch log.
```

80

1        A.    What exhibit is this so I can

2   refresh --

3        Q.    Exhibit 1.

4        A.    Okay.

5        Q.    It's about two-thirds of the way down

6   the first page.

7        A.    Okay.

8        Q.    45:54?

9        A.    45:54.  That shows the time I was on

10  scene based off of the paperwork here.

11       Q.    Okay.  And if there's no radio

12  traffic with you calling dispatch to say you were

13  on the scene, is it fair to assume you pushed your

14  button at 45:54?

15       A.    You know, it could have been.

16  There's so many different variables on when

17  somebody could have put me on scene based off of

18  the computer system.  I don't know if I pushed a

19  button.  I don't know if it was radio traffic.  I

20  don't know if it was -- you know, I don't know

21  what Deputy Haas' radio traffic was, if he had any

22  on, and, you know, she automatically put me on

23  scene, I don't know.  I don't know when or how or

24  what that night -- unfortunately, how I -- how a

25  computer shows that I'm on scene.

81

```
 1        Q.   Do you have any reason to dispute
 2   that you were there at 45:54?
 3        A.   I don't have any reason --
 4             MS. DINEHART:  Objection.
 5             THE WITNESS:  -- to dispute it.
 6   BY MS. BRANCH:
 7        Q.   When you got on scene, where was
 8   Officer Haas?
 9        A.   As I was on scene, I don't know
10   exactly where he was.  The only thing that, you
11   know, really resonates in my mind is around the
12   time I was exiting my car, and I don't remember if
13   it was just as I was exiting or just after I
14   exited, but it was somewhere in that time frame,
15   you know, Deputy Haas was -- I could hear Deputy
16   Haas telling me that he had a gun.
17             MS. BRANCH:  Could you read back that
18   answer for me?
19             (Record read.)
20   BY MS. BRANCH:
21        Q.   So if we go back to Exhibit 14, which
22   in your book is under Tab 13, and you see the
23   vehicles -- the photograph of the vehicles --
24        A.   Yes.
25        Q.   -- when you were exiting your car,
```

82

 1  you were exiting in the car behind the sheriff's

 2  car two car lengths back from the Grand Prix?

 3       A.   Yeah, I'm the -- my patrol car is the

 4  one that's closest to the camera.

 5       Q.   And Officer Haas, was he standing --

 6  at the time you heard him say he has a gun, was he

 7  standing close to the driver's side of the Grand

 8  Prix?

 9       A.   Yes.

10            (Thereupon, Mr. Mazer exited the

11  room.)

12  BY MS. BRANCH:

13       Q.   So he was several yards in front of

14  you?

15       A.   Yeah.  You see the distance.  I don't

16  know what the exact distance was, but yeah.

17       Q.   All right.  And when you heard him

18  say he has a gun, where were you standing?

19       A.   You know, again, I was somewhere on

20  that -- near the front of my vehicle.  I don't

21  know if it was just outside my door or -- you

22  know, near the front of my vehicle is about as

23  good as I could get you.

24       Q.   All right.  And at that point had you

25  already pulled out any equipment?  I'm sorry, that

83

```
 1   was a bad question.

 2            Before you heard him say he's got a

 3   gun had you pulled out any equipment?

 4        A.   I don't -- I may have had my

 5   flashlight out.

 6        Q.   And then after he said he has a gun

 7   did you draw your firearm?

 8        A.   Yeah, at some point after that.

 9        Q.   And what did you do?

10        A.   I made a tactical approach to the

11   passenger side of Dontae's car.

12        Q.   So at the time you approached the

13   Grand Prix you had your -- both your flashlight

14   and your firearm?

15        A.   Correct.

16        Q.   And you had your flashlight in your

17   left hand, firearm in your right hand?

18        A.   Yes.

19        Q.   And then what did you do as you

20   approached the Grand Prix?

21        A.   Began ordering Dontae to drop the

22   firearm.  Again, I don't remember how many times I

23   ordered him; but I moved in closer to Dontae to

24   get a better vantage point of being able to see

25   what he was doing on the inside and to put myself
```

84

1  in a position to safely protect my partner and the

2  community.

3        Q.    And as you moved in closer, at some

4  point you got close enough that your flashlight

5  lit up the inside of the vehicle; is that right?

6        A.    Yes.

7        Q.    So at the point where you could see

8  inside the vehicle, that moment, where was Deputy

9  Haas?

10       A.    I have no idea where Deputy Haas was.

11       Q.    When did you first realize where

12 Deputy Haas was during the incident?

13       A.    There was a couple times I could see

14 him out of my peripheral kind of moving back and

15 forth.  He was toward the driver's side of the

16 vehicle, but I couldn't give you an exact

17 location.

18       Q.    Did you ever make eye contact with

19 Deputy Haas?

20       A.    No.

21       Q.    Before the shooting?

22       A.    No.

23       Q.    Did you call out to him?

24       A.    No.

25       Q.    Was -- were you conscious of where

1   Deputy Haas was after you drew your firearm so

2   that you wouldn't shoot him?

3          A.   I would -- I was going to say I'm

4   conscious to the point that I know he's not in

5   front of me or he's not in an area that should I

6   fire my weapon, that he is in danger of my rounds.

7          Q.   Okay.

8          A.   But as far as -- I was conscious to

9   the location that he wasn't in a vital spot for

10  me.

11         Q.   Was Deputy Haas ever in your line of

12  fire?

13         A.   No.

14         Q.   So it sounds like it just took you a

15  few seconds to get from your vehicle to the

16  passenger side rear window of the Grand Prix?

17         A.   Yes.

18         Q.   And how soon after you arrived did

19  you fire your weapon?

20         A.   I have no idea.

21         Q.   How soon after you arrived at the

22  back of the Grand Prix did Deputy Haas fire his

23  weapon?

24         A.   I have no idea.

25         Q.   And when you fired your weapon, you

Patricia Martin, Admin., et al. vs Joshua Haas, et al.     Gust A. Teague

86

```
 1  said you shot seven bullets?
 2          A.    Yes.
 3          Q.    And how many rounds had Deputy Haas
 4  shot?
 5          A.    I have no idea.
 6          Q.    When you got to the -- before you
 7  fired your weapon, did you say anything to anyone?
 8          A.    Yes.
 9          Q.    You gave commands to Dontae Martin --
10          A.    Correct.
11          Q.    -- to put down the gun?
12          A.    Yes.
13          Q.    Did you give commands to any of the
14  bystanders?
15          A.    Yes.
16          Q.    And what did you tell them?
17          A.    Get away.
18          Q.    And where were they?
19          A.    What do you mean where were they?
20  After my orders, before the orders for them to get
21  away?
22          Q.    Let's start with as you -- when you
23  first noticed bystanders, where did you see them?
24          A.    There was -- there was one individual
25  that was probably, I'll say, ten, fifteen foot in
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 87 of 216 PAGEID #: 1023
Patricia Martin, Admin., et al. vs. Joshua Haas, et al.
Gust A. Teague

87

 1  front of the vehicle -- of Dontae's vehicle

 2  standing like in the middle of the road or toward

 3  the roadway, and there were several other -- I

 4  have no idea how many there were, but there were

 5  several other civilians kind of in a front yard,

 6  on a driveway, they were just kind of scattered

 7  about toward the right-hand side or the passenger

 8  side of the vehicle.  All of them were out in

 9  front.

10        Q.   The one individual that you saw in

11  the roadway --

12        A.   Yes.

13        Q.   -- where was that person, if you

14  could point to on Exhibit 14?

15        A.   There's -- you know, with it being so

16  dark, I couldn't even begin to -- you know, I'd

17  say wherever that red thing -- whatever that red

18  thing is to the left of the cruisers, I don't know

19  what that red thing is, but I would say, you know,

20  somewhere probably in that area.

21        Q.   Okay.

22             (Thereupon, Plaintiff's Exhibit 44,

23  previously marked Plaintiff's Exhibit 14, was

24  marked for purposes of identification.)

25  BY MS. BRANCH:

88

```
 1           Q.    I'm going to give you my copy of
 2    Exhibit 14.  If you could mark it for me.  I'm
 3    going to try a red pen.  It may not work since
 4    this is a black photo.  But we've marked a copy of
 5    Exhibit 14 and made it Exhibit 44.
 6           A.    Okay.
 7           Q.    And if you could put a mark on 44
 8    where you saw the person.
 9           A.    Okay.  Well, now that this one is
10    obviously a lot lighter in color than this one,
11    you know, it wouldn't be where the red thing was.
12    I would say even further back.
13           Q.    Do you want to mark the one in the
14    book?
15           A.    No.  What I'm saying -- it looked
16    like it was further up; but in your brighter
17    picture, it looks like it's directly to the left
18    of Dontae's car.  You know, it's --
19           Q.    Could you put -- I just want to see
20    where you're looking.
21           A.    That's fine.
22           Q.    I know it's glared.  If you need to
23    hold it up, that's fine.
24           A.    You know, I said earlier that it was
25    next to the red thing.  This picture is brighter
```

89

1    than this one and from being able to look at the

2    brighter one, it definitely wasn't where the red

3    thing was, it was further back; but I don't know

4    the angles and stuff, you know, so --

5             Q.    Could you put a mark, an X, where you

6    were pointing with the pen as to where the

7    individual was in the roadway?

8             A.    As I just said, I couldn't tell you

9    because I don't know what the angles are here.  It

10   was a pretty decent angle to the point that from

11   where I was standing, he would have been in my

12   line of fire so, you know, not knowing how the

13   situation was going to go, at the time of this

14   starting I had no idea how the end result was

15   going to be, but when I know I've got a guy with a

16   gun, it's time to clear people away so that nobody

17   is struck innocently so...

18            Q.    Can you mark on Exhibit 44 the

19   portion of the roadway where you think the

20   individual was standing?

21            A.    Again, no, I can't because I have no

22   idea where he was based off of this single

23   dimensional photo.  You know, it's a little

24   difficult to do it.

25            Q.    Could you circle the red item that

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

90

```
 1   you referred to in your testimony?
 2           A.   Yeah, I can circle the red item.
 3   (Indicating.)
 4           Q.   Can you put your initials underneath
 5   that?
 6           A.   (Witness complies.)
 7           Q.   Thank you.  And where were people --
 8   you said that's where bystanders were when you
 9   said get away?
10           A.   Yes.
11           Q.   And when you said get away --
12           A.   Hang on a second.  I'm sorry.  Are
13   you referring to the red dot -- or the red circle
14   is where the bystanders were standing?
15           Q.   No.  I was just asking you -- the
16   question I asked you originally was where were the
17   bystanders before you said get away.
18           A.   Okay.  There were several of them
19   scattered out toward the front of the vehicle.
20           Q.   You already answered that.  I was
21   going to now ask the next question.
22           A.   Oh, okay.
23           Q.   When you saw those individuals there
24   and you said get away, where were you?
25           A.   I don't know exactly.  I know I was
```

1  on my approach to the vehicle.

2          Q.    And did you see where -- or if

3  anybody moved after you said get away?

4          A.    Yeah, I saw them all moving.  You

5  know, they were scattering about.  Where they were

6  going, I have no idea.

7          Q.    And did you see anybody in the

8  roadway at the time that you shot your weapon?

9          A.    Not in front of me, no.

10         Q.    When you approached the car, did you

11 try to open the doors before you shot your weapon?

12         A.    No.

13         Q.    Did you knock on the windows?

14         A.    No.

15         Q.    Did Officer Haas try to open the

16 doors or knock on the windows before he approached

17 the car?

18         A.    No idea.

19         Q.    I'm sorry, before he shot his weapon?

20         A.    No idea what he did.

21         Q.    Do you know how long it was from the

22 moment that you got out of your car until you were

23 able to see inside the vehicle?

24         A.    No idea.

25         Q.    Or how long it was from the time you

92

1    got out of your car until the time you shot Dontae

2    Martin?

3         A.   No idea.

4         Q.   If the whole incident took fourteen

5    seconds from the time that you got out of your car

6    until the time you shot, do you think that's about

7    right?

8         A.   It doesn't sound right to me, no.

9         Q.   In what way?

10        A.   It seems like it's too fast.

11        Q.   Why do you think that fourteen

12   seconds would be too fast?

13        A.   It just seems like it would be too

14   fast to me.

15        Q.   Do you recall using your radio to

16   alert dispatch that you had one with a gun?

17        A.   I don't remember if I did it or if

18   Deputy Haas did it.

19        Q.   Did you hear that being broadcast on

20   the radio?

21        A.   No.  I don't remember any radio

22   traffic.  I don't -- when you're involved in a

23   situation like this, my focus goes toward the

24   safety of myself, my partner, the community, and

25   to get whatever that issue is in the incident to

1  start complying to our commands, to make it a safe

2  situation.

3         Q.   Did you have any tools with you that

4  could break the window of a vehicle like if you

5  needed to rescue somebody inside the car?

6         A.   Yeah.

7         Q.   What would you be able to use?

8         A.   I know our patrol cars are equipped

9  with special spring-loaded window-break systems,

10  and I could have used an asp to break out a window

11  in an emergency situation to rescue someone.  I

12  would imagine I could use, you know, the hard end

13  of the handcuffs or a larger portion of the

14  handcuffs if I really needed to get in there and

15  rescue somebody from a vehicle.  I'm sure there's

16  a vast array that I could come up with inside of

17  our patrol vehicles.

18         Q.   Have you ever had to do that?

19         A.   Yes.  Unfortunately, the rescue

20  didn't work.

21         Q.   Did you hear Officer Haas say

22  anything else -- or say anything before you heard

23  him say gun?

24         A.   I don't know what Josh said.  I don't

25  remember hearing what he said.  After I heard him

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

94

```
 1   say he's got a gun, you know, I went into a

 2   particular focus mode.  My senses went into a

 3   focus mode that, you know, from -- you know, the

 4   mind goes into this special focus where things

 5   appear to slow down and you can use super focus,

 6   supernatural -- I don't know how to explain it,

 7   but you begin to focus in on a -- on the issue at

 8   hand, and, you know, I focused in on him holding

 9   that firearm, I focused in on me ordering him to

10   drop the firearm several times, and then, you

11   know, continuing to disobey my orders to drop the

12   firearm until he pointed the firearm in the

13   direction of Deputy Haas and forced me to protect

14   his life by firing my weapon.  Things that were

15   said, where people were moving, I don't know

16   exactly where they were and what they were saying.

17          Q.   Did Officer Haas communicate to you

18   at any time before the shooting?

19          A.   Did he do what?

20          Q.   Communicate anything to you before

21   the shooting other than he's got a gun.

22          A.   If he did, I don't know.

23               MS. BRANCH:  So let's get this marked

24   as 45.

25               (Thereupon, Plaintiff's Exhibit 45,
```

1  one colored photograph, was marked for purposes of

2  identification.)

3  BY MS. BRANCH:

4          Q.    This is another photograph of the

5  Grand Prix from a different angle.  Have you seen

6  this photograph before?

7          A.    No.

8          Q.    Can you see the bullet holes in the

9  rear passenger window, the window that doesn't

10 open?

11         A.    I assume they're bullet holes, but,

12 yes, I see holes in it.

13         Q.    Can you tell from this photograph

14 where you were standing at the time you shot your

15 weapon?

16         A.    I -- again, we're looking at an angle

17 issue.  If it was a -- like a photo from the top

18 of it, I could probably give you a better -- like

19 a topographical shot of the scene.  I don't even

20 know if those are available or if we had those;

21 but, again, I could just say it was near the rear

22 passenger door and that tire several feet this way

23 of the car (indicating).

24         Q.    This way, what's that mean?

25         A.    Toward me.  If I'm looking at the

 1  car, toward me.

 2                MS. BRANCH:  I'm going to give you

 3  another exhibit and see if that's a better angle.

 4                (Thereupon, Plaintiff's Exhibit 46,

 5  photograph Bates stamped GB003726, was marked for

 6  purposes of identification.)

 7  BY MS. BRANCH:

 8        Q.    In this one do you see the bullet

 9  holes through the rear passenger window?

10        A.    Yes.

11        Q.    And do you see the bullet hole in the

12  door?

13        A.    Yes.

14        Q.    Can you see where you were standing

15  in this photograph?

16        A.    I would say probably -- I can't give

17  an exact, but I would say in between the tree and

18  the end of the orange paint, somewhere in that

19  area.

20        Q.    And that's when you were shooting

21  your weapon?

22        A.    That's -- in that area is when I

23  started shooting my weapon.

24        Q.    All right.  And when you first

25  started shooting your weapon, if I understand your

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 97 of 216 PAGEID #: 1033
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

97

1    testimony, was when you first could see into the

2    vehicle with your flashlight?

3         A.   No.

4            MS. DINEHART:  Objection.

5            THE WITNESS:  No, I did not start

6    firing my weapon when I could first see into the

7    vehicle.  I started firing my weapon after I could

8    initially see into the vehicle and that he was

9    still holding a firearm and would not obey my

10   commands to drop the firearm and he pointed it at

11   Deputy Haas and I had to protect Deputy Haas'

12   life, that's when I began firing my weapon.

13   BY MS. BRANCH:

14        Q.   Okay.  Could you put an X with your

15   initials where you were standing when you fired

16   the weapon on Exhibit 46?

17        A.   I could put an X where I believe I

18   was standing --

19        Q.   Sure.

20        A.   -- but I can't say exactly where I

21   was standing.

22        Q.   That's fine.

23        A.   (Indicating.)

24        Q.   Thank you.  And when you approached

25   the car, you were approaching from off camera of

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                        Gus A. Teague

98

1  this photograph, correct?

2          A.    Yes.

3          Q.    You were approaching from behind the

4  vehicle?

5          A.    Yes.

6          Q.    And where were you when you could see

7  into the vehicle and see Dontae Martin?

8          A.    You know, somewhere between that X

9  and the orange paint, somewhere in that area.

10         Q.    Could you put a circle at the point

11 where you were standing when you could see into

12 the vehicle.

13         A.    (Witness complies.)

14         Q.    Thank you.  Were you ever in a

15 position further forward than the X in this circle

16 on Exhibit 46?

17         A.    I don't remember being any further

18 forward.

19               MS. BRANCH:  I'm going to make this

20 47.

21               (Thereupon, Plaintiff's Exhibit 47,

22 one colored photograph, was marked for purposes of

23 identification.)

24 BY MS. BRANCH:

25         Q.    This angle of the photograph shows

99

```
 1   that the car was on an incline with the driver's

 2   side of the car being downhill from the passenger

 3   side of the car.  Is that correct?

 4          A.   According to the picture, yes.

 5          Q.   Was that your memory of the scene?

 6          A.   I don't remember it being an angle,

 7   but I'm not saying that there wasn't.

 8          Q.   From this angle do you see that

 9   there's vegetation between the tree and the car?

10          A.   Yes.

11          Q.   Do you know in that patch of

12   vegetation how close you were standing?

13          A.   Yeah, from this angle, again, it's

14   very difficult to put where I was standing, but,

15   you know, if we refer back to 46, that's about the

16   best view I can give you as to where I was

17   standing.

18          Q.   So 46 has the best angle for figuring

19   that out?

20          A.   Yes.

21          Q.   All right.

22               MS. DINEHART:  Of the photos she's

23   shown you, right?

24               THE WITNESS:  Yeah.  Of the photos

25   that I've seen, yes.
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 100 of 216 PAGEID #: 1036

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                      Gust A. Teague

100

1   BY MS. BRANCH:

2          Q.    Now, you said you could see Dontae

3   Martin through the back window of the passenger

4   side move up and down, right?

5          A.    Yes.

6          Q.    And when you saw him, could you see

7   the seat he was sitting in?

8          A.    You know, I wasn't looking at the

9   seat.  I was looking -- I was focused on the gun.

10         Q.    At any point that evening did you

11  notice the position of the driver's seat?

12         A.    No.

13         Q.    Did you know that it was reclined?

14         A.    No.

15         Q.    Did you know -- did you see his head

16  on the headrest?

17         A.    After the shooting was over, yes.

18         Q.    How about before the shooting?

19         A.    No.

20         Q.    Where was his head before the

21  shooting?

22         A.    He was leaning forward, kind of

23  moving back and forth, looking in his rearview

24  mirror.

25         Q.    Did you -- do you agree with Officer

```
 1  Haas that Dontae Martin's head was on the headrest
 2  before the shooting?
 3              MS. DINEHART:  Objection.
 4              THE WITNESS:  I have no idea where
 5  his head was before the shooting from Deputy Haas'
 6  vantage point.
 7              I've got to use the restroom again.
 8  Can we have a minute?
 9  BY MS. BRANCH:
10         Q.   Sure.  If you want to take a break.
11              MS. DINEHART:  It's 12:40, I don't
12  know where you are in your --
13              MS. BRANCH:  Give me a minute to see
14  if I'm done with these photos.  Go ahead and take
15  a break and we'll come back and we'll see if we
16  want to take a lunch break.
17              (Pause in proceedings.)
18              (Thereupon, Plaintiff's Exhibit 7,
19  Ohio traffic crash report diagram, was previously
20  marked for purposes of identification.)
21  BY MS. BRANCH:
22         Q.   We can finish up this line of
23  questioning and then we can take a lunch break.
24  Just thought I would show you Exhibit 7, page two.
25  Page one is the full version --
```

```
 1            A.   Okay.
 2            Q.   -- of the crime scene diagram that
 3    was done by the detectives after the shooting.
 4    Have you seen that before?
 5            A.   No.
 6            Q.   And then the second page is sort of
 7    an enlargement of a portion of that that shows all
 8    the vehicles on the road and the Grand Prix.  Do
 9    you see that?
10            A.   Yes.
11            Q.   You said you were looking for an
12    overhead shot.  We don't have -- I don't have an
13    overhead photograph but I have this overhead
14    diagram.  Does that -- looking at that, does that
15    change your testimony as to where you were
16    standing?
17            A.   No.
18                 (Thereupon, Plaintiff's Exhibit 48,
19    one colored photograph, was marked for purposes of
20    identification.)
21    BY MS. BRANCH:
22            Q.   So this photograph is Exhibit 48.
23    This is a photo taken by the detectives after the
24    shooting through the driver's side back rear
25    window -- door window where you can see the
```

1　reclined headrest and seat.

2　　　　A.　Okay.

3　　　　Q.　And on the other side of the vehicle

4　you can see that small non-movable passenger side

5　rear window.

6　　　　A.　Okay.

7　　　　Q.　Do you see that?

8　　　　A.　Yes.

9　　　　Q.　And do you see the holes in the

10　window?

11　　　　A.　Yes.

12　　　　Q.　Does this photograph refresh your

13　memory of how the seat was reclined at the time of

14　the shooting?

15　　　　A.　No, I don't remember even looking at

16　the seat so I couldn't tell you.

17　　　　Q.　I know later on you were involved

18　with removing Dontae Martin from the vehicle; is

19　that right?

20　　　　A.　Yes.

21　　　　Q.　And when you removed him from the

22　vehicle, do you recall that the seat was in a

23　reclining position?

24　　　　A.　No.

25　　　　　　MS. BRANCH:　Okay.　I can move on or

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 104 of 216 PAGEID #: 1040

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

104

 1   I can take a break, whatever you'd like to do.

 2                   MS. DINEHART:  Let's do the break for

 3   now.  You want to take forty-five minutes?

 4                   MS. BRANCH:  Whatever.

 5                   (Pause in proceedings.)

 6   BY MS. BRANCH:

 7          Q.   Before we took the lunch break I was

 8   asking you about your actions before the shooting

 9   and your position at the time and before the

10   shooting so I want to go back to that point in

11   time.

12                   You were standing at the passenger

13   side rear of the Grand Prix at the time that you

14   discharged your weapon into the vehicle; is that

15   right?

16          A.   Yes, somewhere in that area.

17          Q.   Okay.  And you told us earlier that

18   you discharged seven shots of your fourteen that

19   were in your weapon?

20          A.   Yes.

21          Q.   Can you tell me what you could see

22   when you were shooting your weapon into the

23   vehicle?

24          A.   Muzzle flash.  You know, it happened

25   so fast, it was -- I really don't know exactly

1　what I could see.  That's kind of what led me to

2　stop because I could no longer see.

3　　　　　Q.   When you stopped shooting, what did

4　you observe?

5　　　　　A.   I really couldn't see into the

6　vehicle from where I was at.  I know I had to kind

7　of reposition myself so that I could see into the

8　vehicle.

9　　　　　Q.   Moving forward again?

10　　　　　A.   Yes, moving forward back toward the

11　car, still on the passenger side.  I don't

12　remember where I was, but at some point as I got

13　closer I could see Dontae in the car.

14　　　　　Q.   And what did you see?

15　　　　　A.   I could see his -- he was laid back

16　in the driver's seat.  I don't remember which

17　direction he was facing -- his face was facing,

18　but I could tell he was motionless.  I could not

19　see him moving at all so I just continued

20　positioning myself to -- until I could see the

21　weapon or a sign of the weapon or where the weapon

22　might be at.

23　　　　　Q.   And where was it?

24　　　　　A.   It was located -- I seen part of the

25　weapon on the -- kind of like in between his right

106

1   thigh and the center console.

2           Q.   On the seat?

3           A.   I don't remember off the top of my

4   head.  I think it was laying down -- kind of

5   wedged in between the seat and the center console

6   with the handle kind of sticking up.

7           Q.   And where was -- if the handle was

8   sticking up, where was the barrel pointed?

9           A.   It would be pointed down.

10          Q.   And when you saw that, was that the

11  first thing you saw when you looked into the car

12  was the gun on the -- between the -- wedged

13  between the seat and the console?

14          A.   No.  The first thing I could see was

15  Dontae.

16          Q.   Okay.  And then the gun?

17          A.   Yeah.

18          Q.   Did you see Officer Haas?

19          A.   No.

20          Q.   What did you do when you saw the gun?

21          A.   My concentration was focusing on the

22  firearm, and, you know, I don't -- I don't

23  remember if I told Josh that I found the gun or

24  that I could see the gun, but I remember at some

25  point after finding the firearm -- or seeing the

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 107 of 216 PAGEID #: 1043

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

107

 1  firearm -- I won't say finding, but after I could

 2  see the firearm, hearing Deputy Haas told me the

 3  doors were locked -- or I think I told -- or kind

 4  of yelled out the gun is between -- by his leg by

 5  the center console, and then Deputy Haas telling

 6  me that the doors were locked.

 7          Q.   Then what happened?

 8          A.   I remember checking the doors on the

 9  passenger side.  The doors were locked there as

10  well.

11          Q.   What did you do?

12          A.   I don't remember what I did other

13  than focusing on the firearm and focusing on

14  Dontae's hands, making sure he wasn't going to

15  reach for the firearm anymore.  I waited there,

16  and at some point the window broke out on the

17  driver's side of the car, I don't remember which

18  window it was, but the window breaking out.

19          Q.   By Officer Haas?

20          A.   I don't know if he's the one that

21  broke it out or if some other officer arrived on

22  scene.  I just -- my focus was that firearm and

23  Dontae.

24          Q.   And while you were looking inside the

25  vehicle with your focus on the firearm, was Dontae

1    moving?

2              A.    No.

3              Q.    And after the window was broken what

4    happened?

5              A.    I remember the driver's side door

6    opening up at some point.

7              Q.    And what were you doing at that

8    point?

9              A.    I was still focused on that firearm,

10   focused on Dontae.

11             Q.    Were you standing still on the

12   passenger side but now at the front door window?

13             A.    I don't remember exactly where I was

14   standing.  I just know I could look in and see the

15   center console area and by his leg.

16             Q.    And where was your flashlight?

17             A.    It's in my hand.

18             Q.    What were you pointing it at?

19             A.    Down toward that firearm and Dontae.

20             Q.    So your light was on the firearm in

21   the vehicle?

22             A.    Yes.

23             Q.    Okay.  The driver's side door opened,

24   and then what happened?

25             A.    I believe it was -- I know when the

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                Gust A. Teague

109

1    door opened up, at some point the firearm was --

2    actually, I take that back.  It was -- I can

3    remember after the door opening up some time had

4    gone by, it would seem like forever but I know it

5    was just a matter of seconds, we were trying to

6    extract -- I say we, it wasn't me.  Somebody was

7    trying to extract Dontae from the car and yelling

8    out, you know, he's caught, he's stuck, he's

9    stuck.  I can remember running over to the

10   driver's side and one of his legs was stuck on --

11   in like the brake and accelerator -- not his leg

12   but his pant leg was.  And I don't remember if his

13   seat belt was part of the restriction or not.  I

14   don't know if he was wearing a seat belt, but we

15   could not get him out because something was

16   holding him in there.  And then it was -- whatever

17   it was holding him in there, it released or I'm

18   not sure if somebody reached in and released him

19   or untangled his pant leg or something, but we

20   pulled him out and -- I say we, it would be Deputy

21   Bender and I pulled him out and drug him to the

22   rear of the car where we had a flatter surface to

23   begin first aid to make every exhaustive chance to

24   try to save Dontae.

25          Q.   And who is the we that tried to

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

1    extract him?  You and Deputy Bender?

2           A.    Yes.

3           Q.    Anyone else?

4           A.    I don't know.

5           Q.    Anyone else on scene other than you,

6    Haas, and Bender?

7           A.    I don't know who else was on scene.

8           Q.    Was there anyone else?

9           A.    I don't know who else was on scene.

10          Q.    Do you know if there was anyone there

11   other than Deputy Bender?

12          A.    Again, I do not know who was on

13   scene.

14          Q.    You don't recall anyone other than

15   Deputy Bender at the time of the extraction of

16   Dontae Martin?

17          A.    Again, ma'am, I do not know who else

18   was on scene.

19          Q.    After he was extracted do you recall

20   anyone coming on the scene?

21          A.    I know Deputy Amber Haas, I don't

22   know if she was on scene during the extraction or

23   if she came shortly after I started doing chest

24   compressions on Dontae.

25          Q.    You noticed her during the CPR?

1       A.   Yes.

2       Q.   Anyone else you noticed while the CPR

3 was ongoing?

4       A.   No.

5       Q.   When was -- when were you relieved

6 from -- well, did you perform CPR?

7       A.   I was performing chest compressions.

8       Q.   Chest compressions.  And how long did

9 you do that?

10      A.   I have no idea exactly.  It felt like

11 forever.

12      Q.   And was that with Deputy Bender?

13      A.   Yes.  Well, Deputy Bender was near

14 me.  I was doing the chest compressions.  Deputy

15 Bender helped me take him out or I helped Deputy

16 Bender take Dontae out of the car.  What Deputy

17 Bender was doing first aid-wise, I don't know.  I

18 was doing chest compressions.

19      Q.   Anybody doing airway?

20      A.   I don't know what anybody else was

21 doing.

22      Q.   Anybody doing rescue breathing?

23      A.   That would be airway.  I have no idea

24 what they were doing.

25      Q.   All right.  So, I'm sorry, I

1  interrupted.  How long do you think you were doing

2  chest compressions?

3          A.    It would be an estimated time, and I

4  would say for twenty, thirty seconds or so.

5          Q.    And then what happened?

6          A.    Amber Haas came over to me and

7  relieved me of doing chest compressions.

8          Q.    And when she relieved you, where did

9  you go?

10          A.    I went and -- I had another person,

11  and I don't know -- it was an officer, I have no

12  idea who it was, you know, told me to go over

13  there and trying to get me away from the medical

14  attention that was being provided to try to limit

15  any kind of traumatic experience that I had to

16  endure from that point on, and he kind of

17  pointed it would be west on Springbrook.  I don't

18  know how far I went but I would say a couple of

19  cars behind mine and I sat on the front bumper of

20  a cruiser.

21          Q.    Anybody with you?

22          A.    Deputy Haas showed up sometime

23  after -- after I was sitting there leaning on the

24  bumper.

25          Q.    And did you see any supervisors on

```
 1   the scene before you sat on the bumper?

 2            MS. DINEHART:  Objection.

 3            THE WITNESS:  I don't -- I don't

 4   remember seeing a supervisor until later on.

 5   BY MS. BRANCH:

 6        Q.   How about Sergeant McLaughlin?

 7        A.   I know he was there, but I don't

 8   remember when I saw him arrive on scene -- or when

 9   I saw him on scene.

10        Q.   Did he give you any directions or

11   orders as your supervisor?

12        A.   No.

13        Q.   And when you were doing chest

14   compressions, do you know where Deputy Joshua Haas

15   was?

16        A.   No.

17        Q.   And do you know what he was doing

18   before he arrived at the bumper?

19        A.   No.

20        Q.   Did you ever ask him where he was?

21        A.   No.

22        Q.   All right.  Anything else happen that

23   you recall before you were told to go over there

24   and sit on the bumper?

25        A.   No.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gus A. Teague

114

```
 1          Q.   When was the gun retrieved from the
 2   vehicle?
 3          A.   I don't remember when it was
 4   retrieved.
 5          Q.   Was it before Dontae Martin was
 6   extracted?
 7          A.   I don't remember.
 8          Q.   Would that be something in your
 9   statement?
10          A.   It might be.
11          Q.   And who actually took the gun out of
12   the vehicle?
13          A.   I don't know.
14          Q.   Were you there to see that happen?
15          A.   I may have been on scene, but I don't
16   remember watching it happen.
17          Q.   I want to go back now to the
18   shooting -- the time of the shooting.  I had you
19   after lunch talk about your activities from the
20   time you fired shots until you sat on the bumper
21   of the vehicle.  When did you notice that Officer
22   Haas was also firing his weapon?
23          A.   I never noticed him firing his
24   weapon.
25          Q.   Who fired first?
```

```
 1              A.   I have no --

 2              MS. DINEHART:  Objection.

 3              THE WITNESS:  -- no idea.

 4  BY MS. BRANCH:

 5              Q.   And have you ever asked him what his

 6  opinion is of who fired first?

 7              A.   No.

 8              Q.   Sitting here today, do you know who

 9  fired first?

10              A.   No.

11              Q.   And how's come you haven't asked him

12  about that?

13              A.   It's irrelevant to the fact of this

14  issue of Dontae not complying with our orders to

15  drop a firearm.  You know, unfortunately, he

16  failed to comply, pointed the gun at Deputy Haas,

17  and I was forced to fire to protect his life.

18  Protect his, mine, the citizens there, and who

19  fired first is totally irrelevant.  The only thing

20  relevant is the fact that Dontae failed to comply

21  with the orders and pointed a firearm at a police

22  officer.

23              Q.   Would you agree that if Dontae

24  Martin -- this is a hypothetical.  Would you agree

25  that if Dontae Martin had been unconscious, that
```

116

1    you would not have been justified in shooting him

2    even if you saw a weapon in the vehicle?

3                    MS. DINEHART:  Objection.

4                    THE WITNESS:  Ma'am, I'm a police

5    officer.  I get up and work eight and a half hours

6    a day, five days on, two days off, five days on,

7    three days off, and I don't deal in hypotheticals.

8    BY MS. BRANCH:

9            Q.   Okay.  But as a --

10           A.   I deal with every issue at hand.

11           Q.   It's a question --

12           A.   And every issue is dealt with

13   differently based off of what is going on at that

14   moment.

15           Q.   Okay.  It's a question --

16           A.   Okay.

17           Q.   -- that I'd like you to answer.

18           A.   Okay.

19           Q.   If Dontae Martin had been

20   unconscious, would you have been justified in

21   shooting him even if you saw a gun in the vehicle?

22                   MS. DINEHART:  Objection.

23                   THE WITNESS:  If Dontae Martin had

24   complied with us, that's the best hypothetical I

25   can give you, had he not pointed that firearm at

117

 1   Deputy Haas, we wouldn't be sitting here today.

 2   But unfortunately, the hypothetical question that

 3   you're asking I can't answer because I wasn't

 4   there.

 5   BY MS. BRANCH:

 6          Q.   Is it your understanding of the use

 7   of force policy of Montgomery County that you are

 8   justified in shooting an unconscious person?

 9                MS. DINEHART:  Objection.

10                THE WITNESS:  There is nothing that

11   says that somebody that's unconscious can't be

12   shot; however -- that I know of.  However, without

13   a specific thing occurring in front of me and

14   being able to make that decision, I can't give you

15   that answer because I -- you know, again, every

16   issue is dealt with differently.  I cannot think

17   of something off the top of my head that would

18   justify shooting an unconscious person, but you're

19   also asking a question that's hypothetical that I

20   need to see it in order for something to happen.

21   BY MS. BRANCH:

22          Q.   Do you have training at Montgomery

23   County on use of force?

24          A.   Yes.

25          Q.   Are you trained in how to make a

1    threat assessment prior to using deadly force?

2         A.    Yeah, that's part of the training.

3         Q.    And does your training also include

4    using live action simulators?

5         A.    I believe that's what the FATS

6    machine is I think is what it's called.  I believe

7    that's what that is.  We do scenario-based

8    training so if that's what you're referring to as

9    live action, then yes.

10        Q.    And in your simulators, have you ever

11   been given exercises where you are faced with a

12   person with a gun who is unconscious?

13        A.    No.

14        Q.    If Dontae Martin did not have a gun

15   in the vehicle but Officer Haas thought he saw a

16   gun, would Officer Haas be justified in shooting

17   Dontae Martin?

18             MS. DINEHART:  Objection.

19             THE WITNESS:  I can't tell you what

20   Deputy Haas is going to do.

21   BY MS. BRANCH:

22        Q.    So I'll ask it as a hypothetical.  If

23   an officer is mistaken and thought he saw a gun

24   and shot somebody, would that be a justified

25   shooting?

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

119

```
 1                MS. DINEHART:  Objection.
 2                THE WITNESS:  I'm not going to answer
 3   what another officer is going to do in a
 4   hypothetical question.  I don't deal with
 5   hypothetical situations.
 6   BY MS. BRANCH:
 7        Q.   Can you --
 8        A.   I deal with real life.
 9        Q.   Can you answer the question if it was
10   you in a situation where you saw -- or thought you
11   saw a gun inside a vehicle, would you be justified
12   in shooting that person if there really hadn't
13   been a gun inside the vehicle --
14                MS. DINEHART:  Objection.
15   BY MS. BRANCH:
16        Q.   -- based on your training and
17   understanding of Montgomery County's use of force
18   policy?
19                MS. DINEHART:  Objection.
20                THE WITNESS:  You're giving me a
21   quick, one sentence, two sentence type of scenario
22   to try to evaluate.  Okay.  There are so -- there
23   is so much more that goes into using force than
24   just a quick, you know, attorney sitting down in
25   her office one day and coming up with a quick
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 120 of 216 PAGEID #: 1056

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

120

1   question to try to see if I'm justified in doing

2   some shooting.  There is a totality of a

3   circumstance that I have to follow from the moment

4   I'm dispatched all the way until I clear that call

5   based off of the things that I do.  You keep

6   asking for a hypothetical situation and I cannot

7   give you an answer for a hypothetical situation

8   unless we have a long time for you to sit down

9   here and try to describe it, and then I don't even

10  know if I could still give you an answer to that

11  hypothetical.

12  BY MS. BRANCH:

13          Q.   Is one of the circumstances that you

14  took into account before you fired your weapon at

15  Dontae Martin the fact that you saw a gun?

16          A.   Ask that one more time.

17               MS. BRANCH:  Can you just read it

18  back?

19               (Record read.)

20               THE WITNESS:  Yes.

21  BY MS. BRANCH:

22          Q.   And if Dontae Martin did not have a

23  gun, would your perception of him having a gun be

24  a circumstance that you would have to take into

25  account?

1          A.    Again, you're going into the ifs and

2    the hypotheticals.  If Dontae Martin had complied

3    with my orders in the beginning, we wouldn't be

4    sitting here today --

5          Q.    If he didn't --

6          A.    -- so I can't tell you what would

7    have happened if Dontae had a gun or didn't have a

8    gun or not because that was not what happened that

9    night.

10          Q.    If Dontae Martin did not brandish a

11    gun in the vehicle, would we be sitting here

12    today?

13               MS. DINEHART:  Objection.

14               THE WITNESS:  I don't know.

15    BY MS. BRANCH:

16          Q.    Would you --

17          A.    But that's not the case.  The case is

18    the fact that he had a gun --

19          Q.    Would you be justified --

20          A.    -- and he pointed it at my partner.

21          Q.    Would you be justified in shooting

22    him if Dontae Martin did not have a gun?

23               MS. DINEHART:  Objection.

24    BY MS. BRANCH:

25          Q.    Given all the other circumstances

122

1  that you testified to.

2          A.    Dontae Martin had a firearm,

3  therefore, that's why he was shot.  This has

4  nothing to do with whether or not if he didn't

5  have a gun.

6          Q.    Well, this is a question about the

7  extent of your authority to use deadly force.  So

8  given all the circumstances you've testified to,

9  take one circumstance away, Dontae Martin did not

10 have a gun, would you be justified in shooting

11 him?

12              MS. DINEHART:  Objection.

13              THE WITNESS:  I don't know.

14 BY MS. BRANCH:

15         Q.    You don't know under the policies and

16 training of the Montgomery County Sheriff's

17 Office?

18         A.    If Dontae Martin had not brought a

19 gun that night, the whole scenario would have

20 changed.  Had Dontae Martin complied with our

21 orders to drop the firearm, this whole scenario

22 would have changed.

23         Q.    So you would agree that if he didn't

24 have a gun, you would not have been justified in

25 shooting him?

1          MS. DINEHART:  Objection.

2          THE WITNESS:  No.  I don't know.  I

3  have no idea.

4  BY MS. BRANCH:

5          Q.  Are you experienced with assessing

6  threat inside a car with tinted windows in your

7  experience as a law enforcement officer?

8          A.  I don't know what is experienced.  I

9  don't know if it's five incidents or five hundred

10  incidents; but yes, I have dealt with over

11  twenty-some years in law enforcement dealing with

12  people with tinted windows.

13          Q.  And have you had experience looking

14  into -- trying to look through a tinted window in

15  the dark, the light at night situation?

16          A.  Yes.

17          Q.  And have you had experience in using

18  a flashlight in that situation?

19          A.  Yes.

20          Q.  And in your experience, have you ever

21  seen a reflection of an image in the tinted window

22  when a flashlight is shown on the window?

23          A.  I'm not saying I've never seen a

24  reflection in the window, but my focus is inside

25  the vehicle.  You know, I've dealt with many of

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gus V. Teague

124

1    cases where an individual has had tinted windows,

2    but I've never dealt with an individual with

3    tinted windows who's pointed a firearm at another

4    police officer after being told to put the firearm

5    down.

6         Q.   Well, my question was if you've ever

7    seen in your twenty-some years of experience a

8    reflection in a tinted window when you're using a

9    flashlight?

10        A.   You know, I never made it a mental

11   note to remember, so no, I don't remember ever

12   seeing reflections of things inside a tinted

13   window when I've shined my light on it.

14        Q.   Have you been trained to avoid a

15   reflection when using a flashlight on a tinted

16   window?

17        A.   Not that I'm aware of.

18        Q.   Are you aware at what angle a

19   reflection will occur when using a flashlight on a

20   tinted window in the dark?

21        A.   No.

22        Q.   Do you know of any other officers who

23   have ever experienced a reflection in a tinted

24   window with a flashlight?

25             MS. DINEHART:  Objection.

125

```
 1              THE WITNESS:  No.
 2              (Thereupon, Plaintiff's Exhibit 49,
 3  one colored photograph, was marked for purposes of
 4  identification.)
 5  BY MS. BRANCH:
 6         Q.   So you've been handed Exhibit 49.
 7  This is a photograph taken by the sheriff's
 8  department during their investigation of Dontae
 9  Martin's car at the garage.  From this angle can
10  you see bullet holes in the rear window?
11         A.   Yes.
12         Q.   And can you see the bullet hole in
13  the door of the back passenger side door?
14         A.   Yes.
15         Q.   And you see the dowel rod that's
16  sticking out?
17         A.   Yes.
18         Q.   Can you tell from this photograph if
19  that -- what the flight path was of your bullets
20  through that window?
21              MS. DINEHART:  Objection.
22              THE WITNESS:  No.
23  BY MS. BRANCH:
24         Q.   Has anyone asked you to go to the
25  vehicle and attempt to recreate where you were
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

126

1  standing?

2          A.    No.

3          Q.    Has anyone asked you to go to any

4  vehicle and try to recreate what happened that

5  night?

6          A.    No.

7          Q.    Has anyone asked you to attempt to

8  see through a window -- a tinted window with your

9  flashlight in a dark situation --

10         A.    No.

11         Q.    -- to try to recreate the scene?

12         A.    No.

13         Q.    Do you see in this photograph how the

14 light is reflecting on the tinted window and you

15 can see a person's face in the window?

16         A.    Yes.

17         Q.    Is that similar to a reflection

18 you've seen in a tinted window --

19              MS. DINEHART:  Objection.

20 BY MS. BRANCH:

21         Q.    -- in your experience as a law

22 enforcement officer?

23              MS. DINEHART:  Objection.

24              THE WITNESS:  In my experience

25 over -- yeah, I've seen reflections in windows

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 127 of 216 PAGEID #: 1063
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gus V. Teague

127

1  before.

2  BY MS. BRANCH:

3       Q.   In tinted windows?

4       A.   Yeah, I've seen reflections in tinted

5  windows.

6       Q.   In the light and in the dark?

7       A.   Most of my -- that I can think of

8  really seeing reflections would be during the

9  daytime, you know, when the sun is angled on it I

10  guess just right or a nice shiny car.  This is a

11  very nice shiny car so -- in an extremely well lit

12  area, but, yeah.

13       Q.   Have you seen a reflection in a

14  tinted window in the dark?

15       A.   I don't remember anything specific of

16  seeing a reflection in the dark.

17       Q.   It wouldn't surprise you to know that

18  tinted windows reflect in the light or in the

19  dark?

20            MS. DINEHART:  Objection.

21            THE WITNESS:  No, it wouldn't

22  surprise me.

23            MS. BRANCH:  We'll mark Exhibit 50.

24            (Thereupon, Plaintiff's Exhibit 50,

25  photograph Bates stamped GB003777, was marked for

128

1  purposes of identification.)

2  BY MS. BRANCH:

3          Q.   Does Exhibit 50 show approximately

4  where Dontae Martin was when you were performing

5  chest compressions?

6          A.   Yes, I would say approximately.

7          Q.   And how long did it take you to

8  extract him from the vehicle and lay him in the

9  grass there?

10          A.   A couple seconds.

11          Q.   In this picture there's a red object

12  in the grass.  Do you see that?

13          A.   Yes.

14          Q.   Is that some sort of lighting

15  device -- portable lighting device?

16          A.   That's what it looks like to me.

17              (Thereupon, Plaintiff's Exhibit 51,

18  oath of office, was marked for purposes of

19  identification.)

20  BY MS. BRANCH:

21          Q.   You've been handed Exhibit 51.  Is

22  this your oath of office that you signed?

23          A.   It looks like it, yes.

24          Q.   Is that your signature three lines

25  from the bottom?

1    A.   Yes.

2    Q.   And you swore that you would support

3 the Constitution of the United States and the

4 Constitution of the State of Ohio, and that you

5 would faithfully discharge the duties of deputy

6 sheriff of Montgomery County, Ohio during your

7 continuance in office; is that right?

8    A.   Yes.

9    Q.   And with each sheriff you are

10 required to sign a new oath of office; is that

11 right?

12    A.   Yes.

13    Q.   This is the one you signed with

14 Sheriff Plummer?

15    A.   Yes.

16    Q.   Are you trained in knowing what the

17 Constitutional duties are of being a deputy

18 sheriff in Montgomery County as it relates to

19 using deadly force?

20    A.   Yes, we're trained on those duties.

21    Q.   And what are they?

22    A.   Do you have a copy of the

23 Constitutional rights for deadly force so I can

24 relate to those?  It would make me feel more

25 comfortable in answering the question.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 130 of 216 PAGEID #: 1066

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust V. Teague

130

1        Q.    Well, it's the Fourth Amendment to

2    the Constitution.  I don't have a copy of the

3    Constitution.

4        A.    Neither do I.

5        Q.    So do you know what your training is

6    to make sure that you comply with the Constitution

7    of the United States when you're using deadly

8    force?

9        A.    Yeah.

10       Q.    And what are those duties?

11       A.    You're asking me a question, but, you

12   know, the Constitution, the Fourth Amendment is a

13   lengthy one, I'd like to refer to it if you have

14   it.

15       Q.    Do you know what your requirements

16   are or prohibitions are in using deadly force as a

17   police officer?

18            MS. DINEHART:  Objection.

19            THE WITNESS:  You're asking a

20   question that's a relatively long answer to it.

21   You know, I can give you a summary-type situation,

22   but I would prefer to have it with me so I can

23   give you the full answer.

24   BY MS. BRANCH:

25       Q.    What is the it you would like?

1          A.    I'm sorry, say it again.

2          Q.    You said that you would like to have

3    it with you.  What's the it that you're referring

4    to?

5          A.    The Fourth Amendment.

6              (Thereupon, Plaintiff's Exhibit 51,

7    use of force policy read and sign for Gust A.

8    Teague, was marked for purposes of

9    identification.)

10   BY MS. BRANCH:

11         Q.    Can you tell me what Exhibit 52 is?

12         A.    It's a signature stating that I have

13   read and understand the Montgomery County

14   Sheriff's Office policy regarding the use of force

15   as outlined in the Montgomery County Sheriff's

16   Office General Manual, Section 1.1.3.

17             (Thereupon, Plaintiff's Exhibit 2,

18   use of force policy, was previously marked

19   for purposes of identification.)

20   BY MS. BRANCH:

21         Q.    And is that Exhibit 2 in the exhibit

22   book?

23         A.    2?  Yes, that's what it looks like.

24         Q.    On page -- on the third page of the

25   exhibit, number 1600, there's the use of force

```
1    policy at 1.1.3.  Do you see that?

2           A.   Yes.

3           Q.   Do you agree that the Montgomery

4    County Sheriff's Office recognizes and respects

5    the value and special integrity of human life.  In

6    vesting law enforcement officers with the lawful

7    authority to use force to protect the public

8    welfare, a careful balancing of all human

9    interests is necessary.  Is that right?

10          A.   That's what it says.

11          Q.   And do you agree that part of that

12   balancing is taking into account, as you call it,

13   the totality of the circumstances before taking a

14   human life?

15          A.   Yes.

16          Q.   If you look at the next page under

17   item 6, the sheriff's office strongly encourages

18   employees to use physical force only when the

19   situation absolutely demands it.  Is that right?

20          A.   Yes.

21          Q.   And a few sentences down it says if a

22   safe alternative to the use of deadly force is

23   likely to achieve the purpose of averting an

24   imminent danger, deadly force is not necessary; is

25   that correct?
```

133

```
 1              A.   Yes, that's what it says.

 2              Q.   And one of the things -- one of the

 3   relevant factors to consider is the availability

 4   of cover, and that cover provides a tactical

 5   advantage that works both ways; is that right?

 6              A.   You lost me in that part right there.

 7   I don't see it.

 8              Q.   Oh.  Second bullet point under --

 9              A.   Oh, okay.

10              Q.   -- relevant.

11              A.   Now ask that again, please.  I'm

12   sorry.

13              Q.   One of the things you should consider

14   before taking a human life is the availability of

15   cover, and that cover is a tactical advantage that

16   can work in your favor; is that right?

17              A.   That's what this says, but I would

18   need to read the entire paragraph to make sure I'm

19   not missing something in there.

20              Q.   If you could turn to page 16 --

21              A.   Ma'am, you asked me a question.  Do

22   you want me to read this and answer the question?

23              Q.   Oh, I thought you did.

24              A.   No, I said I'd need to read this so I

25   could fill in the answer to the question that you
```

```
 1  asked about the availability of cover.

 2         Q.   Is cover something you're trained to

 3  utilize --

 4         A.   Yes.

 5         Q.   -- before using deadly force?

 6              MS. DINEHART:  Objection.

 7              THE WITNESS:  I just read a little

 8  sentence in here, this is why I didn't want to

 9  answer you before, the agency follows the action

10  response use of force.  The employee must use the

11  continuum as a guideline whenever force is used.

12  BY MS. BRANCH:

13         Q.   You can read silently to yourself and

14  I'll have the question read back and you can

15  answer it again.  Let me know when you're done

16  reading the policy.

17         A.   It's the third or fourth sentence in

18  here that says nothing in this directive is to be

19  construed to require -- you know, this is not a

20  situation where we could take cover and wait for

21  something else to happen.  This was a situation

22  where he pointed the firearm at another police

23  officer and it was necessary -- necessary for me

24  to protect Deputy Haas' life by firing my weapon.

25         Q.   Would you agree that it's the policy
```

135

 1  of the Montgomery County Sheriff's Office and that

 2  you're trained to consider using cover prior to

 3  using deadly force?

 4          A.   It's a guideline.  It's not required.

 5          Q.   Uh-huh.  And did you consider using

 6  cover before approaching the vehicle with your

 7  weapon drawn?

 8          A.   Yes, I used cover.

 9               MS. DINEHART:  Objection.

10  BY MS. BRANCH:

11          Q.   And how did you use cover?

12          A.   The body of the vehicle was cover.

13  The tree -- excuse me.  The tree was cover.

14          Q.   And did you consider having Officer

15  Haas use cover when he said that he saw a gun?

16               MS. DINEHART:  Objection.

17               THE WITNESS:  I can't tell Deputy

18  Haas what to do, how to take his cover.  He has a

19  total different vantage point than I do.  I make

20  assessments for myself.  I don't make them for

21  other officers.

22  BY MS. BRANCH:

23          Q.   At the point in time that you

24  realized that Officer Haas believed he saw a gun,

25  what were your options?

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 136 of 216 PAGEID #: 1072

Patricia Mahin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

136

```
 1              A.    To make a --

 2                    MS. DINEHART:  Objection.

 3                    THE WITNESS:  To make a tactical

 4  approach, utilize cover as part of that tactical

 5  approach, to observe what was going on inside the

 6  vehicle, give directives, try to persuade the

 7  individual, who later was identified as Dontae, to

 8  obey our commands, and in each one of those steps

 9  he failed to do -- failed to obey those commands,

10  to drop the firearm, and then he unfortunately

11  went to the next level by pointing that firearm at

12  a police officer.

13  BY MS. BRANCH:

14              Q.    I was asking about your options.  Did

15  you also have the option to call for backup?

16                    MS. DINEHART:  Objection.

17                    THE WITNESS:  To call for backup.

18  You know, I know that we was -- it was announced

19  over the radio, I'm not sure if it was me or if it

20  was Deputy Haas, that we had a guy with a gun.

21  That is not a situation where I get on and ask for

22  backup.  It's pretty much a known -- I'm not sure

23  what the right words are, but it's known amongst

24  law enforcement officers that if somebody else

25  gets on the radio and says they have somebody with
```

1  a gun, if you're close, go because he needs help.

2  BY MS. BRANCH:

3      Q.   So at the time that dispatch was told

4  that there was a gun, did you just assume that

5  backup was on its way?

6      A.   Yes.

7      Q.   At the time that you heard that

8  Deputy Haas believed there was a gun, did you tell

9  Deputy Haas that he should seek cover?

10     A.   No.

11          MS. DINEHART:  Objection.

12  BY MS. BRANCH:

13     Q.   Did you tell Deputy Haas he should

14  retreat --

15     A.   No.

16     Q.   -- and come back to the vehicle where

17  you were?

18     A.   (Witness shaking head from side to

19  side.)

20          (Thereupon, Plaintiff's Exhibit 53,

21  Deputy Gust Teague's statement, was marked for

22  purposes of identification.)

23  BY MS. BRANCH:

24     Q.   You're being handed Exhibit 53.  Do

25  you recognize this?

138

1         A.    Yes.   This looks like my statement on

2    the night.

3         Q.    And have you read that recently?

4         A.    Not been very recent but it's been a

5    good while back.

6         Q.    Do you need to read it again before I

7    ask you questions about it?

8         A.    I'll go ahead and read it and then

9    refer back to it during questioning.

10             MS. BRANCH:   So we'll take a break

11   when you read it and then just let me know when

12   you're done.

13             THE WITNESS:   We'll take a break.

14   Are we taking a break?

15   BY MS. BRANCH:

16        Q.    I'm taking a break so you can read it

17   and do whatever else you would like to do.   Just

18   let me know when you come back, after you're done

19   reading it, we'll go back on the record.

20        A.    Oh.  If you want to stay on the

21   record, we can stay on the record.  I just figured

22   if you guys were taking a break, we'll all just

23   take a break.  Okay.

24        Q.    Is your statement accurate?

25        A.    Yes.

139

```
1          Q.   Is there anything you'd like to add
2   to it?
3               MS. DINEHART:  Objection.
4               THE WITNESS:  No.
5   BY MS. BRANCH:
6          Q.   Is there anything that you would like
7   to change?
8          A.   No.
9          Q.   Do you recall saying to Dontae
10  Martin -- or directing Dontae Martin to put his
11  hands in the air?
12         A.   I don't remember it today, but based
13  off my report it says I did.
14         Q.   Did you also tell him to drop the
15  gun?
16         A.   Yes.
17         Q.   Any other commands that you gave?
18         A.   No.  Drop the gun.
19         Q.   In your statement, first page,
20  paragraph five, last sentence it says I
21  immediately notified dispatch to give us the
22  channel because we have one with a gun.
23         A.   Okay.
24         Q.   Is that accurate, that you're the one
25  that called dispatch and said we have one with a
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 140 of 216 PAGEID #: 1076

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

140

1  gun?

2            A.    That's what my report says, yes.

3            Q.    Two paragraphs below that, last line

4  of the page, Martin's right hand was also on his

5  right thigh near the handgun.  Did I read that

6  correctly?

7            A.    Yes.

8            Q.    So at the point -- the first time you

9  saw the gun the gun was on his thigh --

10           A.    That's what --

11           Q.    -- and his hand was on his thigh?

12           A.    That's what my report says.

13           Q.    Is that right?

14           A.    That's what my report says, yes.

15           Q.    On the next page there's a quote, you

16  said sheriff's office, drop the gun.  Is that

17  right?

18           A.    Yes.

19           Q.    There's no other time in your report

20  where you identified yourself as sheriff's office.

21  Is this the only time in your report?

22                 MS. DINEHART:  Objection.

23                 THE WITNESS:  Yeah, I've got it

24  quoted as saying sheriff's office, drop the gun,

25  but I believe -- I have to go back through and

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

141

1   reread it again, but I think it says I made orders
2   at him several times.
3   BY MS. BRANCH:
4           Q.   Let me ask it this way.  Is there
5   anywhere else in your report that you say you
6   identified yourself as sheriff?
7           A.   No.
8           Q.   After you said sheriff's office, drop
9   the gun you wrote Martin appeared to be placing
10  the handgun back on his thigh.  Did I read that
11  correctly?
12          A.   Yes.
13          Q.   And the next sentence says, Martin
14  moved the handgun back to his thigh.  Did I read
15  that correctly?
16              MS. DINEHART:  Objection.
17              THE WITNESS:  Martin appeared to be
18  placing the handgun back on his thigh but then he
19  then raised it a second time approximately six
20  inches again is what it says.
21  BY MS. BRANCH:
22          Q.   And then the next sentence you wrote
23  Martin moved the handgun back to his thigh and
24  looked over his shoulder toward Deputy Haas.
25          A.   Correct.

142

```
 1          Q.    Is that what you wrote?

 2          A.    Correct.

 3          Q.    So in this section of your report

 4   after telling him to put his hands up, you now

 5   tell him to drop the gun, and it appeared to you

 6   as if he was placing the gun back on his thigh at

 7   least two more times?

 8          A.    Yes.

 9                MS. DINEHART:  Objection.

10   BY MS. BRANCH:

11          Q.    Then in the third paragraph on the

12   second page you use the phrase I engaged Martin

13   with my service weapon.  Does that mean you shot

14   him?

15          A.    Yes.

16          Q.    Two more paragraphs below, toward the

17   end of that paragraph the sentence starts I

18   maintained a visual.  Do you see where I am?

19          A.    Yes.

20          Q.    You wrote I maintained a visual on

21   Martin and the handgun while he broke the window

22   out.  Deputy Haas was able to break the window,

23   enter the driver's side door, and retrieve the

24   handgun.  Did I read that correctly?

25          A.    Yes.
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

143

1          Q.    So Deputy Haas retrieved the handgun
2     from the driver's side door before you extracted
3     Martin from the vehicle; is that correct?
4          A.    That's the way that I read this, yes.
5          Q.    Is that the way you meant it?
6          A.    What I wrote is what I meant, but
7     you've got to remember this was three years ago --
8     three and a half years ago so it's a little --
9          Q.    Now, at the beginning of that
10    paragraph you say I requested Deputy Haas to
11    approach and retrieve the firearm while I
12    maintained cover for him.  Do you see that?
13         A.    Yes.
14         Q.    So you gave Deputy Haas a direction
15    to retrieve the firearm while you covered for him;
16    is that right?
17         A.    Yes.
18         Q.    Did he follow your direction?
19         A.    The report also reads that Deputy
20    Haas advised me that the doors on the driver's
21    side were locked.  Deputy Haas told me he needed
22    to break out the window to unlock it from the
23    inside.  It says that I maintained the visual on
24    Martin while he retrieved the handgun, while he
25    broke out the window.  So, yeah.

1        Q.    After the shooting you said you

2   walked back to the passenger side front to look

3   for the gun?  After you finished shooting --

4        A.    Okay.

5        Q.    -- you went to the front window to

6   look for the gun; is that right?

7        A.    Okay.  Uh-huh.

8        Q.    Did you tell Deputy Haas at that

9   point that you could see the gun?

10       A.    Yeah, I'm not sure when I

11  specifically told Haas I could see the gun.

12       Q.    But he knew you had a visual on the

13  gun?

14       A.    Based off of what I told him, yes.

15       Q.    And it's your testimony it was in

16  plain view?

17       A.    Yes.

18       Q.    Your statement does not mention any

19  other officers on the scene other than Amber Haas

20  and Deputy Bender; is that right?

21       A.    I saw something in here.  I believe

22  so, yes.

23       Q.    And at the point in time that you end

24  your statement after Amber Haas requested that you

25  stop compressions so that she could take over, you

1  walked away from the scene.  Is that the last act

2  that you summarized in your statement?

3         A.    Yes.

4         Q.    And at that point you do not mention

5  whether Sergeant McLaughlin was on scene; is that

6  right?

7         A.    Correct.

8         Q.    This statement says -- if you go back

9  to the top of the second page and also at the top

10  of the first page it says draft.  Do you see that?

11         A.    Yes.

12         Q.    Was this your first draft of your

13  statement, your final draft of your statement?

14             MS. DINEHART:  Objection.

15             THE WITNESS:  It was a -- this is my

16  final draft.  I don't know why draft is up there.

17  I don't understand how the reporting system is,

18  but this was my final statement given.

19  BY MS. BRANCH:

20         Q.    Okay.  Did you have prior versions

21  that were drafts?

22         A.    Yeah, there were -- there were drafts

23  that I typed up that I went over with my attorney

24  and we did some grammatical corrections and things

25  like that.

146

```
 1          Q.    And was your attorney Robert
 2   Sauter --
 3          A.    Yes.
 4          Q.    -- S A U T E R?
 5          A.    Yes.
 6          Q.    And did he help you draft your
 7   statement?
 8          A.    No, he didn't --
 9                MS. DINEHART:  Objection.
10                THE WITNESS:  No, he didn't help me
11   draft my statement.  I drafted my statement and,
12   you know, the office assisted me with like some
13   grammatical errors or if they were confused on
14   something because of improper grammar --
15   BY MS. BRANCH:
16          Q.    When you say --
17          A.    -- it was corrected.
18          Q.    -- the office, do you mean like his
19   secretarial staff?
20          A.    You know, I don't -- I don't know who
21   worked on things with him so...
22          Q.    And where did you type it?
23          A.    At work.
24          Q.    And were you on administrative leave
25   at the time you typed it?
```

```
 1              A.    Yes.

 2              Q.    And how did you have access to your

 3   work computer to type if you were on leave?

 4              A.    I got in my car and drove to work and

 5   I logged in on the computer and typed it up.

 6              Q.    And when you logged in, were you

 7   logging into this Investigation 15-6691?

 8              A.    No.  It was done like on Microsoft

 9   Word or something along those lines.

10              Q.    And how many drafts do you think you

11   worked on?

12              A.    I think it was just one.

13              Q.    Then you had somebody in the

14   attorney's office review it?

15              A.    I gave it to my attorney.  I don't

16   know who reviewed it.

17              Q.    And after it was reviewed how many

18   changes were made?

19              A.    How many changes in that report were

20   made or in that statement was made?  I don't have

21   any idea how many was on there, but there were --

22   you know, you need a comment here -- or a comma

23   here, period there, this isn't capitalized, that

24   is capitalized.  I made the corrections, they

25   looked at it and said okay.  That was it.
```

148

1      Q.    And what did you do with it after he

2   said okay?

3      A.    I don't remember if -- if I went into

4   the system and put it in.  I don't -- I remember

5   typing it up and giving it to my attorney.  Where

6   it went from there, I don't remember.

7      Q.    Yeah, that was my question, how did

8   it get in as an official report in the

9   Investigation 15-6691?

10      A.    I don't remember if I got into the

11   system and copied and pasted it in there type deal

12   or if the attorney got it in there.  I really

13   don't even remember.

14      Q.    And when was that that you finished

15   the final version and turned it in to the

16   sheriff's office?

17      A.    Within a couple of days of the

18   incident.

19      Q.    Detective Kellar testified that you

20   handed it to him at the time he met with you and

21   your attorney on July 28th.  Does that sound

22   correct?

23      A.    I don't remember a date, but that

24   could be correct.

25      Q.    And if you go back to the policy,

149

1  Exhibit 2, I'd ask you to look at the Section J on

2  page 1607.

3          A.   Did you say Section 2?

4          Q.   Yes.  Exhibit 2, page 1607.  It's

5  under the letter J.

6          A.   Okay.

7          Q.   Do you see that?  In Number 2 it says

8  after an employee uses any type of force, he

9  completes a use of force report and submits it to

10 his supervisor before the end of his watch.  Did I

11 read that correctly?

12         A.   I'm still trying to find out where

13 you -- okay.  Yes, you are correct.

14         Q.   And did you do that in the shooting

15 of Dontae Martin?

16         A.   No.

17         Q.   Why not?

18         A.   I was working at the direction of my

19 attorney.

20         Q.   And did your supervisor direct you to

21 turn in a report before your end of shift on July

22 23rd?

23         A.   No.

24         Q.   Did anyone from the sheriff's office

25 direct you to comply with this policy and turn in

1    a written report by the end of shift?

2           A.    No.

3           Q.    Did you talk to anyone at the

4    sheriff's office about when you would have your

5    written report done?

6           A.    No.

7           Q.    How did this meeting on July 28th get

8    set up with you and Detective Kellar?

9           A.    Everything went through my attorney.

10          Q.    Is your attorney still representing

11   you in this matter, Mr. Sauter?

12          A.    I would assume if it was to become a

13   criminal issue again, they would, but I've not

14   talked to them since the grand jury cleared us.

15          Q.    And was he -- is he an FOP attorney

16   or an attorney that you personally engaged?

17          A.    FOP.

18          Q.    Is he still with the FOP?

19          A.    I have no idea.

20          Q.    Did anyone from the sheriff's office

21   ever ask you any questions about your statement

22   other than Detective Kellar?

23          A.    About my statement.  Gosh.  No.

24          Q.    Anybody from internal interview you

25   or ask you questions about what happened that

151

 1  | night?

 2  |         A.    No.

 3  |         Q.    Anybody from -- any of your

 4  | supervisors up the chain of the command, did the

 5  | sheriff ask you any questions about what happened

 6  | that night?

 7  |         A.    The only thing outside of Detective

 8  | Kellar questioning us was what they call a

 9  | walkthrough, and it was a very limited

10  | description, and I cannot remember who did that

11  | with me.  It was the night of the offense and it

12  | was very -- very, very brief but no details were

13  | given or anything of that nature.

14  |               (Thereupon, Plaintiff's Exhibit 11,

15  | Detective Isaiah Kellar's investigation, was

16  | previously marked for purposes of identification.)

17  | BY MS. BRANCH:

18  |         Q.    If you could turn to Exhibit 11.

19  | That's the investigation report.  You've not seen

20  | this before; is that your testimony?

21  |         A.    Correct.

22  |         Q.    Page 6858 is Detective Kellar's

23  | summary of the walkthrough with you.

24  |         A.    Okay.

25  |         Q.    Second full paragraph starts I also

1   asked Deputy Teague.  Do you see that?

2          A.   Yes.

3          Q.   That paragraph, the second, third,

4   and fourth paragraph after it summarize his

5   account of the walkthrough.

6          A.   Okay.

7          Q.   I'm going to ask you to read those

8   paragraphs silently to yourself and then just let

9   me know when you're done.

10         A.   Okay.

11         Q.   Does that refresh your memory of the

12  walkthrough with Detective Kellar?

13         A.   It seems a little bit more detailed

14  than I remember, but yes.

15         Q.   Is his summary of what you told him

16  accurate?

17         A.   Yes.

18         Q.   Anything you would want to change?

19         A.   No.

20         Q.   In the second paragraph that starts

21  Deputy Teague said --

22         A.   Okay.

23         Q.   -- he writes Deputy Teague said he

24  observed Martin raise the gun off his hip and then

25  drop it back down.  Deputy Teague stated Martin

153

```
 1  then raised the firearm a second time and began
 2  pointing it at Deputy Haas.  Deputy Teague said as
 3  Martin pointed the firearm toward Haas, he
 4  discharged his duty weapon at him.  Did I read
 5  that correctly?
 6          A.   Yes.
 7          Q.   Next sentence reads, Deputy Teague
 8  told me after firing his duty weapon he retreated
 9  behind the vehicle for cover and then reapproached
10  the passenger side door.  Is that accurate?
11          A.   Yes.
12          Q.   So you did seek cover behind the
13  Grand Prix?
14          A.   Yes.
15          Q.   And then when you came back to the
16  driver's side -- the passenger side door you saw
17  the gun lying beside the driver's right hip/leg
18  area; is that right?
19          A.   Yes.
20          Q.   So in this statement you have Dontae
21  Martin dropping the gun and then raising the gun
22  and pointing it at Deputy Haas; is that right?
23          A.   Yes, that's what Detective Kellar
24  wrote.
25          Q.   Do you know if that interview with
```

```
 1   you was recorded?

 2        A.   I have no idea.

 3        Q.   Have you ever had walkthroughs

 4   before?

 5        A.   No.

 6        Q.   Ever since?

 7        A.   Well, let me rephrase the

 8   walkthrough.  Yes, we've been on incidents where,

 9   you know, something has happened and we'll, you

10   know -- like a sergeant will ask us what happened

11   and we just give them a very quick synopsis, you

12   know, we told the subject to do this, he failed to

13   do this so we did that.  So if you want to count

14   that as a walkthrough, yes.  But a walkthrough

15   like this where it involved our firearm, no, I

16   never had that before.

17        Q.   In any time when you described what

18   something happened to a superior or an

19   investigator, were any of those recorded?

20        A.   Not that I'm aware of.

21             MS. BRANCH:  All right.  I'm going to

22   take a break while we get Exhibit 43 set up.

23   That's the dispatch reporting.  So it will take

24   about five minutes.

25             (Pause in proceedings.)
```

155

```
 1   BY MS. BRANCH:
 2        Q.   The written statement, do you have
 3   any of the drafts available on any computer
 4   device?
 5        A.   No.
 6        Q.   Or have access to them?
 7        A.   No.
 8        Q.   Do you know if your attorney still
 9   has the drafts?
10        A.   I have no idea.
11        Q.   Okay.  You were placed on
12   administrative leave after the shooting of Dontae
13   Martin; is that correct?
14        A.   Correct.
15        Q.   And how long was that leave for?
16        A.   I returned to work for a -- I think
17   it was a day and a half sometime in October or
18   November, I can't remember, and then put back on
19   paid leave until I returned to full active duty,
20   continuous to today, was -- I think it was January
21   4th, 2016.  Whatever that first Monday was in
22   2016.
23        Q.   And why were you on leave for so
24   long?
25        A.   There was just an absolute confusion,
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 156 of 216 PAGEID #: 1092
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

156

1  miscommunications as far as how some of the

2  processes were going.  In order to get that

3  information, you would have to speak with the

4  sheriff about that.

5          Q.    That's for the sheriff?

6          A.    Yes.

7          Q.    And do you know how long -- do you

8  know why you came back for a day and a half in

9  October?

10         A.    Again, that goes to the confusion.

11 Some form of miscommunications with doctors.  The

12 sheriff's office wanted to send us to a different

13 doctor.  There was some sort of a communications

14 error in there.  He brought us back and after a

15 day and a half the sheriff met with the -- myself

16 and Deputy Haas and put us back on paid leave

17 pending another evaluation from a doctor.

18         Q.    And have you had any other meetings

19 with the sheriff other than that one regarding

20 your leave or Dontae Martin or the shooting?

21         A.    No, I just had one that I can

22 remember.

23         Q.    And did the sheriff ask you any

24 questions about your actions or what happened?

25         A.    No.

157

```
 1              Q.    It was just to talk about the leave?
 2              A.    Yes.
 3              Q.    And who did -- how many fitness for
 4    duty evaluations did you have?
 5              A.    I have no idea.
 6              Q.    More than one?
 7              A.    Oh, yes.  Yes, ma'am.
 8              Q.    More than two?
 9              A.    Yes.
10              Q.    Did Dr. Daum interview you for one of
11    your fitness for duties?
12              A.    He did the majority of the fitness
13    for duty evaluations.
14              Q.    And do you know what doctors did the
15    other ones?
16              A.    Dr. Daum did the initial ones.  I do
17    not know the doctor who did a -- he just did one
18    evaluation up in Columbus.  I don't know what his
19    name was.  And then Dr. Platoni did the remaining
20    three.
21              Q.    And can you spell that?
22              A.    P L A T O N I, I believe.  P L A.
23              Q.    T O N I?
24              A.    You're spelling it P A L.
25    It's P L A T O N I.
```

158

```
1          Q.   And where is he based?

2          A.   She is based in Centerville.

3          Q.   And how many evaluations did she do?

4          A.   Three.

5          Q.   And what were they?  They were all

6   fitness for duty?

7          A.   Yes.

8          Q.   For you?

9          A.   Yes.

10         Q.   Were they all mental health based or

11  physical or both?

12         A.   It was all mental health based.

13         Q.   Okay.  And do you know why it took so

14  long for you to be cleared to come back?

15         A.   Through Dr. Platoni?

16         Q.   Yes.

17         A.   Dr. Platoni told me that she will not

18  release somebody back to full duty until she met

19  with them at least three times.

20         Q.   Did she have any concerns?

21         A.   No.

22         Q.   Did any of your doctors recommend

23  treatment --

24         A.   No.

25         Q.   -- or any conditions for your return
```

1  to work?

2          A.    No.

3          Q.    And do you know why three doctors

4  were involved?

5          A.    Dr. -- Dr. Daum, we had our initial

6  request to go there.  I don't know exactly what

7  Deputy Haas did, but I went and saw Dr. Daum

8  within I'd say a week or so of the shooting, spoke

9  with him.  He said he felt I could return to work

10 immediately, however, he did not want me to return

11 to work immediately due to the current climate in

12 law enforcement and the fact that we were

13 receiving death threats at the sheriff's office.

14 We were not -- when I say we, I was not receiving

15 a direct death threat.  I was informed of death

16 threats from -- Sergeant Hutchison informed me of

17 some death threats that were heard through the

18 grapevine while responding to calls.  I don't know

19 the specifics to those death threats.  And

20 Dr. Daum said that he would rather -- he would

21 feel more comfortable leaving me off duty until a

22 grand jury cleared me because he did not want, you

23 know, to put me out there with death threats

24 active, the current climate in law enforcement, et

25 cetera.

```
 1              Q.    And did he ever clear you?

 2              A.    No.

 3              Q.    Did he refuse to clear you?

 4              A.    Yes.

 5              Q.    And then another doctor was found in

 6   Columbus?

 7              A.    Excuse me.  I received a phone call

 8   from Julie Droessler telling me that she was not

 9   happy with Dr. Daum's activities and that she was

10   sending me to Columbus for an evaluation.

11              Q.    And who is Julie Droessler?

12              A.    She is our personnel director.

13              Q.    And how did it go -- when did you go

14   see that doctor in Columbus?

15              A.    That's the one that was in September,

16   October.  I don't remember an exact time frame.

17              Q.    And what was the outcome of that

18   evaluation?

19              A.    Julie Droessler asked me to call and

20   report to her my thoughts of the doctor up in

21   Columbus.  I didn't even leave the doctor's office

22   and I called Julie Droessler and told her that

23   this guy was completely out of his mind.  I

24   informed her that he fell asleep during the

25   evaluation.  It was an hour -- it was an hour-long
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust v. Teague

161

 1   evaluation -- it was an hour-long evaluation and

 2   he probably slept forty minutes of it.  And after

 3   the evaluation, he felt compelled to tell me that

 4   I was gaining weight and that I needed to hit the

 5   gym, that I was getting too fat, which I agree

 6   with but I don't need a doctor telling me that,

 7   especially a psychologist.  And when I told her

 8   that, she sounded like she was appalled at the

 9   information that I relayed back to her and said

10   that she would find me another doctor and would

11   listen to what Deputy Haas had to say and hope

12   that Deputy Haas didn't have to go through the

13   same type of evaluation.  I'm thinking it was

14   another ten, fifteen days, somewhere in that area,

15   she called and gave us a return to duty -- or gave

16   me a return to duty date and told me that Deputy

17   Haas was going to be returning to work as well.

18          Q.   And then what happened to derail

19   that?

20          A.   I asked her what happened to the

21   other doctor evaluation, and she said that the

22   doctor in Columbus had reported that -- that I was

23   clear to come back to work.  And I questioned the

24   liability issue as far as having one doctor

25   clearing me, and that I, you know, put it on

162

1   record with her that I felt that it was very

2   unprofessional in how he could give a true opinion

3   by falling asleep forty minutes of an evaluation

4   and I've got another doctor telling me that he

5   would rather us stay off work until the grand jury

6   had cleared us.  And she, you know, informed me

7   that if I didn't return to work on this day, that

8   I was going to go off the payroll.  So I returned

9   to work that day and Deputy Haas returned to work

10  that day and the two of us were assigned to court

11  security.  Some things occurred during the day and

12  that's when we were called into the sheriff's

13  office.

14          Q.   The sheriff overruled her?

15          A.   Yes.

16          Q.   Did the sheriff ask you if you felt

17  ready to come back to work?

18          A.   Yes.

19          Q.   And what did you say?

20          A.   I told him that I felt ready.

21          Q.   And why didn't he bring you back

22  then?

23          A.   Why?

24          Q.   Why didn't he have you stay instead

25  of putting you back on leave?

1          A.    I'm sorry.  I'm getting confused.

2    Why didn't he what?

3          Q.    Oh.  I thought you said that --

4    earlier that the sheriff put you back on leave

5    until you could be evaluated by a third doctor.

6          A.    Yeah.  This meeting that we are in is

7    where he puts us back on leave.

8          Q.    Right.  So why did he put you back on

9    leave even though you were ready to return?

10         A.    Okay.  Because I -- he asked me if I

11   was ready to return.  I told him yes, I felt I was

12   ready to return.  And he asked me if I -- what my

13   thoughts were to stay at work because we had an

14   issue in the jail that day escorting an inmate and

15   there was a jail -- or a prisoner inside the jail

16   who recognized my name and brought it up to

17   several subjects inside there.  He actually walked

18   over to me, I watched him read my nameplate, and

19   he looked over at a couple other people, called

20   them out by name, I don't remember what their name

21   was, and he said this is the motherfucker that

22   killed Tae.

23              So that made me uneasy being inside

24   the jail knowing that people recognize my name and

25   that I was involved in this incident.  I reported

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

164

```
 1   that to my supervisor, and I don't remember which
 2   sergeant it was, but then in turn the sergeant
 3   reported to somewhere, someone where it made it up
 4   the chain of command.  That's when the sheriff
 5   requested us to come over there.  And I told him
 6   that I felt I was ready to return to work.  He
 7   asked if -- I don't remember exactly how the
 8   question was asked, but my response to him was I
 9   felt that there might be a little bit of a
10   liability issue with me having a doctor that has
11   cleared me that I've already reported to sleeping
12   for forty minutes of an hour visit versus a doctor
13   telling me I'm not clear to go back, and he sent
14   me back to work.  By the end of that day my
15   sergeant informed me that the sheriff was putting
16   us back on administrative leave and not to come to
17   work tomorrow, to go ahead and go home.
18            Q.   And then what happened to bring you
19   back in January?
20            A.   I don't remember exactly how we come
21   across Dr. Platoni's name; but when I received a
22   call that we were going to go to Dr. Platoni,
23   she's supposed to be an expert in dealing with
24   police officers and military personnel who have
25   gone through traumatic experiences as such, that
```

 1  they recommend that we went to Dr. Platoni.

 2          Q.    So I thought the grand jury cleared

 3  you sometime in November.

 4          A.    I don't remember the date.

 5          Q.    So was it after the grand jury had a

 6  no bill that Dr. Platoni was referred to you?

 7          A.    I don't remember the exact dates, but

 8  I know the visit with Dr. Platoni, we had three --

 9  I had three visits with Dr. Platoni.  They were, I

10  want to say, two weeks apart, each visit, so over

11  a six week period -- six to eight week period, and

12  I was -- I think my final visit with her was

13  December 30th.

14          Q.    Okay.  And then you came back to work

15  the next shift?

16          A.    I was cleared December 30th and,

17  yeah, I came back to work on January 4th.  It was

18  a Monday.

19          Q.    Why is everybody smiling at you?

20          MS. DINEHART:  Because he sighed a

21  big breath.

22          THE WITNESS:  Because this is my good

23  side, I guess, I don't know.

24  BY MS. BRANCH:

25          Q.    Have you seen any mental health

166

1    professionals other than these three doctors since

2    the shooting?

3          A.    No.

4          Q.    Are you currently receiving any

5    treatment for mental health issues?

6          A.    No.

7          Q.    Have you been involved in any use of

8    force since you've returned to work that resulted

9    in an injury to anyone?

10         A.    The only use of force that resulted

11   in an injury was an injury to myself, and that

12   was -- yeah, just an injury to myself.

13         Q.    How did you get injured?

14         A.    Twisted my ankle.

15         Q.    You were involved in two incidents

16   involving a suspect who was shot within a six

17   month period at the Montgomery County Sheriff's

18   Office; is that right?

19         A.    I don't know if it was within six

20   months, but, yeah, close.

21         Q.    Has that impacted your ability to do

22   your job?

23         A.    No.

24         Q.    And why not?

25               MS. DINEHART:  Objection.

 1              THE WITNESS:  Because it's not

 2  impacted my ability.

 3  BY MS. BRANCH:

 4        Q.   Do you know why Officer Haas left

 5  Montgomery County?

 6        A.   No.

 7             (Thereupon, Plaintiff's Exhibit 43,

 8  CD with audio recordings, was previously marked

 9  for purposes of identification.)

10  BY MS. BRANCH:

11        Q.   I'm going to play for you the

12  recording of the -- one of the dispatch logs we

13  have.

14        A.   Okay.

15        Q.   It's Exhibit 43.  So there are

16  multiple recordings on here.  The first one I'm

17  going to play is number 6130237.

18             MS. JAGIELSKI:  Jennifer, could you

19  repeat that number for me, please?

20             MS. BRANCH:  Yeah, 6130237.

21             MS. JAGIELSKI:  Thank you.

22  BY MS. BRANCH:

23        Q.   So what I'm going to do is I'm just

24  going to play it through, just let you listen to

25  it, and then you tell me how many times if you

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 168 of 216 PAGEID #: 1104

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

168

 1  need me to replay it.

 2          A.    Okay.

 3          Q.    Sometimes you have to listen to it a

 4  couple times to figure out what's going on.  And

 5  then when you feel like you've understood it, I'm

 6  going to ask you questions about it.

 7                So this is the one where dispatch is

 8  calling you out for the run.  Well, maybe not.

 9  This says it doesn't have sound.  Hang on.

10                (Thereupon, an audio recording was

11  played.)

12  BY MS. BRANCH:

13          Q.    All right.  I'm going to play that

14  again.

15                (Thereupon, an audio recording was

16  played.)

17  BY MS. BRANCH:

18          Q.    Were you able to understand that?

19          A.    Yes.

20          Q.    Bower, is that the street you were

21  on?

22          A.    No.

23          Q.    Okay.  I thought she was checking up

24  on you at Bower Street.  So the dispatcher is

25  asking Harrison 121, which is Officer Haas, to

1  check and advise at Springbrook, two vehicles,

2  green car and a Grand Prix with tinted windows, no

3  one has gotten out yet.  Is that the dispatch

4  call?

5          A.    Yes.

6          Q.    Okay.  And then she gave the time as

7  0:44.  Did you hear that?

8          A.    Yes.

9          Q.    Okay.  The next call I'm going to

10 do -- play is 6130266.  This is, I think, about

11 thirty seconds.

12              (Thereupon, an audio recording was

13 played.)

14 BY MS. BRANCH:

15         Q.    Have you heard that one before today?

16         A.    Not that I remember, no.

17         Q.    Did you have access to the dispatch

18 back when you were writing your statement?

19         A.    I don't think so.

20         Q.    I can play it again -- I guess I did

21 play it again.  Was that your voice, we have one

22 with a gun?

23         A.    Yeah, it was my voice.

24         Q.    And on this recording that was said

25 at about one second in.  I'll play it again.

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

170

1          (Thereupon, an audio recording was

2    played.)

3    BY MS. BRANCH:

4          Q.   It was about two seconds in you said

5    we have one with a gun?

6          A.   Yes.

7          Q.   And then next we hear Sergeant -- or

8    Officer Haas start to say Harrison 121, shots

9    fired.  So I'm just going to play it until we get

10   there.

11          (Thereupon, an audio recording was

12   played.)

13   BY MS. BRANCH:

14          Q.   I'm going to interrupt.  So she

15   says -- she does the tone -- plays the tone and

16   then says restriction and says 46.  Does that

17   alert everybody that there is a suspect with a

18   gun?

19          MS. DINEHART:  Objection.

20          THE WITNESS:  I have to hear that

21   again on 46.

22   BY MS. BRANCH:

23          Q.   The 46 is the time code, right?

24          A.   That would be my guess because I

25   don't know of a Code 46 as far as it being --

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust V. Teague

171

```
 1            Q.    Oh, right.   She's -- the tone is the
 2   signal to everybody that the line is -- the
 3   channel is restricted?
 4                  MS. DINEHART:   Objection.
 5                  THE WITNESS:   Okay.
 6   BY MS. BRANCH:
 7            Q.    Is that right?
 8            A.    Let's just play it again.
 9            Q.    Sure.  I'll go back to two seconds
10   and play it again.
11                  (Thereupon, an audio recording was
12   played.)
13   BY MS. BRANCH:
14            Q.    Restrictions?
15            A.    What about it.
16            Q.    Is that what she said?
17            A.    Yes.
18            Q.    That she was putting restrictions on
19   the channel?
20            A.    Yes.
21            Q.    At 0:46?
22            A.    Yes.
23            Q.    And that was at twelve seconds.  I
24   don't know if you can see that on there.
25            A.    Okay.
```

172

```
 1                   (Thereupon, an audio recording was

 2      played.)

 3      BY MS. BRANCH:

 4           Q.    So did you hear Officer Haas say 21,

 5      shots and that's all he got out before somebody

 6      stepped on top of him?

 7           A.    Yes.

 8                   (Thereupon, an audio recording was

 9      played.)

10      BY MS. BRANCH:

11           Q.    And he says 21, shots at fifteen

12      seconds into the tape, this recording?

13           A.    Okay.

14           Q.    Is that correct?  I don't know if you

15      can see the time code down here (indicating).

16           A.    Barely, but yes.

17                   (Thereupon, an audio recording was

18      played.)

19      BY MS. BRANCH:

20           Q.    And that was Officer Haas when he

21      says Harrison 121, you copy, shots fired, start

22      the medic?

23           A.    Yes.

24                   (Thereupon, an audio recording was

25      played.)
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 173 of 216 PAGEID #: 1109

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

173

1  BY MS. BRANCH:

2       Q.   So the dispatcher says at 0:46

3  affirmative, shots fired, and then she asks

4  officer or citizen, and Deputy Haas responds 121,

5  shots fired, we just shot the suspect; is that

6  right?

7       A.   Yes.

8       Q.   Did you hear your voice anywhere else

9  on this recording other than the beginning where

10 you say we have one with a gun?

11      A.   No.

12           (Thereupon, an audio recording was

13 played.)

14 BY MS. BRANCH:

15      Q.   You hear the discussion between the

16 dispatcher and somebody that sounds like he's at

17 the bottom of a well?

18      A.   Yes.

19      Q.   Do you know whose voice that is?

20      A.   Sergeant McLaughlin.

21      Q.   And what is he saying there?

22      A.   He's telling dispatch to have the

23 medics come in from the east because we have the

24 road blocked off.

25      Q.   Okay.  Does that refresh your memory

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 174 of 216 PAGEID #: 1110

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

174

1  on whether Sergeant McLaughlin was on the scene

2  before or after Dontae Martin was extracted from

3  the vehicle?

4         A.   I don't know if he was extracted from

5  the vehicle yet at this time.  I have no idea when

6  he was extracted versus when Sergeant McLaughlin

7  was talking on the radio.

8         Q.   So at the time that the -- you're

9  calling in one with a gun, how soon after Officer

10 Haas said he has a gun did you let dispatch know?

11        A.   How soon after Deputy Haas announced

12 he had a gun did --

13        Q.   Did you tell dispatch?

14        A.   -- did I notify?

15        Q.   Yes.

16        A.   I don't know how long it was.

17        Q.   Was that something that you did

18 before -- did you notify dispatch that you had one

19 with a gun before shots were fired?

20        A.   Yes.

21        Q.   Sometime after Deputy Haas told you

22 but before shots were fired?  Is the sequence

23 correct for the reporting that you notified

24 dispatch we have one with a gun before Deputy Haas

25 said shots fired?

175

1          A.    Yes, I notified dispatch that we had

2   a guy with a gun.  Following that Deputy Haas and

3   I shot Dontae.

4          Q.    Okay.  And how soon after the shots

5   were fired did Deputy Haas notify dispatch?

6          A.    I don't know.

7          Q.    Would it be common police practice

8   that you would notify dispatch as soon as you were

9   aware that a suspect had a gun?

10               MS. DINEHART:  Objection.

11               THE WITNESS:  When practical.

12  BY MS. BRANCH:

13         Q.    And would it be proper procedure to

14  notify dispatch as soon as shots were fired?

15               MS. DINEHART:  Objection.

16               THE WITNESS:  When practical.

17  BY MS. BRANCH:

18         Q.    The difference in time between your

19  notification and Deputy Haas' notification is

20  fourteen seconds.  Do you dispute that time gap

21  between notifying dispatch about the gun and then

22  notifying the dispatch about the shots fired?

23         A.    I didn't have a stopwatch out there,

24  ma'am.  I have no idea what the time frame was.

25         Q.    That's the time that's shown by

176

```
1   looking at the recording.
2          A.   Yeah.  I have no idea how dispatch
3   works and their time stamps and how that stuff
4   goes.
5          Q.   So I've already taken the deposition
6   of Sergeant Lewis who explained to me this
7   recording.
8          A.   Okay.
9          Q.   Do you have any reason to dispute his
10  explanation of how the recording is timed and what
11  the sequencing is?
12         A.   I have no reason to dispute or
13  confirm what he said.
14         Q.   Did you see the internal
15  investigation into the shooting of Dontae Martin?
16         A.   No.
17         Q.   Anybody notify you from internal
18  about the results of that?
19         A.   The only thing I remember from
20  internal is being told that they were going to
21  utilize the criminal investigation for the
22  internal.  I don't remember results coming out or
23  anything like that.
24         Q.   At this point in time have you been
25  cleared by Montgomery County?
```

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 177 of 216 PAGEID #: 1113
Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

177

1          A.    I don't remember if I had been

2     cleared or not by the sheriff's office.

3          Q.    Do you think you're still under

4     investigation by the sheriff's office?

5          A.    I don't think I'm still under

6     investigation, no.

7          Q.    Has anybody at the sheriff's office

8     told you you did anything improper during the

9     shooting of Dontae Martin?

10         A.    No.

11         Q.    Or in the aftermath of the retrieving

12    the gun, doing the paperwork, or anything like

13    that?

14         A.    No.

15         Q.    Have any policies been changed in --

16    the use of force policies and practices since the

17    shooting of Dontae Martin regarding the use of

18    deadly force?

19              MS. DINEHART:  Objection.

20              THE WITNESS:  No.

21    BY MS. BRANCH:

22         Q.    Have you personally been retrained by

23    anyone at the sheriff's office in the use of

24    deadly force?

25         A.    We're trained several times a year on

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 178 of 216 PAGEID #: 1114

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

178

1  use of force.

2          Q.    As a result of your actions in the

3  shooting of Dontae Martin, have you received any

4  training?

5          A.    No.

6          Q.    All right.  I'm going to ask you some

7  questions related to the interrogatories we sent

8  you.  So one of the interrogatories, number four,

9  asked how many cartridges did you carry in your

10  firearm at the time of the encounter, and I think

11  you've testified today that it was fourteen; is

12  that right?

13          A.    No.

14          Q.    How many cartridges did you carry in

15  your firearm at the time?

16          A.    If we're splitting hairs, I was

17  carrying no cartridges.  I was carrying a bullet.

18  It's not until the bullet is used that it expels a

19  cartridge.

20          Q.    Okay.  How many bullets were you

21  carrying?

22          A.    So I'm not sure what you're asking.

23          Q.    How many bullets were you carrying?

24          A.    In my firearm?

25          Q.    Yes.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 179 of 216 PAGEID #: 1115

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

179

1        A.    A total of fourteen.

2        Q.    The next question, number five, asks,

3   explain why you approached Dontae Martin's vehicle

4   on July 23rd, 2015.  Include in your response what

5   you knew about the situation before you approached

6   the vehicles and what facts you considered before

7   approaching the vehicle, and your answer was to

8   see the narrative which we marked today --

9            MS. DINEHART:  53.

10  BY MS. BRANCH:

11       Q.    -- as Exhibit 53.  So do you have

12  anything to add to that answer other than Exhibit

13  53?

14       A.    No.

15       Q.    Question six asks, explain how you

16  and Deputy Teague approached Dontae Martin's

17  vehicle on July 23rd, 2015.  And the answer you

18  gave to every one of the next questions that I'm

19  going to ask is see Exhibit 53.  Is there any

20  other information regarding how you approached the

21  vehicle other than what you have provided in

22  Exhibit 53?

23       A.    I am Deputy Teague.

24       Q.    Right.

25       A.    Your question was how you and Deputy

1  Teague.

2       Q.   Yeah, so I'll read it as how you

3  approached the vehicle.  Is there anything else --

4  do you have any explanation for how you approached

5  Dontae Martin's vehicle on July 23rd other than

6  what's in Exhibit 53?

7       A.   No.

8       Q.   Number seven is how much time elapsed

9  from when you exited your vehicle until you took

10  your first shot at Dontae Martin.  The answer was

11  see your narrative supplement, Exhibit 53.

12       A.   Yes.

13       Q.   Is there any other -- well, let me

14  say it this way.  Exhibit 53 didn't have any --

15  your statement doesn't have any time frames in it;

16  is that right?

17       A.   Correct.

18       Q.   Okay.  So the testimony that you've

19  given today in your deposition appears to be that

20  only seconds elapsed from the time you exited your

21  vehicle until you took the first shot at Dontae

22  Martin; is that correct?

23       A.   I have no idea how long it was from

24  the time I exited my vehicle to the time I shot

25  Dontae.

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 181 of 216 PAGEID #: 1117

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

181

```
 1          Q.   If the audio recording is correct
 2   that you were notified and then you notified
 3   dispatch that Dontae Martin had a gun, we have one
 4   with a gun, and then fourteen seconds later
 5   dispatch was notified shots were fired, would you
 6   agree that it was fourteen seconds or less between
 7   the time you exited your vehicle and took your
 8   first shot at Dontae Martin?
 9               MS. DINEHART:  Objection.
10               THE WITNESS:  I can't agree to that
11   because I have no idea.
12   BY MS. BRANCH:
13          Q.   Number eight asks, explain all facts
14   and circumstances that you considered before you
15   shot at Dontae Martin.  Again, the answer was see
16   your narrative supplement which we have as Exhibit
17   53.  Is there any other answer to that question?
18          A.   No.
19          Q.   I know you probably aren't familiar
20   with the legal documents in the case but you filed
21   what's called an answer to our complaint, it's
22   your response to the complaint, and in your answer
23   at paragraph eighteen you denied that Dontae
24   Martin was unconscious, which is what we alleged
25   in the complaint.  Your answer for -- we asked you
```

182

1  to describe all the facts that support your claim

2  that he was conscious during the incident, and

3  your response was to see your narrative

4  supplement, Exhibit 53.  Do you have any

5  additional response to that question?

6         A.   No.

7         Q.   Interrogatory number ten asks you to

8  describe all the actions you took after you fired

9  your last shot until you left the scene of the

10  encounter.  Please -- include in your response

11  either the time you took each action or the order

12  in which each action was taken.  And again you say

13  see your narrative supplement, which we have as

14  Exhibit 53.  53 didn't really describe what

15  happened after you shot Dontae Martin; is that

16  right?

17         MS. DINEHART:  Objection.

18  BY MS. BRANCH:

19         Q.   Is there any additional statement

20  that you have about your actions that you took

21  after you shot Dontae Martin that you haven't

22  already testified to in your deposition today?

23         A.   No.

24         Q.   We asked in interrogatory fifteen for

25  your cell phone that you were carrying on July

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

183

 1  23rd and July 24, 2015.  Do you still have those

 2  cell phones?

 3          A.    No.

 4          Q.    Did you have a work-related cell

 5  phone?

 6          A.    No.

 7          Q.    Did you have a personal cell phone?

 8          A.    Yes.

 9          Q.    And is your personal cell phone with

10  the same carrier today as you had in July of 2015?

11          A.    No.

12          Q.    Who was your carrier in July of '15?

13          A.    I don't remember.

14          Q.    Who is your current carrier?

15          A.    Verizon.

16          Q.    What other carriers have you had for

17  your cell phone -- your personal cell phone?

18          A.    Cincinnati Bell.  I think AT&T.

19          Q.    Any others in the last few years?

20          A.    Sprint.

21          Q.    Which one did you have prior to

22  Verizon?

23          A.    I have Verizon now so all of those

24  would be prior to Verizon.

25          Q.    Do you know which one in sequence?

184

```
 1          A.   No, I don't have a clue.

 2          Q.   Okay.  And has your cell phone number

 3  been the same the whole time?

 4          A.   Huh-uh.  No.  It changed when I came

 5  to Verizon, I believe.

 6          Q.   Okay.  So I'm not going to ask for

 7  your cell phone number on the record but I'll ask

 8  you to provide it to your attorney, your cell

 9  phone number that was your personal number back in

10  July of 2015.

11          A.   Okay.  I'll see if I can find it.

12          Q.   Do you know what it is?

13          A.   No.  That's what I said, I'll have to

14  see if I can find it.  I have no idea.

15          Q.   Did you use a cell phone during the

16  incident or after the incident with Dontae Martin?

17               MS. DINEHART:  Objection.  Can you

18  give a better time frame than after the incident?

19  BY MS. BRANCH:

20          Q.   Between July 23rd, 2015 and when you

21  came back to duty.

22          A.   Did I use a cell phone during that

23  time?

24          Q.   While you were on duty.

25          A.   No, I never came back to duty from
```

1  the time of the incident to January 4th.  That

2  would -- you said July 23rd to January 4th?

3          Q.   Yeah.  So let me start with July

4  23rd.  Did you have your personal cell phone on

5  you while you were at work that shift?

6          A.   Yes.

7          Q.   Okay.  Was that cell phone able to

8  access text messaging?

9          A.   Yes.

10          Q.   Internet?

11          A.   Yes, I think so.

12          Q.   What about e-mail?

13          A.   I don't think I had e-mail through

14  them, but I'm not a hundred percent sure.

15          Q.   Did you have a personal e-mail

16  account back in July of '15?

17          A.   No.  Yes, I had a personal e-mail

18  account.

19          Q.   Okay.  And do you know that e-mail?

20  I'm not going to ask for it on the record, but can

21  you give that to your attorney, your e-mail

22  address?

23          A.   Okay.

24          Q.   Do you know what it is to be able to

25  give it to your attorney?

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 186 of 216 PAGEID #: 1122

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

186

 1          A.   Off the top of my head, no, but I can
 2   try to find out.
 3          Q.   You can find out?
 4          A.   Yeah.
 5          Q.   Were you involved with any social
 6   media back in July of '15; Facebook, Instagram,
 7   Twitter?
 8          A.   No.
 9          Q.   Are you currently?
10          A.   Yes.
11          Q.   What is your privacy settings for
12   your Facebook currently?
13          A.   I have no idea what they are.
14          Q.   Is it open to anyone to read?
15          A.   I don't think so, but I'm not a
16   hundred percent sure.
17          Q.   And what name do you use for your
18   Facebook page?
19          A.   It's a joint account with my wife.
20   Mac --
21          Q.   I don't want to put it on the record.
22          A.   Okay.
23          Q.   You'll give it to your attorney and
24   we can -- did you have your Facebook account back
25   in 2015?

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 187 of 216 PAGEID #: 1123

Patricia Martin, Admin., et al. vs Joshua Haas, et al.    Gust A. Teague

187

1          A.    I don't think so.

2          Q.    And what about any other social media

3    in July of '15?

4          A.    No.

5          Q.    And how about any other recordings of

6    communications you would have made back in let's

7    say just July of 2015?

8          A.    No, nothing.

9          Q.    And what search of your records have

10   you done to find those things, to see if you had

11   any e-mails related to this incident or text

12   messages or anything else in writing?

13         A.    I don't understand what you're

14   saying.  Why would I search to see what I had?

15         Q.    Well, because we asked for it in

16   discovery.

17         A.    You're asking me if I searched it?

18         Q.    Right.

19         A.    Why would I search?

20         Q.    Because we asked you in discovery.

21         A.    No, I have not searched for my own

22   stuff.  You're kind of confusing me there.

23         Q.    Did you keep any notes, journals,

24   diaries, calendars, anything in writing that would

25   record what you did or what you said regarding the

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

188

1   shooting, the investigation of the shooting,

2   anything that happened between July 23rd and when

3   you came back to work?

4           A.   No.

5                MS. BRANCH:  Okay.  I'm going to take

6   maybe a five-minute break and just go through my

7   notes and see if I've got anything left for you

8   but we may be done.

9                (Pause in proceedings.)

10               MS. BRANCH:  I have no further

11  questions.

12               MS. DINEHART:  We will read.

13               (Thereupon, the deposition was

14  concluded at 4:01 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                          Gust A. Teague

189

1        I, GUST A. TEAGUE, do hereby certify that

2   the foregoing is a true and accurate transcription

3   of my testimony.

4

5

6                    _ _ _ _ _ _ _ _ _ _ _ _ _ _

7

8            Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Job: 181113KSB

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 190 of 216 PAGEID #: 1126

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

190

```
 1   STATE OF OHIO          )

 2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE

 3              I, Kathy S. Wysong, a Notary

 4   Public within and for the State of Ohio, duly

 5   commissioned and qualified,

 6              DO HEREBY CERTIFY that the

 7   above-named GUST A. TEAGUE, was by me first duly

 8   sworn to testify the truth, the whole truth and

 9   nothing but the truth.

10              Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14              I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20

21

22

23

24

25
```

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

191

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and seal of office at Dayton, Ohio, on this

3     15th day of November, 2018.

4

5

6     _____

      KATHY S. WYSONG, RPR

7     NOTARY PUBLIC, STATE OF OHIO

      My commission expires 12-1-2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                                Gust A. Teague

**0**

**0:44** 169:7
**0:46** 171:21 173:2

**1**

**1** 68:10,11 70:6,18 73:2 80:3
**1.1.3** 131:16 132:1
**11** 151:14,18
**11:30** 40:18 44:20 45:13
**121** 72:23 168:25 170:8 172:21 173:4
**12:40** 101:11
**13** 72:8 81:22
**14** 71:24 72:5,7,9 73:16 81:21 87:14,23 88:2,5
**15** 34:22 183:12 185:16 186:6 187:3
**15-6691** 147:7 148:9
**15th** 16:24 17:3
**16** 133:20
**1600** 131:25
**1607** 149:2,4
**19** 30:11,15
**1995** 18:18
**1997** 25:23

**2**

**2** 131:17,21,23 149:1,3,4,7
**2000** 40:3
**2001** 40:3
**2006** 25:24,25
**2009** 14:24
**2010** 14:24
**2015** 30:21 33:4 35:20 40:13 46:15 179:4,17 183:1,10 184:10,20 186:25 187:7
**2016** 155:21,22
**21** 172:4,11
**21st** 18:18
**22nd** 44:17,19,20 45:11,13
**23** 45:25
**23rd** 30:21 40:13 45:1 149:22 179:4,17 180:5 183:1 184:20 185:2,4 188:2

**24** 183:1
**28th** 148:21 150:7

**3**

**30th** 165:13,16
**324** 43:9

**4**

**43** 154:22 167:7,15
**43:31** 71:3 73:3
**44** 87:22 88:5,7 89:18
**45** 94:24,25
**45:54** 80:8,9,14 81:2
**46** 96:4 97:16 98:16 99:15, 18 170:16,21,23,25
**47** 98:20,21
**48** 102:18,22
**49** 125:2,6
**4:01** 188:14
**4th** 155:21 165:17 185:1,2

**5**

**50** 127:23,24 128:3
**51** 128:17,21 131:6
**52** 131:11
**53** 137:20,24 179:9,11,13, 19,22 180:6,11,14 181:17 182:4,14

**6**

**6** 132:17
**6130237** 167:17,20
**6130266** 169:10
**6858** 151:22

**7**

**7** 101:18,24

**8**

**8:00** 44:21
**8:02** 40:18 44:21

**9**

**94** 19:20

**97** 18:10 20:14
**99** 70:15

**A**

**abandoned** 42:10,11
**ability** 8:11,15 48:14 166:21 167:2
**absolute** 155:25
**absolutely** 59:24 132:19
**academy** 20:12,13,20
**accelerator** 109:11
**access** 35:13 147:2 155:6 169:17 185:8
**accident** 40:23,24 41:25 43:20 58:22 67:23 68:16, 21 69:2,7 70:5,14,16,22 71:6 73:10
**account** 64:16 120:14,25 132:12 152:5 185:16,18 186:19,24
**ACCUNK** 70:22
**accurate** 8:8 138:24 139:24 152:16 153:10
**accurately** 73:24
**accused** 27:22
**achieve** 23:8 132:23
**acid** 45:4
**act** 65:19 145:1
**action** 118:4,9 134:9 182:11,12
**actions** 104:8 156:24 178:2 182:8,20
**activate** 34:5 35:19,23 75:23
**activated** 34:6,7,11,14,21 35:6
**activating** 75:20
**active** 155:19 159:24
**activities** 114:19 160:9
**actual** 16:7 69:7 70:8
**add** 139:1 179:12
**additional** 182:5,19
**address** 185:22
**administrative** 146:24 155:12 164:16
**advantage** 133:5,15
**advise** 169:1
**advised** 143:20
**affirmative** 173:3

**aftermath** 177:11
**age** 6:5 18:6
**agencies** 21:18
**agency** 20:21 134:9
**agree** 60:5 61:9,17,20,23, 24 64:9 74:3,18 75:2 100:25 115:23,24 122:23 132:3,11 134:25 161:5 181:6,10
**agreement** 38:11,19
**ahead** 101:14 138:8 164:17
**aid** 68:18 109:23
**aid-wise** 111:17
**aim** 24:9
**air** 139:11
**airway** 111:19,23
**alert** 92:16 170:17
**allegations** 38:15
**alleged** 181:24
**allowed** 37:19 38:4,5,8
**alternative** 132:22
**Amber** 110:21 112:6 144:19,24
**Amendment** 130:1,12 131:5
**Andrew** 6:23
**Andy** 6:25
**angle** 49:8 52:1 89:10 95:5,16 96:3 98:25 99:6,8, 13,18 124:18 125:9
**angled** 127:9
**angles** 89:4,9
**ankle** 166:14
**announced** 136:18 174:11
**answering** 13:18 36:18 129:25
**answers** 7:11
**anymore** 107:15
**apologies** 12:21
**appalled** 161:8
**appeared** 31:1 141:9,17 142:5
**appears** 180:19
**applying** 27:17
**approach** 77:12 83:10 91:1 136:4,5 143:11
**approached** 77:6 83:12, 20 91:10,16 97:24 179:3,5,

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 193 of 216 PAGEID #: 1129

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Gust A. Teague

16,20 180:3,4

**approaching** 77:2 97:25
98:3 135:6 179:7

**approximately** 9:23
128:3,6 141:19

**area** 40:4 41:22 50:8 51:5
85:5 87:20 96:19,22 98:9
104:16 108:15 127:12
153:18 161:14

**Arlington** 20:17

**array** 93:16

**arrested** 19:13,14

**arrive** 113:8

**arrived** 43:9 75:18 77:21
78:15,19,24 85:18,21
107:21 113:18

**arriving** 73:6 78:17

**asks** 173:3 179:2,15
181:13 182:7

**asleep** 160:24 162:3

**asp** 32:16,17 93:10

**assessing** 123:5

**assessment** 54:5 64:15
118:1

**assessments** 135:20

**assigned** 40:14 162:10

**assignment** 40:14

**assist** 42:18,19

**assistance** 73:12

**assisted** 146:12

**assume** 8:23 13:11 43:25
79:15 80:13 95:11 137:4
150:12

**AT&T** 183:18

**attached** 34:3 68:22

**attempt** 125:25 126:7

**attention** 112:14

**attorney** 9:14,21 11:7,17
13:17,21 38:11 119:24
145:23 146:1 147:15
148:5,12,21 149:19 150:9,
10,15,16 155:8 184:8
185:21,25 186:23

**attorney's** 39:21 147:14

**attorneys** 12:24 13:2,12
14:3

**audio** 69:8,10 75:20 167:8
168:10,15 169:12 170:1,11
171:11 172:1,8,17,24
173:12 181:1

**authority** 122:7 132:7

**auto** 41:24 43:20 58:22
67:23 68:16,20 69:7 70:5

**automatically** 80:22

**auxiliary** 20:22 21:4

**availability** 133:3,14
134:1

**averting** 132:23

**avoid** 124:14

**aware** 124:17,18 154:20
175:9

**awareness** 58:13

---

**B**

**back** 7:22 23:14 34:22
35:20 40:8 46:15 49:8
50:16 52:19 53:7 57:23
59:3 63:2 75:10 78:1
81:17,21 82:2 84:14 85:22
88:12 89:3 99:15 100:3,23
101:15 102:24 104:10
105:10,15 109:2 114:17
120:18 125:13 134:14
137:16 138:5,9,18,19
140:25 141:10,14,18,23
142:6 144:2 145:8 148:25
152:25 153:15 155:18
156:8,14,16 158:14,18
161:9,23 162:17,21,25
163:4,7,8 164:13,14,16,19
165:14,17 169:18 171:9
184:9,21,25 185:16 186:6,
24 187:6 188:3

**background** 18:12

**backup** 136:15,17,22
137:5

**backwards** 49:6,8

**bad** 83:1

**balance** 24:5 28:2

**balancing** 132:8,12

**Ballato** 39:22

**Barely** 172:16

**barrel** 106:8

**based** 80:10,17 89:22
116:13 119:16 120:5
139:12 144:14 158:1,2,10,
12

**Basically** 71:19

**basics** 29:25

**basis** 37:20

**Bates** 96:5 127:25

**beat** 15:1 42:25 43:1,2

**began** 49:19 83:21 97:12
153:1

**begin** 87:16 94:7 109:23

**beginning** 121:3 143:9
173:9

**belief** 38:21

**believed** 135:24 137:8

**Bell** 183:18

**belt** 31:7 109:13,14

**Bender** 109:21 110:1,6,
11,15 111:12,13,15,16,17
144:20

**beverages** 44:1

**big** 34:16 165:21

**bill** 165:6

**birth** 18:6

**bit** 16:10 55:4 152:13
164:9

**black** 72:22 88:4

**block** 72:21

**blocked** 173:24

**blue** 72:21

**body** 135:12

**book** 30:16 81:22 88:14
131:22

**boots** 32:1,6,10

**bottom** 72:20 128:25
173:17

**Boulevard** 43:10

**Bower** 168:20,24

**box** 35:9

**brake** 109:11

**Branch** 6:9,11 24:1,25
25:8 26:24 27:13 28:1,24
29:16 30:14 37:1 39:2
46:13,24 50:25 52:8,16
53:6 56:23 57:14 58:4,17
60:1,18 61:13 63:1,8 64:20
65:20 68:25 72:2 78:13
81:6,17,20 82:12 87:25
94:23 95:3 96:2,7 97:13
98:19,24 100:1 101:9,13,
21 102:21 103:25 104:4,6
113:5 115:4 116:8 117:5,
21 118:21 119:6,15
120:12,17,21 121:15,24
122:14 123:4 125:5,23
126:20 127:2,23 128:2,20
130:24 131:10,20 134:12
135:10,22 136:13 137:2,
12,23 138:10,15 139:5
141:3,21 142:10 145:19
146:15 151:17 154:21
155:1 165:24 167:3,10,20,
22 168:12,17 169:14
170:3,13,22 171:6,13
172:3,10,19 173:1,14
175:12,17 177:21 179:10
181:12 182:18 184:19
188:5,10

**brand-new** 32:8

**brandish** 121:10

**breaching** 38:25

**break** 13:23 36:15,20
93:4,10 101:10,15,16,23
104:1,2,7 138:10,13,14,16,
22,23 142:22 143:22
154:22 188:6

**breaking** 59:11 107:18

**breast** 34:25

**breath** 165:21

**breathing** 111:22

**brighter** 88:16,25 89:2

**brightness** 33:9

**bring** 162:21 164:18

**broad** 16:11,17

**broadcast** 92:19

**broader** 10:23

**broke** 107:16,21 142:21
143:25

**broken** 108:3

**brought** 122:18 156:14
163:16

**bullet** 95:8,11 96:8,11
125:10,12 133:8 178:17,18

**bullets** 49:24 50:1 86:1
125:19 178:20,23

**bumper** 51:5 112:19,24
113:1,18,24 114:20

**business** 60:10

**button** 34:7,11 35:6,8,13,
19 36:2 79:6,10,12,16,19
80:14,19

**bystanders** 86:14,23
90:8,14,17

---

**C**

**calendars** 187:24

**caliber** 45:25

**call** 15:23 37:8 40:22
41:25 42:4,13,17,22 43:11
68:22 70:12,25 73:11
79:10 84:23 120:4 132:12
136:15,17 151:8 160:7,19
164:22 169:4,9

**called** 41:20 118:6 139:25
160:22 161:15 162:12
163:19 181:21

**calling** 80:12 168:8 174:9

**calls** 159:18

**camera** 82:4 97:25

**capacity** 46:5

**capitalized** 147:23,24

**car** 34:15 40:23 49:14 50:6,11 63:11,16 67:24 69:3 71:6 72:17 74:14 76:12,15 81:12,25 82:1,2,3 83:11 88:18 91:10,17,22 92:1,5 93:5 95:23 96:1 97:25 99:1,2,3,9 105:11,13 106:11 107:17 109:7,22 111:16 123:6 125:9 127:10,11 147:4 169:2

**care** 77:25

**career** 20:1 30:7

**careful** 132:8

**carried** 45:21

**carrier** 183:10,12,14

**carriers** 183:16

**carry** 47:4 57:5,9,13,18,19 178:9,14

**carrying** 178:17,21,23 182:25

**cars** 93:8 112:19

**cartridge** 178:19

**cartridges** 178:9,14,17

**case** 12:16 13:8 14:3 38:1 39:20 48:4 121:17 181:20

**cases** 40:9 124:1

**catching** 14:14

**caught** 109:8

**caused** 54:24

**cautioned** 6:6

**CD** 167:8

**cell** 182:25 183:2,4,7,9,17 184:2,7,8,15,22 185:4,7

**center** 106:1,5 107:5 108:15

**Centerville** 158:2

**certification** 21:7

**certified** 6:7

**cetera** 159:25

**chain** 151:4 164:4

**chamber** 47:8

**chance** 22:21 109:23

**change** 102:15 139:7 152:18

**changed** 24:14 34:9,13 45:23 70:10,24 71:23 122:20,22 177:15 184:4

**channel** 139:22 171:3,19

**charge** 66:20

**check** 169:1

**checking** 107:8 168:23

**checks** 43:12

**chest** 33:23 110:23 111:7, 8,14,18 112:2,7 113:13 128:5

**Cincinnati** 183:18

**circle** 89:25 90:2,13 98:10, 15

**circumstance** 120:3,24 122:9

**circumstances** 64:21 120:13 121:25 122:8 132:13 181:14

**citizen** 29:12 173:4

**citizens** 56:24 115:18

**city** 43:2

**civilians** 55:19 60:13 87:5

**claim** 182:1

**classified** 22:8

**clear** 89:16 120:4 160:1,3 161:23 164:13

**cleared** 150:14 158:14 159:22 162:6 164:11 165:2,16 176:25 177:2

**clearing** 161:25

**climate** 159:11,24

**close** 51:13 75:14,15 76:15 82:7 84:4 99:12 137:1 166:20

**closer** 51:6,9 83:23 84:3 105:13

**closest** 74:21,23 82:4

**clue** 184:1

**code** 170:23,25 172:15

**college** 19:21

**color** 88:10

**colored** 30:12 71:25 95:1 98:22 102:19 125:3

**colors** 33:7

**Columbus** 157:18 160:6, 10,14,21 161:22

**comfortable** 36:5 129:25 159:21

**comma** 147:22

**command** 56:6 61:18,21 62:4 65:23 151:4 164:4

**commands** 55:7 58:19 59:8 61:25 65:14,15,21,25 66:4,6,10,13,24 67:3,4,10, 12,15 78:9 86:9,13 93:1 97:10 136:8,9 139:17

**comment** 58:2 147:22

**committee** 24:20

**common** 175:7

**communicate** 94:17,20

**communications** 156:13 187:6

**community** 29:23 56:10 84:2 92:24

**compelled** 161:3

**complainant** 43:24

**complaint** 43:19,20,22,23 77:9 181:21,22,25

**completely** 160:23

**completes** 149:9

**complied** 116:24 121:2 122:20

**complies** 90:6 98:13

**comply** 59:7 60:15 115:16,20 130:6 149:25

**complying** 55:6 56:6 93:1 115:14

**compressions** 110:24 111:7,8,14,18 112:2,7 113:14 128:5 144:25

**computer** 71:14 72:10 80:18,25 147:3,5 155:3

**computers** 71:19

**concealed** 57:9,13,19

**concentrate** 8:11,15

**concentration** 106:21

**concerns** 158:20

**concise** 67:17

**concluded** 188:14

**conditions** 158:25

**Conduct** 77:24

**confidential** 37:25 38:22

**confidentiality** 39:1

**confirm** 176:13

**confused** 146:13 163:1

**confusing** 187:22

**confusion** 155:25 156:10

**conscious** 84:25 85:4,8 182:2

**considered** 20:22 24:12 40:20,21 68:1 179:6 181:14

**consistent** 66:11 67:12

**console** 106:1,5,13 107:5 108:15

**constant** 63:19

**Constitution** 129:3,4 130:2,3,6,12

**Constitutional** 129:17,23

**construed** 134:19

**contact** 51:20 84:18

**continuance** 129:7

**continue** 60:9

**continued** 60:20,21 105:19

**continues** 55:8,9 58:12, 23 59:1 65:16

**continuing** 59:4,21 94:11

**continuous** 62:12 155:20

**continuum** 134:11

**convened** 16:25

**conversation** 17:23

**conversations** 13:12,22

**converse** 77:18

**copied** 148:11

**copy** 88:1,4 129:22 130:2 172:21

**cordial** 16:1

**Corps** 18:14,16

**correct** 21:1 26:17 31:7 46:2 54:1 57:9 67:25 71:1 73:23 74:6 75:21 83:15 86:10 98:1 99:3 132:25 141:25 142:2 143:3 145:7 148:22,24 149:13 151:21 155:13,14 172:14 174:23 180:17,22 181:1

**corrected** 146:17

**corrections** 22:3,6,9,16, 19,22 25:13 26:1 145:24 147:24

**correctly** 36:9 68:15 72:16 140:6 141:11,15 142:24 149:11 153:5

**count** 48:16 154:13

**County** 7:3 10:6 17:18 21:19 22:1,3,6,15,21 25:12,20,22 26:11,19 27:5, 8,14,15,22 28:4,8,16 29:18 67:2,10 117:7,23 122:16 129:6,18 131:13,15 132:4 135:1 166:17 167:5 176:25

**County's** 28:19 119:17

**couple** 7:10 15:6 21:13 24:4 36:21 42:8 43:7 84:13 112:18 128:10 148:17 163:19 168:4

**court** 39:3,4,5 162:10

**cover** 133:4,15 134:1,2,20 135:2,6,8,11,12,13,15,18

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

136:4 137:9 143:12 153:9,
12

**covered** 143:15

**CPR** 110:25 111:2,6

**crash** 101:19

**crime** 69:24 102:2

**criminal** 150:13 176:21

**CROSS-EXAMINATION**
6:8

**cruiser** 112:20

**cruisers** 87:18

**current** 14:11 159:11,24
183:14

---

**D**

**danger** 85:6 132:24

**dark** 74:19 87:16 123:15
124:20 126:9 127:6,14,16,
19

**date** 18:6 148:23 161:16
165:4

**dates** 165:7

**Daum** 157:10,16 159:5,7,
20

**Daum's** 160:9

**day** 20:19 44:23 45:14
69:9,13,14 78:4 116:6
119:25 155:17 156:8,15
162:7,9,10,11 163:14
164:14

**days** 9:13,23 11:7 44:8,9
116:6,7 148:17 161:14

**daytime** 127:9

**Dayton** 43:3

**deadly** 29:19 118:1 122:7
129:19,23 130:7,16
132:22,24 134:5 135:3
177:18,24

**deal** 116:7,10 119:4,8
148:11

**dealing** 123:11 164:23

**dealt** 116:12 117:16
123:10,25 124:2

**death** 159:13,15,17,19,23

**December** 165:13,16

**decent** 89:10

**decide** 66:20

**decided** 64:16

**decision** 117:14

**deeper** 16:10

**defendant** 6:5 37:23 39:7,

16 40:10

**demands** 132:19

**denied** 181:23

**department** 7:4 9:19
20:5,6,7,17,18 21:3,20
125:8

**departments** 21:17

**depending** 49:14

**depict** 73:1

**depicted** 31:15

**depicts** 74:16

**deposed** 38:9

**deposition** 6:15 7:6,19
8:21 176:5 180:19 182:22
188:13

**deputies** 22:8 42:19

**deputy** 6:19 11:22 12:3,5,
6 22:17 23:3 26:7 37:12
41:20 42:2,17,22 43:3,5
54:16,20 55:2,11,13,16
56:5 58:25 61:7,25 62:2,14
63:11 72:17,25 77:1,5,14
78:11 80:21 81:15 84:8,10,
12,19 85:1,11,22 86:3
92:18 94:13 97:11 101:5
107:2,5 109:20 110:1,11,
15,21 111:12,13,14,15,16
112:22 113:14 115:16
117:1 118:20 129:5,17
134:24 135:17 136:20
137:8,9,13,21 141:24
142:22 143:1,10,14,19,21
144:8,20 152:1,21,23,25
153:2,7,22 156:16 159:7
161:11,12,16 162:9 173:4
174:11,21,24 175:2,5,19
179:16,23,25

**derail** 161:18

**describe** 120:9 182:1,8,
14

**description** 11:15 151:10

**designed** 42:24

**detail** 16:17 68:12

**detailed** 152:13

**details** 13:1 17:10,12,20,
24 64:8 151:12

**Detective** 9:1 10:5,12
11:16,22 45:8 148:19
150:8,22 151:7,15,22
152:12 153:23

**detectives** 102:3,23

**device** 128:15 155:4

**diagram** 101:19 102:2,14

**diaries** 187:24

**difference** 175:18

**differently** 116:13 117:16

**difficult** 89:24 99:14

**dimensional** 89:23

**DINEHART** 23:25 24:21
25:5 26:22 27:12,25 28:21
29:13 38:17 46:12,20
50:21 52:6,12 56:20 57:11
59:17 60:6 61:12 64:17
65:10 77:23 81:4 97:4
99:22 101:3,11 104:2
113:2 115:2 116:3,22
117:9 118:18 119:1,14,19
121:13,23 122:12 123:1
124:25 125:21 126:19,23
127:20 130:18 134:6
135:9,16 136:2,16 137:11
139:3 140:22 141:16 142:9
145:14 146:9 165:20
166:25 170:19 171:4
175:10,15 177:19 179:9
181:9 182:17 184:17
188:12

**dinner** 15:6

**dinners** 14:13

**direct** 149:20,25 159:15

**directing** 139:10

**direction** 65:18 94:13
105:17 143:14,18 149:18

**directions** 113:10

**directive** 134:18

**directives** 136:6

**directly** 49:7 88:17

**director** 160:12

**discharge** 129:5

**discharged** 18:20 104:14,
18 153:4

**discipline** 23:12,18,19,21
25:9,19 26:10

**discovery** 12:23 187:16,
20

**discuss** 37:19 38:4,5,8
39:14

**discussion** 76:22 173:15

**discussions** 13:14,20
66:22

**disobey** 94:11

**dispatch** 68:7,12,16,17,
23 69:7,11 70:5,8 71:22
78:18,23 79:10,25 80:12
92:16 137:3 139:21,25
154:23 167:12 168:7
169:3,17 173:22 174:10,
13,18,24 175:5,8,14,21,
22 176:2 181:3,5

**dispatched** 68:7 69:22,24
70:2 71:22 120:4

**dispatcher** 71:5 168:24
173:2,16

**dispatches** 43:18

**dispatching** 70:1

**displacement** 28:3

**displacements** 24:5

**display** 24:17

**dispute** 81:1,5 175:20
176:9,12

**distance** 82:15,16

**distracted** 44:25

**doctor** 156:13,17 157:17
160:5,14,20 161:6,10,21,
22,24 162:4 163:5 164:10,
12

**doctor's** 160:21

**doctors** 156:11 157:14
158:22 159:3 166:1

**documents** 8:21 12:12,16
48:4 181:20

**Dontae** 6:12,13 13:8
26:20 27:1 47:20 48:25
50:19 51:20 53:24 54:6,9,
24,25 55:11,22 56:4,5,7
57:16 60:15 61:18 62:13
63:10 64:11 65:22 83:21,
23 86:9 92:1 98:7 100:2
101:1 103:18 105:13
106:15 107:23,25 108:10,
19 109:7,24 110:16,24
111:16 114:5 115:14,20,
23,25 116:19,23 118:14,17
120:15,22 121:2,7,10,22
122:2,9,18,20 125:8 128:4
136:7 139:9,10 149:15
153:20 155:12 156:20
174:2 175:3 176:15 177:9,
17 178:3 179:3,16 180:5,
10,21,25 181:3,8,15,23
182:15,21 184:16

**Dontae's** 83:11 87:1
88:18 107:14

**door** 49:20,24 50:7 52:7,
14,18,19 53:2,7 63:22
75:10 82:21 95:22 96:12
102:25 108:5,12,23 109:1,
3 125:13 142:23 143:2
153:10,16

**doors** 91:11,16 107:3,6,8,
9 143:20

**dot** 90:13

**dowel** 125:15

**downhill** 99:2

**draft** 145:10,12,13,16
146:6,11

**drafted** 146:11

**drafts** 145:21,22 147:10
155:3,9

draw 83:7

drawn 135:7

drew 85:1

drink 43:14,16

drinking 44:1

driver's 52:14 55:12 63:22 82:7 84:15 99:1 100:11 102:24 105:16 107:17 108:5,23 109:10 142:23 143:2,20 153:16,17

driveway 87:6

Droessler 160:8,11,19,22

drop 55:7,9 56:6 58:22 59:5 62:6 64:23 65:14,15 67:18 78:10 83:21 94:10, 11 97:10 115:15 122:21 136:10 139:14,18 140:16, 24 141:8 142:5 152:25

dropping 153:21

drove 147:4

drug 43:19,20,23 77:8 109:21

due 159:11

duly 6:6

duties 129:5,17,20 130:10 157:11

duty 31:7 153:4,8 155:19 157:4,13 158:6,18 159:21 161:15,16 184:21,24,25

---

**E**

e-mail 185:12,13,15,17, 19,21

e-mails 187:11

earlier 63:10 70:15 88:24 104:17 163:4

early 10:16 30:20 40:3

east 42:24 43:2 173:23

education 19:22

eighteen 181:23

eighty 31:21

elapsed 180:8,20

eleven 42:25

emergency 93:11

employee 134:10 149:8

employees 132:18

encounter 178:10 182:10

encourages 132:17

end 16:12 17:8 37:15 38:3 89:14 93:12 96:18 142:17 144:23 149:10,21 150:1

164:14

endure 112:16

enforcement 18:9 20:1,2, 9 21:18 22:11 29:12 30:7 123:7,11 126:22 132:6 136:24 159:12,24

engaged 142:12 150:16

engine 76:19

enlargement 102:7

ensure 67:2,10

enter 142:23

entered 53:4

entire 21:24 133:18

entries 68:19

entry 71:2 73:3 79:23

equipment 32:12 75:20 82:25 83:3

equipped 93:8

error 156:14

errors 146:13

escorting 163:14

estate 6:13

estimated 112:3

evaluate 119:22

evaluated 163:5

evaluation 156:17 157:18 160:10,18,25 161:1,3,13, 21 162:3

evaluations 157:4,13 158:3

evening 10:12 45:10 46:10 76:9 100:10

events 16:7,10 17:1,9 64:1

evolved 54:15

exact 34:8 82:16 84:16 96:17 160:16 165:7

examined 6:7

exams 26:8

excessive 27:23

excuse 135:13 160:7

exercises 118:11

exhaustive 109:23

exhibit 30:11,15 68:10,11, 24 70:6,18 71:24 72:5,6,18 73:2,16 80:1,3 81:21 87:14,22,23 88:2,5 89:18 94:25 96:3,4 97:16 98:16, 21 101:18,24 102:18,22 125:2,6 127:23,24 128:3, 17,21 131:6,11,17,21,25 137:20,24 149:1,4 151:14,

18 154:22 167:7,15 179:11,12,19,22 180:6,11, 14 181:16 182:4,14

exited 36:24 81:14 82:10 180:9,20,24 181:7

exiting 77:2 81:12,13,25 82:1

expels 178:18

experience 19:11 112:15 123:7,13,17,20 124:7 126:21,24

experienced 123:5,8 124:23

experiences 164:25

expert 164:23

explain 16:10 94:6 179:3, 15 181:13

explained 176:6

explanation 176:10 180:4

extent 122:7

extra 44:11,23

extract 109:6,7 110:1 128:8

extracted 110:19 114:6 143:2 174:2,4,6

extraction 110:15,22

extremely 16:16 127:11

eye 84:18

---

**F**

face 105:17 126:15

Facebook 186:6,12,18,24

faced 118:11

facing 105:17

fact 54:19,25 55:1,5 60:14 62:14 75:8 115:13,20 120:15 121:18 159:12

factors 133:3

facts 179:6 181:13 182:1

failed 60:16 115:16,20 136:9 154:12

fair 79:15 80:13

fairly 43:16

faithfully 129:5

falling 162:3

familiar 72:13 181:19

families 15:14

family 15:17

fast 92:10,12,14 104:25

fat 161:5

FATS 118:5

fault 16:22

favor 133:16

federal 39:4

feel 129:24 159:21 168:5

feet 42:3 51:4,9,11,15,19, 20 75:9 95:22

fell 160:24

felt 111:10 159:9 161:3 162:1,16,20 163:11 164:6, 9

fender 49:10,23 51:5

fifteen 86:25 161:14 172:11 182:24

fifty 78:19

fifty-four 79:24

figure 168:4

figured 138:21

figuring 99:18

file 23:14 26:14,16

filed 181:20

fill 133:25

final 145:13,16,18 148:15 165:12

find 38:23 149:12 161:10 184:11,14 186:2,3 187:10

finding 68:19 106:25 107:1

fine 36:20 49:18 58:3 88:21,23 97:22

finish 8:3 36:18 60:6 101:22

finished 19:17,24 144:3 148:14

fire 20:5,6 21:16 33:3 51:10 54:24 60:24 64:16 85:6,12,19,22 89:12 115:17

firearm 26:25 27:4 31:6 32:17,24 33:1 45:20 54:9, 12,20,25 55:2,5,6,7,8,9,12 56:4,5,7,14,19,25 57:2,5,8, 16,18,21,22,25 58:9,18,19, 23 59:2,5,9,14,15,23,24 60:4,9,16,17,22,23 61:6, 10,16 63:5,16 64:22,24 65:12,14,15 67:19 78:8,10, 11 83:7,14,17,22 85:1 94:9,10,12 97:9,10 106:22, 25 107:1,2,13,15,22,25 108:9,19,20 109:1 115:15, 21 116:25 122:2,21 124:3, 4 134:22 136:10,11 143:11,15 153:1,3 154:15

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 197 of 216 PAGEID #: 1133

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Gust A. Teague

178:10,15,24

**firearms** 45:23

**fired** 45:25 47:16 53:22
61:5 77:16,19 85:25 86:7
97:15 114:20,25 115:6,9,
19 120:14 170:9 172:21
173:3,5 174:19,22,25
175:5,14,22 181:5 182:8

**firefighter** 20:3

**firefighting** 20:9

**firing** 46:18 49:19,22
50:17 51:4,7 94:14 97:6,7,
12 114:22,23 134:24 153:8

**Fish** 15:12

**fitness** 157:3,11,12 158:6

**five-minute** 188:6

**fix** 7:17

**flash** 104:24

**flashlight** 31:9 32:16,21
33:3,12,15 49:4 51:23 52:2
75:9 83:5,13,16 84:4 97:2
108:16 123:18,22 124:9,
15,19,24 126:9

**flatter** 109:22

**flight** 125:19

**focus** 92:23 94:2,3,4,5,7
107:22,25 123:24

**focused** 94:8,9 100:9
108:9,10

**focusing** 106:21 107:13

**follow** 120:3 143:18

**foot** 41:22 42:6,15 86:25

**footwear** 32:5

**FOP** 150:15,17,18

**force** 23:23 24:2,12,16,17,
20,22 25:4,13 26:18,19
27:5,10,16,18,23 28:3,7,
11,14,18 29:1,6,11,17,19
30:8 34:15 62:23 63:6
117:7,23 118:1 119:17,23
122:7 129:19,23 130:8,16
131:7,14,18,25 132:7,18,
22,24 134:5,10,11 135:3
149:8,9 166:8,10 177:16,
18,24 178:1

**forced** 60:24 61:8 65:5
78:11 94:13 115:17

**forces** 24:18 25:2 65:19

**Forest** 20:6

**forever** 109:4 111:11

**forget** 51:16

**forgive** 49:13

**form** 13:2 156:11

**formal** 19:21

**forty** 45:25 161:2 162:3
164:12

**forty-five** 78:24 79:24
104:3

**forty-six** 79:21

**Forty-three** 18:7

**forward** 41:13 98:15,18
100:22 105:9,10

**found** 28:11 64:25 78:7
106:23 160:5

**fourteen** 43:1 47:10 92:4,
11 104:18 175:20 178:11
179:1 181:4,6

**fourth** 130:1,12 131:5
134:17 152:4

**frame** 38:24 40:19 81:14
160:16 175:24 184:18

**frames** 180:15

**friend** 14:17

**friends** 15:5

**frisking** 41:17

**front** 34:25 52:18 74:15
82:13,20,22 85:5 87:1,5,9
90:19 91:9 108:12 112:19
117:13 144:2,5

**full** 6:17 22:20 41:23
101:25 130:23 151:25
155:19 158:18

**full-time** 22:2,11,15,25
23:2

---

## G

**gaining** 161:4

**gap** 175:20

**garage** 125:9

**gas** 43:13

**gave** 11:17 37:11 60:21
61:17,21 65:21 86:9
139:17 143:14 147:15
161:15 169:6 179:18

**GB003726** 96:5

**GB003777** 127:25

**general** 14:13 79:17
131:16

**give** 7:9 12:9 16:15 36:21
66:24 67:15 84:16 86:13
88:1 95:18 96:2,16 99:16
101:13 113:10 116:25
117:14 120:7,10 130:21,23
136:6 139:21 154:11 162:2
184:18 185:21,25 186:23

**giving** 66:6 67:3,12 69:6
119:20 148:5

**glared** 88:22

**glass** 50:12

**Glendale** 20:6

**Glock** 45:24 46:15

**Golf** 21:3,15,22 25:4,7,10

**good** 6:10 15:21 41:12
82:23 138:5 165:22

**Gosh** 150:23

**graduate** 19:19

**grammar** 146:14

**grammatical** 145:24
146:13

**grand** 16:25 17:7 69:3
71:7 73:22 75:4,11 76:11,
19 77:2 82:2,7 83:13,20
85:16,22 95:5 102:8
104:13 150:14 153:13
159:22 162:5 165:2,5
169:2

**grapevine** 159:18

**grass** 128:9,12

**greater** 55:10

**green** 69:3 71:6 76:15
169:2

**Gresham** 6:11

**ground** 7:9,10 36:13

**grounds** 38:10,18 61:10

**group** 41:10

**guess** 11:18,20 16:15
127:10 165:23 169:20
170:24

**guideline** 134:11 135:4

**gun** 46:10 47:3 61:18,20
62:5,6,7,10,14,18,22
63:19,24 65:1,4,17,22
67:16 81:16 82:6,18 83:3,6
86:11 89:16 92:16 93:23
94:1,21 100:9 106:12,16,
20,23,24 107:4 114:1,11
115:16 116:21 118:12,14,
16,23 119:11,13 120:15,23
121:7,8,11,18,22 122:5,10,
19,24 135:15,24 136:20
137:1,4,8 139:15,18,22
140:1,9,16,24 141:9 142:5,
6 144:3,6,9,11,13 152:24
153:17,21 169:22 170:5,18
173:10 174:9,10,12,19,24
175:2,9,21 177:12 181:3,4

**Gust** 6:4,19 131:7 137:21

**guy** 64:22 78:8 89:15
136:20 160:23 175:2

**guys** 138:22

**gym** 161:5

---

## H

**Haas** 12:3,6,7 14:6,17
16:2 17:23 41:20 42:3,17,
22 43:3,5 54:7,16,20 55:2,
11,14,16 56:5 61:8 62:1,2,
14 63:11 66:5 77:1,5,7,14
78:11,15 81:8,15,16 82:5
84:9,10,12,19 85:1,11,22
86:3 91:15 92:18 93:21
94:13,17 97:11 101:1
106:18 107:2,5,19 110:6,
21 112:6,22 113:14 114:22
115:16 117:1 118:15,16,20
135:15,18,24 136:20
137:8,9,13 141:24 142:22
143:1,10,14,20,21 144:8,
11,19,24 153:2,3,22
156:16 159:7 161:11,12,17
162:9 167:4 168:25 170:8
172:4,20 173:4 174:10,11,
21,24 175:2,5

**Haas'** 72:17,25 73:21
74:10 80:21 97:11 101:5
134:24 175:19

**Haases** 12:5

**hairs** 178:16

**half** 116:5 143:8 155:17
156:8,15

**hand** 59:24 63:17,19 78:9
83:17 94:8 108:17 116:10
140:4,11

**handcuffing** 27:11

**handcuffs** 27:16,17,23
32:16,17 93:13,14

**handed** 125:6 128:21
137:24 148:20

**handgun** 140:5 141:10,
14,18,23 142:21,24 143:1,
24

**handle** 106:6,7

**hands** 107:14 139:11
142:4

**hands-on** 28:3

**hang** 15:20,25 22:14
60:20 90:12 168:9

**happen** 78:7 113:22
114:14,16 117:20 134:21

**happened** 10:14 16:18,20
18:3 37:10 104:24 107:7
108:4,24 112:5 121:7,8
126:4 150:25 151:5 154:9,
10,18 156:24 161:18,20
164:18 182:15 188:2

**happening** 64:2

**happy** 160:9

**HAR** 72:23

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                      Gust A. Teague

**hard** 93:12

**Harrison** 40:15 41:6 42:23,25 72:23 168:25 170:8 172:21

**head** 7:12 55:25 100:15,20 101:1,5 106:4 117:17 137:18 186:1

**headlights** 74:9 76:14

**headrest** 100:16 101:1 103:1

**health** 158:10,12 165:25 166:5

**hear** 58:6 68:23 81:15 92:19 93:21 169:7 170:7, 20 172:4 173:8,15

**heard** 10:8 69:9,10,17 82:6,17 83:2 93:22,25 137:7 159:17 169:15

**hearing** 58:16 93:25 107:2

**hears** 18:2

**heel** 32:9

**height** 31:18,22,25

**heighten** 55:10

**Heights** 20:17

**helped** 111:15

**hereinafter** 6:6

**high** 19:17,22,24,25

**hip** 31:6,16 152:24

**hip/leg** 153:17

**history** 68:12

**hit** 34:16 49:24 50:1,8,9, 14,15 161:4

**hitting** 35:6 36:1 50:7,10

**hold** 57:2 58:23 59:1 88:23

**holding** 54:12,25 55:5,6 56:4,13 57:16 58:18 59:13, 15,23 61:2,6,10,16 63:16 64:22 65:12 94:8 97:9 109:16,17

**hole** 96:11 125:12

**holes** 95:8,11,12 96:9 103:9 125:10

**home** 164:17

**hope** 161:11

**hour** 160:25 164:12

**hour-long** 160:25 161:1

**hours** 40:17 116:5

**house** 15:8 74:12,14

**how's** 115:11

**Huh-uh** 184:4

**human** 132:5,8,14 133:14

**hundred** 11:23 31:20,21 47:23 123:9 185:14 186:16

**hunt** 15:10,11

**hunting** 15:9

**hurt** 56:16

**Hutchison** 159:16

**hypothetical** 115:24 116:24 117:2,19 118:22 119:4,5 120:6,7,11

**hypotheticals** 116:7 121:2

---

**I**

**idea** 28:17 29:14 32:3,11 42:20 44:9 46:22 48:1,17 50:1 51:18 52:3 61:2,3 62:9,11 65:13 66:8,12,13 70:1 74:23 79:1,7 84:10 85:20,24 86:5 87:4 89:14, 22 91:6,18,20,24 92:3 101:4 111:10,23 112:12 115:3 123:3 147:21 150:19 154:2 155:10 157:5 174:5 175:24 176:2 180:23 181:11 184:14 186:13

**ideal** 67:7,8

**identification** 30:13 68:13 72:1 87:24 95:2 96:6 98:23 101:20 102:20 125:4 128:1,19 131:9,19 137:22 151:16 167:9

**identified** 54:18,23 58:24, 25 136:7 140:20 141:6

**ifs** 121:1

**illuminating** 76:16

**image** 123:21

**imagine** 93:12

**immediately** 139:21 159:10,11

**imminent** 132:24

**impacted** 166:21 167:2

**impair** 8:15

**impaired** 8:11

**improper** 146:14 177:8

**inch** 32:9

**inches** 141:20

**incident** 13:1 16:3 26:20 37:14,15 63:5 64:19 67:18 68:12 75:25 76:1 77:8 78:5 84:12 92:4,25 148:18 163:25 182:2 184:16,18 185:1 187:11

**incidents** 123:9,10 154:8

**166:15**

**incline** 99:1

**include** 118:3 179:4 182:10

**includes** 56:4

**incomplete** 7:20

**inconsistent** 66:11

**incorrect** 7:21

**increases** 58:13

**indicating** 90:3 95:23 97:23 172:15

**individual** 57:24 58:11,16 59:6,20,22 63:5 65:12 86:24 87:10 89:7,20 124:1, 2 136:7

**individuals** 41:10,16 90:23

**information** 71:10,13,18, 21 73:5 156:3 161:9 179:20

**informed** 159:15,16 160:24 162:6 164:15

**ingested** 45:18

**initial** 54:14 157:16 159:5

**initially** 97:8

**initials** 90:4 97:15

**initiated** 77:9

**injured** 68:5 78:1 166:13

**injuries** 70:14,16

**injury** 18:14,24 19:5,9 166:9,11,12

**inmate** 163:14

**innocently** 89:17

**inside** 34:2,4,24 35:3 50:20 73:12 83:25 84:5,8 91:23 93:5,16 107:24 119:11,13 123:6,24 124:12 136:5 143:23 163:15,17,23

**Instagram** 186:6

**integrity** 132:5

**interact** 15:15

**interested** 38:12,13

**interests** 132:9

**internal** 11:25 150:24 176:14,17,20,22

**Internet** 185:10

**interrogatories** 178:7,8

**interrogatory** 182:7,24

**interrupt** 170:14

**interrupted** 112:1

**interview** 8:25 9:15,17,18 10:2 11:6 45:8 150:24 153:25 157:10

**interviewed** 9:3,13

**interviewing** 9:6

**interviews** 10:5,9

**investigate** 41:16 68:4

**investigated** 24:19,23 25:15 28:8 29:9

**investigating** 41:8

**investigation** 9:10 41:1, 24 42:1,10 77:25 125:8 147:7 148:9 151:15,19 176:15,21 177:4,6 188:1

**investigations** 12:1 28:15

**investigator** 154:19

**involved** 25:3 30:6 37:14 39:13 40:9 62:17,21 63:4 68:18 92:22 103:17 154:15 159:4 163:25 166:7,15 186:5

**involving** 26:20 27:10 166:16

**irrelevant** 115:13,19

**Isaiah** 151:15

**Island** 18:23

**issue** 38:14 92:25 94:7 95:17 115:14 116:10,12 117:16 150:13 161:24 163:14 164:10

**issues** 166:5

**item** 89:25 90:2 132:17

---

**J**

**Jagielski** 36:24 53:4 167:18,21

**jail** 163:14,15,24

**January** 155:20 164:19 165:17 185:1,2

**Jennifer** 6:11 167:18

**job** 14:11 166:22

**jogged** 7:21

**joint** 186:19

**jolt** 34:16

**Josh** 15:19,25 17:1 93:24 106:23

**Joshua** 12:7 14:6,16 16:2 17:23 113:14

**journals** 187:23

**Julie** 160:8,11,19,22

Patricia Martin, Admin, et al. vs Joshua Haas, et al.                                    Gust A. Teague

**July** 16:24 17:3 30:21 33:4 34:22 40:13 44:19,20 45:1 46:15 148:21 149:21 150:7 179:4,17 180:5 182:25 183:1,10,12 184:10,20 185:2,3,16 186:6 187:3,7 188:2

**jurisdictions** 29:7

**jury** 16:25 17:7 150:14 159:22 162:5 165:2,5

**justified** 25:3,18 28:12,18 29:7,10 30:9 59:14 116:1, 20 117:8 118:16,24 119:11 120:1 121:19,21 122:10,24

**justify** 29:11 65:9 117:18

———————

**K**

**Kellar** 9:1 10:12,21,22 11:16 45:9 148:19 150:8, 22 151:8 152:12 153:23

**Kellar's** 151:15,22

**keys** 32:19

**kids** 15:22

**kill** 56:17

**killed** 163:22

**kind** 15:4 32:4 38:25 46:22 84:14 87:5,6 100:22 105:1, 6,25 106:4,6 107:3 112:15, 16 187:22

**knew** 36:7 42:16 70:1 144:12 179:5

**knock** 91:13,16

**knowing** 55:22 89:12 129:16 163:24

———————

**L**

**laid** 21:24 105:15

**lamp** 74:13

**lap** 61:2

**large** 34:15 55:17

**larger** 93:13

**law** 18:8 19:25 20:2,9 21:18 22:11 29:12 30:7 123:7,11 126:21 132:6 136:24 159:12,24

**lawful** 6:5 132:6

**lawsuit** 37:9,11,20,23 38:8,19,23

**lay** 128:8

**laying** 106:4

**leaning** 100:22 112:23

**leave** 21:22 22:1,24

146:24 147:3 155:12,15, 19,23 156:16,20 157:1 160:21 162:25 163:4,7,9 164:16

**leaving** 159:21

**led** 17:9 105:1

**left** 19:2 42:12 49:13,15 63:24,25 64:3 65:1 83:17 87:18 88:17 167:4 182:9 188:7

**leg** 18:14 58:24 59:2 61:7 107:4 108:15 109:11,12,19

**legal** 57:18 59:23 181:20

**legs** 109:10

**lengths** 82:2

**lengthy** 130:13

**lethal** 62:23 63:6

**letter** 149:5

**level** 136:11

**Lewis** 176:6

**liability** 161:24 164:10

**life** 65:6 78:12 94:14 97:12 115:17 119:8 132:5,14 133:14 134:24

**lifting** 61:6

**light** 74:15 108:20 123:15 124:13 126:14 127:6,18

**lighter** 88:10

**lighting** 74:4 128:14,15

**lights** 34:7,12,21 74:7 75:19

**limit** 112:14

**limited** 16:16 151:9

**limits** 29:18

**limp** 19:10

**lines** 16:19 128:24 147:9

**listen** 58:11 69:9,14 161:11 167:24 168:3

**listening** 58:16 59:7 65:14

**lit** 84:5 127:11

**litigation** 40:2,10

**live** 118:4,9

**located** 105:24

**location** 84:17 85:9

**locked** 107:3,6,9 143:21

**log** 68:7,12 70:5,9 78:18, 23 79:25

**logged** 147:5,6

**logging** 147:7

**logs** 167:12

**long** 7:15 18:8 21:9 22:13 23:5 42:6 43:5 51:17 59:18,19 78:22 91:21,25 111:8 112:1 120:8 128:7 130:20 155:15,24 156:7 158:14 174:16 180:23

**longer** 8:2 48:19,23,25 49:3 50:19,23 51:2 53:23 54:3,21 56:3 66:17 105:2

**looked** 8:24 9:9 10:1 11:15 12:13,16 13:7 15:8 38:20 48:3 55:11 63:11,22, 23 64:2 73:2 88:15 106:11 141:24 147:25 163:19

**lost** 51:20 133:6

**lot** 61:15 88:10

**loud** 7:11 67:16

**Loveland-symmes** 20:5

**lower** 59:2,3

**lunch** 101:16,23 104:7 114:19

**lying** 153:17

**Lynnette** 39:22

———————

**M**

**Mac** 186:20

**machine** 118:6

**made** 20:8 54:15 56:8 64:12 83:10 88:5 124:10 141:1 147:18,20,24 163:23 164:3 187:6

**magazine** 47:5

**magazines** 32:18 47:6,14

**maintained** 61:4 142:18, 20 143:12,23

**majority** 157:12

**make** 7:16 8:7 16:11,23 54:22 84:18 93:1 98:19 109:23 117:14,25 129:24 130:6 133:18 135:19,20 136:1,3

**making** 107:14

**man** 67:16

**Manor** 21:3,15,23 25:4,7, 10

**Manual** 131:16

**March** 18:18

**marijuana** 41:9,19,20 43:21,24

**Marine** 18:13,15

**mark** 88:2,7,13 89:5,18 127:23

**marked** 30:12 68:13 71:25 87:23,24 88:4 94:23 95:1 96:5 98:22 101:20 102:19 125:3 127:25 128:18 131:8,18 137:21 151:16 167:8 179:8

**maroon** 69:3 71:7 74:14

**Martin** 6:2,12,13 13:9 26:21 27:2 47:21 48:25 50:20,24 51:21 53:24 54:6, 24,25 56:4,5,6,7 57:16 61:18 62:13 63:10 64:12 65:23 86:9 92:2 98:7 100:3 103:18 110:16 114:5 115:24,25 116:19,23 118:14,17 120:15,22 121:2,10,22 122:2,9,18,20 128:4 139:10 141:9,13,17, 23 142:12,21 143:3,24 149:15 152:24,25 153:3,21 155:13 156:20 174:2 176:15 177:9,17 178:3 180:10,22 181:3,8,15,24 182:15,21 184:16

**Martin's** 101:1 125:9 140:4 179:3,16 180:5

**matter** 109:5 150:11

**Mazer** 82:10

**Mclaughlin** 42:15 113:6 145:5 173:20 174:1,6

**MDT** 71:14 72:10 73:1

**meant** 143:5,6

**media** 186:6 187:2

**medic** 172:22

**medical** 68:2 73:12 112:13

**medication** 45:5,16,18

**medications** 8:14 45:3, 10

**medics** 173:23

**meeting** 14:2 150:7 163:6

**meetings** 156:18

**memory** 7:21 8:10,15 69:1,20 72:16 99:5 103:13 152:11 173:25

**mental** 124:10 158:10,12 165:25 166:5

**mentally** 78:1

**mention** 144:18 145:4

**messages** 187:12

**messaging** 185:8

**met** 148:20 156:15 158:18

**mic** 34:1 35:8

**microphone** 31:16 33:17 34:2,21,24 35:19,24 75:24 76:4

Microsoft 147:8

middle 6:23 87:2

midnight 10:14,16 78:25 79:22

midnights 40:19

military 18:11 19:3,11 164:24

mind 70:13 81:11 94:4 160:23

minds 57:24

mine 112:19 115:18

minute 36:11 101:8,13

minutes 10:14 36:22 42:8 78:24 79:22,24 104:3 154:24 161:2 162:3 164:12

mirror 55:12 63:11,22,23 64:2,25 65:17 100:24

miscommunications 156:1,11

missing 133:19

mistaken 118:23

mode 47:1,3 94:2,3

Model 45:25

moment 17:5 58:20 84:8 91:22 116:14 120:3

Monday 155:21 165:18

Montgomery 7:3 10:5 22:14 25:22 26:11,19 27:5, 7,14,15,22 28:4,19 29:18 67:2,10 117:7,22 119:17 122:16 129:6,18 131:13,15 132:3 135:1 166:17 167:5 176:25

month 44:13,14,15 166:17

months 12:15 13:9 14:1,7 17:11 18:21 166:20

morning 6:10 10:16 16:13 30:21 31:2 44:21,22

mother 6:12

motherfucker 163:21

motionless 105:18

move 22:21 53:12 100:4 103:25

moved 49:4 50:18 83:23 84:3 91:3 141:14,23

movie 15:7

moving 49:5,6 84:14 91:4 94:15 100:23 105:9,10,19 108:1

multiple 33:4,7 61:25 167:16

Muzzle 104:24

## N

named 39:6

nameplate 163:18

names 11:17

narcotics 40:25

narrative 179:8 180:11 181:16 182:3,13

nature 151:13

needed 93:5,14 143:21 161:4

Newer 34:12

nice 127:10,11

night 8:18 9:3,6 10:13,15 16:3,8,13,18 32:2 33:18 43:14 44:3,21 45:13,21 47:10,16 73:25 74:18 80:24 121:9 122:19 123:15 126:5 138:2 151:1,6,11

nod 7:12

non-movable 103:4

non-semiautomatic 46:6

nonalcoholic 44:1

nonemergency 79:9

normal 43:16 44:6,7

note 124:11

notes 68:22 187:23 188:7

notice 65:22 66:1 100:11 114:21

noticed 65:24 86:23 110:25 111:2 114:23

notification 175:19

notified 139:21 174:23 175:1 181:2,5

notify 174:14,18 175:5,8, 14 176:17

notifying 175:21,22

November 16:25 17:8 155:18 165:3

number 16:14,16 47:18 131:25 149:7 167:17,19 178:8 179:2 180:8 181:13 182:7 184:2,7,9

numerous 55:18 64:23 65:15

## O

oath 128:18,22 129:10

obey 78:9 97:9 136:8,9

object 128:11

Objection 23:25 24:21 25:5 26:22 27:12,25 28:21 29:13 46:12,20 50:21 52:6, 12 56:20 57:11 59:17 61:12 64:17 65:10 77:23 81:4 97:4 101:3 113:2 115:2 116:3,22 117:9 118:18 119:1,14,19 121:13,23 122:12 123:1 124:25 125:21 126:19,23 127:20 130:18 134:6 135:9,16 136:2,16 137:11 139:3 140:22 141:16 142:9 145:14 146:9 166:25 170:19 171:4 175:10,15 177:19 181:9 182:17 184:17

observe 105:4 136:5

observed 30:7 152:24

occasion 35:18 43:12

occur 124:19

occurred 17:10 79:21 162:11

occurring 117:13

October 155:17 156:9 160:16

odor 41:18,19

offense 151:11

office 10:6,19,21 11:6,11 21:20,21 25:22 26:11,20 62:6 119:25 122:17 128:18,22 129:7,10 131:14,16 132:4,17 135:1 140:16,20,24 141:8 146:12,18 147:14 148:16 149:24 150:4,20 156:12 159:13 160:21 162:13 166:18 177:2,4,7,23

officer 6:10 7:3 20:11,16 22:4,6,16 23:4,5,9,10 25:13 29:12 30:8 35:18 37:14 54:7 57:23 58:7,10 59:22 61:11 62:18,22 66:5, 15,24 67:3,5 70:15,25 73:21 74:10 78:14 81:8 82:5 91:15 93:21 94:17 100:25 106:18 107:19,21 112:11 114:21 115:22 116:5 118:15,16,23 119:3 123:7 124:4 126:22 130:17 134:23 135:14,24 136:12 167:4 168:25 170:8 172:4, 20 173:4 174:9

officers 22:9 39:13 67:2, 11 68:18,21 124:22 132:6 135:21 136:24 144:19 164:24

official 148:8

Ohio 56:24 57:4 59:14 101:19 129:4,6

ongoing 111:3

open 52:22 57:5,18 91:11, 15 95:10 186:14

opened 108:23 109:1

opening 108:6 109:3

operating 46:10

opinion 67:7 115:6 162:2

opportunity 22:23 78:3

option 136:15

options 135:25 136:14

orange 96:18 98:9

order 58:8 60:3 62:12 117:20 156:2 182:11

ordered 83:23

ordering 64:23 83:21 94:9

orders 39:1 55:8 58:11 59:4 60:21 86:20 94:11 113:11 115:14,21 121:3 122:21 141:1

orient 72:9

original 69:12

originally 90:16

outcome 29:10 61:2 160:17

outcomes 25:1,17

outlined 131:15

overhead 34:7,12,20 102:12,13

overruled 162:14

## P

p.m. 188:14

pages 9:11

paid 155:19 156:16

paint 96:18 98:9

pairs 32:15

pant 109:12,19

pantoprazole 45:4,16

paper 13:4 20:18

paperwork 80:10 177:12

paragraph 133:18 139:20 142:11,17 143:10 151:25 152:3,4,20 181:23

paragraphs 140:3 142:16 152:8

Park 20:6

parked 71:6 73:21

Parris 18:23

**part** 21:5,9 38:4 50:11
55:17 105:24 109:13 118:2
132:11 133:6 136:4

**part-time** 21:24 22:18

**partner** 29:22 54:7 60:12,
24 61:1 64:24 65:17,19
84:1 92:24 121:20

**partner's** 65:5

**pass** 15:2

**passenger** 49:17,20,23
51:5 52:5,7,10,14,15,18,
19,21 53:2 63:15 75:10
83:11 85:16 87:7 95:9,22
96:9 99:2 100:3 103:4
104:12 105:11 107:9
108:12 125:13 144:2
153:10,16

**past** 24:4 74:14

**pasted** 148:11

**patch** 99:11

**path** 125:19

**paths** 20:1

**Patricia** 6:2,12

**patrol** 26:3 41:22 42:4,7,
15 43:17 82:3 93:8,17

**pause** 8:6 36:23 101:17
104:5 154:25 188:9

**pay** 20:25

**payroll** 162:8

**Pelican** 33:14

**pen** 88:3 89:6

**pending** 156:17

**people** 11:1,8,10 57:4
60:11 89:16 90:7 94:15
123:12 163:19,24

**perceive** 59:6

**perceived** 64:25

**perceiving** 57:16

**percent** 11:23 47:23
185:14 186:16

**perception** 120:23

**perform** 111:6

**performing** 111:7 128:4

**period** 147:23 165:11
166:17

**peripheral** 84:14

**permanent** 19:5

**permits** 57:13

**permitted** 56:24 57:2

**person** 33:18 35:7 59:10,
15 61:9 62:22 67:8 87:13
88:8 112:10 117:8,18

118:12 119:12

**person's** 126:15

**personal** 183:7,9,17
184:9 185:4,15,17

**personally** 150:16 177:22

**personnel** 23:13 26:13
160:12 164:24

**persuade** 136:6

**pertaining** 58:9 68:20

**phone** 58:4 160:7 182:25
183:5,7,9,17 184:2,7,9,15,
22 185:4,7

**phones** 183:2

**photo** 30:25 88:4 89:23
95:17 102:23

**photograph** 30:12,16,17,
19,22,24 31:15 33:25
73:16,20 74:4 81:23 95:1,
4,6,13 96:5,15 98:1,22,25
102:13,19,22 103:12
125:3,7,18 126:13 127:25

**photographed** 72:19

**photographs** 50:3 71:25
72:6

**photos** 99:22,24 101:14

**phrase** 142:12

**physical** 132:18 158:11

**pick** 35:2 43:13

**picture** 31:12 72:21 88:17,
25 99:4 128:11

**pictures** 50:5

**pistol** 45:25

**place** 40:2

**placing** 141:9,18 142:6

**plain** 144:16

**plaintiff** 40:11

**Plaintiff's** 30:11 68:11
71:24 87:22,23 94:25 96:4
98:21 101:18 102:18 125:2
127:24 128:17 131:6,17
137:20 151:14 167:7

**plan** 77:1,4,21 78:4,6

**planning** 77:15

**Platoni** 157:19 158:15,17
164:22 165:1,6,8,9

**Platoni's** 164:21

**play** 167:11,17,24 168:13
169:10,20,21,25 170:9
171:8,10

**played** 168:11,16 169:13
170:2,12 171:12 172:2,9,
18,25 173:13

**plays** 170:15

**Plummer** 129:14

**pocket** 33:21,22,23 34:3,
4,25 35:3,14,15,19 36:1

**point** 15:22 49:3 51:2
55:11 63:14 67:17 76:4,25
82:24 83:8,24 84:4,7 85:4
87:14 89:10 98:10 100:10
101:6 104:10 105:12
106:25 107:16 108:6,8
109:1 112:16 133:8
135:19,23 140:8 144:9,23
145:4 176:24

**pointed** 54:20 55:1 60:23
61:1,7 62:14,18,22 63:5
78:10 94:12 97:10 106:8,9
112:17 115:16,21 116:25
121:20 124:3 134:22 153:3

**pointing** 54:16 55:13 56:5
89:6 108:18 136:11 153:2,
22

**points** 59:9

**police** 20:10,17,20 21:3,
20 23:10 37:13 57:23 58:7
59:21 61:11 78:3 115:21
116:4 124:4 130:17 134:22
136:12 164:24 175:7

**policies** 28:19 122:15
177:15,16

**policy** 24:14 28:23 29:1,5
30:1,4 117:7 119:18 131:7,
14,18 132:1 134:16,25
148:25 149:25

**porch** 74:15

**portable** 128:15

**portion** 89:19 93:13 102:7

**position** 18:2 22:2,5,16
23:1,2 73:25 84:1 98:15
100:11 103:23 104:9

**positioned** 49:9

**positioning** 105:20

**possess** 56:18 57:4,8,18

**possesses** 57:20

**possessing** 54:9

**potential** 57:21 68:1

**potentially** 73:11

**pothole** 34:17

**pouch** 32:19

**pounds** 31:21

**practical** 175:11,16

**practice** 79:8 175:7

**practices** 177:16

**prefer** 130:22

**preparation** 8:21

**prescription** 45:9,16

**present** 6:1 9:14,21 10:18
11:5 12:3 13:21 67:4,11
74:5

**pretty** 74:16 78:16 89:10
136:22

**previous** 7:20

**previously** 30:12 68:13
71:25 87:23 101:19 131:18
151:16 167:8

**prior** 66:23 73:6 118:1
135:2 145:20 183:21,24

**priority** 70:24

**priors** 71:20

**prisoner** 163:15

**privacy** 186:11

**Prix** 69:3 71:7 73:22 75:5,
11 76:11,19 77:3 82:2,8
83:13,20 85:16,22 95:5
102:8 104:13 153:13 169:2

**problem** 7:16 60:14

**procedure** 175:13

**procedures** 28:20

**proceedings** 36:23
101:17 104:5 154:25 188:9

**process** 24:23

**processes** 156:2

**professionals** 166:1

**prohibitions** 130:16

**promotional** 26:8

**promotions** 26:5

**pronounced** 39:25

**proper** 175:13

**Properly** 27:17

**property** 15:9

**protect** 29:22 65:5 78:12
84:1 94:13 97:11 115:17,
18 132:7 134:24

**provide** 184:8

**provided** 112:14 179:21

**psychologist** 161:7

**public** 132:7

**pull** 46:7 48:13,14 56:16

**pulled** 48:11 82:25 83:3
109:20,21

**pulling** 48:17

**purpose** 132:23

**purposes** 30:13 68:13
72:1 87:24 95:1 96:6 98:22
101:20 102:19 125:3
128:1,18 131:8,19 137:22

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 202 of 216 PAGEID #: 1138

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

151:16 167:9

**push** 79:9,11

**pushed** 79:5,16,19 80:13, 18

**pushing** 34:6,11

**put** 60:3,16,17,22 61:18,20 62:5,6,10 65:22 79:3,20 80:17,22 83:25 86:11 88:7, 19 89:5 90:4 97:14,17 98:10 99:14 124:4 139:10 142:4 148:4 155:18 156:16 159:23 161:25 163:4,8 186:21

**puts** 60:8 163:7

**putting** 60:22 63:17,18,20 162:25 164:15 171:18

---

## Q

**question** 8:3 13:16,18 36:19 56:1,22 63:2 65:7 70:3 83:1 90:16,21 116:11, 15 117:2,19 119:4,9 120:1 122:6 124:6 129:25 130:11,20 133:21,22,25 134:14 148:7 164:8 179:2, 15,25 181:17 182:5

**questioned** 161:23

**questioning** 7:22 101:23 138:9 151:8

**questions** 6:14 7:11,15, 25 8:1 12:25 13:3,13 138:7 150:21,25 151:5 156:24 168:6 178:7 179:18 188:11

**quick** 119:21,24,25 154:11

**quote** 140:15

**quoted** 140:24

---

## R

**radio** 31:13,15 32:17 41:20 79:6,12,14,20 80:11, 19,21 92:15,20,21 136:19, 25 174:7

**raise** 55:8 59:2,3 152:24

**raised** 55:12 63:24 65:1,4 141:19 153:1

**raises** 59:9 65:17

**raising** 58:24 63:17,18,19 153:21

**range** 46:18

**rank** 11:14 23:8

**reach** 51:17 107:15

**reached** 38:1 109:18

**read** 28:23,25 29:2,4 30:1, 3 47:23 63:1,3 79:23

81:17,19 120:17,19 131:7, 13 133:18,22,24 134:7,13, 14 138:3,6,8,11,16 140:5 141:10,14 142:24 143:4 149:11 152:7 153:4 163:18 180:2 186:14 188:12

**reading** 134:16 138:19

**reads** 143:19 153:7

**ready** 65:13 162:17,20 163:9,11,12 164:6

**real** 119:8

**reality** 59:8

**realize** 7:20 84:11

**realized** 79:19 135:24

**reapproached** 153:9

**rear** 49:10,20,23 51:5 52:4,10,15 53:14,19 85:16 95:9,21 96:9 102:24 103:5 104:13 109:22 125:10

**rearview** 100:23

**reason** 8:10 19:2 81:1,3 176:9,12

**reasons** 17:10

**recall** 9:5,14 11:14 26:12, 15 30:21 64:1,4 66:6 92:15 103:22 110:14,19 113:23 139:9

**receive** 25:9

**received** 20:25 26:5 160:7 164:21 178:3

**receiving** 159:13,14 166:4

**recent** 138:4

**recently** 9:11 138:3

**reclined** 100:13 103:1,13

**reclining** 103:23

**recognize** 137:25 163:24

**recognized** 163:16

**recognizes** 132:4

**recommend** 158:22 165:1

**record** 6:18 8:7 63:3 81:19 120:19 138:19,21 162:1 184:7 185:20 186:21 187:25

**recorded** 10:6 154:1,19

**recording** 36:10 167:12 168:10,15 169:12,24 170:1,11 171:11 172:1,8, 12,17,24 173:9,12 176:1,7, 10 181:1

**recordings** 10:8 167:8,16 187:5

**records** 45:24 187:9

**recreate** 125:25 126:4,11

**red** 71:19 87:17,19 88:3, 11,25 89:2,25 90:2,13 128:11

**refer** 99:15 130:13 138:9

**referred** 90:1 165:6

**referring** 9:4 12:7 38:20 90:13 118:8 131:3

**reflect** 47:24 48:7 127:18

**reflecting** 126:14

**reflection** 123:21,24 124:8,15,19,23 126:17 127:13,16

**reflections** 124:12 126:25 127:4,8

**reflux** 45:5

**refresh** 69:1,20 80:2 103:12 152:11 173:25

**refuse** 160:3

**refused** 78:9

**relate** 129:24

**related** 12:16 13:8 18:24 48:4 178:7 187:11

**relates** 129:18

**relationship** 14:23 15:16, 21,22 62:7

**relayed** 161:9

**release** 158:18

**released** 63:18 109:17,18

**relevant** 115:20 133:3,10

**relieved** 111:5 112:7,8

**remaining** 157:19

**remember** 9:16,17 10:4 11:2,9,16 21:11 23:19,20 24:16 25:6 30:24 33:10 34:8,9,13,18 37:5,21 39:21 41:4,23,25 42:12 43:8,18 44:14 50:5,7,10,14,16 67:14 68:6 69:18 71:16,18, 21 74:25 75:12 76:8,10,17 77:10 79:5 81:12 83:22 92:17,21 93:25 98:17 99:6 103:15 105:12,16 106:3, 23,24 107:8,12,17 108:5, 13 109:3,9,12 113:4,8 114:3,7,16 124:11 127:15 139:12 143:7 148:3,4,6,10, 13,23 151:10 152:14 155:18 156:22 160:16 163:20 164:1,7,20 165:4,7 169:16 176:19,22 177:1 183:13

**removed** 103:21

**removing** 103:18

**repeat** 167:19

**rephrase** 154:7

**replay** 168:1

**report** 9:10 12:22 45:22 47:24,25 48:2,7,8 101:19 139:13 140:2,12,14,19,21 141:5 142:3 143:19 147:19 148:8 149:9,21 150:1,5 151:19 160:20

**reported** 161:22 163:25 164:3,11

**reporting** 145:17 154:23 174:23

**reports** 48:4

**reposition** 105:7

**represent** 6:12

**represented** 39:19

**representing** 150:10

**request** 159:6

**requested** 143:10 144:24 164:5

**require** 134:19

**required** 20:20 129:10 135:4

**requirements** 130:15

**reread** 141:1

**rescue** 93:5,11,15,19 111:22

**resonates** 81:11

**respects** 132:4

**respond** 65:24 66:2

**responded** 65:23 66:3

**responding** 43:22 68:17 69:2 73:9 75:22 159:18

**responds** 173:4

**response** 12:25 58:19 62:24 134:10 164:8 179:4 181:22 182:3,5,10

**responses** 12:24

**restricted** 171:3

**restriction** 109:13 170:16

**restrictions** 171:14,18

**restroom** 36:12 101:7

**result** 89:14 178:2

**resulted** 166:8,10

**results** 176:18,22

**retrained** 177:22

**retreat** 137:14

**retreated** 153:8

retrieve 142:23 143:11,15

retrieved 114:1,4 143:1, 24

retrieving 177:11

return 158:25 159:9,10 161:15,16 162:7 163:9,11, 12 164:6

returned 155:16,19 162:8, 9 166:8

returning 161:17

review 23:15 45:22 147:14

reviewed 8:20,23 147:16, 17

reviewing 26:15

right-hand 31:13 87:7

rights 129:23

rise 37:11

road 22:25 23:3,4,5 26:3 87:2 102:8 173:24

roadway 87:3,11 89:7,19 91:8

Robert 6:11 146:1

rod 125:15

roll 43:11

room 11:8 36:25 53:5 82:11

rotation 44:10

rounds 45:25 47:4,7,10 85:6 86:3

rules 7:9,10 36:14

run 68:2 69:11 77:12,19 168:8

running 109:9

**S**

safe 60:11,12 93:1 132:22

safely 84:1

safety 55:23 56:9 64:13 92:24

sat 112:19 113:1 114:20

Sauter 146:2 150:11

save 109:24

scattered 87:6 90:19

scattering 91:5

scenario 119:21 122:19, 21

scenario-based 118:7

scene 9:7 11:1 54:6 66:16, 19,23 67:20 69:24 71:11 73:6 75:18 77:22 78:8,14,

17 79:2,4,7,9,13,15,19,20, 22,23 80:10,13,17,23,25 81:7,9 95:19 99:5 102:2 107:22 110:5,7,9,13,18,20, 22 113:1,8,9 114:15 126:11 144:19 145:1,5 174:1 182:9

schedule 44:7

school 19:17,22,24,25

screen 71:14 72:10

search 187:9,14,19

searched 187:17,21

seat 100:7,9,11 103:1,13, 16,22 105:16 106:2,5,13 109:13,14

seconds 78:19,24 79:24 85:15 92:5,12 109:5 112:4 128:10 169:11 170:4 171:9,23 172:12 175:20 180:20 181:4,6

secretarial 146:19

section 131:16 142:3 149:1,3

security 162:11

seek 137:9 153:12

seeks 65:16

semiautomatic 46:3,8 47:1,2

send 156:12

sending 160:10

senior 66:15

sense 7:16 16:17

senses 94:2

sentence 119:21 134:8,17 139:20 141:13,22 142:17 153:7

sentences 132:21

September 18:10 20:14 160:15

sequence 174:22 183:25

sequencing 176:11

sergeant 42:14 113:6 145:5 154:10 159:16 164:2,15 170:7 173:20 174:1,6 176:6

serve 18:22

serves 72:16

service 142:13

set 150:8 154:22

settings 33:5 186:11

settlement 38:1,6,11,13

seventy-five 31:21

shaking 137:18

sheriff 59:1 129:6,9,14,18 141:6 151:5 156:4,5,15,19, 23 162:14,16 163:4 164:4, 15

sheriff's 7:3 9:19 10:6,19, 21 11:6,10 21:19,21 25:22 26:11,19 62:6 82:1 122:16 125:7 131:14,15 132:4,17 135:1 140:16,20,24 141:8 148:16 149:24 150:4,20 156:12 159:13 162:12 166:17 177:2,4,7,23

shift 8:17 15:1 16:12,13 40:14,17,20,21 43:9 44:17, 18,23 45:11,15 149:21 150:1 165:15 185:5

shifts 15:3 44:11

shined 124:13

shining 51:23 75:9

shiny 127:10,11

shoes 31:23 32:1

shoot 24:6 26:25 27:1 46:7 56:16,17 61:10 62:15 85:2

shooting 9:4,6,24 10:15, 20 13:8 14:4 16:4,12,24 17:2,5,9,13,17,21,24 30:20 31:4 32:14 49:11 50:4 51:24 56:2 59:15 65:9 68:19 69:15 70:11 74:1,5,9 79:21 84:21 94:18,21 96:20,23,25 100:17,18,21 101:2,5 102:3,24 103:14 104:8,10,22 105:3 114:18 116:1,21 117:8,18 118:16, 25 119:12 120:2 121:21 122:10,25 144:1,3 149:14 155:12 156:20 159:8 166:2 176:15 177:9,17 178:3 188:1

short 8:1

shortly 110:23

shot 46:7 48:10 62:19 86:1,4 91:8,11,19 92:1,6 95:14,19 102:12 117:12 118:24 122:3 142:13 166:16 173:5 175:3 180:10,21,24 181:8,15 182:9,15,21

shots 47:16 53:23 77:15, 19 104:18 114:20 170:8 172:5,11,21 173:3,5 174:19,22,25 175:4,14,22 181:5

shoulder 31:16 55:13 63:21,24,25 64:3 65:1,5,18 141:24

show 27:4 45:24 73:24 101:24 128:3

showed 112:22

shown 99:23 123:22 175:25

shows 80:9,25 98:25 102:7

side 31:13 42:24 43:1,2,4, 6 49:14,17 51:5 52:11,14, 15,18,19,21 53:2 55:12 63:15,22 82:7 83:11 84:15 85:16 87:7,8 99:2,3 100:4 102:24 103:3,4 104:13 105:11 107:9,17 108:5,12, 23 109:10 125:13 137:18, 19 142:23 143:2,21 144:2 153:10,16 165:23

sighed 165:20

sign 105:21 129:10 131:7

signal 171:2

signature 128:24 131:12

signed 13:4,5 128:22 129:13

silently 134:13 152:8

similar 126:17

simulators 118:4,10

simultaneously 78:17

single 32:18 46:7,11 89:22

sirens 75:19

sit 78:1,3 113:24 120:8

sitting 17:22 47:15 69:23 100:7 112:23 115:8 117:1 119:24 121:4,11

situation 27:5 58:10,21 60:25 62:21 67:8 89:13 92:23 93:2,11 119:10 120:6,7 123:15,18 126:9 130:21 132:19 134:20,21 136:21 179:5

situations 27:21 28:10 62:17 67:6 119:5

sixty-four 9:10

skipped 36:14

sleeping 164:11

slept 161:2

slow 94:5

small 52:21 53:12 103:4

smelled 41:9,18,19,21 43:21,24

smiling 165:19

social 15:15 186:5 187:2

socialize 14:20

sort 102:6 128:14 156:13

sound 78:20,25 92:8

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 204 of 216 PAGEID #: 1140

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                    Gust A. Teague

148:21 168:9

**sounded** 161:8

**sounds** 85:14 173:16

**spare** 47:14

**spares** 47:13

**speak** 156:3

**speaks** 67:8

**special** 93:9 94:4 132:5

**specific** 58:8 67:14 117:13 127:15

**specifically** 144:11

**specifics** 159:19

**speed** 34:15

**spell** 6:20 157:21

**spelling** 157:24

**split** 43:2

**splitting** 178:16

**spoke** 159:8

**spoken** 16:2

**sponsored** 20:21

**sports** 15:12

**spot** 85:9

**spotlight** 76:7

**spring-loaded** 93:9

**Springbrook** 40:24 43:10 67:21 77:12 112:17 169:1

**Sprint** 183:20

**staff** 21:25 146:19

**stamped** 96:5 127:25

**stamps** 176:3

**standing** 55:19 82:5,7,18 87:2 89:11,20 90:14 95:14 96:14 97:15,18,21 98:11 99:12,14,17 102:16 104:12 108:11,14 126:1

**start** 8:4 14:23 17:4 25:25 86:22 93:1 97:5 170:8 172:21 185:3

**started** 26:3,6 36:10 49:11 51:7,10 54:2 96:23,25 97:7 110:23

**starting** 89:14

**starts** 142:17 151:25 152:20

**state** 6:17 39:3,5 129:4

**stated** 59:13 152:25

**statement** 8:23 12:13,21 17:18 48:5 64:9,10 114:9 137:21 138:1,24 139:19 144:18,24 145:2,8,13,18

146:7,11 147:20 150:21,23 153:20 155:2 169:18 180:15 182:19

**statements** 12:18,19,20

**States** 129:3 130:7

**stating** 131:12

**stations** 43:13

**status** 14:12

**stay** 22:13 23:6 138:20,21 162:5,24 163:13

**Steele** 11:23

**step** 38:17

**stepped** 172:6

**stepping** 66:23

**steps** 51:9 136:8

**sticking** 106:6,8 125:16

**stop** 43:15 105:2 144:25

**stopped** 48:19,23 49:21 50:17 51:3 53:10 56:2 105:3

**stopping** 34:15 41:17

**stopwatch** 175:23

**street** 41:3,4,10,11 77:10 168:20,24

**streetlight** 74:21,24,25

**Strike** 76:24

**strongly** 132:17

**struck** 47:20 89:17

**stuck** 109:8,9,10

**stuff** 15:3 74:16 89:4 176:3 187:22

**subject** 154:12

**subjected** 28:15

**subjects** 163:17

**submits** 149:9

**sudden** 34:15

**sued** 37:2,15,18 38:14 39:3,13

**suffer** 19:8

**suffered** 18:14

**summaries** 9:1

**summarize** 152:4

**summarized** 145:2

**summary** 10:1 151:23 152:15

**summary-type** 130:21

**sun** 127:9

**super** 94:5

**superior** 154:18

**supernatural** 94:6

**supervisor** 113:4,11 149:10,20 164:1

**supervisors** 112:25 151:4

**supplement** 180:11 181:16 182:4,13

**support** 129:2 182:1

**supposed** 13:4 164:23

**surface** 109:22

**surprise** 127:17,22

**surrounded** 72:22

**suspect** 24:7,10 27:1 62:15,18 166:16 170:17 173:5 175:9

**suspects** 23:23

**switch** 20:8

**swore** 129:2

**sworn** 6:6 20:16 22:5

**synopsis** 154:11

**system** 34:8,10,14,17,18 71:17 80:18 145:17 148:4, 11

**systems** 34:9,11,12 70:11 93:9

---

**T**

**Tab** 72:8,9 81:22

**table** 58:5

**tactical** 83:10 133:4,15 136:3,4

**Tae** 163:22

**taking** 30:24 45:3 132:12, 13 133:14 138:14,16,22

**talk** 12:6 17:1,8,12,18,19 76:25 77:5,11,14 114:19 150:3 157:1

**talked** 14:2,6,8,9 16:5,7 17:19,20 77:7 150:14

**talking** 41:16 52:13 174:7

**tall** 51:16

**tape** 172:12

**taser** 24:3 27:7 32:16

**Teague** 6:4,10,19,22 131:8 152:1,21,23,25 153:2,7 179:16,23 180:1

**Teague's** 137:21

**techniques** 28:3 46:18,22

**telling** 48:2 59:4 81:16 107:5 142:4 160:8 161:6

162:4 164:13 173:22

**ten** 86:25 161:14 182:7

**terminal** 72:19

**terms** 28:19

**testified** 38:21 122:1,8 148:19 178:11 182:22

**testimony** 90:1 97:1 102:15 144:15 151:20 180:18

**text** 185:8 187:11

**thigh** 106:1 140:5,9,11 141:10,14,18,23 142:6

**thing** 32:7 38:22 43:16 59:12 81:10 87:17,18,19 88:11,25 89:3 106:11,14 115:19 117:13 151:7 176:19

**things** 14:21 15:4,24 16:1, 19 37:17 64:15 71:23 94:4, 14 120:5 124:12 133:2,13 145:24 146:21 162:11 187:10

**thinking** 55:22 56:8 64:12 65:3,9 161:13

**thirteen** 43:1 47:7,13

**thirty** 112:4 169:11

**thought** 22:18 30:8 48:3 58:13 101:24 118:15,23 119:10 133:23 163:3 165:2 168:23

**thoughts** 160:20 163:13

**threat** 48:20,22,24 54:3,5, 6,7,10,11,14,15,21 55:1,2, 10,16,17,18,20 56:3,14,15, 18 57:17,21 58:14 59:8,13, 21 64:14 118:1 123:6 159:15

**threats** 54:17,23 159:13, 16,17,19,23

**time** 9:11 10:22 13:23 14:16 15:1 16:3 17:16,17 18:1 21:5,10 22:20 24:15 31:4,18 32:13 34:10 38:24 40:19 43:19 48:16 49:3,10 51:24 53:10 57:15 62:1,25 63:7 74:1,5,8 75:11,23 76:9 77:7 79:1 80:9 81:12, 14 82:6 83:12 89:13,16 91:8,25 92:1,5,6 94:18 95:14 103:13 104:9,11,13 109:3 110:15 112:3 114:18,20 120:8,16 135:23 137:3,7 140:8,19,21 141:19 144:23 146:25 148:20 153:1 154:17 160:16 169:6 170:23 172:15 174:5,8 175:18,20, 24,25 176:3,24 178:10,15 180:8,15,20,24 181:7 182:11 184:3,18,23 185:1

**timed** 176:10

**times** 15:7 16:6,16 24:14
34:9 37:4 48:10,12,14
64:23 79:18 83:22 84:13
94:10 141:2 142:7 158:19
167:25 168:4 177:25

**tinted** 53:17 69:4 71:7
75:2 123:6,12,14,21 124:1,
3,8,12,15,20,23 126:8,14,
18 127:3,4,14,18 169:2

**tire** 95:22

**tired** 44:3

**titled** 19:7 38:2

**today** 6:14 8:12 12:6
17:22 19:9 32:7,22 34:13,
17 38:10,21 47:16 69:23
70:11 115:8 117:1 121:4,
12 139:12 155:20 169:15
178:11 179:8 180:19
182:22 183:10

**told** 38:3 41:20 51:16
58:22 59:12 60:15,16
104:17 106:23 107:2,3
112:12 113:23 124:4 137:3
143:21 144:11,14 152:15
153:8 154:12 158:17
160:22 161:7,16 162:20
163:11 164:5 174:21
176:20 177:8

**tomorrow** 164:17

**tone** 170:15 171:1

**tools** 93:3

**top** 55:25 70:17 95:17
106:3 117:17 145:9 172:6
186:1

**topographical** 95:19

**total** 11:18 47:18 135:19
179:1

**totality** 58:20 64:19 120:2
132:13

**totally** 115:19

**touch** 51:13,14 75:15

**Township** 40:15 41:6
42:23

**traffic** 79:14 80:12,19,21
92:22 101:19

**trained** 117:25 124:14
129:16,20 134:2 135:2
177:25

**training** 18:25 28:20
46:19 47:1 67:1,9,15
117:22 118:2,3,8 119:16
122:16 130:5 178:4

**traumatic** 112:15 164:25

**treatment** 158:23 166:5

**tree** 96:17 99:9 135:13

**trigger** 46:7 48:11,13
56:16

**true** 162:2

**turn** 72:3 76:7 133:20
149:21,25 151:18 164:2

**turned** 17:17 148:15

**turning** 34:7,12 76:3,8,10

**twelve** 42:25 171:23

**twenty** 112:4

**twenty-some** 123:11
124:7

**twenty-two** 74:22

**Twisted** 166:14

**Twitter** 186:7

**two-page** 72:6

**two-thirds** 80:5

**type** 24:2 67:18 70:11,20
119:21 146:22 147:3
148:11 149:8 161:13

**typed** 12:24 71:5 145:23
146:25 147:5

**typing** 68:21 148:5

---

## U

**uh-huh** 7:12 135:5 144:7

**unconscious** 115:25
116:20 117:8,11,18 118:12
181:24

**underneath** 90:4

**understand** 7:15 10:15
35:21 67:21 96:25 131:13
145:17 168:18 187:13

**understanding** 30:19
68:15 117:6 119:17

**understands** 39:1

**understood** 38:7 168:5

**uneasy** 163:23

**uniform** 32:13

**United** 129:3 130:7

**unjustified** 28:11

**unknown** 69:2 70:14,16,
22 73:10

**unlock** 143:22

**unprofessional** 162:2

**unsworn** 22:6

**untangled** 109:19

**utilize** 134:3 136:4 176:21

---

## V

**vantage** 63:14 83:24
101:6 135:19

**variables** 80:16

**vast** 93:16

**vegetation** 99:9,12

**vehicle** 34:16 40:23 43:11
49:1,4,10 50:4,14,19,20
51:12,24 53:24 71:5,6,15
72:10,11,25 73:7,10,13,21
74:10 75:3,6,7,13,16,19
76:6,22,24 77:2,6 82:20,22
84:5,8,16 85:15 87:1,8
90:19 91:1,23 93:4,15
97:2,7,8 98:4,7,12 103:3,
18,22 104:14,23 105:6,8
107:25 108:21 114:2,12,21
116:2,21 118:15 119:11,13
121:11 123:25 125:25
126:4 128:8 135:6,12
136:6 137:16 143:3 153:9
174:3,5 179:3,7,17,21
180:3,5,9,21,24 181:7

**vehicles** 42:3 69:3 73:25
81:23 93:17 102:8 169:1
179:6

**Verizon** 183:15,22,23,24
184:5

**version** 101:25 148:15

**versions** 145:20

**versus** 164:12 174:6

**vesting** 132:6

**vibration** 58:1

**victim** 55:18

**video** 75:20

**view** 99:16 144:16

**visible** 74:8

**visit** 164:12 165:8,10,12

**visits** 165:9

**visual** 51:20 142:18,20
143:23 144:12

**vital** 85:9

**voice** 35:2 169:21,23
173:8,19

---

## W

**wait** 134:20

**waited** 107:15

**walk** 19:10 59:22

**walked** 144:2 145:1
163:17

**walkthrough** 9:5 10:12,
19 151:9,23 152:5,12
154:8,14

**walkthroughs** 154:3

**wanted** 20:10 22:25 23:2
67:19 156:12

**wanting** 15:25

**Warren** 21:19 22:1,3,5,15,
21 25:12,19

**watch** 149:10

**watched** 15:7 163:18

**watching** 114:16

**ways** 133:5

**weapon** 24:6,9 46:3,17
47:11 49:19 54:24 60:25
61:5 64:16 85:6,19,23,25
86:7 91:8,11,19 94:14
95:15 96:21,23,25 97:6,7,
12,16 104:14,19,22
105:21,25 114:22,24 116:2
120:14 134:24 135:7
142:13 153:4,8

**wear** 32:5

**wearing** 31:14 32:1,7,13
109:14

**wedged** 106:5,12

**week** 159:8 165:11

**weeks** 165:10

**weight** 31:19 161:4

**welfare** 132:8

**west** 42:24 43:1,4,6
112:17

**Whoever's** 58:4

**wife** 15:20,21,23 186:19

**window** 52:5,10,15,18,19,
22 53:3,8,12,15,20 75:10
85:16 93:4,10 95:9 96:9
100:3 102:25 103:5,10
107:16,18 108:3,12
123:14,21,22,24 124:8,13,
16,20,24 125:10,20 126:8,
14,15,18 127:14 142:21,22
143:22,25 144:5

**window-break** 93:9

**windows** 52:25 63:15
69:4 71:7 75:3,4 76:11
91:13,16 123:6,12 124:1,3
126:25 127:3,5,18 169:2

**windshield** 53:19

**witnessed** 10:11

**wives** 16:1

**Woodlawn** 21:20 22:3,10
23:6,23 24:13,19 37:13
40:5

Case: 3:17-cv-00160-TMR Doc #: 51 Filed: 02/26/19 Page: 206 of 216 PAGEID #: 1142

Patricia Martin, Admin., et al. vs Joshua Haas, et al.                                    Gust A. Teague

**word** 70:9 147:9

**words** 8:7 46:6 73:2
   136:23

**work** 14:17,18,21 15:5
   21:14 44:7,8 45:1 78:3
   88:3 93:20 116:5 133:16
   146:23 147:3,4 155:16
   159:1,9,11 161:17,23
   162:5,7,9,17 163:13 164:6,
   14,17 165:14,17 166:8
   185:5 188:3

**work-related** 183:4

**worked** 8:17 20:15,18,19,
   24 21:19 43:3 44:5,11,16,
   20 146:21 147:11

**working** 14:25 15:3 19:25
   21:16 43:6 149:18

**works** 133:5 176:3

**workweek** 44:6

**worn** 32:15,19

**worried** 55:23 56:8 64:12

**worry** 55:19 64:14 65:8

**wound** 37:15

**writes** 152:23

**writing** 169:18 187:12,24

**written** 12:13 17:17 150:1,
   5 155:2

**wrong** 79:23

**wrote** 141:9,22 142:1,20
   143:6 153:24

---

### Y

**yard** 87:5

**yards** 74:22 82:13

**year** 17:1 19:19 40:2
   177:25

**years** 13:13 21:13 23:7
   40:2 43:7 123:11 124:7
   143:7,8 183:19

**yelled** 107:4

**yelling** 109:7







GB003726



PLAINTIFF'S
EXHIBIT
47
Kw 11/13/18







GB003777

# MONTGOMERY COUNTY SHERIFF'S OFFICE
# DEPUTY SHERIFF COMMISSION

After the oath hereinafter taken, I, Phil Plummer, Sheriff of Montgomery County, Ohio, do hereby appoint the following persons as Deputy Sheriffs of Montgomery County, Ohio, pursuant to the authority vested in me by Section 311.04 of the Ohio Revised Code.

**PHIL PLUMMER, SHERIFF**

## OATH OF OFFICE

The State of Ohio, Montgomery County, ss.

I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Ohio, and that I will faithfully discharge the duties of Deputy Sheriff of Montgomery County Ohio, during my continuance in office.

| PRINT FULL NAME & PSN | SIGNATURE OF APPOINTEE | DOB |
|---|---|---|
| Richard Jeffrey Eckhart 141 | | |
| STEVEN GLENN EGLESTON # 76 | | |
| Tony Ray Ball #432 | | |
| GREGORY LEE BROCK # 72 | | |
| Walter Alan Benton 585 | | |
| BRIAN Scott KRIMMER #498 | | |
| Harold James Clark #90 | | |
| TYLER ALAN WATSON #337 | | |
| Joseph Philip Castro III # 889 | | |
| BRYANT WADE FIELDS #355 | | |
| Gust Andrew Teague # #901 | | |
| GERARD JOSEPH Fulwie/er 392 | | |
| Ron Mid/Thomas #57 | | |

Sworn to and subscribed in my presence, this ___15___ day of ___July___, 20 _08_.

_____
Notary Public, State of Ohio

My Commission Expires ___12-10-12___
Recorded in Montgomery County



PLAINTIFF'S EXHIBIT
51
KW 11|13|18

MC-001999

# USE OF FORCE POLICY

I, Deputy _6. TEAGUE_                    Unit# _902_
Have read and understand the Montgomery County Sheriff's
Office Policy regarding the use of force as outlined in the
Montgomery County Sheriff's Office General Orders Manual,
Section 1.1.3.

Trainee _____ 902          Date _04-14-06_

FTO _____       Date _4-14-06_



MC-002041

**15-6691**

Investigative No
0015

# MONTGOMERY COUNTY SHERIFF'S OFFICE **DRAFT**

330 W SECOND ST

DAYTON, OHIO 45422

Phone
(937) 225-4096
Fax
(937) 496-7975

Reported Date
07/23/2015
Nature of Call
DEAD
Officer
TEAGUE,GUST A II

## Administrative Information

| Agency | | | | | Report No | | Investigative No | Reported Date | | Reported Time |
|---|---|---|---|---|---|---|---|---|---|---|
| MONTGOMERY COUNTY SHERIFF'S OFFICE | | | | | 15-6691 | | 0015 | 07/23/2015 | | 00:42 |
| CAD Call No | Dispo | | | Nature of Call | | | | | | |
| 152040053 | DEATH OF SUSPECT | | | DECEASED PERSON | | | | | | |
| Location | | | | | | City | | | ZIP Code | |
| 324 SPRINGBROOK BL | | | | | | HARRISON TOWNSHIP | | | 45405 | |
| Rep Dist | Area | Beat | From Date | From Time | Officer | | | | | |
| H1D | HA | H11 | 07/23/2015 | 00:42 | 902/TEAGUE,GUST A II | | | | | |
| Assignment | | Entered by | Assignment | | Approving Officer | | | Approval Date | | |
| ROAD PATROL | | 902 | ROAD PATROL | | | | | | | |
| Approval Time | | | | | | | | | | |

## Narrative

On July 23, 2015 at approximately 0044 hours, Deputy J. Haas (723) and I were dispatched to 324 Springbrook Blvd., Harrison Township, for an auto accident. We were requested to check for injuries during the initial dispatch. I did not check my MDT in responding. Because of the nature of the call, the time of night and the closeness of our location in responding to the call, I did not respond with lights and siren. Without my lights being on, my dashcam was not activated.

, approached the scene at 324 Springbrook Blvd. from Dale View Avenue. I approached the accident scene from the west and could see a maroon Pontiac Grand Prix off the roadway with the tail lights on.

The Pontiac Grand Prix was in a front yard facing east and approximately 10 feet south of Springbrook Blvd. As I approached, I saw that all the doors to the Pontiac were closed and several people were standing east of the Pontiac.

Deputy J. Haas also approached the scene from Dale View Ave. His patrol vehicle was directly in front of mine as we arrived on scene. Deputy J. Haas parked his patrol car near the grass on the south side of the eastbound lane of Southbrook Blvd., approximately 10 feet west of the Pontiac Grand Prix. I parked my patrol vehicle approximately a car length behind Deputy J. Haas' patrol vehicle.

Deputy J. Haas and I exited our patrol vehicles. Deputy J. Haas approached the driver's side of the Pontiac Grand Prix as I approached the crash site. I yelled out to the people standing in the area to the east to ask if everyone was ok. At this point, Deputy Haas yelled out that he has a gun. I immediately notified Dispatch to give us the channel because we have one with a gun.

I yelled to the people in the area to get away and approached the Pontiac on the passenger side of the car. I pulled my Glock 22 service weapon and my Pelican flashlight from my gunbelt. My service weapon was in my right hand and my flashlight was in my left hand. I could not see the subject, later identified as Dontae Martin, inside the Pontiac until I was next to the car at the rear door on the passenger side and used my flashlight to illuminate the interior of the Pontiac.

I could see that Martin was the only occupant in the Pontiac. I illuminated the interior and could see a large black semi-automatic handgun on Martin's right thigh pointed forward to the east. Martin's right hand was also on his right thigh near the handgun. I began yelling at



PLAINTIFF'S
EXHIBIT
53
KW 11/13/15

| Report Officer | Printed At | |
|---|---|---|
| 902/TEAGUE,GUST A II | 02/26/2016 10:12 | Page 1 of 2 |