IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| PATRICIA MARTIN, et al., | ) | CASE NO. 3:17-cv-00160 |
| | ) | |
| Plaintiffs, | ) | DISTRICT JUDGE THOMAS M. ROSE |
| | ) | MAGISTRATE JUDGE MICHAEL R. MERZ |
| v. | ) | |
| | ) | **DEFENDANTS' REPLY BRIEF IN SUPPORT** |
| JOSHUA HASS, et al., | ) | **OF MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants, Joshua Hass, Gust Teague, Sheriff Phil Plummer, Montgomery County and

the Montgomery County Board of Commissioners, by and through undersigned counsel, hereby

submit the attached reply memorandum in support of its Motion for Summary Judgment.

Respectfully submitted,

By: */s/ Jillian L. Dinehart*
KEITH HANSBROUGH (0072671)
JILLIAN L. DINEHART (0086993)
Marshall Dennehey Warner Coleman & Goggin
127 Public Square, Suite 3510
Cleveland, Ohio 44114
P:  216.912.3809 / F:  216.912.3801
Email: jldinehart@mdwcg.com

By: */s/ Joseph D. Saks*
JOSEPH D. SAKS (0088082)
BENJAMIN A. MAZER (0087756)
ANNE M. JAGIELSKI, (0093047)
Assistant Prosecuting Attorneys
Montgomery County Prosecutor's Office
301 West Third Street, P.O. Box 972
Dayton, Ohio 45422
P:  937. 496.7176 / F:  937.225.4822
Email:  saksj@mcohio.org

*Counsel for Defendants*

TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     THE STANDARD OF REVIEW DOES NOT ALLOW FOR ALL CIRCUMSTANTIAL
        EVIDENCE ............................................................................................................2

III.    PLAINTIFF'S "CIRCUMSTANTIAL EVIDENCE" IS NOT SUPPORTED BY THE
        SWORN RECORD..................................................................................................6

    A.      Did Mr. Martin Point his Gun at Deputy Haas or was it a Reflection?...........................6

    B.      Was Mr. Martin's gun Visible to the Deputies?..............................................................7

    C.      Was Mr. Martin Moving Inside the Vehicle?..................................................................8

    D.      The Above Facts Cannot be used to Create a Genuine Issue of Material Fact .............10

IV.     PLAINTIFF LACKS SUPPORT FOR THE ALLEGATIONS THAT THE DEPUTIES'
        ACTS WERE UNREASONABLE...........................................................................10

    A.      Segmented Analysis ......................................................................................................11

    B.      Defendants had a Reasonable Response to an Unknown Accident Scene ....................12

    C.      The Deputies' Verbal Warnings were Reasonable ........................................................15

    D.      The Deputies Gave Mr. Martin Time to Comply .........................................................16

V.      THE INVESTIGATION WAS PROPER AND THERE IS NO *MONELL* LIABILITY ..16

VI.     CONCLUSION.....................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Alexander v. Beale St. Blues Co., Inc. 108 F.Supp.2d 934, 949 (W.D. Tenn. 1999) ..................20

Askew v. City of Memphis, W.D. Tenn. No. 14-cv-2080, 2016 WL 3461549, 2016 U.S.
Dist. Lexis 80232, *7 (June 21, 2016)...............................................................................4, 5

Burnette v. Gee, 137 Fed. Appx. 806 (6th Cir. 2005) ...........................................................12, 15

Chappell v. City of Cleveland, 585 F.3d 901, 909 (6th Cir. 2009) ...............................................13

Cox v. Kentucky DOT, 53 F.3d 146, 150 (6th Cir.1995)..............................................................2, 4

Daniels v. City of Columbus, No. C2–00–562, 2002 WL 484622, (S.D. Ohio Feb.20, 2002).....20

Estate of Collins v. Wilburn, 6th Cir. No. 17-6436, 2018 U.S. App. LEXIS 32339, at *12-13
(Nov. 15, 2018).......................................................................................................................2

George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013)...................................................................16

Graham v. Connor, 490 U.S. 386 (1989)......................................................................................11

Greenlee v. Miami Tp, Ohio, S.D. Ohio No. 3:14-CV-173, 2015 WL 631130 (2015).....19, 20, 21

Hammett v. Paulding Cty., Ga., 875 F.3d 1036 (11th Cir., Nov. 17, 2017)................................3, 4

Jefferson v. Lewis, 594 F. 3d 454 (6th Cir. 2010).........................................................................5

Leach v. Shelby County Sheriff, 891 F.2d 1241, 1248 (6th Cir.1989) ...................................20, 21

Livermore v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2007) ...........................................................13

Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir.1985) ...........................................................20, 21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89
L.Ed 2d 538 (1986).............................................................................................................5, 11

Maynard v. Jackson Cnty., 706 F.Supp.2d 817, 827-28 (S.D. Ohio 2010)..................................20

Moore v. Chesapeake & O.R. Co., 340 U.S. 573, 71 S.Ct 428 (1951) ............................................2

Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994).................................................................12

Sherrod v. Williams, S.D. Ohio NO. No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915 (Jan. 15,
2019).............................................................................................................13, 14, 16, 17

Tennessee v. Garner, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).............................16

Thomas v. City of Columbus, 854 F.3d 361, 366-67 (6th Cir. 2017) ...........................................16

Ward v. County of Cuyahoga, 721 F.Supp.2d 677 (N.D. Ohio 2010) ..........................................17

Wright v. City of Canton, Ohio, 138 F.Supp.2d 955 (2001) ........................................................19

**Statutes**

Fed. R. Civ. P. 56(a) ....................................................................................................................5

<u>**REPLY MEMORANDUM IN SUPPORT**</u>

**I.**     <u>**INTRODUCTION**</u>

Plaintiff asserts three facts that she argues present a material question of fact as to whether these deputies committed a constitutional violation, thereby depriving Defendants of all immunities. First, Plaintiff argues that since Mr. Martin was not moving, he could not be perceived as a significant immediate threat. There is no evidence, or even a reasonable inference, that Mr. Martin did not move to raise the weapon at the deputies. Second, Plaintiff argues that Mr. Martin's gun was not visible to the deputies, therefore they could not have perceived him as a significant immediate threat. There is no evidence, or reasonable inference, that Mr. Martin did not have a visible gun in the cabin of the vehicle. Third, and related to the first point, Plaintiff argues that Deputy Haas reacted to his own reflection raising a gun and perceived the reflection as a threat. There is no evidence, or reasonable inference that the deputies were reacting solely to a reflection.

Relying on her "circumstantial evidence," Plaintiff asserts four theories as to how the deputies were unreasonable in their approach to Mr. Martin and understanding the threat he presented. First, Plaintiff argues that the deputies were unreasonable by not alerting Mr. Martin to their presence on the scene. Second, Plaintiff argues that the deputies were unreasonable by not giving Mr. Martin sufficient time to comply with their demands to drop the weapon. Third, Plaintiff argues that the deputies were unreasonable in their failure to warn Mr. Martin that he would be shot if he failed to comply with their orders to drop the weapon. Finally, Plaintiff argues that the deputies were unreasonable for failing to take cover and call for backup when they saw the weapon. Plaintiff has failed to support any of these arguments with facts found in the record or with case law indicating a violation of a clear constitutional right.

1

## II.    THE STANDARD OF REVIEW DOES NOT ALLOW FOR ALL CIRCUMSTANTIAL EVIDENCE

Plaintiff opens her brief by stating that she opposes Defendants' Motion for Summary Judgment because there is "sufficient evidence for a reasonable jury to conclude that no reasonable officer responding to a car accident would have opened fire on her potentially injured, unmoving, likely unconscious son, who had no gun in sight, and posed no threat to the deputies or his neighbors."  Plaintiff goes on to state that Deputy Haas must have seen the reflection of his own weapon in Mr. Martin's tinted car window and shot when he saw his own reflection.  These reasons are nothing but speculation that fly directly in the face of sworn testimony offered by the deputies and have no support in the record.  "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence.  Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment." *Cox v. Kentucky DOT*, 53 F.3d 146, 150 (6th Cir.1995); *Estate of Collins v. Wilburn*, 6th Cir. No. 17-6436, 2018 U.S. App. LEXIS 32339, at *12-13 (Nov. 15, 2018).  Plaintiff bases her brief in opposition nearly entirely on arguments regarding Defendants' credibility by speculating about what must have happened at the scene of the shooting.  However, speculation cannot supply the place of proof.  *Moore v. Chesapeake & O.R. Co.*, 340 U.S. 573, 71 S.Ct 428 (1951).  Where there is no evidence to support Plaintiff's theory of causation or negligence, then there is no genuine issue of material fact with which to deny summary judgment.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  However, there is a limit to what constitutes a "genuine dispute."

> "A genuine dispute requires more than some metaphysical doubt as
> to the material facts.  The fact that the records contain anything at

2

> all in support of the nonmovant's position is not dispositive; a genuine dispute requires that the evidence is such that a reasonable jury could find for the nonmovant.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  Although all reasonable inferences are to be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable."

*Hammett v. Paulding Cty., Ga.*, 875 F.3d 1036 (11th Cir., Nov. 17, 2017)  In *Hammett*, two officers were granted qualified immunity on an excessive force/wrongful death claim because the evidence stood at odds with plaintiff's theory of surrender and retreat.  Plaintiff's theory was that the decedent must have not presented a threat to the officers because he was shot in the back.  Instead, the facts showed that the decedent refused to obey the officers' commands to show his hands, shifted an object between his hands, and rapidly approached the officers.  Although the fatal bullet entered the decedent on the back-left side of his torso, there was no affirmative evidence that the plaintiff had attempted to retreat given the amount of time between the shots and the ultimate trajectory of the bullet.  The court found that it was reasonable for the officers to believe there was a threat of serious harm and to engage in deadly force.  The Eleventh Circuit found that the officers were entitled to qualified immunity as there was no question of fact as to what had occurred.

To come to this holding, the *Hammett* Court followed the Supreme Court instruction that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  A plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.  *Hammett*, 875 F.3d at 1050 citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514 (1986).

Plaintiff's reliance on entirely circumstantial evidence to defeat qualified immunity is not sufficient. The *Cox* Court, supra, limited their holding allowing for the application of inferences to cases relating to discrimination - where there needed to be a determination regarding a party's motivation for employment decisions. ("A party may rely upon both direct and circumstantial proof to oppose a motion for summary judgment in all actions anchored in discrimination, including motions for summary judgment evolving from qualified immunity issues.") *Cox*, 53 F.3d at 152 (6th Cir.1995). This is not a case where the subjective mindset of the deputies is at issue. This is a Fourth Amendment seizure that is analyzed in accordance with the actions of a reasonable deputy in similar circumstances.

It is uncontroverted that when "the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Askew v. City of Memphis*, W.D. Tenn. No. 14-cv-2080, 2016 WL 3461549, 2016 U.S. Dist. Lexis 80232, *7 (June 21, 2016) citing *Burnett v. Gee*, 137 Fed. Appx. 806, 809 (6th Cir. 2005). However, the Court is still limited to reviewing the evidence and drawing only those *reasonable* inferences in favor of the non-movant. *Askew*, at * 3, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed 2d 538 (1986). Those reasonable inferences must be enough to allow a jury to find in favor of the non-moving party.

> "When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some 'specific facts showing that there is a genuine issue for trial.' These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. The Court should ask 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' The Court must enter

4

> summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."

*Askew*, at \*3-4 (internal citations omitted).  Plaintiff cites to *Jefferson v. Lewis*, 594 F. 3d 454 (6th Cir. 2010) for the argument that her "circumstantial evidence" must be admitted since the deputies have presented the only witness testimony about the shooting.  Besides this being patently untrue as all of the bystanders heard the deputies tell Mr. Martin to drop the gun, the *Jefferson* holding is not so broad.  The *Jefferson* Court doesn't hold that a court must accept all of plaintiff's theories without affirmative evidence to support that theory.

In *Jefferson*, an officer shot at an unarmed civilian after she opened a glass door that the officer said reflected light, causing him to believe there was a muzzle flash, despite there being no accompanying "pop" of a gunshot.  The injured citizen was able to give testimony about the ambient light in the area that accompanied forensic evidence to rebut the officer's testimony that he saw a flash.  The officer argued that the flash must have been from a passing car, but couldn't present evidence that a car had actually passed.  In that instance, the court found that there was a genuine issue of material fact that precluded summary judgment in favor of the police officer.  In this case, Plaintiff is asking this Court to assume that Mr. Martin was asleep, that Mr. Martin never raised his weapon, and that Mr. Martin's gun was not visible to the deputies.  There is no witness statement to support these hypothetical situations.  Plaintiff relies almost entirely on Mr. Martin's blood alcohol content to support these inferences.  As addressed below, Plaintiff has failed to present specific facts beyond a mere scintilla of evidence to demonstrate that there is a genuine issue of material fact preventing this Court from entering summary judgment in favor of Defendants.

### III. PLAINTIFF'S "CIRCUMSTANTIAL EVIDENCE" IS NOT SUPPORTED BY THE SWORN RECORD

#### A. Did Mr. Martin Point his Gun at Deputy Haas or was it a Reflection?

The only evidence in the record is that Mr. Martin pointed a gun at Deputy Haas. Haas Dep. 94:25-96:1, 123:3-6 (ECF 49, PageID 753-755, 782); Teague Dep. at 64:22-65:6 (ECF 51, PageID 1000-1001). In her brief, Plaintiff cited to Deputy Haas's testimony, but glaringly absent from Plaintiff's briefing is that Deputy Teague, from the other side of the car, also saw Mr. Martin repeatedly pick up the gun and ultimately point it at Deputy Haas. Teague Dep. at 64:22-65:6 (ECF 51, PageID 1000-1001).[1] If Deputy Teague saw the same action from the opposite side of the vehicle, then Deputy Haas could not have been reacting solely to his reflection, if any, in the tinted window. Also, both deputies testified that they saw Mr. Martin repeatedly raise his gun off his lap. This is not an action that can be accounted for by Deputy Haas's reflection.

Moreover, it was agreed by the deputies *and the bystanders* that Deputy Haas had his gun holstered when he approached the vehicle, therefore he could not have seen a reflection of his own gun when he first identified Mr. Martin's gun in the vehicle. Haas Dep. at 93:6-16 (ECF 49, PageID 752; C. Oninku Dep. at 154:14-19 (ECF 50, PageID 919).

Plaintiff's theory that a reflection in the glass caused Deputy Haas to shoot is not supported by the record. Even if witnesses and experts acknowledged that it's possible for a tinted window to reflect light, the testimony of Deputy Teague indicates that he saw Mr. Martin point the gun towards Deputy Haas. Without more, the fact that tinted windows can create a reflection cannot establish a genuine issue of material fact sufficient to defeat summary judgment.

---

[1] See Brief in Support of Motion for Summary Judgment (ECF 64, PageID 1645).

**B.     Was Mr. Martin's gun Visible to the Deputies?**

Having debunked the idea that Deputy Haas was only seeing the reflection of his own gun through Deputy Teague's and bystander testimony there can be no believable theory that Mr. Martin did not have a gun in his lap.

Plaintiff argues that because Christensen Oninku did not see Mr. Martin's gun when he examined Mr. Martin before the deputies arrived, there is a question of fact as to whether the Deputies can be believed that they saw a gun in the vehicle.  Haas Dep. 93:6-16 (ECF 49, PageID 752)(saw Mr. Martin holding the gun in his right hand) Teague Dep. 140:3-7, 95:21-23 (ECF 51, PageID 1076, 1031)(Mr. Martin's right hand was resting on his thigh near the handgun).[2]  When Mr. Oninku first approached Mr. Martin's car, he used his iPhone flashlight and viewed Mr. Martin's torso, hands and legs, but did not see a gun.  C. Oninku Dep. at 59:11-63:9 (ECF 50, PageID 895-896).  He also does not recall seeing any other parts of the vehicle, including the center console which would have been nearest to Mr. Martin's right hand where the deputies indicate the gun was initially seen.  Id. at 62:1-4 (ECF 50 PageID 896).  Mr. Oninku readily admits that he does not know if Mr. Martin was holding a gun at any time after Mr. Oninku's first approach to the vehicle.  Id. at 66:5-13; 74:11-18 (ECF 50, PageID 897, 899).

Additionally, prior to discharging their weapons, the deputies yelled repeatedly for Mr. Martin to drop his gun.  All of the bystanders agree that though they could not see into the vehicle, they heard the deputies order Mr. Martin to drop the weapon several times.  C. Oninku dep. at 74:23-75:3, 72:23-25, 88:11-21 (ECF 50, PageID 899, 898, 902); D. Oninku Dep. at 70:16-71:6; 72:3-16; 75:2-10 (Ecf 57, PageID 1336, 1337), K. Oninku Dep. at 28:8-18, 44:20-45:4, 45:15-46:5 (ECF 59, Page ID 1179, 1236, 1185, 1189); Marshall Dep. at 25:10-14; 82:9-

---

[2] Plaintiff alleges that Deputy Haas could not have seen the gun from the rear driver's window, but she neglects to take into consideration the angle of the driver's seat at the time of the encounter.  Furthermore, Plaintiff does not refute that Deputy Teague indicates that he also saw the gun in Mr. Martin's lap.

17; 31:12-20; 35:5-8 (ECF 53, PageID 1179, 1236, 1185, 1189); D. Johnson Dep. at 33:15-34:9; 36:11-37:8 (ECF 55, PageID 1280-1281, 1283-1284). This fact weighs in favor of deputies having told the truth that they saw Mr. Martin's gun prior to discharging their service weapons.

Finally, there is forensic evidence that Mr. Martin's gun was in the open cab of the vehicle at the time of the shooting. Expert Scott Roder testified in deposition that he could see glass fragments on the gun in scene photographs. Those glass fragments are indicative of the gun being in the cabin of the car; not stashed beneath the seat or under a rug as Plaintiff claims was Mr. Martin's custom. Roder Dep. at 119:3-9, 121:5-9 (ECF 75, PageID 2544, 2546).

Even if there is a question of fact as to whether or not Deputy Haas saw a gun on his initial approach to the vehicle, as detailed above, there is no question of fact that Mr. Martin ultimately lifted the gun from a location in the vehicle and pointed it at Deputy Haas.

### C. Was Mr. Martin Moving Inside the Vehicle?

There is no question that Mr. Martin's blood alcohol content was substantial, but that is not enough to indicate that he was unconscious and immobile at the time of the shooting. Plaintiff's own pharmacology expert has admitted that even in a stuporous state, Mr. Martin could have lifted his gun. Dr. Fran Gengo testified that while one can appear to be unconscious, with some stimulation that person can be aroused enough to become "stuporous" and can move their limbs.[3] Gengo Dep. at 24:21-25:4; 42:5-12 (ECF 68, PageID 1921-22, 1939). Dr. Gengo even agrees that the deputies' description of Mr. Martin (that he had repeatedly raised his weapon) was consistent with the expected effects of the measured concentrations of alcohol and marijuana in Mr. Martin's system. Id. at 49:11-50:16 (ECF 68, PageID 1946-47).

---

[3] Plaintiff notes that the movement would not be purposeful and suggests that the fact that Mr. Martin may have not been in this right mind when he raised the weapon at Deputy Haas should alter the analysis. However, whether Mr. Martin purposefully pointed his gun at Deputy Haas is meaningless. The standard to be considered is that of a reasonable officer, not of an officer with mind-reading capabilities.

Furthermore, Dr. Gengo testified that a tolerant alcoholic could appear less intoxicated at any alcohol concentration level. Gengo Dep. at 29:13-18 (ECF 68, PageID 1926). In fact, we know that his family wanted Mr. Martin to attend AA meetings to change his life and to leave alcohol behind. Damon Martin Dep. at 19:8-20:7 (ECF 73, PageID 2317-18). It can be inferred that Mr. Martin's alcohol use was substantial and his tolerance would be higher than others, especially considering that Mr. Martin was driving only moments before this incident. Therefore, it is reasonable to conclude that Mr. Martin was able to move about the cabin of his vehicle as testified to by the deputies.

Plaintiff presents the testimony of their use of force expert, David Balash, to create a question of fact as to whether Mr. Martin was moving at the time of the shooting. However Mr. Balash does not have any medical training to support such a conclusion, nor is he a pathologist. Balash Dep. at 44:11-14 (ECF 71, PageID 2265). Despite his lack of training, he attempts to contradict the pathologist's finding that Mr. Martin's arm was extended at the time a bullet passed through his arm. Id. at 43:17-21 (PageID 2264). In light of the fact that Mr. Martin was seen moving and as the toxicologist testified that it was possible that Mr. Martin was moving at the time of the shooting, Mr. Balash's attempted medical testimony is not credible testimony that can support a verdict in favor of Plaintiff.

Plaintiff also argues that the number of actions that the deputies allege the parties took could not have occurred in the approximate 14 seconds between the moment that Deputy Teague announced that they had encountered a person with a gun, and Deputy Haas announced that shots had been fired. Plaintiff does not have any expert analysis of the time that it takes for a deputy and his partner to visually identify a gun, radio dispatch, make commands to drop a weapon, for a suspect to raise the weapon from his lap, lower the weapon, raise the weapon again and point it

it the deputy, and then for each deputy to take several shots and radio dispatch again. Without an expert opinion, Plaintiff cannot question the deputies' credibility that these actions took place within fourteen seconds. This is an unreasonable speculation that cannot be considered as evidence for summary judgment considering that it is uncontroverted that the deputies made these radio calls and the shots were fired within fourteen seconds.

Finally, there is no evidence in this matter that Mr. Martin was ever unconscious. Although bystanders testified that Mr. Martin appeared dazed, those bystanders also testified that Mr. Martin was moving his head back and forth on the headrest and his eyes were open. C. Oninku Dep. at 44:10-45:18 (ECF 50, PageID 891-892). This conforms to Dr. Gengo's opinion that though stuporous, Mr. Martin could have taken the actions as described by the deputies.

### D.     The Above Facts Cannot be used to Create a Genuine Issue of Material Fact

Plaintiff's allegation that the deputies shot Mr. Martin without ever seeing a gun in the car, without ever seeing Mr. Martin point a gun at the deputies, and without ever seeing Mr. Martin move is thoroughly disproven by the record and cannot support a verdict. These are not reasonable inferences as described in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* These are wild assertions without any basis in the testimony or forensic evidence.

## IV.     PLAINTIFF LACKS SUPPORT FOR THE ALLEGATIONS THAT THE DEPUTIES' ACTS WERE UNREASONABLE

Deputies Haas and Teague acted as a reasonable officer would when they investigated an unknown accident scene and faced a driver that refused to release his gun and ultimately pointed that gun at Deputy Haas. No matter the tactics employed to investigate the accident, once Mr. Martin pointed the weapon at Deputy Haas, lethal force was justified as he presented an immediate and significant threat to the officers, and he was committing a crime against the officers by threatening them with a weapon. See *Graham v. Connor*, 490 U.S. 386 (1989).

A. **Segmented Analysis**

Even if the deputies' approach was flawed and they should have used lights and sirens to alert Mr. Martin that deputies were on scene or have taken cover, this argument cannot be used to find that the deputies used excessive force. The Sixth Circuit uses a segmented analysis when reviewing excessive force cases. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). The *Dickerson* Court supported its reasoning as follows:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such things begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id*. at 1161, quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994). The question at issue is never whether it was reasonable for the officer to create the circumstances; it is only whether the force was reasonable given the totality of the circumstances. *Id*. In *Burnette v. Gee*, 137 Fed. Appx. 806 (6th Cir. 2005), (a case cited by Plaintiff), the Sixth Circuit held that when an officer charged a suicidal man holding a weapon, thereby allegedly causing the man to raise the weapon and the officer to shoot, the excessive force analysis could not include the charge by the officer. The analysis could only include "the direct moments preceding the attack." *Burnette*, 137 F.App'x at 809-810. While courts have considered an officer's prior actions in an analysis of the reasonableness of the officer's subsequent actions towards a suspect, courts have only done so where the prior actions involved excessive force or brutality against the suspect. *Id*. There is no such prior excessive force or brutality in the case herein, therefore the Court is limited to reviewing only the direct moments preceding the shooting.

11

Moreover, one bad tactic by a law enforcement officer does not so taint the remaining actions of the officer such that his conduct becomes objectively unreasonable. In *Mullins v. Cyranek*, S.D. Ohio No. 1:12-cv-384, 2014 U.S. Dist. Lexis 98736 (Jul. 21, 2014) the court found that although there was a better and less risky way for an officer to effectuate a stop, that alone did not make the course of conduct chosen by the offer objectively unreasonable under the circumstances. As stated by the *Mullins* Court, "[w]hile plaintiff focuses, in part, on whether Officer Cyranek could have prevented the circumstances, the question is not the reasonableness of Officer Cyranek's conduct leading up to the shooting, but the reasonableness of the shooting itself." *Mullins*, Id. at * 35, citing *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009); *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). Plaintiff asks this Court to review all of the deputies' actions prior to the moment that Mr. Martin raised his gun towards Deputy Haas in defiance of lawful orders and asks this Court to question the tactics that these deputies employed – specifically their decision not to use emergency lights and not to retreat to cover. Such an analysis would be impermissible under *Dickerson* and *Mullins* to find that the deputies engaged in unconstitutional force.

**B.** **Defendants had a Reasonable Response to an Unknown Accident Scene**

Plaintiff repeatedly faults Deputies Haas and Teague for failing to use their lights and sirens when responding to a "traffic stop." However, it is undisputed that this was not a traffic stop – the deputies did not pull Mr. Martin over. Lyman Dep. at 46:9-13 (ECF 70, PageID 2099). The deputies responded to an accident with unknown injuries. There is no Montgomery County Sheriff's Department policy that requires a deputy to respond to an accident scene with lights and sirens or to identify themselves in any manner other than verbally or through their uniforms. (See ISU Report, ECF 64-3, PageID 1684). Further, Plaintiff fails to cite to any case law that indicates that the deputies' arrival on scene was unreasonable.

12

Plaintiff cites to *Sherrod v. Williams*, S.D. Ohio NO. No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915 (Jan. 15, 2019) to argue that Deputies Haas and Teague improperly identified themselves. However, *Sherrod* involved officers that were responding to what they thought was an active shooter situation in a Wal-Mart. When the officers came upon the armed suspect, they shouted to him to drop the weapon. The suspect turned and raised the pellet gun slightly upon hearing the shout. The officers in *Sherrod* discharged their weapons within 1.5 seconds of their first command to drop the weapon and never announced themselves as law enforcement officers. This case is factually distinct from *Sherrod*. In this matter, there is evidence that after at least seven seconds of commands to drop the weapon, and after Deputy Teague announced a police presence, Mr. Martin raised the weapon and pointed it at Deputy Haas. Teague Dep. at 58:24-59:3 (ECF 51, PageID 994). In *Sherrod*, the court properly considered the totality of circumstances in the moments before the shooting. Not only did the court consider that the officer shot quickly and with limited warning, there was a question of fact regarding whether the suspect was actually raising his weapon based upon surveillance footage and an expert analysis of his body movement in response to the order from the officers. *Sherrod* cannot stand for the proposition that Deputies Haas and Teague were unreasonable in verbally announcing themselves as Sheriff's deputies even after having arrived in marked police cars and wearing police uniforms and repeatedly shouting at Mr. Martin to drop his gun.

Plaintiff also attempts to create a question as to the Defendants reasonableness in their effort to announce their presence to Mr. Martin by citing to their police practices expert Michael Lyman, Ph.D. Dr. Lyman offered an opinion that the deputies should have activated their overhead lights and pulled onto the lawn directly behind Mr. Martin's vehicle and activated the

take-down light.[4]  Lyman Dep. at 104:19-24 (ECF 70, 2157).  Dr. Lyman does not have any support for his opinion that emergency lights were needed on scene or that the police vehicle needed to pull onto the lawn directly behind Mr. Martin.  He cannot cite to a local or national policy that would require those actions, nor does he have any personal experience with responding to check and advise accidents.  Id. at 113:4-116:23; 85:11-22 (PageID 2166-2169, 2139).  Dr. Lyman's opinion, when broken down to its most basic level, is that officers on an emergency call must announce themselves.  Plaintiff does not dispute that Officer Teague announced himself and Plaintiff fails to cite to any case law that holds that such an announcement is constitutionally deficient.

The same arguments are true for Plaintiff's criticism that the deputies did not take cover and call for back up when they realized that Mr. Martin had a gun.  There is no question that this was a rapidly evolving situation.  Though impossible to put a perfect clock on it, the incident took less than 14 seconds.  From the moment that Deputy Haas identified the gun, Mr. Martin is alleged to have picked up his weapon and started moving it about the vehicle.  As stated above, even if the deputies should have taken cover, a theory that Defendants expressly disagree with given the presence of bystanders, that "bad tactic" cannot be considered when questioning the deputies' use of force.  Though dangerous from the moment that Deputy Haas approached the vehicle, the situation became exponentially more serious the moment that Mr. Martin pointed the gun at Deputy Haas.  At that moment, there can be no question that the deputies were entitled to use lethal force to eliminate a significant and immediate threat.  Like in *Burnette*, where an officer rushing a suspect must be segmented out of the excessive force analysis, so must an

---

[4] Interestingly, Dr. Lyman admitted that using the take-down light would actually have obstructed Mr. Martin's view of the deputies on scene.  Lyman Dep. at 106:8-20 (PageID 2159).

officer's decision to not drop back and seek cover. Also like *Burnette*, where the plaintiff pointed a gun at an officer, this Court should find that the deputies' use of force was reasonable.

Regardless, as argued above, the segmented analysis applied in this Circuit precludes the Court from including these alleged "bad tactics" in their evaluation of the deputies' decision to shoot Mr. Martin after he raised his gun to Deputy Haas.

### C. The Deputies' Verbal Warnings were Reasonable

Plaintiff is critical of the deputies' failure to warn Mr. Martin that they would use lethal force. However, a warning is only necessary when feasible. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). Sometimes, the time or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover. *Thomas v. City of Columbus*, 854 F.3d 361, 366-67 (6th Cir. 2017). However, the Fourth Amendment does not always require officers "to delay their fire until a suspect turns his weapon on them." If the armed individual makes "a furtive movement, harrowing gesture, or serious verbal threat," this may give rise to a reasonable belief that he poses an imminent threat of serious bodily harm. *Sherrod v. Williams*, at *26-27, citing *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). In an area surrounded by innocent bystanders, the deputies moved quickly to assess the threat that Mr. Martin posed as he waived his gun around the compartment of his vehicle. Ultimately, when Mr. Martin pointed the gun at Deputy Haas, the deputies had no choice but to shoot to protect their own lives and those surrounding the accident scene.

Again, Plaintiff cites to *Sherrod v. Williams* for the argument that the deputies were required to warn Mr. Martin that they would shoot if he did not drop the weapon. However, the *Sherrod* Court did not find that the failure to warn alone was possibly a constitutional violation, but the failure to warn paired with the failure to identify as officers and shooting within 1.5

15

seconds of a command to drop the weapon was enough to deny qualified immunity.  That is not the same "totality of circumstances" as the deputies encountered here.  Plaintiff also cites to *Ward v. County of Cuyahoga*, 721 F.Supp.2d 677 (N.D. Ohio 2010) to argue that the deputies were required to warn that they would use lethal force.  However, *Ward* does not hold that there is a constitutional violation for a failure to warn.  In *Ward*, an officer alleged that he advised the suspect to "back off" immediately prior to shooting the suspect.  But the Court found that there was a question of fact as to whether or not that warning was actually issued.  The warning referenced by that court was not "back off or I'll shoot" it was simply "back off." *Ward*, 721 F. Supp. 2d at 690.  If that is all that is constitutionally required, if anything, then the deputies herein complied by repeatedly shouting at Mr. Martin to drop the gun and put his hands up.

### D. The Deputies Gave Mr. Martin Time to Comply

This case is not like *Sherrod* in which the deputy shot at the suspect within 1.5 seconds of telling the suspect to drop the weapon.  Mr. Martin was told to drop his weapon, he lowered the weapon to his lap, but then decided to raise the weapon again and point it at Deputy Haas.  Mr. Martin clearly showed that he considered complying with the deputies' orders but decided against it.  Once Mr. Martin decided to point his gun at a Sheriff's Deputy, there was no amount of time that the deputies were required to wait before opening fire.  Plaintiff is unable to point to any case law to indicate that the deputies were unreasonable where there is no evidence to counter the fact that a suspect pointed a weapon at an officer.

## V. THE INVESTIGATION WAS PROPER AND THERE IS NO *MONELL* LIABILITY

After the shooting, Deputies Haas and Teague were under criminal investigation.  They performed a walk-through of the scene with detectives performing the criminal investigation and detectives performing an internal investigation were also on scene.  Kellar Dep. at 28:14-24;

31:4-6 (ECF 77, PageID 2755, 2758). Ultimately, the detective investigating the criminal aspect of the shooting shared his reports with the inspectional services unit (internal affairs). Id. at 193:17-18 (ECF 77, Page ID 2920). The interview completed by the criminal detectives was also used by inspectional services instead of re-interviewing the deputies as inspectional services felt that the questions and responses were sufficient for their investigation. Parin Dep. at 94:16-21 (ECF 61, PageID 1396). Inspectional services detectives reviewed the information from the criminal investigation and found that the deputies' statements and interviews were corroborated by the evidence at the scene. Id. at 95:4-7 (PageID 1396); see also ECF 64-3. This was not a case where the internal investigation unit failed to interview the deputies entirely – this internal unit simply made use of the criminal investigation that had already been performed by the Montgomery County Sheriff's Office. Additionally, Christensen Oninku was interview twice as part of the investigation. C. Oninku Dep. at 128:2-7 (ECF 50, PageID 912). In support of her proposition that Montgomery County ratified this shooting through their failure to investigate, Plaintiff only cites to case law in which the involved officers or important witnesses were not interviewed at all. That was not the case here.

Plaintiff is also critical of the fact that the deputies were allowed to meet with an attorney and delay their statements. Sgt. Parin, the officer in charge of the inspectional services unit, explained why the deputies were allowed to wait to give their statement and allowed the benefit of counsel.

> "(The deputies) have the opportunity to speak with counsel because it's a criminal events that's going to be investigated as a criminal action, and like any other individual in the United States, they are afforded the opportunity to consult with counsel prior to being interviewed if they so wish to. So that opportunity does not – is not eliminated just because they're wearing a uniform. They have certain safety duties that night as to numbers of suspects and the basic information, (***) – that is the rights of the individual at

> that time is to consult with counsel if they so choose to." Parin
> Dep. at 72:4-18 (ECF 61, PageID 1390).

It is the practice of Montgomery County to allow officers involved in shootings to turn in their written statements days after the shooting because time is necessary for "the full recall and the ability to think about the incident and have a full recall of the events that occurred in that traumatic situation. A couple days later, three, four days later is what we typically do in these situations." Id. at 83:8-13 (PageID 1393).

Plaintiff cites to the case *Wright v. City of Canton, Ohio*, for the proposition that a use of force investigation that is entirely inadequate can result in ratification for *Monell* purposes. *Wright v. City of Canton, Ohio,* 138 F.Supp.2d 955 (2001). In *Wright,* the defendant city failed to interview a physician who treated the plaintiff immediately after a use of force at the hospital. *Id.* at 955, 960. The court in *Wright* found the investigation was inadequate because defendants knew that the doctor had information and she was excluded from the investigation. *Id.* at 966-67. There was no similar exclusion of witnesses in this case, in fact some witnesses were interviewed multiple times.

A subsequent decision by this Court distinguishes *Wright* and is applicable in this matter. *See Greenlee v. Miami Twp, Ohio*, S.D. Ohio No. 3:14-CV-173, 2015 WL 631130 (2015). This Court relied upon a decision in *Daniels v. City of Columbus,* holding, "[i]n most cases, once an individual's rights have been violated, a subsequent failure to conduct a meaningful investigation cannot logically be the "moving force" behind the alleged constitutional deprivation." *Greenlee v. Miami Twp, Ohio,* S.D. Ohio No. 3:14-CV-173, 2015 WL 631130, *7–8; citing *Daniels v. City of Columbus*, No. C2–00–562, 2002 WL 484622, (S.D. Ohio Feb.20, 2002). This Court held that mere ratification of the conduct at issue does not generally subject a municipality to § 1983 liability. *Greenlee*, id.

One exception to this premise exists and it is set forth in *Marchese v. Lucas* and *Leach v. Shelby County Sheriff*, - a documented pattern of abuse prior to the incident at issue will allow for potential *Monell* liability. *Greenlee*, id. at *8; *See Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir.1985)*; Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1248 (6th Cir.1989). "When such documentation exists, failure to investigate a complaint or to discipline the wrongdoer may constitute evidence that the municipality has a policy or custom of tolerating unconstitutional behavior." *Id.*; *See also Alexander v. Beale St. Blues Co., Inc.* 108 F.Supp.2d 934, 949 (W.D. Tenn. 1999). "A 'single, isolated incident' of a failure to conduct a meaningful investigation or to discipline the officers involved cannot give rise to municipal liability." *Id.*; *See Maynard v. Jackson Cnty.*, 706 F.Supp.2d 817, 827-28 (S.D. Ohio 2010)(holding that sheriff's failure to discipline an officer "on this single occasion" could not be deemed the "moving force" behind the constitutional violation).

The decision in *Greenlee* is applicable in the instant matter. A meaningful investigation was conducted in this matter, but to the extent that Plaintiff argues that the investigation was a farce, the Plaintiff has not demonstrated a documented pattern of abuse *prior to* the incident that would establish the exception that applies in *Marchese* and *Leach*. As a result, this would be a single, isolated incident of ratification, and the holding under *Greenlee* applies to deny *Monell* liability. Mere ratification of the conduct at issue herein cannot as a matter of law constitute the "moving force" behind the alleged constitutional deprivation for municipal liability.

## VI. CONCLUSION

Plaintiff's only argument that the deputies committed a constitutional violation or to defend against their qualified and statutory immunity, is to ask this Court to consider circumstantial evidence about Mr. Martin's level of consciousness and the presence of the weapon – a weapon that was indisputably found in Mr. Martin's vehicle. Although there are

circumstances when speculation is acceptable for a constitutional analysis, this is not that situation. There is no evidence to support the speculation that Plaintiff seeks to introduce. For all of the above reasons, Defendants respectfully request that this Court find that the deputies did not commit a constitutional violation and that Montgomery County does not have a pattern and practice of ratifying constitutional violations such that it could have *Monell* liability. Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment.

Respectfully submitted,

By: */s/ Jillian L. Dinehart*
KEITH HANSBROUGH (0072671)
JILLIAN L. DINEHART (0086993)
Marshall Dennehey Warner Coleman & Goggin
127 Public Square, Suite 3510
Cleveland, Ohio 44114
P: 216.912.3809 / F: 216.912.3801
Email: jldinehart@mdwcg.com

By: */s/ Joseph D. Saks*
JOSEPH D. SAKS (0088082)
BENJAMIN A. MAZER (0087756)
ANNE M. JAGIELSKI, (0093047)
Montgomery County Prosecutor's Office
301 West Third Street, P.O. Box 972
Dayton, Ohio 45422
P: 937.496.7176 / F: 937.225.4822
Email: saksj@mcohio.org

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief has been drafted and filed in accordance with Civ. R. 5.2 and Loc. R. 7.2.

By: _/s/ Jillian L. Dinehart_____

JILLIAN L. DINEHART (0086993)
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 4, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By: _/s/ Jillian L. Dinehart_____

JILLIAN L. DINEHART (0086993)
*Counsel for Defendants*